UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10075 PBS

OCEAN TERRACE CONDOMINIUM TRUST,

vs.

GENERAL ELECTRIC COMPANY

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Preamble

On June 1, 2002 there was a fire at the Ocean Terrace Condominium building in Gloucester, MA which resulted in the total loss of the building. This case involves a claim for money damages for that property damage. The Plaintiff claims that the fire started in a through-the-wall air conditioner unit installed in condominium Unit 3A.

The Ocean Terrace building was constructed in 1971 as an apartment building. The through-the-wall air conditioner in Unit 3A consists of two principal structures for the purposes of this case. One structure is a wall sleeve which is a metal box inserted into and attached to the wall in order to hold the air conditioner unit. The wall sleeve has a rear grille on its exterior side attached by hardware. The wall sleeve for Unit 3A was part of the original construction of the building in 1971. The second structure is the air conditioner present in Unit 3A on 6/1/02 which was manufactured in July 1985 and inserted into the wall sleeve.

The Plaintiff claims that after 30 years of use the rear grille for the wall sleeve fell off and was not replaced for approximately 9 months before the fire and that during this period a squirrel or squirrels entered the air conditioner unit. The Plaintiff claims that electrical wires were damaged due to squirrel bites and that this damage led to an arc which ignited nesting materials allegedly introduced into the air conditioner unit in issue.

**Undisputed Material Facts**

1.  A building permit for the construction of an apartment building which later became the Ocean Terrace Condominium building was issued on August 13, 1971. (Deposition of William Sanborn, pertinent portions of which are attached hereto as Exhibit 1, p. 11; the building permit is Exhibit 2. The curriculum vitae was previously produced.

2.  Kerry Kotar (Kotar) was designated pursuant to Fed. R. Civ. P. Rule 30(b)(6) to testify as the representative of the Plaintiff Ocean Terrace Condominium Trust (Ocean Terrace) (Deposition of Kerry Kotar, pertinent portions of which are attached as Exhibit 3, pp. 13-14; Notice of Deposition is Exhibit 4).

3.  Kotar testified that Ocean Terrace was built around 1969. When the building was originally built it had a mansard roof made of wood shingles. The mansard roof was replaced by a roof with asphalt shingles before the time of the fire in issue. The decks and some sliding doors and windows as well as support beams on the concrete slab were also replaced before the time of the fire. (Exhibit 3, pp. 16-18).

4.  Kotar had no information about any construction or installation activities concerning through the wall air conditioner units at the time the building was originally built. (Exhibit 3, pp. 18-19).

5.  Kotar never looked at the hardware for any outside grill of an air conditioner wall sleeve at Ocean Terrace and was not aware of any other Trustee who did so. The hardware for air conditioner grilles has never been the subject of any Trustee's meeting. (Exhibit 3, p. 21).

6.  Kotar had no information as to whether the wall sleeves for the air conditioners were owned by the condominium unit owners or the condominium association. (Exhibit 3, p. 27).

7.  Before the time of the fire in issue, Kotar is not aware of anything the Condominium Trust did to maintain or inspect the air conditioner wall sleeves. (Exhibit 3, p. 28).

8.  Ocean Terrace had no information concerning:
    a.  the identity of the builder of the Ocean Terrace building;
    b.  the identity of the original installer of the wall sleeves for the air conditioner;
    c.  how the wall sleeves were installed;
    d.  the hardware that was originally used to install the wall sleeves or the exterior grilles. (Exhibit 3, pp. 39-40).

9.  Ocean Terrace had no knowledge of the air conditioner unit installed in Unit 3A before the time of the condominium conversion. (Exhibit 3, p. 70).

2

10.  Kotar regarded the replacement of the exterior screens for air conditioners as a unit owner responsibility. (Exhibit 3, p. 71).

11.  Neither Kotar nor the other Trustees had any personal knowledge of any basis for a claim against General Electric Company (GE) in this case. Exhibit 3, pp. 76-77).

12.  Before the time of the fire Ocean Terrace had a management agreement with EP Management which was responsible for many maintenance items. (Exhibit 3, p. 36).

