

Volume: I
Pages: 1-69
Exhibits:  4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 10075 PBS

OCEAN TERRACE CONDOMINIUM TRUST,
                    Plaintiff,

v.

GENERAL ELECTRIC COMPANY,
                    Defendant.

DEPOSITION of WILLIAM SANBORN, a

witness called by and on behalf of the defendant,

taken pursuant to Rule 30(b)(6) of the Federal

Rules of Civil Procedure, before Roberta J.

Daniels, a court reporter and notary public

within and for the Commonwealth of Massachusetts,

at Gloucester Building Department, CATA and City

Hall Annex, Three Pond Road, Gloucester,

Massachusetts  01930-1834, on Monday, May 8,

2006, commencing at 12:00 P.M.

MELVIN LIPMAN
Court Reporter
101 Tremont Street
Boston, Massachusetts  02108
617-227-3985

5

1        P R O C E E D I N G S

2                                    Monday, May 8, 2006

3                                        12:00 P.M.

4               MR. CURLEY:  And for stipulations,

5        we'll waive the sealing and filing of the

6        deposition.  We'll waive notarization.  The

7        witness will be given an opportunity to read and

8        sign.  Signing can be under the pains and

9        penalties of perjury.  We'll reserve all

10       objections, except as to matters of form, until

11       the time of trial, and we'll reserve motions to

12       strike until the time of trial.

13              DIRECT EXAMINATION

14       By MR. CURLEY:

15   Q   Could you state your name for the record, please?

16   A   William Sanborn.

17   Q   Mr. Sanborn, I'm Bob Curley.  I represent the General

18       Electric Company, and I'm going to ask you a few

19       questions, and then Mr. Harmeyer will have an

20       opportunity to ask you some questions.  If at any time

21       you're asked a question by either of us that you don't

22       understand in any way, just tell us and we'll rephrase

23       the question for you.  All right?

24   A   Uh-huh.

11

1    A    No.

2    Q    Have you talked to anybody about this lawsuit?

3    A    I talked to an investigator who was down three, four

4         weeks ago.

5    Q    Now, earlier today we marked as Exhibit 152 a building

6         permit dated August 13, 1971, for the Ocean Terrace

7         Condominium building site, although it was apartments

8         at that time, correct?

9    A    According to the permit, yes.

10   Q    And do you recognize that exhibit as the initial

11        building permit for that structure?

12   A    Yeah, it appears it would be.  I was, obviously, not

13        employed at the time, but these are copies of city

14        permits.

15   Q    You were probably in the seventh or eighth grade at

16        the time?

17   A    Yes, I was.

18   Q    And you grew up in the Gloucester area?

19   A    Yes.

20   Q    You don't happen to have any memory of this building

21        being built, do you?

22   A    Not this particular building, no.

23   Q    Now, do you know what building code was involved at

24        the time of the construction of this building?

MELVIN LIPMAN *Court Reporter* 617-227-3985



## City of Gloucester, Mass.

# BUILDING PERMIT

Gloucester, Mass. _____Aug. 13_____ 19 71

43

Permission is granted to _____Oceanus Realty Trust Paul G. Riccardi_____
_____Gloucester, Mass._____
Authorized agent and permittee _____Trusty_____

Address _____P.O. Box 756_____ To _____Build 42 apartment house_____

On the _____Pl. # 169 Lot # 3_____ Side of _____Ocean Ave_____ Section _____Magnolia_____

Family units _____42_____ No. of new rooms _____54_____ Baths _____42_____ Lavatories _____

Bldg. or addition overall width _____185'_____ Depth _____65'_____ No. of stories _____3_____ Height _____30'_____

Foundation _____poured_____ Roof _____Tar on gravel_____ Estimated cost _____360,750._____

Permit Fee _____105.18_____ Owner's name _____Paul G. Riccardi_____ Present address _____Gloucester P.O. Box 756_____

PERMISSION MUST BE OBTAINED FROM THE BUILDING INSPECTOR BEFORE ANY CHANGES IN APPROVED
PLANS CAN BE MADE.

UNDER STATE LAW AND CITY ORDINANCES SEPARATE PERMITS ARE REQUIRED FOR    - ELECTRICAL -
OIL BURNER - PLUMBING - and SEWAGE DISPOSAL WORKS.

_____Chester H. Kennedy Jr._____
Building Inspector


DEFENDANT'S
EXHIBIT #152
Mahoney
5-8-06

*PM₁ in F2 Box A*

# City of Gloucester, Mass.



# BUILDING DEPARTMENT

## APPLICATION FOR PERMIT TO BUILD

No. _43_                                    Gloucester, ~~JULY 29~~ *Aug 13*, 19 _71_

To the Inspector of Buildings:

The undersigned hereby applies for a permit to build according to the following specifications:

1. Owner's Name _OCEANUS REALTY TRUST  PAUL G. RICCARDI, TRUSTEE_
2. Owner's Address _P.O. BOX 756, GLOUCESTER, MASS._
3. Architect's Name _BRUCE SCOTT AND ROBERT WHEELER_
4. Builder's Name _SAME AS #1 - GENERAL CONTRACTOR_
5. Builder's Address _____
6. Location of Building:    No. _____    Street _OCEAN AVE. AND FLUME RD._
7. Use of Building _42 APARTMENT DWELLING UNITS_
8. Distance from Street Line _23'-15'-27'_ Right Side Line _25'_ Left Side Line _27'_ Rear Line _101'_
9. Size of Building:    Length _185'_ Height _30'_ Width _65'_ No. of Stories _3_
10. Construction:    Frame (✓)  Brick Veneer (✓)  Brick ( )  Stone Veneer ( )  Stone ( )  Stucco ( )
    Concrete ( )    Cinder Block ( )    Other _____
11. Type of Foundation Walls:    Block Fdns. ( )    Poured Fdns. (✓)    Brick Fdns. ( )    Stone ( )
    Other (Specify) _____
12. Type of Finished Floor:    Hard (✓ AND  Soft (✓)    Tile ( )
13. Type of Inside Finish:    Plastered ( )    Sheetrock (✓)    Sheathing ( )    Other (Specify) _____
14. Type of Heating:    Warm Air Heat ( )    Hot Water Heat ( )    Steam Heat ( )    _ELECTRIC_ (✓)
15. Type of Roofing:    Asbestos Shgl. ( )    Built Up Rfg. ( )    Asphalt Shgl. ( )    Tar and Gravel Rfg.  (✓)
    Slate Rfg. ( )
16. Will building be erected on solid or filled land? _SOLID_
17. Provision for surface drainage:    Dry Wells (✓)    City Drain ( )
18. Type of Sewage:    Sanitary Sewer ( )    Combined Sewer ( )    Drain ( )    Cesspool ( )    Septic Tanks (✓)
    _AMERATION SYSTEM_
19. Area of Land _42,238_ Estimated Cost of Building (must be filled out) _360,750.—_
20. Grade of first floor above street grade. _APPROX. 5'_

Permit must be renewed if work not started within 90 days.

Plans must be submitted with application.

Applicant agrees to give the Inspector of Buildings 24 hours notice before lathing, plastering or closing-in studding on this building.  The building will conform to the requirements of the law.

_$105.18 Pd_                                    Signature of Applicant _Paul G. Riccardi_

FILE NO: _71-36_

DATE: _July 29, 1971_

TO: BUILDING INSPECTOR

FROM: OFFICE OF THE CITY ENGINEER                    *See Sheet 1/5/71*

SUBJECT: ZONING ORDINANCE: Compliance with, for issuance of Building Permit.

Enclosure (1). One (1) copy of Applicant's Plat, as submitted.

In accordance with Section 22 of the City Zoning Ordinance,

_Paul Riccardi_
(name)

has satisfactorily filed in the City Engineer's Office, two (2) copies

of a Plat of a property located at _Flume Rd and Ocean Ave_
(street)

which is owned by _Oceanus Realty Trust_
(name)

One copy of which is forwarded herewith as enclosure (1) for your records.