13.  Ocean Terrace was not aware of anything EP Management did to maintain the wall sleeves for the air conditioners. (Exhibit 3, p. 36).

14.  Ronda Ziner, the president of EP Management testified on its behalf Deposition of Ronda Ziner, pertinent portions of which are attached hereto as Exhibit 5, pp. 4-5.

15.  Ms. Ziner had no knowledge from any source about the original construction of the Ocean Terrace building or the original installation of wall sleeves for air conditions or any air conditioner unit. (Exhibit 5, p. 17).

16.  According to Ms. Ziner the unit owners were responsible for air conditioners. (Exhibit 5, p. 40).

17.  Ms. Ziner recalled the inspection of air conditioner sleeves in the late 1990s in conjunction with work performed by Noblin Associates. She recalled that some air conditioner sleeves were to be removed and reflashed but could not say which ones. (Exhibit 5, p. 41).

18.  Ms. Ziner had no knowledge concerning hardware used to fasten exterior grilles to wall sleeves for air conditioners. (Exhibit 5, p. 44).

19.  Ms. Ziner was not aware of anyone who ever inspected exterior hardware for air conditioner wall sleeves at Ocean Terrace. (Exhibit 5, p. 45).

20.  In November 2000, Ms. Ziner noticed that air conditioner grilles were missing on two units and she wrote to the unit owners directing them to replace the grilles. (Exhibit 5, p. 45; the letters are Exhibit 6).

21.  Ms. Ziner had no information as to how the grilles on those two units came to be missing or the kind of hardware used to secure the grille to the sleeve. (Exhibit 5, p. 50).

22.  In 1999, Shernecker Property Services rebuilt the mansard roof under the direction of Noblin Associates. (Exhibit 5, pp. 71-72)

23.   On October 18, 1999 Ms. Ziner sent a memo to all third floor unit owners directing that they remove their air conditioners so that flashing around the sleeves could be installed. (Exhibit 5, p. 70; the memo is Exhibit 7).

24.   Ms. Ziner had no memory if the sleeves were removed or not. (Exhibit 5, p. 73).

25.   Timothy Little is a Senior Project Manager for Noblin Associates, Inc. He received a degree in Civil Engineering from Cornell in 1982 (Deposition of Timothy Little, pertinent portions of which are attached hereto as Exhibit 8, pp. 4-6).

26.   Mr. Little took photographs of the Ocean Terrace building in 1998 (Exhibit 8, p. 14) (color copies of these photographs are attached as Exhibit 9).

27.   Mr. Little had no information about the original construction of the building which he believed was in the 1960s. (Exhibit 8, pp. 15-16).

28.   Mr. Little photographed a missing cover on an air conditioner in 1998 but he was not familiar with the make of the air conditioner. (Exhibit 8, pp. 21-22).

29.   The air conditioner sleeves were one of Mr. Little's concerns in his 1998 study but he never looked into the type of hardware used with the cover (grilles) on the sleeves. (Exhibit 8, p. 29).

30.   The exterior decks had deteriorated by 1998 to the point where they had lost some of their structural integrity. (Exhibit 8, p. 29).

31.   Mr. Little recommended the complete replacement of the mansard roof including the installation of flashing around all sides of the air conditioners. (Exhibit 8, p. 30).

32.   The contractor was given discretion as to how to accomplish the flashing of the air conditioner wall sleeves. Acceptable methods included work involving the air conditioners and the sleeves. (Exhibit 8, pp.38-39).

33.   All of the third floor air conditioners were to be reflashed in 1999. (Exhibit 8, p. 39).

34.   Covers (grilles) on openings where air conditioners were removed would need to be removed. (Exhibit 8. p. 40).

35.   Doors and windows were replaced as part of the project. (Exhibit 8, p. 41).

36.   Old flashing around air conditioners needed to be removed. Exhibit 8, pp. 41-42).

37.   In a Field Report dated 10/5/99, Mr. Little documented the need to coordinate the disconnection and removal of air conditioners on the third floor to allow for installation of flashing. (Exhibit 8, pp. 72-73). (The report is Exhibit 9).