by) _RKingston_
Engineering Division

MISCELLANEOUS INFORMATION

Property Deed - Book _____ Page _____

Recorded Plan - Book _____ Page _____

Land Court Plan ;No. _____

Land Court Certificate No. _____

Assessors Plan No. _169_ Lot No. _3_

Other plan or plan reference _____

EXHIBIT 3

Volume I
Pages 1-97

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
OCEAN TERRACE CONDOMINIUM,          )
TRUST,                              )
          Plaintiff,                )
                                    )
v.                                  )
                                    )
GENERAL ELECTRIC COMPANY,           )
          Defendant.                )
                                    )
```

DEPOSITION OF KERRY KOTAR,

a witness called on behalf of the Defendant,

taken pursuant to the Massachusetts Rules of

Civil Procedure, before Diane Hulme, Court

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices

of Curley & Curley, 27 School Street, Boston,

Massachusetts, on Monday, February 27, 2006,

commencing at 9:06 a.m.


MELVIN LIPMAN
COURT REPORTER
101 Tremont Street - Suite 700
Boston, Massachusetts  02108
Tel. (617) 227-3985

4

PROCEEDINGS

1

2          (Exhibit No. 63, Renotice of Taking

3     Deposition and Schedule A, premarked for

4     identification.)

5          KERRY KOTAR, a witness called for

6     examination by counsel for the Defendant,

7     provided a Massachusetts driver's license before

8     being first duly sworn, was examined and

9     testified as follows:

10          MR. CURLEY:  Among the parties we

11     can waive sealing, notarization, filing.  Signing

12     can be under the pains and penalties of perjury.

13     We'll reserve all objections, except as to

14     matters of form, until the time of trial.  And

15     we'll reserve motions to strike until the time of

16     trial.  Is that acceptable?

17          MR. HARMEYER:  That's acceptable.

18          DIRECT EXAMINATION

19  Q.  (By Mr. Curley)  Could you state your name for

20     the record, please?

21  A.  My name is Kerry Kotar.

22  Q.  Kerry, as you know, I'm Bob Curley.  I represent

23     General Electric.  I'm going to ask you a number

24     of questions.  If at any time I ask you anything

13

1      trustees at the time of the fire or before then?

2   A.  I know that -- Let me just back up.  Valerie

3       was.  Kenny was not.  And I believe Linda and

4       Sara both were.

5   Q.  Do each of the trustees own units at the Ocean

6       Terrace Condominiums?

7   A.  They did, but they may not still.  I'm not sure

8       of the status there.

9   Q.  Do you know which units were owned by the

10      trustees?

11  A.  Not by number, no.

12  Q.  Do you know if any of them had a third-floor

13      unit?

14  A.  No.  I don't know where they live.  Kenny

15      McCarthy may have, but he's not living at the

16      condo association now.

17  Q.  Have you seen Exhibit 63 before today the

18      Renotice of taking deposition of the Ocean

19      Terrace Condominium Trust?

20  A.  I saw a copy.

21  Q.  Can you tell me how you came to be designated to

22      respond to that notice of deposition?

23  A.  At a recent condo board meeting, it was decided

24      that I would represent the association.

14

Q.  At that board meeting, was there some discussion
as to why it was that you should represent the
Condominium Trust as opposed to one of the
prefire trustees, for example?

A.  Yes.  It was thought that I could best represent
the association.

Q.  What was it about your tenure or service as a
trustee that made you the best representative for
the Condominium Trust?

A.  I'm not sure how to best answer that.  Valerie
Faye, for instance, has health problems as does
Sara Cardin so I think there were some issues or
concerns around the building effectively
communicating and travel.

Q.  What's the nature of Sara Cardin's health
problems?

A.  I don't know.  It seems that she's getting worse
though.  I mean she has some difficulty with
mobility.

Q.  She was at the board meeting?

A.  She was.

Q.  And Valerie Faye what's the nature of her health
problems?

A.  I understand she's had a couple of minor -- at

16

1    Q.    Did the Board determine that you were at least as
2          knowledgable as the other trustees concerning the
3          matters about which inquiry was requested?
4    A.    Fort the most part, yes.
5    Q.    Do you know when the Ocean Terrace Condominium
6          building was originally constructed?
7    A.    My understanding from a neighbor on Ocean Ave is
8          it was 1969 or thereabouts.
9    Q.    Do you have any understanding of what the nature
10         of the building was in 1969?
11   A.    Only that it was the same as the building was
12         when it burned down.
13   Q.    Do you have any understanding of changes that
14         were made to the building structure after 1969?
15   A.    Recent changes I do.
16   Q.    Changes that occurred before the fire?
17   A.    Yes.
18   Q.    What changes were made to the original
19         construction?
20   A.    The mansard roof was reconstructed, it had a wood
21         shingle, and the most obvious change was it was
22         changed to an asphalt shingle.
23   Q.    Are you aware of any other changes to the
24         structure of the building?

17

1   A.   The cantilever decks were replaced and at the

2         same time some number of the sliding doors and/or

3         windows were replaced at the owner's option.

4   Q.   Are you aware of any other changes to the

5         construction of the building after it was

6         originally built?

7   A.   Only related to the sliders.  There were some

8         replacement of the beams that sat on the cement

9         slab.  There were the beams that would support

10        some of the outside walls.

11   Q.   Is it your understanding that when the building

12        was originally constructed that it had a mansard

13        roof?

14   A.   It is my understanding that it had a mansard

15        roof.

16   Q.   How have you come by that understanding?

17   A.   I've lived in Manchester since 1973.  I've been