4

38.     The inspection of the air conditioner sleeves required by Mr. Little would have been done from the outside and would have required the covers (grilles) to be removed. (Exhibit 8, p. 73).

39.     The 1999 work involved the removal of shakes and flashing around the third floor air conditioner units and the addition of additional plywood sheathing, asphalt saturated felt underlayment, metal flashings and asphalt shingles all around the third floor air conditioner wall sleeves. (Exhibit 8, pp. 100-118).

40.     There was damage to at least one air conditioner grille during the demolition for the 1999 construction work. (Exhibit 8, p. 133).

41.     On November 1, 1999 Mr. Little recommended the replacement of air conditioner "pans," i.e. wall sleeves as air conditioner units were installed in the future. (Exhibit 8, p. 134. The Field Report containing the recommendation is Exhibit 10).

42.     Fred Schernecker, designated representative of Schernecker Property Services, Inc. recalled performing the construction at Ocean Terrace in 1999 with respect to rebuilding the decks and replacing the mansard roof. (Exhibit 11, pp. 7, 10). He had no memory of how the air conditioner units were installed or of the condition of any hardware or exterior screens. (Exhibit 11, pp. 17-18). He had no memory of how the flashing was accomplished around the air conditioning units. (Exhibit 11, p. 23).

43.     Katherine Hull was the owner of Unit 3A at Ocean Terrace. She purchased it in 1998. (Deposition of Catherine Hull, pertinent portions of which are attached as Exhibit 12, p. 7). She did not move in until February 1999.

44.     There was an air conditioner in Unit 3A which Ms. Hull thought was "old," "at least 13 years old" when she bought the unit. (Exhibit 12, pp. 10-11).

45.     Ms. Hull had a roommate Mark DeFelice who was living in Unit 3A at the time of the fire. (Exhibit 12, pp. 14-15).

46.     When she bought the unit the grille cover on the outside of the air conditioner was attached. It did not appear to be loose. She paid no attention to the fasteners. (Exhibit 12, pp. 12-13).

47.     A floor plan of Unit 3A showing the location of the air conditioner is attached as Exhibit 13, Exhibit 12, p. 19.

48.     In October 2001 Ms. Hull noticed that the rear grille for her air conditioner was missing. (Exhibit 12, p. 44). She had no recollection of the grille being loose or rattling before it became missing. (Exhibit 12, p. 22.) It was missing after a Fall rain and wind storm which she described as a Northeaster. (Exhibit 12, p. 45, 51).

5

49.   Ms. Hull believed the grille had four attachment points. She knew that one or two screws "sheared off" and maybe one screw was missing. She thought that all four fastening points were the same. (Exhibit 12, pp. 46-47).

50.   She noticed that the top of the screw had sheared off. She had seen that the screw heads were outside of the grille. (Exhibit 12, p. 48).

51.   The screws were made of a white plastic. (Exhibit 12, p. 49). The threaded part of the screw was left. The threads were normal, coarse and far apart. (Exhibit 12, pp.48-50).

52.   The sheared off screw was still in the hole and it appeared to go from the outside toward the inside. (Exhibit 12, p. 50-51).

53.   She last saw the grille on the ground and the next day it was gone. (Exhibit 12, p. 51).

54.   She tried to cover the back of the air conditioner with home screening due to what she thought were exposed electrical parts. (Exhibit 12, p. 52-53). She did not bother to go to a hardware store to get screws to attach the screen but just squeezed the screen into the opening. (Exhibit 12, p. 55).

55.   She made no effort to try to order a replacement grille because she did not think she could find one due to the age of the unit. (Exhibit 12, p. 53).

56.   Mark DeFelice contacted a friend in the HVAC trade to fabricate a replacement screen (Exhibit 12, p. 54). He did this after the screen she put up was damaged and removed by squirrels after 3 or 4 days. (Exhibit 12, pp. 56, 60).

57.   She saw a squirrel inside the air conditioner. (Exhibit 12, p. 57-58).

58.   The air conditioner was uncovered for a few days until Ms. Hull again replaced the screen. (Exhibit 12, pp. 60-61).