18        by the place but that's about the extent of my

19        first-hand knowledge.  In other words, I know

20        what it looked like at the time.

21   Q.   So you actually have a memory that back in 1973

22        there was a mansard roof on the structure?

23   A.   I can't tell you exactly when I would have formed

24        that memory but that's my impression.  Yes.

1   Q.   Is it your understanding that the structure
2       always had a veneer brick wall?

3   A.   It's my understanding that it did.

4   Q.   How do you come by that understanding?

5   A.   Just some discussion with the engineers involved
6       with the rebuilt project.

7   Q.   This is the post-fire rebuilt?

8   A.   Correct.  And the prefire work I mentioned the
9       beams that were replaced.  There was some
10      indication that water was getting behind the
11      brick veneer.

12   Q.   Do you know if the brick veneer was designed with
13      weep holes?

14   A.   I do not.

15   Q.   Do you know if any changes were made to the
16      construction of the building when it was
17      converted to condominiums?

18   A.   I do not.

19   Q.   Do you have any information as to whether there
20      were through the wall air conditioners when the
21      building was originally constructed?

22   A.   I do not.

23   Q.   Do you have any information as to whether there
24      were air conditioner sleeves installed in the

19

1    walls when the building was originally

2    constructed?

3    A.   No, I do not.

4    Q.   Do you have any information as to when the air

5    conditioner sleeves were put in?

6    A.   No, other than I know that they were there when

7    the conversion occurred from apartments to

8    condominiums.

9    Q.   How is it that you know that the air conditioner

10   sleeves were present when the conversion

11   occurred?

12   A.   Well, I know the air conditioners were there.  I

13   don't know the nature of the installation whether

14   it had a sleeve or didn't have a sleeve.  I know

15   that because of the discussions I had with the

16   prior owner of the unit.

17   Q.   This is the prior over of your unit?

18   A.   1-D, correct.

19   Q.   Who was that?

20   A.   Honestly I'd have to look that up.  I don't

21   recall his name.

22   Q.   Did that individual indicate that they had owned

23   that unit at the time of the conversion?

24   A.   No.

21

1   Q.   Have you ever looked at the hardware for any

2        outside grill of the air conditioner wall sleeve

3        at the Ocean Terrace Condominium building?

4   A.   No, I did not.

5   Q.   Do you know if any of the trustees have?

6   A.   I do not know, no.

7   Q.   Has the hardware for the air conditioner grills

8        ever been discussed at any trustee's meeting?

9   A.   Not that I was present at.

10  Q.   Do you know when the conversion of the

11       condominiums occurred?

12  A.   It's my understanding based on the tax assessment

13       information in terms of the succession of owners

14       it would have been around 1984.

15  Q.   Are you trustee pursuant to a declaration of

16       trust?

17  A.   I'm not sure I understand the question.

18  Q.   Do you understand that there's any legal document

19       that governs your being a trustee and your duties

20       and responsibilities?

21  A.   I know there's bylaws for the condominium

22       association.

23  Q.   Have you ever read those bylaws?

24  A.   I have but it's been awhile.

27

1           would be the plaster.

2    Q.     Those units that had balconies the balconies

3           would have been owned by each of the unit owners?

4    A.     To my understanding.

5    Q.     Now, do you have any understanding as to who

6           owned the wall sleeves for the air conditioning

7           units?

8    A.     Who owned the wall -- No, I do not.

9    Q.     Do you know of anybody on the board of trustees

10          that would have such an understanding?

11   A.     No, I do not.

12   Q.     Based on what you've just seen, would that

13          document indicate to you that it was the condo

14          association that owned the wall sleeves?

15   A.     I didn't look as to the air conditioner.  May I

16          look again.

17   Q.     Of course, you may.

18   A.     I know the air conditioners were opened by the

19          individual owners.

20   Q.     I didn't ask you about the air conditioners,

21          however, that's the document I just showed you

22          and you can look at any other parts of the

23          document that you'd like to as well.

24   A.     I don't know who owns the sleeves.

28

1    Q.   Well, the document that you've just looked at

2         didn't assist you in any way in that regard?

3    A.   That's correct.

4    Q.   The condo trust owned the exterior walls,

5         correct?

6    A.   That's my understanding.

7    Q.   So the condo trust owned all the studs?

8    A.   Yes.

9    Q.   Are you aware of any document that granted

10        ownership to the wall sleeves to individual unit

11        owners?

12    A.   No, I'm not.

13    Q.   Before the time of the fire, are you aware of

14        anything that the Condominium Trust did to

15        maintain the wall sleeves for the air

16        conditioners?

17    A.   Before the point of the fire?

18    Q.   Right.

19    A.   No, I'm not.

20    Q.   Before the time of the fire, are you aware of

21        anything that the Condominium Trust did to

22        inspect the wall sleeves?

23    A.   No, I'm not.

24    Q.   Before the time of the fire, did the Condominium

39

1   A.   Ronda Ziner.

2   Q.   Was Rhonda Ziner connected with EP Management?

3   A.   Yes.

4   Q.   Is Rhonda still involved with the Ocean Terrace

5       Trust Condominium building?

6   A.   Yes.

7   Q.   Is she still employed by EP Management?

8   A.   Yes.

9   Q.   Do you know what her position is?

10   A.   I don't know specifically her title.  She appears

11       to be a principal in the management company with

12       her brother.

13   Q.   Do you know what stairway or --

14   A.   No.

15   Q.   -- closet these records were supposedly in?