59.   She thought that the air conditioner unit itself would be damaged if the new grille was off. (Exhibit 12, p. 62).

60.   The second screen did not last long. (Exhibit 12, p. 63).

61.   Ms. Hull could not recall any other cover or device that was on the back of the air conditioner between the winter of 2001-2002 and the fire on June 1, 2002. (Exhibit 12, p. 66).

62.   Ms. Hull was afraid a squirrel would chew the wires and cause damage. (Exhibit 12, pp. 68-69).

63.   Ms. Hull never contacted GE. (Exhibit 12, p. 71).

6

64. Before the grille fell off Ms. Hull was aware of an animal infestation problem in the building itself. (Exhibit 12, p. 22). She heard digging from squirrels or mice in the ceiling above her master bedroom. (Exhibit 12, pp. 22-23).

65. On the day of the fire, Ms. Hull's cat was focused on the wall beside the slider door where the State Fire Marshall determined the fire started. (Exhibit 12, pp. 29-35). This was not the area where the air conditioner was located. (Exhibit 12, p. 29).

66. Ms. Hull could not testify that the remains of the plastic screw she saw were similar to a photograph of hardware for a grille in another unit. (Exhibit 12, p. 109-110, 115-116). She did not remember ever seeing any white plastic on the outside of her air conditioner's rear grille before this fire. (Exhibit 12, p. 116).

67. Mark DeFelice was a licensed journeyman electrician since 1988 (Deposition of Mark DeFelice, pertinent portions of which are attached as Exhibit 14, pp 6-9).

68. Mr. DeFelice lived in Ocean Terrace, Unit 3A for 13 to 14 months before the fire. (Exhibit 14, p. 13).

69. Mr. DeFelice stated that he observed that this grille was rusty. He thought the grille was a capstyle which slid over the top. It was rusted probably an inch to an inch and a half around the edges. (Exhibit 14, pp. 21-22). He drew a sketch of the grille showing the amount of rust which is attached as Exhibit 15. (Exhibit 14, p. 23).

70. Mr. DeFelice observed the heads of two sheet metal screws on each side of the grille. He did not observe any white plastic material which the sheet metal screws went through. (Exhibit 14, pp. 23-24).

71. Mr. DeFelice remembers the grille coming off in early Fall 2001. He never saw it loose. He retrieved it and determined that he could not use the screws to re8nstall it due to rust. Consequently he used duct tape to reattached the grille. (Exhibit 14, pp. 28-29).

72. Mr. DeFelice was aware that aluminum does not rust as oppose to steel. (Exhibit 14, p. 30).

73. The grille which he observed had a 90° flange and had parts that were rusted all the way through. (Exhibit 14, p. 31).

74. The duct tape held the grille in place for only a couple of weeks. Mr. DeFelice found the grille on the deck and reattached it with duct tape. (Exhibit 14, p. 33).

75. Mr. DeFelice contacted a friend to fabricate a grille but it never got done. (Exhibit 14, p. 33).

76. Mr. DeFelice remembered removing 8 quarter inch hex head screws from the box (wall sleeve) and throwing them out. (Exhibit 14, pp. 35-36)

77. When he took the screws out he saw no plastic. (Exhibit 14, pp. 36-37).

78. The screws went from the outside of the box toward the inside. (Exhibit 14, p. 37).

79. The grille fell off again by early winter 2001. (Exhibit 14, p. 38).

80. Mr. DeFelice attempted to buy a grille from an appliance store but could not do so. He never attempted to contact GE or a GE appliance dealer although he knew the air conditioner was a GE product. (Exhibit 14, pp. 39-40).

81. Mr. DeFelice believes either he or Cathy Hull threw the grille out. (Exhibit 14, p. 42).

82. Mr. DeFelice had heard noises from the air conditioner unit and at one point pounded on the front of the air conditioner and saw a squirrel take off. (Exhibit 14, p. 44). He also heard noises in the ceiling and attic which he attributed to squirrel activity. (Exhibit 14, p. 45).

83. Ms. Hull used window screen material to try to cover the back of the air conditioner but it got chewed out. Mr. DeFelice saw the starting of a nest. (Exhibit 14, p. 47).