16   A.   No.

17   Q.   Do you have any information as to who the builder

18       of the Ocean Terrace Condominium Trust building

19       was?

20   A.   No.

21   Q.   Do you have any information concerning who

22       installed the wall sleeves for air conditioners

23       originally?

24   A.   I do not.

40

1   Q.   Does the Ocean Terrace Condominium Trust have any
2        information as to how the wall sleeves for the
3        air conditioners were originally installed?
4   A.   Not to my knowledge.
5   Q.   Does the Ocean Terrace Condominium Trust have any
6        information as to what hardware was used when the
7        air conditioner wall sleeves were originally
8        installed?
9   A.   Again, not to my knowledge.
10  Q.   Does the Ocean Terrace Condominium Trust have any
11       information as to what changes were made with
12       respect to the hardware for the exterior grills
13       for the wall sleeves for the air conditioners
14       before the time of the fire?
15  A.   Not to my knowledge.
16  Q.   Has the Ocean Terrace Condominium Trust done
17       anything to try to determine how the wall sleeves
18       were originally installed for the air
19       conditioners?
20  A.   Not since I've been on the Board.
21  Q.   Has the Ocean Terrace Condominium Trust done
22       anything to try to determine the hardware that
23       was used for the wall sleeves of the air
24       conditioners before the time of the fire?

70

1       damage was due to access by the fire department.

2       I don't know.  I'd be guessing.

3    Q. But age was at least a significant part of the

4       damage?

5    A. Yes.

6    Q. Had there been portions of the Ocean Terrace

7       Condominium Trust building that had been slated

8       for any kind of renovations or rehabilitation

9       before the time of the fire that hadn't occurred?

10   A. No, none that was discussed or brought to the

11      attention of the owners.

12   Q. When a unit owner decides to replace something

13      like an air conditioner at the Ocean Terrace

14      Condominium Trust building, did they have to

15      provide any kind of notice to the trustees or the

16      management company?

17   A. Not that I'm aware of.

18   Q. Does the Condominium Trust have any knowledge

19      concerning any air conditioner that had been

20      installed in Unit 3-A before the time of the

21      condominium conversion?

22   A. No.

23   Q. Who is responsible for the appropriate electrical

24      wiring of air conditioners in individual

1   condominium units?  For example, who's

2   responsible for making sure that an air

3   conditioning unit is installed on a circuit with

4   a properly rated electrical breaker?

5   A.  I'd say the unit owner.

6   Q.  Have the trustees or the management company ever

7   involved themselves in determining that

8   electrical appliances used in individual units

9   are on circuits with appropriate ratings?

10  A.  Not that I'm aware of.

11  Q.  Have you ever seen the air conditioner that has

12  been made the subject of this lawsuit?

13  A.  I have not.

14  Q.  At any time have the trustees or the management

15  company ever replaced exterior screens for air

16  conditioners?

17  A.  I'm not aware of any such replacement.

18  Q.  Have you ever inquired as to whether that was

19  done?

20  A.  It's my understanding that was, again, a unit

21  owner's responsibility.

22  Q.  On what do you base that understanding?

23  A.  A discussion at a recent board meeting.

24  Q.  Who said that was a unit owner's responsibility?

1   A.   No.

2   Q.   Do you know what the basis was for the filing of

3        this lawsuit against the General Electric

4        Company?

5   A.   Only what I've been told there's speculation --

6        well, not speculation.  There's some reason to

7        think the air conditioning unit may have played a

8        role in the original fire because of the source

9        of --

10   Q.   What's the source of your information on that?

11   A.   Initially feedback through Rhonda that there was

12        such an action being contemplated by St. Paul

13        Travelers.

14   Q.   What did Rhonda tell you?

15   A.   That we were asked to participate or otherwise

16        support such an action.

17   Q.   Did Rhonda tell you anything about any alleged

18        basis for this claim against General Electric

19        Company?

20   A.   Only that Travelers had the air conditioning unit

21        in question.  At that time, there was no

22        discussion because we didn't know any results of

23        any investigation by St. Paul Travelers.

24   Q.   You personally have no personal knowledge of any

77

1    basis for this claim against General Electric

2    Company?

3  A.  It seems that when we were first notified of the

4    action I had no personal knowledge, other than

5    they were suspicious the air conditioning unit

6    was at fault.

7  Q.  And the trustees had no personal knowledge of any

8    basis for this claim against General Electric

9    Company?

10  A.  That's correct.

11  Q.  Did the Condominium Trust try to obtain any

12    consulting advice or professional advice from any

13    source before the time of the fire about fire

14    protection?

15  A.  I'm not aware of whether they did or they didn't.

16  Q.  When the building was rebuilt, did the

17    Condominium Trust obtain any consulting or

18    professional advice concerning fire protection?

19  A.  Nobin Associates.

20  Q.  Do you know anything about the procurement of

21    insurance for the Condominium Trust building

22    before the time of the fire?

23  A.  I do not, only what I read.

24  Q.  Have you ever read any loss prevention inspection

36

1    Q.    Do you know who the management company was?

2    A.    EP Management.

3    Q.    Did you have any dealings with EP management?

4    A.    I did.

5    Q.    What were your dealings with EP Management?

6    A.    At the time as an owner, just corresponding with

7          the administrative information, for instance,

8          mail box names, license plates of cars that would