84. The squirrels always came back to the air conditioner no matter what was done between the Fall of 2001 and 6/1/02. Mr. DeFelice heard them inside the air conditioner and heard the noises of squirrels in the walls and the ceiling. (Exhibit 14, p. 58).

85. As an electrician Mark DeFelice had known of animals chewing on and damaging electric wires before the time of the fire. (Exhibit 14, pp. 104-105).

86. Mr. DeFelice was shown a photograph of a rear grille from an air conditioner at another unit at Ocean Terrace. He said the rear grille for the air conditioner at Unit 3A was different from this other grille because it had a flange. (Exhibit 14, pp 105-107). He was shown a photograph of a screw with a white piece of material on it used to attach a rear grille for another unit at Ocean Terrace. He saw no fasteners like this used for the air conditioner in Unit 3A. (Exhibit 14, pp. 107-108).

87. On 6/1/02 there was a fire at Ocean Terrace which was investigated by State Trooper James Welch of the State Fire Marshall's office. (Deposition of Trooper James M. Welch pertinent portions of which are attached as Exhibit 15, pp. 38-43; his report is attached as Exhibit 16).

88. The area of the origin of the fire determined by Trooper Welch was the corner of the living room of Unit 3A on the opposite side of the room where the air conditioner was located. (Exhibit 16). It was not possible that the air conditioner caused the fire. (Exhibit 15, p. 245).

89. GE has used stamped aluminum rear grilles for its through-the-wall air conditioner products since before 1961. (Deposition of H.D. Moore pertinent portions of which are attached as Exhibit 17, p. 39).

90. The air conditioner in issue is a model J series. It has used a stamped aluminum grille since 1959. The physical dimensions of the grille have not changed although the louvers of the grille have been modified. (Exhibit 17, pp. 45-46).

91. GE stopped producing J series air conditioners in 1987. After that time Sanyo produced J series air conditions for GE from 1987 to 1997 and Sharp has produced them since 1997. (Exhibit 17, pp. 57-58).

92. The life expectancy of a model J series air conditioner is 15 years but that does not mean that everything will last for 15 years because there are many factors involved including maintenance and the environment. (Exhibit 17, pp. 67-68).

93. Mr. Moore was involved in GE air conditioner operations from 1963 to the present exclusive of his military service. (Exhibit 17, pp. 5-9, 20-22, 27). Between 1987 and 1998 Mr. Moore was a field quality engineer who monitored and resolved any field complaints concerning air conditioners.

94. Mr. Moore did not know of any case in which he was involved where an outdoor grille fell off. (Exhibit 17, p. 71). He never got a call about grilles falling off. (Exhibit 17, p. 72).

95. The primary function of the grille is aesthetics and proper air distribution. (Exhibit 17, p. 74-75).

96. The openings in the grille are designed to make sure small birds do not get in and nest in the air conditioner. (Exhibit 17, p. 76).

97. Mr. Moore was not aware that squirrels getting inside an air conditioner had ever been considered a risk in anyway. (Exhibit 17, p. 78).

98. He was not aware of any occurrence of a squirrel or bird getting into an air conditioner. He was the most knowledgeable person in this area. (Exhibit 17, p. 78).

99. All GE rear grilles for air conditioners are designed so that they have to be installed from inside. This is done for security and for ease of installation in multi-story buildings. (Exhibit 17, pp. 79-80).

100.    The nuisance of a squirrel getting inside an air conditioner was never discussed at GE as a risk.  (Exhibit 17, pp. 80-81.)

101.    The J series air conditioner in issue is a U.L. listed product.  (Exhibit 17, p. 82).

102.    GE did not introduce products without a U.L. listing.  GE policy was for every product to be listed by U.L.  (Exhibit 17, p. 83).

103.    The model air conditioner in issue was last sold in 1987.  (Exhibit 17, p. 84).  When Sanyo stated to make the product the exterior grille wall sleeve and grille fasteners was not changed.  (Exhibit 17, p. 86).  The sleeves, grilles and fasteners were listed by U.L. and subject to independent tests.  (Exhibit 17, p. 88-89).