9          be parked in the parking lot, so on and so forth.

10   Q.    Do you have any understanding of EP Management's

11         duties and responsibilities were before the time

12         of the fire?

13   A.    Not specifically, no.

14   Q.    Do you have any general understanding of what

15         their duties and responsibilities were before the

16         time of the fire?

17   A.    Well, as a management company, they were

18         responsible for many of the items which would

19         fall under maintenance.

20   Q.    Are you aware of anything that EP Management

21         Company did to maintain the wall sleeves for the

22         air conditioners?

23   A.    I'm not.

24   Q.    Was there a maintenance person from EP Management





UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10075 PBS

OCEAN TERRACE CONDOMINIUM          )
TRUST,                Plaintiffs                      )
                                                                 )
vs.                                                          )
                                                                 )
GENERAL ELECTRIC COMPANY         )
            Defendant                                 )

## RE-NOTICE OF TAKING DEPOSITION

TO:    All Counsel of Record

Please take notice that at 9:00 o'clock **A.M.** on **Monday, February 27, 2006,** at

the offices of Curley & Curley, P.C., 27 School Street, Boston, MA 02108, the Defendant,

**General Electric Company,** by its attorneys will take the deposition upon oral

examination of **the Plaintiff, Ocean Terrace Condominium Trust,** pursuant to the

applicable provisions of the Massachusetts Rules of Civil Procedure, before Melvin

Lipman Notary Public in and for the Commonwealth of Massachusetts, or before some

other officer authorized by law to administer oaths.

The deponent is requested to produce at the deposition all written or otherwise

recorded materials pertaining to the subjects set forth in Schedule A which were

previously requested by any part.

The oral examination will continue from day to day until completed.  You are

invited to attend and cross examine.

GENERAL ELECTRIC COMPANY,
By its Attorneys,
CURLEY & CURLEY P.C.

Robert A. Curley, Jr., Esq.
27 School Street
Boston  MA  02108
(617)  523-2990
BBO # 109180

## CERTIFICATE OF SERVICE

I, Robert A. Curley, Jr., hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston    MA    02110


Ronald W. Harmeyer, Esq.
Falk Johnson, LLC
Bank One Plaza
111 East Wisconsin Avenue
Suite 1370
Milwaukee   WI   53202


Paul T. Falk, Esq.
Falk Johnson LLC
20 South Clark Street
Suite 1990
Chicago IL  60603

Dated:   2|17|06

Robert A. Curley, Jr.

## SCHEDULE A

1) The original construction of the premises in issue.

2) The original installation of wall sleeves for air conditioners and air conditioners in the premises in issue.

3) All efforts made at fire protection and fire prevention of the premises in issue at any time.

4) All reconstruction and renovation activities performed at any time after the original construction including but not limited to at the time of the conversion to condos and in or about 1999 when the mansard roof reconstruction occurred.

5) The presence of animals(other than pets), rodents, birds or squirrels in the premises and all efforts taken to control or eliminate the presence of such animals.

6) The installation of the air conditioner in issue.

7) The post-installation removal, maintenance, repair or handling of the air conditioner in issue at any time.

8) The installation of the wall-sleeve for the air conditioner in issue.

9) The post-installation removal, maintenance, repair or handling of the wall-sleeve for the air conditioner in issue.

10) The fire in issue.

11) The investigation of the fire in issue.

12) All inspections of the premises in issue by any property insurer prior to the fire including but not limited to St. Paul Travelers.

13) The damages claimed by the plaintiff.

14) The existence and location of any documents relating to the above matters which have not previously been produced by the plaintiff.

15) The identity and present address of persons with knowledge of the above matters.

EXHIBIT 5

1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3                Docket No. 0510075PBS

4
   ****************************
5  OCEAN TERRACE CONDOMINIUM TRUST,
             Plaintiff
6
   VS.
7
   GENERAL ELECTRIC COMPANY,
8             Defendant
   ****************************
9

10

11

12

13

14          DEPOSITION OF RONDA ZINER,

15  taken pursuant to Massachusetts Rules of Civil

16  Procedure, before Barbara A. Hoey, a Notary Public in

17  and for the Commonwealth of Massachusetts, at the Law

18  Offices of Curley & Curley, 27 School Street, Boston,

19  Massachusetts on February 28, 2006 commencing at

20  9:00 a.m.

21

22

23            LIPMAN COURT REPORTING
                101 Tremont Street
24              Boston, MA 02108
                617-227-3985
25

4

1            S T I P U L A T I O N S

2

3            It is hereby stipulated and agreed by

4    and between counsel for the respective parties that the

5    deposition transcript will be read and signed by the

6    deponent under the pains and penalties of perjury.

7            Counsel have further stipulated and

8    agreed that all objections, except as to form, and

9    motions to strike are reserved until the time of trial.

10            RONDA ZINER, a witness called by the

11    Defendant, having first been duly sworn, deposes and

12    says as follows in answer to

13    EXAMINATION BY ATTORNEY CURLEY:

14        Q.    State your name for the record please?

15        A.    Ronda Ziner.

16        Q.    You are here on behalf of EP Management

17    pursuant to a subpoena that was served?

18        A.    Correct.

19        Q.    Is this a true copy of the subpoena?

20        A.    Yes, it is.

21            (Subpoena marked as Exhibit 67.)

22        Q.    As you know my name is Bob Curley.  I

23    represent the General Electric Company.  I'm going to

24    ask you quite a few questions.  If at any time I ask

25    you anything you don't understand in anyway, tell me.

5