104.    In the event of a short circuit involving the wiring of the model air conditioner in issue the circuit breaker in the home should trip.  (Deposition of H.D. Moore Vol. II, pertinent portions of which are attached as Exhibit 18, pp. 17-18).

105.    The descriptions of the rear grille and hardware on the air conditioner in Unit 3A provided by Ms. Hull and Mr. DeFelice do not describe a component designed, manufactured or sold by GE.  Kathy Hull described four identical attachment points for the new grille with the attachments made with plastic screws inserted from the outside toward the inside.  Mr. DeFelice described a rusty grille with a flange around the side with eight attachment points with 8 quarter inch hex head screws which went from the outside toward the inside.  The grille provided by GE for the type of wall case in issue was made of stamped aluminum which would not rust.  It had two attachment points for clips at the top of the wall case and two attachment points for screws to be inserted from the inside of the wall case toward the outside.  (Affidavit of H.D. Moore attachment as Exhibit 19).

106.    The wall case for the air conditioner in Unit 3A was of a type sold by GE in the 1960's and early 1970's.  (Affidavit of H.D. Moore, Exhibit 19).

107.    The air conditioner in Unit 3A was manufactured in July 1985.  (Exhibit 19).

108.    Robert Crabb, Jr. is a GE employee whose duties have included monitoring field reports concerning the performance of air conditioner units.  (Deposition of Robert Crabb pertinent portions of which are attached hereto as Exhibit 20, pp. 6, 24-25).  Mr. Crabb has never seen any comments about failed fasteners for exterior grilles of J series air conditioners in any of his daily queries.  (Exhibit 20, p. 36).

109.    The Plaintiff contends that the use of nylon grommets to retain the rear grille to the wall sleeve rendered the product defective.  See the Final Report of W. Joseph Fallows III attached as Exhibit 21.  This unverified report is submitted to document this contention only and not for the truth of its content.)  The claim is that absence of the grille can permit the intrusion of animals such as squirrels

which can cause electrical problems by chewing on wires and can cause fires by introducing nesting materials as fuel.

110. Although it was initially Mr. Fallows assumption that the wall sleeve for Unit 3A was installed in 1985, he changed that assumption after reading the disclosures of GE's experts when he learned that the wall sleeve was installed in 1971 and was 31 years old at the time of the fire. (Deposition of W. Joseph Fallows III, pertinent potions of which are attached as Exhibit 22, pp. 43-45).

111. Mr. Fallows assumed that a GE grille and grommets were installed along with a GE air conditioner in Unit 3A in 1971. (Exhibit 22, p.46).

112. Mr. Fallows has admitted that he never saw any grille for Unit 3A or any fasteners used with that grille. (Exhibit 22, p. 45).

113. Mr. Fallows has admitted that he is not aware of any evidence of the manner of installation of any wall sleeve, grille or associated hardware in Unite 3A in 1971. (Exhibit 22, p. 47). He had no evidence as to whether any screws were put in straight or crooked or torqued too much or two little. (Exhibit 22, p. 50).

114. He did no investigation of the history of the wall sleeve, rear grille or associated hardware between 1971 and 2001. (Exhibit 22, p. 48).

115. Other than making an assumption he has no evidence of what fasteners were used with the wall sleeve in Unit 3A in 1971. (Exhibit 22, p. 50).

116. Mr. Fallows had no understanding of who the manufacturer of any screw grommets used in Unit 3A was in 1971. (Exhibit 22, pp. 52-53).

117. In his Final Report Mr. Fallows stated that the grille should stay on for the life of the product, namely 15 years. (Exhibit 22, p. 53).

118. After he read the disclosure of the defense experts, Mr. Fallows changed his opinion to a generalized statement that the wall sleeve has an expected useful life longer than the air conditioner but that he had no opinion as to how long a wall sleeve should last. (Exhibit 22, p. 56).

119. He was not aware of the opinion of any other person as to how long a wall sleeve or exterior grille should last and certainly not the opinion of any consensus – making group or body. (Exhibit 22, pp. 55-56).