```
 1  I'll phrase the question for you.  Is that acceptable
 2  for you?
 3      A.   Sure.
 4      Q.   What is your date of birth?
 5      A.   12/15/61.
 6      Q.   Where do you presently reside?
 7      A.   201 South Bradford Street, North Andover,
 8  Mass.
 9      Q.   Are you married?
10      A.   Yes, I am.
11      Q.   What is your husband's name?
12      A.   Charles A. Perkins, Junior.
13      Q.   What is his occupation?
14      A.   Attorney.
15      Q.   What firm is he with?
16      A.   Perkins and Antico.
17      Q.   Are you employed by EP Management?
18      A.   Yes, I am.
19      Q.   What is your position?
20      A.   President.
21      Q.   Is EP Management a corporation?
22      A.   Yes, it is.
23      Q.   Is it a Massachusetts corporation?
24      A.   No, it isn't.
25      Q.   Where is it incorporated?
```

1    A.    No.

2    Q.    When did you last speak to Mr. Levine?

3    A.    During the transition when we took over the

4  management of Ocean Terrace.

5    Q.    Was he managing Ocean Terrace before EP

6  Managment?

7    A.    Yes.

8    Q.    Did he have a company that was involved in

9  the management?

10    A.    Levine Enterprise I think is the name of his

11  firm.

12    Q.    Do you have any knowledge from any source

13  about the original construction of the Ocean Terrace

14  Condominium building?

15    A.    No.

16    Q.    Have you brought with you today any documents

17  pertaining to the original installation of wall sleeves

18  for air conditioners or air conditioners in the Ocean

19  Terrace Condominium building?

20    A.    No.

21    Q.    Do you know of the existence of any such

22  documents?

23    A.    I do not.

24    Q.    Do you have any knowledge concerning the

25  installation of wall sleeves or air conditioners at the

40

1    Q.    Would you have had any such records?

2    A.    No, I wouldn't.

3    Q.    Was the installation of an air conditioner

4  something that was up to the unit owner to do?

5    A.    The unit owners were responsible for air

6  conditioners.

7    Q.    Was that a formalized responsibility in

8  anyway?  Was it in writing?

9    A.    It's part of the condominium documents.

10    Q.    Which condominium document?

11    A.    Ocean Terrace Condominium documents.

12    Q.    The Declaration of Trust?

13    A.    It's most likely in the master deed.    I

14  would specifically have to have the documents here.

15    Q.    What is it about the master deed that you

16  think puts the responsibility for air conditioners on

17  the unit owner?

18    A.    The master deed would outline what is

19  considered common areas, what is considered unit

20  owners' boundaries as well as responsibilities.

21    Q.    You don't remember what those boundaries are

22  without seeing the master deed?

23    A.    I'd have to see the documents.

24    Q.    Do you have any documents that you brought

25  with you today about the post installation, removal,

1   maintenance, repair or handling of the air conditioner

2   that was in Unit 3A at the time of the fire?

3      A.   No.

4      Q.   In the work that was done through Noblin

5   Associates in the late 1990s are you aware of removal

6   of any air conditioners or air conditioner sleeves in

7   conjunction with that work?

8      A.   I think part of the specifications was to

9   check out the condition of the sleeves as well as

10   caulking around the air conditioner as part of the

11   mansard roofing.

12      Q.   Do you recall at least some sleeves were to

13   be removed as necessary and reflashed?

14      A.   I think so.

15      Q.   Do you have any idea which sleeves were

16   removed?

17      A.   No.

18      Q.   Is there anyway you can determine that at

19   this present time?

20      A.   No.

21      Q.   Are you aware of how anyone else could

22   determine that?

23      A.   The only one that may know is Tim Little.

24      Q.   Have you brought with you today any documents

25   concerning the installation of the wall sleeve for the

44

1    Q.    Is it probable that somebody did that?

2    A.    Yes.

3    Q.    You were quoting a price for service?

4    A.    Correct.

5    Q.    And that price would depend on what you were

6    getting into in terms of the condition of the property

7    and that sort of thing?

8    A.    Correct.

9    Q.    Do you recall that at any time you inspected

10    wall sleeves for air conditioners?

11    A.    No.

12    Q.    Do you have any personal knowledge concerning

13    any hardware that was used to fasten exterior grills to

14    wall sleeves or air conditioners from the time of the

15    fire?

16    A.    No.

17    Q.    Do you have any knowledge concerning such

18    hardware after the time of the fire?

19    A.    No.

20    Q.    Do you know of anybody that does have such

21    knowledge?

22    A.    I don't understand the question.

23    Q.    Did you ever ask Mr. Voysine, for example, to

24    inspect the hardware on exterior grills or air

25    conditioners sleeves at the Ocean Terrace Condominiums?

45