120. Mr. Fallows did not try to analyze whether Kathy Hull's testimony described a GE grille or not. He agreed that Mark DeFelice's testimony did not describe a GE grille. (Exhibit 22, pp. 58-59). When told Kathy Hull's testimony he admitted she did not describe GE part.

121. Mr. Fallows admitted that he had no knowledge or evidence of whether any fasteners used for the wall sleeve and grille for Unit 3A were physically or

11

chemically abused or improperly installed and that he could not rule such abuse or improper installation out as possible causes for any hardware to becoming missing. (Exhibit 22, pp. 60-61).

122.  Mr. Fallows admitted that there is no other case in which he has provided an opinion about the cause of a failure of something he never saw. (Exhibit 22, p. 62).

123.  Mr. Fallows was not aware of any scientific standard that would permit someone to reach a determination as to the cause of a failure of something that is not in existence or visible. (Exhibit 22, p. 63).

124.  Mr. Fallows admitted that without having the opportunity to inspect something to determine whether there has been abuse, or misinstallation, or chemical attack that he could only speculate as to the cause of a failure. (Exhibit 22, p. 63).

125.  Mr. Fallows did not know who the major suppliers of air conditioners were in 1971. (Exhibit 22, p. 80).

126.  He has never looked at the UL 484 standard for room air conditioners which existed in 1971. (Exhibit 22, p. 81). He did understand that the wall sleeve and rear grille was listed by UL in 1971. (Exhibit 22, p. 82).

127.  Mr. Fallows never tried to determine the tensile strength required of a plastic screw grommet in the application in issue. (Exhibit 22, p. 111).

128.  Mr. Fallows did not know what other choices were available for an engineer selecting a plastic part for the application in issue in 1971. (Exhibit 22, p. 138). He did not know if anyone made a screw grommet from anything but nylon in 1971. (Exhibit 22, p. 138).

129.  The material which Mr. Fallows identified in his Final Report as a feasible alternative, namely Valox, was not in existence in 1971. (Exhibit 22, p. 135-142). He did not know of anyone who had ever made a screw grommet from Valox. (Exhibit 22, p. 142).

130.  Mr. Fallows admitted that the owner of a wall sleeve should replace a missing grille. (Exhibit 22, p. 145).

131.  Mr. Fallows admitted he is not an expert on the useful product life of through the wall air conditioning sleeves. (Exhibit 22, p. 150).

132.  Mr. Fallows admitted that he could not say that any alternative means of attaching a rear grille would last better or longer than 31 years. (Exhibit 122, pp. 150-153).

133.   Mr. Fallows had no knowledge of what information about rodents chewing on wires was available before 1971.  (Exhibit 22, p. 167).

134.   Mr. Fallows had no knowledge of any engineer who thought about squirrel penetration into an air conditioner before 1971.  (Exhibit 22, p. 168).

135.   Mr. Fallows was not contending that an air conditioning sleeve that lasted twice the life of an air conditioner violated any standard.  (Exhibit 22, p. 171).

136.   Mr. Fallows had no evidence of any failure of a nylon grommet in less than 15 years.  (Exhibit 22, p. 193)

137.   Ocean Terrace also retained Scott A. Jones as an alleged design expert.  (Deposition of Scott M. Jones, pertinent portions of which are attached hereto as Exhibit 23).

138.   Mr. Jones has admitted that he has never seen any grommets or the actual grille that was used in Unit 3A.  (Exhibit 23, p. 65).

139.   Mr. Jones had no idea of the installer of any grommets in the Unit 3A wall sleeve.  (Exhibit 23, p. 67).  He did not know what happened in the installation.  (Exhibit 23, p. 86).

140.   He had no information about the expected useful life of the air conditioner in issue.  (Exhibit 23, p. 73).

141.   He had no familiarity with any standard relating to the expected useful life of an air conditioner.  (Exhibit 23, p. 73).

142.   He has never been involved in establishing the expected useful life of any product.  (Exhibit 23, p. 76).

143.   He was not aware of any published date concerning the expected useful life for wall enclosures for through-the-wall air conditioners.  (Exhibit 23, p. 76).