```
 1       A.    No.
 2       Q.    Are you aware of anybody that has ever
 3  inspected the exterior hardware on air conditioners
 4  wall sleeves at the Ocean Terrace Condominiums
 5  building?
 6       A.    I don't think so.
 7       Q.    Before the time of fire did you ever notice
 8  any grill missing on a wall sleeve for an air
 9  conditioner at the Ocean Terrace Condominiums building?
10       A.    Yes.
11       Q.    Where did you notice such a grill missing?
12       A.    Well, I actually found two memos of letters
13  we sent to two unit owners.  I think they're here if
14  you want me to find them.
15       Q.    Could you find those please?
16       A.    I actually think there is only one there.
17             (Memos marked as Exhibit 69 and Exhibit 70.)
18       Q.    Were Exhibits 69 and 70 found in the files
19  for year 2000, 2001?
20       A.    No.
21       Q.    Where were they found?
22       A.    On my computer.
23       Q.    Was there -- strike that.   Were there
24  periodic inspections that you and members of the board
25  conducted?
```

50

1    on air conditioner units?

2        A.    Right.

3        Q.    Did you have a system for following up to

4    make sure that things you asked to be corrected were

5    corrected?

6        A.    We would reinspect or we'd ask the board to

7    inspect after a period of time.

8        Q.    Did you do that with this Unit 3J?

9        A.    I don't recall.

10       Q.    Did you make some kind of notes about any of

11   the inspections?

12       A.    I don't have anything.

13       Q.    Did you ever receive any information as to

14   how that cover came to be missing?

15       A.    No.

16       Q.    Do you have any information as to what kind

17   of hardware was used to secure that cover to the

18   sleeve?

19       A.    No.

20       Q.    Do you know if there was any corrosion or

21   wear on the sleeve?

22       A.    I would not know.

23       Q.    Did you notice any kind of animal activity

24   with respect to that air conditioner sleeve or air

25   conditioner?

1  computer would go.

2      Q.   Is there a regular newsletter?

3      A.   Not regular but there was on occasion.

4      Q.   At least anually was there a newsletter?

5      A.   Yes.

6      Q.   Do you have all those newsletters?

7      A.   I'd have to go through my master files that

8  are in my office.

9      Q.   Do those newsletters address the general

10  state of the building and plans for the condominium

11  management?

12      A.   Not necessarily the newsletters.  We possibly

13  would have sent out any kind of updates to unit owners

14  that pertain to things going on that they needed to

15  know or things they needed to do.

16      Q.   Do you know who the contractor was who was

17  doing the mansard roofing work in 1999?

18      A.   Yes.

19      Q.   Who was that?

20      A.   SPS, Scherneker Property Services.

21      Q.   What's the name?

22      A.   Scherneker, S C H E R N E K E R.

23      Q.   That stands for Scherneker Property Services.

24  Who did you deal with there?

25      A.   During that period of time?

72

1    Q.    Yes.

2    A.    The balconies were done by the project

3  manager, a person by the name of John Camplain I think

4  it was.  Mansard roofing was done by Jeff Pike. I may

5  have delt with Fred Scherneker himself at some point.

6    Q.    There's a written contract with them?

7    A.    Yes.

8    Q.    Do you still have that?

9    A.    No, I do not.

10    Q.    Did you at one point in time?

11    A.    Yes.

12    Q.    Is that under the stairs?

13    A.    Yes.

14    Q.    Had the contractor asked you to send Exhibit

15  76 to everyone on the third floor to make sure they got

16  their air conditioner units out?

17    A.    I don't know if it's the contractor or

18  Noblin.

19    Q.    Was Noblin supervising that work?

20    A.    That's correct.

21    Q.    What did you understand the flashing

22  involved?

23    A.    My memory serves me that they were going to

24  make sure that the flashing around the air

25  conditioners, redo the flashing around the air

1    Q.    Do you know where the air conditioners were

2    purchased for reconstruction?

3    A.    Sorry.

4    Q.    Do you know where the air conditioners were

5    purchased for reconstruction?

6    A.    No.

7    Q.    Would Tim Little know that?

8    A.    Maybe.

9          (Memo marked as Exhibit 76).

10   Q.    Is Exhibit 76 a memo that you sent to

11   everyone on the third floor of the Ocean Terrace

12   Condominiums building?

13   A.    I think so.

14   Q.    You sent that on or about October 18, 1999?

15   A.    Yes.

16   Q.    Did you get that from your computer?

17   A.    Correct.

18   Q.    Do you have other correspondence on your

19   computer pertaining to Ocean Terrace Condominiums that

20   you did not bring with you today?

21   A.    Yes.

22   Q.    Do you remember the subject matter generally

23   of any of that correspondence and it would be any

24   letters, memos, newsletters?

25   A.    We have done that, go as far as back as our

1    conditioners.

2        Q.    Was it your understanding that the sleeves

3    were going to be removed?

4        A.    I don't know if they removed the sleeves or

5    they were going to check out the condition of the

6    sleeves.  I don't recall.

7        Q.    Was the contractor going into the interior of

8    the apartment to check out the sleeves?

9        A.    I don't remember.

10        Q.    Unless something was going to be done with

11    the sleeve there wasn't any point in removing air

12    conditioners, was there?

13        A.    Again I just found this.  I don't recall what

14    the history behind this was.

15        Q.    You don't have any memory of actually what

16    was done?

17        A.    I do not.

18        Q.    Do you recall any communications you got from

19    the third floor residents about removing their air

20    conditioners?

21        A.    No, I don't recall.

22        Q.    How were things -- how were memos such as

23    this distributed?

24        A.    First they'd be put on EP Managment

25    stationery.  We wouldn't send it out like that.