144.   Apart from an enclosure which Mr. Jones saw concerning a Fredrick wall sleeve to use with a GE air conditioner he had not seen any other writing that relates to a wall sleeve such as the one installed in 1971 at Ocean Terrace.  (Exhibit 23, p. 80).  He had received no oral information on this subject.  (Exhibit 23, pp. 80-81).

145.   He had no information about any failed screw grommet from the 1971 vintage anywhere.  (Exhibit 23, p. 107).

146.   He had no specific information about what any other air conditioner manufacturer used before 1971 for rear grille fasteners.  (Exhibit 23, p. 110).

147. Mr. Jones did not look for any literature in the scientific community that related to applications of nylon in screw grommets before 1971. (Exhibit 23, p. 112).

148. He has never looked at any version of UL 484 the UL standard for air conditioners which was in existence before 1971. (Exhibit 23, p. 116).

149. He has never done any testing on any nylon grommet. (Exhibit 23, p. 117).

150. Mr. Jones agrees that Kathy Hull and Mark DeFelice should have replaced their rear grille when it became missing. (Exhibit 23, p. 122).

151. Mr. Jones expressed the view that it would have been reasonable for GE to have used double pole contactors in the refrigeration power circuit to provide a double line break. (Exhibit 23, p. 130).

152. He did not know of any manufacturer of an air conditioner that has ever used such a design. (Exhibit 23, p. 130). He did not know of any industry standard that required the use of such a design. (Exhibit 23, p. 130).

153. He was not aware of any other person who has expressed an opinion that double pole contactors to provide a double line break should be used for air conditioning units. (Exhibit 23, p. 133). He was not aware of any scientific literature advocating such a device. (Exhibit 23, p. 133).

154. In Mr. Jones mind, a double pole contactor to provide a double line break addressed a problem of rodent infestation. (Exhibit 23, p. 133).

155. Mr. Jones offered the view that there was a wide selection of polymeric materials available before 1970 which he presumably thought GE could use for rear grille attachment hardware. (Exhibit 23, p. 135).

156. He admitted that he was not a plastics expert and that he had no firsthand knowledge of such materials. (Exhibit 23, p. 135). He could not identify specific materials and did nothing to evaluate the failure modes of these materials. (Exhibit 23, pp. 135-136).

157. He expressed the thought that a device known as a Tinnerman clip might be used to attach the rear grille but he could not identify any manufacturer of an air conditioner which had utilized such a device. (Exhibit 23, p. 140).

158. He has never tested Tinnerman clips for use on a rear enclosure of an air conditioner. (Exhibit 23, p. 140).

159. He did not know of any Tinnerman clip application that had been successfully used for a period in excess of 30 years without repair or replacement of the clip. (Exhibit 23, p. 143).

160. He had not tried to identify any failure made of plastic injection molded grilles and had no data on any plastic injection molded grilles which had been in the field for 30 years. (Exhibit 23, p. 144).

161. He was not aware of the availability of any plastic injection molded grilles before 1971. (Exhibit 23, p. 145).

162. To the extent that Mr. Jones tried to draw conclusions from grommets present after the fire in units 1J and 2M, he did not try to determine the history of these grommets or whether they had been abused or mishandled at any time. (Exhibit 23, p. 148).

163. Mr. Jones did not perform a design review for any alternative fastening system for the rear grille. (Exhibit 23, p. 155).

164. When Mr. Jones formulated his opinions he did not think the age of the wall sleeve was a very relevant quantity. (Exhibit 23, p. 156).

By its attorneys,

**CURLEY & CURLEY, P.C.**

Dated: 12/13, 2006

Robert A. Curley, Jr., Esq.
BBO# 109180
27 School Street, 6th Floor
Boston, MA 02108
(617) 523-2990

## CERTIFICATE OF SERVICE

I, Robert A. Curley, Jr., Esq., hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Paul T. Falk, Esq.
Falk Johnson LLC
20 South Clark Street
Suite 1990
Chicago, IL  60603

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA  02110

Ronald W. Harmeyer, Esq.
Falk Johnson, LLC
Bank One Plaza
111 East Wisconsin Avenue
Suite 1370
Milwaukee, WI  53202

Dated: 12/13/06

Robert A. Curley, Jr., Esq.