

# Fallows Associates
Plastics Consultants

May 15, 2006

Ron Harmeyer Esq.
Falk Johnson LLC
Chase tower
111 East Wisconsin Ave., Suite 1900
Milwaukee, WI 53202

FINAL REPORT

I have been retained to give an engineering opinion on the Ocean Terrace Condominiums v. G.E. case. My investigation consisted of the following:

1.  Nylon property retention vs. weathering data from DuPont.
2.  DuPont "Nylon" Design Guide (weather resistance data).
3.  Material Identification data produced by Travelers Engineering Laboratory in Windsor CT.
4.  Environmental Properties data from Bayer Corp.
5.  Opinion of Dr. George Kriek (Bayer Corp.) regarding the need for UV stabilizers in white and natural unfilled Nylon applications for full time outdoor use.
6.  Grille retention clips from an exemplar air conditioner in the subject building.
7.  Thermo-oxidative Degradation, Photo-oxidation, and weather resistance data from "The Nylons Handbook". ("Nylon Handbook" published by Hanser/Gardner Publications 1995).
8.  Depositions of H.D. Moore, Robert Ambrosi, Cathy Hull, Mark DiFelice, Barry McKay, James Welch, Ralph Hobbs, and Stephen Cooney, and Timothy Little (part 1) including all deposition exhibits.
9.  Microscopic inspection and microphotographs of grille retention clips in the possession of St Paul Travelers Lab.
10. Inspection of the GE air conditioner that is believed to have started the fire.
11. Exemplar grille clips.
12. Friedrick "Through the wall unit" assembly instructions.
13. Frigidaire Owners Manual.
14. UL 484 – Standard For Room Air Conditioners, Sixth Edition March 29, 1982.
15. UL 746C – Polymeric Materials – Use in Electrical Equipment Evaluations
16. UL Testing file SA2141 issued 8-8-75 and revised 10-9-87.
17. Interview of Brad Haymond Fastex Div. Of Illinois Tool Works.
18. Photos of the fire scene, and accompanying opinions of Evan Haynes and Gordon Dupuenoy (Travelers Forensic Specialist and Fire Investigator respectively).
19. GE responses to plaintiff's first set of interrogatories.
20. GE response to plaintiff's first set of requests to produce documents and associated prints.
21. Information from DuPont Plastics website.
22. Discussions with UL HVAC group personnel.

Based upon this investigation I have made the following observations and I have formed the following opinions based upon a reasonable degree of engineering certainty.

The outdoor grille had fallen off of the GE air conditioner in the apartment of Hull / DiFelice. The Grille had fallen off because the plastic retaining clips had deteriorated and failed to engage the stamped metal grille. Subsequent nesting materials were found inside the air conditioner housing.

1

**Improper Material Selection**

Retaining clips from another condominium (with same air conditioning unit) were tested at Travelers Engineering Laboratory in Windsor CT and determined to be a non-reinforced, non-pigmented Nylon 6 (Polyamide). As a class of materials Nylon 6 is arguably one of the most sensitive polymers to moisture. This polymer absorbs moisture in humid environments, and swells. Dimensions change, and most structural properties deteriorate (tensile strength, flexural modulus, etc.).

Analysis of an exemplar grille-retaining clip purchased in 2004 from GE indicates that the replacements are now fabricated from Nylon 66. This has only slightly lower water adsorption and is still considered to be a very hygroscopic and UV sensitive polymer.

When Nylon 6 (or Nylon 66) is exposed to moisture, heat or Ultra Violet radiation, degradation of the polymer takes place. The mechanisms are hydrolysis, thermo-oxidative degradation, or photo-oxidation. If moisture, heat and UV are all combined a very rapid deterioration of the polymers mechanical properties will occur.

Photos indicate severe weathering on the outer surface of the clips (removed from unit 2M).

 

Photos also reveal crazing on the inside of the clips.

 

2

You can see a distinct difference in weathering around the outside of the block surfaces of the clip. One side has far more weathering and is assumed to be the topside where more UV exposure would occur.

 

The grille should stay on for the life of the product. H.D. Moore claims, as does GE (GE responses to Plaintiffs first set of interrogatories; page 7 interrogatory no. 11) that "GE room air conditioners have a useful life of approximately 15 years with normal usage, but the useful life may vary due to environmental and use conditions, which can decrease or increase the life of the product." Yet the weatherability data for Nylons show a stunningly rapid deterioration of mechanical properties. For example DuPont data for their un-reinforced, non UV stabilized, non-pigmented Nylon 66 (Zytel 101) shows after only 6 months of Florida exposure that the % elongation (ductility) drops from 300% to only 10%. Even DuPont Zytel 105 un-reinforced, UV stabilized black Nylon 66, shows a decrease in % Elongation from 160% to 60% in 6 months. Weathering of Nylon is generally less severe in Delaware than in Florida, and yet Zytel 105 un-reinforced, UV stabilized black Nylon 66 in Delaware shows a drop in % Elongation of 215% down to 70% in 12 months. Put differently, even UV stabilized Nylon 66 undergoes a ductility drop of 2/3 in 6 – 12 months on the east coast.

DuPont invented Polyamide and commercialized it in 1938 as Nylon. Polyamide performance characteristics have been known and well documented in resin supplier design guides at least as far back as the 70's. It would be reasonably foreseeable in the late 1970's, that Nylon being used in this application would result in part failure and dislocation of the grille all within the useful life of the product.

Kathy Hull's air conditioner was apparently not the only one experiencing failure of the grille retaining clips. The photos above were from the air conditioner in unit 2M. Exhibit No. 64 (reference Moore deposition part 2, page 17) shows failed clips still mounted in the air conditioner of unit 2M, as does Exhibit 3 (reference Hull Deposition) which shows similar failed clips on unit 1J. One missing clip and one failed clip can be seen on unit 3H, and the same can be seen on unit 1D as shown below.



One missing clip and one failed clip can be seen on unit 3H



One missing clip and one failed clip can be seen on unit 1D

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email -> joef100@comcast.net

It is my conclusion that Polyamide or "Nylon" is a poor choice of resin from which to manufacture the grille-retaining clip and that there were other choices available to the Appliance Park engineers. This is so because Nylon has been known for decades to be very susceptible to hydrolysis, and the effects of UV radiation. When both occur, mechanical properties deteriorate rapidly. It is generally recognized in the industry that Nylon of the type that GE used in this application is a poor choice for outdoor structural applications. For example, Bayer Corporation is one of the largest suppliers of Nylon in the world. Dr. George Kriek of the Bayer Corp.'s Polyamide (Nylon) Knowledge Center responded to the following question posted on their website: "Do I need a UV stabilized version of Durathane (Nylon) for a white or natural unfilled application that will be outdoors all the time? What happens if I don't use a UV stabilized version? From Dr. Kriek @ Bayer: "This is a very good question and very often asked. In many cases these two nylons can be substituted for each other. .... Almost all Nylon outdoor applications use black Nylon, and these grades usually have extra carbon black for added stability. Only the surface of the Nylon parts is typically affected, so change in physical properties is due more to the normal moisture absorption than to degradation. After several years, elongations and impacts will begin to decrease. Natural and light colored nylons will fairly quickly begin to turn yellow when exposed to sunlight. Properties will degrade at a much faster rate than with black. White pigment helps properties to some extent, perhaps by reflecting light. The addition of UV stabilizers will increase the time until property loss, but will only delay the color change of the natural nylon parts, not eliminate it."

UL applies a "(f1)" rating to those polymers that are "Suitable for outdoor use with respect to exposure to Ultraviolet Light, Water Exposure and Immersion in accordance with UL 746C."
There were no non-pigmented, non-reinforced Nylons approved by UL for outdoor use in 1974 (at 2 mm thickness, RTI for mechanical strength > 85C). In 1984 there were still no non-pigmented, non-reinforced Nylon 6 or 66 products that bore UL's (f1) rating.

In 1976 from GE alone, there were 6 grades of non-pigmented, non-reinforced PBT (Valox) given a UL rating of (f1) and by 1977 there were 14 grades!

**Failure to Consider Alternate Materials**
GE recognizes that the grille retaining clips need to withstand a variety of weather conditions (Moore deposition part 2, page 20) but GE clearly failed to specify appropriate materials from which to fabricate them.

GE Plastics is a leader in the production of engineering thermoplastics. Harold Moore (page 25 part 2 of deposition) stated that it would be natural for GE Appliance Park to go to GE Plastics for assistance. And yet, GE Plastics engineers were apparently never contacted by GE Appliance engineers for help in selecting a suitable polymer for the grille retaining clips.

GE has had a plastics group since the early 60's. While GE Plastics has never produced Nylon, they have produced a viable, weather resistant alternative to Nylon called Valox (Polyester). GE has produced UV stabilized versions of Valox since the mid 70's. UV stabilized polyester is often used in outdoor applications such as swimming pool pump housings and Network Interface Devices ("NIDs" are the junction box for telephone service on the outside of every residential house).

At the time of this air conditioning product manufacture Nylon performance data was readily available to, and used by engineers at GE Plastics. Those same engineers would have recommended alternative materials for fabrication of the grille-retaining clip for the reasons stated above. GE had the internal knowledge to say this material should not be chosen. I know this because I worked within the GE Plastics Division. I worked with other GE divisions to identify the most appropriate materials for their applications.

There were several options for grille retaining clip materials at the time Kathy Hull's air conditioner was manufactured, but apparently none were ever explored by GE Appliance Park engineers. They could have utilized a UV stabilized Polyester from GE or other plastics suppliers. It is also likely that the clip could have been cost reduced by utilization of a black pigmented or UV stabilized Polypropylene (lawn furniture).

### Failure to consider Alternate Attachment Options
Not only were there alternate material options that were never explored, but there were also other design options that could have been used by the product designer. Instead of using the grille retaining clips, the designer could have molded plastic bosses onto a plastic grille. Such an approach is offered today on the Zone line air conditioner. Examination of competitor's grille attachment techniques would point out alternate design options as well. For example Friedrich uses four screws directly into bosses on the sleeve. Frigidaire uses four metal screws and washers to attach their grille to the inside surface of the sleeve.

What Cathy Hull saw was consistent with expected performance of a Nylon clip. The snap finger ends of the two grille retaining clips, being severely weathered and embrittled had broken off. The bottom of the grille then fell off the ends of the two retaining clips.

I have designed and received a patent for an air conditioner grille. One of the functions of an exterior grille is to protect the interior wiring and components from damage caused by rodents. Any competent product designer must anticipate all potential situations that the product could experience. It is standard practice to go through extensive "what if scenarios" while designing a product. What happens if the fan fails? What happens if the grille falls off? What are the risks associated with each of these scenarios? This is known as a "risk assessment", and is performed in a theoretical manner so that dangers can be "designed out". Even if some level of risk assessment had been conducted on grille and retention system, it was insufficient and failed to identify and provide for this foreseeable risk.

Harold Moore inappropriately considers a squirrel in the AC unit, as only creating a safety hazard to it's self. He states that the moving fan is the safety hazard for the squirrel. (Pages 79, 80, and 81; part 1 of deposition). When asked if a squirrel inside a J series air conditioner was considered a risk, or hazard to design against Mr. Moore stated that he didn't "..ever recall that being something that was discussed as being a risk." When asked if it was something that a customer was ever warned about, his response was "I'm not aware of any warnings associated with squirrels." Mr. Moore goes on to state "Again, we would not consider it a safety -- personal safety issue with the grill falling off."

Not only does a missing grille present a safety hazard to any child or adult who would put their hand in there, it allows small animals to enter. Raccoons, squirrels and mice are known to chew on wiring. GE failed to recognize and design against the hazards resulting from the exterior grill falling off. Absence of the exterior grille for only a short period of time could result in serious laceration or amputation, small animal incursion into the AC unit interior along with flammable nesting materials, wire insulation being chewed away, subsequent fire, and most certainly reduced product performance. GE failed to address these dangers with a proper grille retention design.

### Designer Awareness of Rodent Danger
It is commonly understood by product designers across a wide range of markets that rodents will chew on wiring insulation. If rodents are allowed to enter areas with electrical wiring, the product is often rendered non functional and in many scenarios a dangerous situation results. The degree to which this understanding is wide spread can be displayed by various bulletins and publications from a variety of markets.

Naval Facilities Engineering Command – Electric Power Distribution Systems Operations, Apr 1990
"2.4.5 Direct Burial. Cables may be buried directly in the ground where permitted by codes and only in areas that are rarely disturbed. The cables used must be suitable for this purpose, that is, resistant to moisture, crushing, soil contaminants, and insect and rodent damage."

Federal Railroad Administration – False Proceed Signal Database,
All Reports – Cause: Maintenance – Wiring Chewed by Rodents; Jan1, 1995 – May 3, 2004
Page 1, item 130 "…Investigation revealed that the signal control wires for this signal had been damaged by rodents."
Page 1, item 582 "…False energy on the 432HGP circuit was caused by rodents chewing through the insulation of the conductors which control the signal mechanism."
Page 3, item 614 "…Through further investigation, it was determined that a rodent had chewed into one of two four-conductor unshielded cables used between the junction box at the bottom of the home signal pole and the SA signal head at the top."
Page 4, item 264 "…It was discovered through ground testing that the wire insulation in the south signal had been removed by rodents causing battery to energize the search light signal, resulting in the false signal."
Page 12 for State of Texas, item 219 "…An investigation revealed a rodent had chewed through the wire insulation in the signal mast which resulted in shorting the voltage from the red signal head wiring to the lunar signal head wiring."
Page 18 for State of Texas, item 421 "An investigation revealed rodent damage to the circuit wiring causing a battery wire to intermittently false pick the EDR relay giving a Green signal."

North Dakota State University Extension Service Newsletter – Water Spouts, No. 160, May 1997
"With the amount of snow we received, rodents were probably working very hard to find safe places to nest. Accessible electrical control boxes, motors, and electrical conduits were most likely inhabited. Rodents do a lot of damage to wiring in these situations so check these places very carefully for any damage such as chewed off wires or wire insulation."

Ontario Ministry of Agriculture Food and Rural Affairs – Rodent Control in Horse Stables, Feb 2000
"Rodents can cause damage to building structures and may cause irreparable losses due to fire as a result of gnawing through wire insulation, exposing the live wires."

NASA – Systems Engineering Processes and Requirements, March 13, 2006
Pg. 65, note 2 "…Particular emphasis needs to be on protecting surfaces from physical damage; preventing corrosion, rodent damage to electronic wiring or cabling, shock or stress damage, heat warping or cold fractures, and moisture and other particulate intrusion that would damage moving parts."

From the Nebraska Dept of Roads - Traffic Signal construction,
Page 3 "The pole bases for towers should not be grouted. The pole bases for galvanized steel poles may be grouted at the Project Manager's discretion to prevent rodent damage to wires."

EMS Grivory – Engineering Plastics Product Review  (Plastics supplier marketing brochure)
Discusses Grilamid TR 55 Application Examples "..sheathing for fiber-optic cables, cable sheathing providing particular protection against rodent damage."

Given this known hazard, GE Appliance Park should have realized that the grille served a safety function of preventing squirrels and other rodents from chewing wires, and bringing flammable nesting materials into the internal workings of the air conditioning unit.  As revealed by Harold Moore's deposition, GE still fails to recognize this hazard, and failed to design the product in order to avoid the risk.


**Inability to Comply with UL 484**
UL 484 is the standard for room air conditioners.  Section 6.1 states "Openings in the enclosure of a room air conditioner shall be designed or located to reduce the risk of unintentional contact with (1) un-insulated high-voltage live parts; (2) moving parts such as fan blades and blower wheels; and (3) parts within the

7

enclosure which exceed the temperature permitted by item E4 of table 37.1" A missing grille would most certainly violate this clause.

UL 484 paragraph 3.7 defines ENCLOSURE as "That part of a room air conditioner which by itself or in conjunction with barriers (1) renders inaccessible all or any parts of the unit that may otherwise present risk of electric shock, (2) reduces the risk of contact with parts which may cause injury to persons, and / or (3) prevents propagation of flame initiated by electrical disturbances occurring within the unit."

UL 484 paragraph 3.12 defines STRUCTURAL PART as "A part used in such manner that failure of that part may present a risk of electric shock or unintentional contact with moving parts."

The outdoor section of the enclosure for a through the wall air conditioner is defined by the sleeve which wraps underneath, along the sides and over the top of the compressor, fan, condenser coil, etc. and the outdoor metal grille which is attached to that sleeve. The grille is secured to the sleeve by two of the plastic clips previously discussed. The clips hold the grille securely to the outer surface of the sleeve. When the clips are installed, molded-in snap fingers capture the grille by passing through a hole in the stamped steel. The snap fingers prevent the steel grill from sliding back off the clip, and the larger domed cap captures the steel grille on the other side of the snap finger. A metal screw passes through the sleeve back surface or "lip" from inside to outside, and inserts into the large rectangular end of the grille retaining clip. As the screw rotates it is drawn down into the clip and prevents the flex fingers from retracting. The screw also mounts the clip on the sleeve back surface. The clip structurally attaches the grill to the sleeve and prevents breach of the enclosure. The screw does not capture the grille nor does the screw contact the grille.

If the grille retaining clip structural integrity should fail, the grille would no longer be secured to the sleeve. The grille is defined as part of the enclosure and the retaining clip is defined as a "polymeric structural component". Discussions with a UL (HVAC group) engineer confirm that the clip is considered a structural polymeric component.

UL 484 chapter 9 calls out the requirements for polymeric materials used to form outer enclosures, structural or functional parts, thermal and acoustical insulation, and miscellaneous parts of a room air conditioner. Table 9.1 indicates the properties to be evaluated, depending on the material application.

Table 9.1

| Characteristic to be evaluated | Structural parts | Reference |
|---|---|---|
| Heat deflection | yes | Section 64 |
| Water absorption | yes | Section 65 (not more than 1.5% by weight) |
| | | |
| *Environmental exposure* | | |
| Air oven aging | yes | Paragraphs 66.1, 66.2 (212F, 1,440 hours) |
| Ultraviolet Light | (where exposed to the effects of weathering) | |
| And | (Per UL 746C then run mechanical tests) | |
| Water exposure | yes | Paragraphs 66.3, 66.4 (360,720hrs per746C) |
| Water Immersion | yes | Paragraphs 66.5 - 66.7 |
| Tensile Strength | yes | Section 67 (*) |
| Flexural Strength | yes | Section 68 (*) |
| Izod or | | |
| Tensile Impact | yes | Section 69 or 70 (*) |
| Impact | yes | section 71 (5 ft-lbs,no break) |
| | | (repeat after 24Hr, @ -40F) |
| Volume Resistivity | yes | Paragraph 9.2, section 72 (*) |

* Note that for mechanical properties, after exposure to weatherometer, properties cannot decrease more than 50 percent after 360 hrs, and be essentially stabilized and no longer significantly changing with exposure time out to 720 hrs.

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email -> joef100@comcast.net

In particular section 66 of UL 484 clearly calls out UV and water exposure testing requirements for structural polymeric components that are exposed to the outdoors.

Section 66 of UL 484 - Ultraviolet Light and Water Exposure

66.3 Polymeric materials, which are used for enclosures or for structural parts and which are affected by sunlight are to be exposed to ultraviolet light and water for periods of 360 and 720 hours (using Xenon Arc). The apparatus and method of exposure is to be in accordance with the procedure employed in evaluation of polymeric materials for use in electrical equipment, UL 746C.

66.4 Following exposure, the specimens are to be subjected to the burning test required for the material application (see sections 60 – 63) and individually to the (1) <u>Tensile Strength Test</u>, Section 67; (2) <u>Flexural Strength Test</u>, Section 68; and (3) <u>Izod Impact Test</u>, Section 69, or <u>Tensile Impact Test</u>, Section 70.

67. Tensile Strength Test – "The tensile strength of a polymeric material used as an enclosure or as a structural part shall (1) <u>not decrease more than 50 percent</u> and (2) be essentially stabilized <u>and no longer significantly changing with exposure time.</u>

Same measures for Flexural Strength Test (section 68)

Same measures for Izod Impact Test (section 69)

This means that the Tensile Strength, Flexural Strength, and Izod Impact or Tensile Impact values must not decrease more than 50% from the "as received" condition to the values after 360 hours of exposure to UV and water. In addition these properties cannot continue to significantly change (+/- 5%) from the 360 hour test values to the 720 hour test values.

The Nylon used to mold the grille retention clips would not pass these tests. DuPont Zytel 101 (unfilled, un-pigmented, non UV stabilized) Nylon 66 after only 600 hours of weatherometer testing shows a drop in tensile strength from 10,100 psi to 7,650 psi and continues to fall to 4,740 psi at 2,000 hours (Pg 84, Table 24 of DuPont Zytel Design Guide). Clearly the material is not "stabilized and no longer significantly changing with exposure time". (CALL DUPONT AND FIND OUT IF THIS WAS XENON ARC)

As well the same material shows a drop in "Elongation %" at 600 hours from 300% down to 10%. This is a huge drop (97%) in ductility. As ductility increases, impact resistance will also improve. The opposite relationship also holds true, that is as ductility decreases the impact resistance drops, and the material becomes more brittle.

The Foreword to UL 484 states in Item C "A product which complies with the text of this standard will not necessarily be judged to comply with the Standard if, when examined and tested, it is found to have other features which impair the level of safety contemplated by these requirements."

Materials such as Valox UV stabilized polyesters would pass these tests. Given the foregoing it is my opinion that the subject air conditioner DOES NOT comply with UL 484 listing requirements.

**No Apparent Testing of Grille Retaining Clips**
As previously stated, the grille-retaining clips are considered a structural polymeric component of the enclosure. Upon review of UL testing file SA 2141 there does not appear to have been any testing of the grille retaining clips. While this unit carries a UL approval, it would not meet the full requirements for that approval if the clips had been tested as required by UL 484. Data for accelerated weathering generated by weatherometer testing for non-UV stabilized Nylons should have been a red flag for any designer. The material clearly would not meet structural requirements throughout the life of the product. Use of inadequate materials eventually results in deficient products, and the creation of obviously hazardous situations.

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email -> joef100@comcast.net

In summary, the GE air conditioner plastic grille retaining clips as currently designed are inappropriate from a material selection standpoint. They clearly will not pass UL 484 requirements for structural polymeric components. The clips can be expected to fail before the typical end of air conditioner product life, and the grille can be expected to fall off resulting in an unreasonably dangerous product. When this occurs a laceration / amputation hazard exists, subsequent intrusion by rodents is likely and a fire risk created. The potential-dangers that this product presents before the expected end of product life would be substantially reduced or eliminated by utilization of a UV stabilized and weather resistant polymer or alternate attachment techniques. All of these opinions are given within a reasonable degree of engineering certainty. I reserve the right to change my opinion should new evidence arise.

My curriculum vita is attached.

Sincerely,


W. Joseph Fallows III



Page 1

1          UNITED STATES DISTRICT COURT

2

3          DISTRICT OF MASSACHUSETTS

4    - - - - - - - - - - - - - - - -

5    OCEAN TERRACE CONDOMINIUM TRUST

6                    Plaintiff,

7      v.                    Civil Action

8                    No.  05-10075PBS

9    GENERAL  ELECTRIC COMPANY,

10                   Defendant.

11   - - - - - - - - - - - - - - - -  VOLUME I

12                            PAGES 1-199

13

14          DEPOSITION of W. JOSEPH FALLOWS, III,

15   a witness called by counsel for the Defendant,

16   taken pursuant to Rule 30 of the Federal Rules

17   of Civil Procedure before Lorraine S. Foley,

18   Registered Professional Reporter and Notary

19   Public in and for the Commonwealth of

20   Massachusetts, at the Offices of Curley &

21   Curley, 27 School Street, Boston,

22   Massachusetts, on June 26, 2006, commencing at

23   9:10 a.m.

24

Page 4

1                P R O C E E D I N G S

2

3                  W. JOSEPH FALLOWS, III,

4

5        a witness called for examination by counsel for

6        the Plaintiff, having been satisfactorily

7        identified by the production of his driver's

8        license being first duly sworn by the notary

9        public, was examined and testified as follows:

10

11               MR. CURLEY:   I would like the witness

12        to read.  We can waive notarization, sealing

13        and filing.  We can reserve all objections

14        except as to matter of form until the time of

15        trial and we can reserve motions to strike

16        until the time of trial.

17               MR. HARMEYER:  That's acceptable.

18               DIRECT EXAMINATION

19       BY MR. CURLEY:

20   Q.  State your name for the record.

21   A.  Walter Joseph Fallows, III.

22   Q.  Mr. Fallows, as you now, I'm Bob Curley.  I

23        represent General Electric Company, and I'm

24        going to ask you quite a few questions.  If at

1      exemplar.

2   Q.  And you have now completely described your

3       activities over the course of that two- or

4       three-hour period?

5   A.  Made a few notes about those photographs and

6       then left.

7   Q.  On the second occasion when you went to the

8       Travelers laboratory in the fall of 2005, who

9       was present?

10  A.  Evan Haynes, briefly Gordon Duquenoy, Ron

11      Harmeyer.  I do not remember any other names of

12      people.

13  Q.  Were there others there?

14  A.  I don't recall.

15  Q.  Okay.  What did you do over the course of the

16      four or five hours that you spent at the lab on

17      that occasion?

18  A.  Looked at the air conditioner unit, looked at

19      exemplar units, examined grilles and sleeves,

20      looked at other exemplar grommets, made a few

21      notes, realized that I was pretty much done

22      with what I needed to do and I asked Ron if I

23      might leave.

24  Q.  Now, when you first saw the air conditioner

Page 44

1       unit at issue in late 2004, early 2005, you

2       also saw the wall sleeve for that air

3       conditioner?

4   A.  Yes, I did.

5   Q.  Did you have an understanding at that time as

6       to how old the wall sleeve was?

7   A.  I did not.

8   Q.  Did you later form some understanding as to how

9       old the wall sleeve was?

10  A.  I did at a later time.

11  Q.  When did you do that?

12  A.  Over the next several weeks, as I gathered more

13      information on the occurrence of the fire, the

14      age of the air conditioner and then quite

15      awhile later, a year, year and a half later,

16      became aware that that sleeve was not installed

17      in the 1985 time frame, but was installed much

18      earlier.

19  Q.  Okay.  Was your initial understanding or

20      assumption that it was installed in 1985, the

21      sleeve?

22  A.  I assumed that it was all from 1985.

23  Q.  Was it this year when you changed that

24      assumption?

1    A.    Yes.

2    Q.    Was it after reading the reports of the defense

3          experts that you changed that assumption?

4    A.    Yes.

5    Q.    Are you presently assuming that it was

6          installed at some other time?

7    A.    I am.

8    Q.    When was that?

9    A.    I am understanding that it was installed when

10          the building was constructed, around the 1971

11          time frame.

12    Q.    So it's your present assumption that the wall

13          sleeve, at the time of the fire, was 31 years

14          old?

15    A.    Yes.

16    Q.    Now, have you ever at any time seen the grille

17          that was used with the wall sleeve for the air

18          conditioning unit at issue?

19    A.    I have not.

20    Q.    Have you ever at any time seen any fasteners

21          that were used in conjunction with any grille

22          that was used on the air conditioner at issue?

23    A.    I have not.

24    Q.    Do you have any information as to what kind of

1        grille was originally installed in 1971?

2   A.   It's my assumption that a General Electric

3        grille and grommets were installed with the

4        General Electric sleeve at the time that a

5        General Electric air conditioner was purchased

6        and installed in that wall.

7   Q.   In 1971?

8   A.   Yes.

9   Q.   All right.  Now, on what do you base that

10       assumption?

11  A.   It is my assumption that air conditioners were

12       all purchased in 1971 from General Electric for

13       that building and that when those air

14       conditioners were purchased, they were

15       purchased with a sleeve and grille combination,

16       all from General Electric.

17  Q.   And on what do you base that assumption?

18  A.   It would seem natural and normal that you would

19       buy a General Electric sleeve and grille to go

20       with the air conditioner and pan when you

21       purchased it.

22  Q.   Are you aware of any evidence concerning

23       whether there was an air conditioner installed

24       in Apartment 3A in 1971 or not?

1  A.  I am not.

2  Q.  Are you aware of any evidence as to the manner

3      of installation of any wall sleeve, grille or

4      associated hardware?

5  A.  Could you rephrase that question?

6  Q.  Are you aware of any evidence concerning the

7      installation of any wall sleeve, grille or

8      associated hardware for Apartment 3A in 1971?

9  A.  I am not.

10  Q.  Did you do anything in the course of your

11      investigation to try to learn anything about

12      the original installation of the wall sleeve,

13      the rear grille and any associated hardware?

14  A.  I did, to the extent that I wanted to

15      understand the relationship of the sleeve, the

16      grille and the grommet and how they attached.

17  Q.  Did you identify any information concerning the

18      manner of installation of the wall sleeve, the

19      grille and any associated hardware or fasteners

20      in 1971?

21  A.  I did not.

22  Q.  And other than making an assumption, you're not

23      aware of any evidence that, in fact, a G.E.

24      grille was installed on the wall sleeve for

Page 50

1  Q.  Did you read both volumes of Mr. Little's

2      deposition?

3  A.  I did read through them.

4  Q.  Now, other than making an assumption, do you

5      have any evidence of what fasteners were used

6      with the wall sleeve in Unit 3A in 1971?

7  A.  I do not have any evidence of what fasteners

8      were used.

9  Q.  Other than making an assumption, do you have

10     any evidence as to whether any screws were put

11     in straight or crooked or torqued too much or

12     torqued too little in 1971?

13 A.  No, I do not.

14 Q.  Now, you've looked at some exemplar screw

15     grommets?

16 A.  Yes, I have.

17 Q.  Are screw grommets the same thing that you've

18     referred to as clips?

19 A.  Yes, they are.

20 Q.  And where did the exemplars come from?

21 A.  Apartment 2M.

22 Q.  And those parts from Apartment 2M, were they

23     also parts that you understood to be installed

24     in 1971?

Page 48

1        Unit 3A at any time; are you?

2   A.   I am not aware of anything other than the fact

3        that I have been told that G.E. air

4        conditioners were installed.

5   Q.   Who told you that a G.E. air conditioner was

6        installed in Apartment 3A, if anyone?

7   A.   It is my understanding that air conditioners

8        were installed in 1971.  It is my deduction,

9        based on reasonable evidence, that there is a

10       General Electric sleeve in 3A and that a

11       replacement air conditioner had been put in

12       there in 1985.

13  Q.   I think my question was, who told you?

14  A.   The evidence -- I do not know.

15  Q.   Now, between 1971 and 2001, did you investigate

16       the history of the wall sleeve, rear grille and

17       any associated hardware at Apartment 3A, Condo

18       Unit 3A?

19  A.   I did not.

20  Q.   Are you aware of the removal of the rear grille

21       at any time in its history?

22  A.   I am not.

23  Q.   Do you have any knowledge or understanding of

24       work that was performed by Noblin & Associates

1    accounting of how much they differ, because one

2    of the designs is not a complete design.

3  Q.  Is that the design that you understand was used

4    in 1971?

5  A.  Yes.

6  Q.  And other than making an assumption, you don't

7    know whose design that was; do you?

8  A.  That is correct.

9  Q.  Now, do you know who the suppliers were of

10    plastic screw grommets in 1971?

11  A.  It is my understanding General Electric

12    supplied the grommets for their sleeves and

13    grilles.

14  Q.  General Electric purchases parts.  You

15    understand that?

16  A.  Uh-huh.

17  Q.  That's a yes?

18  A.  Yes, I do.

19  Q.  Do you have any understanding whether screw

20    grommets were a purchased part or not?

21  A.  Yes.  I do have an understanding that they were

22    purchased by General Electric.

23  Q.  All right.  And do you have any understanding

24    as to who was manufacturing screw grommets in

1       the 1971 time frame?

2    A.   I do not.

3    Q.   Do you know how many manufacturers of screw

4        grommets there were in the 1971 time frame?

5    A.   I do not.

6    Q.   Do you know what materials screw grommets were

7        made from in the 1971 time frame?

8    A.   I do not.

9    Q.   Do you know anything about the commercial

10       context of the screw grommet market in 1971?

11   A.   No, I do not.

12   Q.   So what was commercially feasible or not

13       commercially feasible in 1971 for screw

14       grommets, you simply have no knowledge?

15   A.   That is correct.

16   Q.   Now, would you be able to draw a picture of the

17       complete design of the plastic piece of

18       hardware that was used in 1971?

19   A.   I would not.

20   Q.   Can you describe the correct manner of

21       installation for the piece of plastic hardware

22       that you believe was used in 1971 in a rear

23       wall screen?

24   A.   I cannot.  I have never seen a print or drawing

1      the life of the wall sleeve and exterior

2      screen?

3  A.  I do not know that.

4  Q.  Are you aware of any standard with respect to

5      the expected useful life of a wall sleeve for

6      an air conditioner?

7  A.  I am not.

8  Q.  Have you formed any opinion as to what the

9      expected useful life of a wall sleeve should

10     be?

11 A.  I believe, if I understand your question

12     correctly, my opinion is that the wall sleeve

13     has an expected useful life that is longer than

14     the air conditioner.

15 Q.  Now, when did you first come to that opinion?

16 A.  I don't know.

17 Q.  That opinion isn't in your report; is it?

18 A.  No, it's not.

19 Q.  Is that an opinion that you came to after you

20     wrote your report?

21 A.  I never thought about it in that context in the

22     report.

23 Q.  You knew that you were supposed to disclose all

24     your opinions in the report?

Page 56

1   A.   Yeah.  Yes.

2   Q.   Is that an opinion that you came to after you

3        read the reports of the defense experts?

4   A.   I think it was, yes.

5   Q.   Now, in terms of a specific time period, have

6        you formed any opinion as to how many years a

7        wall sleeve and exterior grille should last?

8   A.   No, I have not.

9   Q.   And are you aware of the opinion of anyone else

10       as to how long a wall sleeve should last, and

11       an exterior grille?

12  A.   I am not.

13  Q.   So apart from -- your opinions in this case or

14       your personal opinions?

15  A.   Right.

16  Q.   And they're not the opinions of any

17       consensus-making group or body?

18  A.   No.

19  Q.   You haven't consulted any other person to

20       determine whether they share your opinions or

21       not?

22  A.   No.

23  Q.   Do you have any knowledge as to how the plastic

24       part and any screw combined with the wall case

1    Q.    You read Kathy Hull's deposition?

2    A.    Yes, I did.

3    Q.    And what is your understanding of how Kathy

4          Hull described the appearance of the grille

5          that was on her unit in 2001?

6    A.    I would have to refresh myself on the

7          deposition.

8    Q.    Was her description that she gave in 2001

9          consistent with a G.E. part?

10              MR. HARMEYER:   I object to the

11         foundation.

12   A.    Would you restate the question differently?

13   Q.    Did you try to determine in the course of your

14         investigation as to whether Kathy Hull's

15         description described a G.E. exterior grille or

16         not?

17   A.    I did not.

18   Q.    All right.  You read Mark DiFelice's

19         deposition; right?

20   A.    Yes.

21   Q.    Did you try to determine whether Mark

22         DiFelice's description of the rear grille

23         described a G.E. part or not?

24   A.    Actually, I did.

Page 59

1    Q.   Did his description describe a part other than

2         a G.E. part?

3    A.   Yes.  It didn't make sense to me.

4    Q.   And is that a conclusion that you came to after

5         reading the disclosure of the defense experts'

6         reports?

7    A.   No.

8    Q.   So before you prepared your report, you had

9         already come to the conclusion that Mark

10        DiFelice's description did not describe a G.E.

11        part?

12   A.   Yes, yes.  I did.

13   Q.   And you did not disclose that conclusion in

14        your report; did you?

15   A.   It was my understanding that his description

16        varied from what Kathy Hull had described, and

17        it also varied from what I saw on the failed

18        unit or sleeve at Travelers labs.  By that I am

19        referring to his description of eight screws

20        being used and being used not axially into the

21        -- or straight into the sleeve, but from around

22        the perimeter.  There weren't eight holes

23        around the perimeter.  There weren't any holes

24        around the perimeter.  There were just the two

1    at the bottom and two places for the clips at

2    the top.  So I basically chalked that up to,

3    Well, he doesn't remember correctly.  But that

4    is not something that I would have put in my

5    opinion.

6  Q.  And did you read that Kathy Hull said that

7    there were four screws?

8  A.  That's something that I don't recall.

9  Q.  Did you read that she said there were circular

10    holes in the grille?

11  A.  I don't recall that.

12  Q.  Assuming she gave that description, that is not

13    consistent with a G.E. part; is it?

14  A.  It is my understanding there are square holes

15    in the bottom of the grilles.

16  Q.  And that only two screws were used?

17  A.  Yes.

18  Q.  So assuming that I've accurately recited her

19    description, her description is not consistent

20    with a G.E. part?

21  A.  That would be correct.

22  Q.  All right.  Now, with respect to whatever

23    fasteners were used in Apartment 3A, which you

24    have no personal knowledge of and no evidence

Page 61

1       of; correct?

2   A.  That is correct.

3   Q.  You have no knowledge as to whether they were

4       ever physically abused in any way?

5   A.  I have no information to that extent.

6   Q.  And you have no knowledge as to whether they

7       were improperly installed in any way?

8   A.  That is correct.

9   Q.  You're not able to rule out improper

10      installation as a cause for whatever hardware

11      was there becoming missing or failed?

12  A.  I cannot.

13  Q.  You cannot rule out physical abuse for whatever

14      reason the hardware became missing or failed?

15  A.  I cannot.

16  Q.  So those remain possible causes for the

17      hardware becoming missing; correct?

18  A.  Yes, they are.

19  Q.  You don't know whether anyone ever applied any

20      kind of chemical or other contaminant to those

21      parts; do you?

22  A.  I do not.

23  Q.  And that's a possible cause of failure that you

24      cannot rule out?

Page 62

1   A.   That is correct.

2   Q.   In any other case that you've worked on, have

3        you ever provided an opinion about the cause of

4        a failure of something that you never saw?

5   A.   I do not recall ever having provided an opinion

6        on a part I haven't seen.

7   Q.   In the other cases that you've worked on,

8        you've always seen -- in the other cases that

9        you've worked on when you've provided opinions

10       concerning the cause of a failure, you have

11       actually seen the failed part; right?

12  A.   Yes, I have.

13  Q.   And in this case, without seeing any allegedly

14       failed part, you can only speculate as to what

15       the possible cause of the failure was; isn't

16       that fair to say?

17            MR. HARMEYER:   I object to the form.

18  A.   I don't think it is.  It is a reasonable

19       assessment that if all of the sleeves on air

20       conditioners grilles, are of General Electric

21       origin in other apartments, common sense would

22       say this was also a combination of General

23       Electric sleeve, air conditioner, grille and

24       grommets.  It's reasonable.

Page 63

```
 1   Q.   That's not what I asked you.  Are you aware of

 2        any scientific standard that indicates that

 3        someone can reach a determination as to the

 4        cause of a failure of something that is not in

 5        existence or visible?

 6   A.   No, I am not.

 7   Q.   And scientifically, without having the

 8        opportunity to actually inspect something to

 9        determine whether there has been abuse or

10        misinstallation or chemical contamination, or

11        those sorts of things, you could only speculate

12        as to what the cause of a failure was; isn't

13        that right?

14            MR. HARMEYER:  Objection to the form.

15   A.   That's correct.

16            (Exhibit No. 203 marked for

17        identification.)

18            (Short recess was taken.)

19   Q.   Exhibit No. 203 is your report.  You labeled

20        this "Final Report".  You labeled it "Final

21        Report"?

22   A.   Yes.

23   Q.   You haven't revised or altered this report in

24        any way; have you?
```

1  Q.  Those are current?

2  A.  Yes.

3  Q.  Was Freidrich in business in 1971?

4  A.  I don't know.

5  Q.  Do you know who the major suppliers and

6     manufacturers of air conditioners were in 1971?

7  A.  I do not.

8  Q.  Do you know anything about assembly

9     instructions or methods of assembly used by the

10    major suppliers and manufacturers of air

11    conditioners in 1971?

12 A.  I do not in 1971.

13 Q.  Do you know what assembly instructions were

14    being provided by the major manufacturers and

15    suppliers of air conditioners at any time

16    before 2000?

17 A.  I am aware of what was being done by Carrier,

18    because I was working there.

19 Q.  Before the time that you worked for Carrier,

20    did you have any knowledge about instructions

21    for assembly that were being provided by any

22    manufacturer of an air conditioning unit?

23 A.  I wasn't cognizant of any.  If they were there,

24    it wasn't something that I would have recalled.

Page 81

1    Q.   Item No. 13 refers to a Frigidaire Owner's

2         Manual?

3    A.   Yes.

4    Q.   For what product is that an owner's manual?

5    A.   That would have been for their air conditioner,

6         through-the-wall air conditioner.

7    Q.   That's a current model?

8    A.   Yes.

9    Q.   The UL 484 standard for room air conditioners

10        that you looked at was dated in 1982?

11   A.   May I look at it?

12   Q.   It's on your report.  You put the date.

13   A.   Yes.  Okay.

14   Q.   That's in Item No. 14?

15   A.   Yes.

16   Q.   Did you ever look at UL 484 as it existed in

17        1971?

18   A.   I tried to.  We were unable to produce that

19        document.

20   Q.   So you have never actually seen UL 484 as it

21        existed in 1971?

22   A.   That is correct.

23   Q.   Now, is it your understanding that the wall

24        sleeve in issue complied with UL 484 as it

```
 1        existed in 1971?

 2   A.   It is my understanding that it probably did

 3        not.

 4   Q.   Okay.  And do you understand that the wall

 5        sleeve and rear screen was listed by UL in

 6        1971?

 7   A.   That's my understanding.

 8   Q.   And you think that somehow UL made a mistake in

 9        listing it?

10   A.   I don't know.

11   Q.   And without seeing UL 484 as it existed in

12        1971, you really couldn't make any

13        determination as to what complied or did not

14        comply with it; isn't that right?

15   A.   Would you repeat the question?

16   Q.   Yes.  Without seeing UL 484 as it existed in

17        1971, you really couldn't make any

18        determination as to what complied or did not

19        comply with it; isn't that right?

20   A.   That's correct.

21   Q.   Item 15 refers to UL 746C.  Is that a standard

22        that existed in 1971?

23   A.   I don't know.

24   Q.   Do you know when UL 746C first came into
```

1       the part.

2    Q.  Can you tell me how much tensile strength this

3        particular application required --

4    A.  No.

5    Q.  -- of the screw grommet?

6    A.  No, I can't.

7    Q.  Have you tried to determine that at all?

8    A.  No.

9    Q.  Did you try to determine the tensile strength

10       of any plastic part in conjunction with this

11       case?

12   A.  No, I didn't.

13   Q.  Does nylon continue to absorb moisture over

14       time?

15   A.  No.  It will reach an equilibrium state.

16   Q.  And with respect to the particular plastic

17       parts in issue, do you know how long it would

18       take to reach that equilibrium state?

19   A.  A reasonable range would be two or three days.

20   Q.  So that within two or three days after the part

21       first began to be used in the outdoors, it

22       would have reached an equilibrium state?

23   A.  Potentially.  However, the outdoor humidity

24       level changes day to day, so you're chasing a

1    footprint is associated with these 1971 vintage

2    parts, then the rectangular part is between the

3    sleeve and the exterior grille; correct?

4  A.  It touches the sleeve.  I don't know if the

5    original dimensions passed through the

6    rectangular hole on the screen or not.

7  Q.  And you haven't tried to determine that?

8  A.  No.

9  Q.  You took no measurements?

10  A.  I did not take measurements of that.

11  Q.  Did you take any measurements?

12  A.  No.

13  Q.  Do you know what other choices were available

14    in 1971 for an engineer selecting a plastic

15    part for this application?

16  A.  I don't.

17  Q.  Do you know whether there was any other choice

18    of part from nylon?

19  A.  There were other polymers in production that

20    could have been looked at.  Don't know.

21  Q.  Do you know whether there was anyone that made

22    a screw grommet from anything other than nylon

23    in 1971?

24  A.  I do not.

Page 135

1    A.   I do not know if anybody evaluated the polymers

2         for 3H or 1D.

3    Q.   And from the photographs, you can't tell the

4         configuration of the part; can you?

5    A.   (No response.)

6    Q.   You can't see behind the grille?

7    A.   The grommets or pieces that I see that I am

8         calling grommets on 3H and 1D look like similar

9         geometries to the grommets on 1J and 2M.

10   Q.   You can't see any part of any plastic piece on

11        the photos of the grilles for Unit 3H or 1D

12        that is behind the bottom of the grille; can

13        you?

14   A.   I cannot.

15   Q.   All right.  So without being able to see it,

16        you can't make any conclusions about what the

17        actual geometry is; isn't that fair to say?

18   A.   Other than what I can see on this side of the

19        grille.  And at least in 3H, it appears to be a

20        rectangular block.

21   Q.   I thought you told me the rectangle was on the

22        inside of the screen?

23   A.   I didn't believe that I did.

24   Q.   All right.  Let's go backwards then.  Is it

1    your understanding that the plastic parts that

2    you've seen from the 1971 vintage, that the

3    rectangular part was on the outside of the

4    exterior grille?

5  A.  It is my understanding that the rectangular

6    part fits through the square opening in the

7    screen and that something that's missing was to

8    have originally prevented the screen from

9    coming off of that rectangular section.

10  Q.  Okay. So the rectangular part went through

11    that rectangular cut out in the bottom of the

12    screen?

13  A.  Uh-huh, yes.

14  Q.  And the cylindrical part that you referred to,

15    did that also go on the inside?

16  A.  I believe the cylindrical part goes to the

17    outside of the screen. It is very difficult to

18    know how it is intended to work without seeing

19    a full part, without seeing one in place or a

20    blueprint.

21  Q.  So is it your understanding that the

22    rectangular part is smaller than the

23    rectangular cut out?

24  A.  I do not know.

Page 137

1   Q.   Do you have any knowledge or information as to
2        whether anything prevents that grommet from
3        going through the rectangular hole entirely?
4   A.   The 1971 version appears to be missing
5        something.  It exhibits a missing, broken end
6        on the screw end of that.
7   Q.   And what that something is, you simply don't
8        know?
9   A.   I don't know what it was.  It is my belief that
10       something was to hold the screen in place.
11  Q.   Do you have any information as to there was
12       something with that plastic part that held it
13       in place on the screen regardless of whether it
14       was screwed in or not?
15  A.   I really don't know what the geometry was.  It
16       is my understanding that what is missing
17       somehow captured the screen, the grille, and
18       held it in place.
19  Q.   Where are the footprints that you referred to
20       earlier?
21  A.   Those are on the external surface of the -- I
22       will call it the lip around the inside
23       perimeter of the sleeve.
24  Q.   So the rectangular part was between -- if that

Page 138

1          footprint is associated with these 1971 vintage

2          parts, then the rectangular part is between the

3          sleeve and the exterior grille; correct?

4     A.   It touches the sleeve.  I don't know if the

5          original dimensions passed through the

6          rectangular hole on the screen or not.

7     Q.   And you haven't tried to determine that?

8     A.   No.

9     Q.   You took no measurements?

10    A.   I did not take measurements of that.

11    Q.   Did you take any measurements?

12    A.   No.

13    Q.   Do you know what other choices were available

14         in 1971 for an engineer selecting a plastic

15         part for this application?

16    A.   I don't.

17    Q.   Do you know whether there was any other choice

18         of part from nylon?

19    A.   There were other polymers in production that

20         could have been looked at.  Don't know.

21    Q.   Do you know whether there was anyone that made

22         a screw grommet from anything other than nylon

23         in 1971?

24    A.   I do not.

Page 139

1   Q.   Are you familiar with nylon's use in outdoor

2        applications?

3   A.   Somewhat, yes.

4   Q.   What outdoor applications has nylon been used

5        in, to your knowledge?

6   A.   I am stretched to think of a lot of -- any

7        outdoor applications.  It will be black.  It

8        will be UV stabilized to some degree.  And

9        traditionally you will be coaxed into using a

10       different supplier by that nylon supplier if

11       it's going to be direct outdoor exposure.

12  Q.   In 1971, do you know how nylon was being used

13       in external environments?

14  A.   I don't.

15  Q.   In 1985 do you know how nylon was being used in

16       external environments?

17  A.   I am struggling to think of nylon in outdoor

18       exposure environments.  The ones that I can

19       think are heavily glass reinforced, like Thule

20       roof racks.  They have black or grey pigment,

21       lots of it.  The glass is carrying the load.

22  Q.   Are you aware of any applications of

23       non-pigmented nylon in external environments?

24  A.   One, the General Electric grommet.

1   Q.   Are you aware that the grommets that are used

2        today are unpigmented nylon?

3   A.   Yes.

4   Q.   Have you looked at their performance in the

5        field?

6   A.   No.

7   Q.   Did you look at an unpigmented nylon grommet

8        that was present at the Travelers laboratory of

9        the present style?

10  A.   Yes.

11  Q.   Did that show any degradation?

12  A.   I'm sorry.  I misunderstood your question.  Did

13       I look at a grommet that had been in service or

14       was new?

15  Q.   A grommet that had been in service?

16  A.   I did not.

17  Q.   So you didn't look at the newer style grommet

18       that was present on one of the air conditioning

19       units at the Travelers lab?

20  A.   I did not.  I looked at an exemplar of a brand

21       new one.

22  Q.   And you didn't look at whether it was showing

23       any signs of degradation or not?

24  A.   No.  May I add one comment to that?  You could

Page 141

```
 1        go for years without seeing physical detriment,

 2        and yet properties could be reduced.

 3   Q.   So you think that nylon parts of the type at

 4        issue could be in service for years without

 5        showing any kind of degradation, visible sign

 6        of degradation?

 7   A.   Visible signs of degradation, that is correct.

 8   Q.   And how long it would be before there would be

 9        any visible sign of degradation, you don't

10        know?

11   A.   I don't know.  It is geometry dependent,

12        exposure dependent.

13   Q.   And you're not aware of when UL 746C was first

14        promulgated?

15   A.   I do not know the date when it was first

16        promulgated.

17   Q.   And you don't know what version it was in in

18        1971?

19   A.   I do not.

20   Q.   Was Valox in existence in 1971?

21   A.   Off the top of my head, I do not know the

22        introduction date of Valox.

23   Q.   Valox was introduced later than 1971; wasn't

24        it?
```

Page 142

1   A.   Without going through my notes, I don't know.

2   Q.   Is that something that you determined and that

3        you would expect to see in your notes?

4   A.   Uh-huh.

5   Q.   That's a yes?

6   A.   I'm sorry.  Yes.  I believe I have that date in

7        my notes.

8   Q.   And to the extent that your report indicates

9        that an alternative to nylon that G.E. could

10       have used was Valox, if Valox hadn't been

11       introduced as of 1971, it couldn't have been

12       used; right?

13  A.   That's correct.

14  Q.   Now, on Page 5 of your report you say that G.E.

15       has produced UV stabilized versions of Valox

16       since the mid 1970s.

17  A.   Yes.

18  Q.   Would that indicate to you that it wasn't until

19       after 1971 that Valox was available?

20  A.   No.

21  Q.   Okay.  Do you know if a screw grommet has ever

22       been made by anyone out of Valox?

23  A.   I don't know.

24  Q.   Do you know of any material that is, in fact,

Page 145

1   Q.   Well, that doesn't mean that they didn't ask a

2        supplier, Have you got something better, have

3        you got something different, or whatever; does

4        it?

5   A.   There were options that were being explored or

6        used by their competitors.  They have never

7        changed their design.

8   Q.   What options were being used by competitors in

9        1985?

10  A.   I believe I reference a couple of the

11       competitors using screws into bosses on the

12       grille.

13  Q.   I think you told me those were current designs

14       or later than 1985 designs.

15  A.   To your point, I don't know when those designs

16       were initiated.

17  Q.   Do you think that owners of air conditioners,

18       air conditioner sleeves should maintain them?

19  A.   Could you tell me what you mean by maintaining

20       them?

21  Q.   Well, if a grille went missing from a wall

22       sleeve, do you think the owner should replace

23       it?

24  A.   Yes.

1   A.  I guess the answer would be yes, utilizing

2       accelerated test data to extrapolate the

3       performance characteristics of the polymer at

4       some time in the future.  Usually it's someone

5       else's product; it's not my product, but I'm

6       helping them design it.

7   Q.  Can you tell me what products you made

8       determinations about useful product life on?

9   A.  For example, the 746 -- it's an air separate

10      for a Boeing 746 jet.  Product life was to be

11      roughly 20 years.

12  Q.  And you made that determination?

13  A.  No.  That was the guidelines for Hamilton

14      Sunstrand for what is, in essence, a piece of

15      an air conditioning system.

16  Q.  Have you ever personally made a determination

17      about the useful life of a product?

18  A.  I have never determined what the life should be

19      for the product.

20  Q.  Is it fair to say that you're not an expert on

21      useful product life?

22  A.  That's correct.

23  Q.  And you're certainly not an expert on the

24      useful product life of through-the-wall air

1      conditioning sleeves?

2   A.   That is correct.

3   Q.   Have you evaluated the useful product life of

4        any alternate design for the rear grille of an

5        air conditioner that is mentioned or contained

6        in your report?

7   A.   Have I evaluated the useful life of a grille?

8   Q.   Yes.  For example, you say, for example,

9        Freidrich uses four screws directly into bosses

10       on the sleeve.  Have you done anything to

11       evaluate the useful product life of that

12       design?

13  A.   No, I haven't.

14  Q.   Do you know if they fail ten years, 15 years,

15       20 years, or whenever?

16  A.   I don't.

17  Q.   You indicate that molded plastic bosses could

18       be used; right?

19  A.   Sure.

20  Q.   Have you evaluated the useful product life of

21       molded plastic bosses?

22  A.   No.

23  Q.   Okay.  So it's not possible for you to make any

24       kind of comparison between the alternative

1          designs that you mentioned and the design of

2          the G.E. through-the-wall sleeve without having

3          such data; right?

4     A.   I believe the comparisons that I would make

5          would be relative to the efficacy of holding

6          the grille to the sleeve and the ability to do

7          that in a way that perhaps is not using the

8          grommet, but another approach.

9     Q.   But whether that other approach is going to

10         last for five years, ten years or 15 years, you

11         just don't know?

12    A.   I don't know.

13    Q.   And there are certainly failure modes with

14         using screws; right?

15    A.   There can be, yes.

16    Q.   And whether those failure modes have occurred

17         with Freidrich or not, you don't know?

18    A.   I don't know.

19    Q.   And there are failure modes with molded bosses;

20         right?

21    A.   There are.

22    Q.   And whether a screen with molded bosses is

23         going to fail after five years, ten years, 15

24         years, you simply don't know?

1    A.   I don't know.

2    Q.   And without having such knowledge, you don't

3         have any basis of comparing those design

4         methods with the air conditioner sleeve at

5         issue that lasted almost 31 years; is that fair

6         to say?

7    A.   I can only say that the sleeve that lasted 31

8         years appears to have been failing, because

9         they are broken.  I don't know whether metal

10        screws are going to last better, longer.

11   Q.   Now, on Page 6 of your report in the third

12        paragraph, you make a statement that the snap

13        finger ends of the two grille-retaining clips,

14        being severely weathered and brittle, had

15        broken off.  Do you see that?

16   A.   In the third paragraph?

17   Q.   Yes.

18   A.   Starting with the words  --

19   Q.   -- "What Kathy Hull saw".

20   A.   I'm sorry.  Yes.  Okay.

21   Q.   All right.  Do you have any information that

22        there were snap finger ends on any nylon pieces

23        that were used with the sleeve on Unit 3A?

24   A.   Only that I'm assuming it is the same grille,

1    Q.    Now, do you have any knowledge of what

2          information, if any, concerning rodents chewing

3          on wires of appliances was available before

4          1971?

5    A.    No.  This is just common sense amongst

6          designers.  You have to foresee the things that

7          could happen.  If it's a toaster in the house,

8          no, you're not going to worry about that, but

9          if it's a part that sees the outdoors, you try

10         to envision all the things that could happen.

11   Q.    Do you know of any designer of an air

12         conditioner that considered squirrel

13         penetration into an air conditioning unit

14         before 1971?

15   A.    I have no comment about 1971, because I wasn't

16         a practicing engineer even close to 1971.

17         However, I think that it has always been the

18         practice of an engineer to envision the

19         environment of the product that they are

20         designing and do a failure modes effects

21         analysis and try to understand how severe the

22         risk is of that failure mechanism happening.

23   Q.    Were there any appliance manufacturers who were

24         doing failure modes effects analyses before

Page 168

1         1971?

2    A.   It wouldn't have been called failure modes

3         effects analysis, but the engineers would have

4         in their mind been predicting what the failure

5         mechanisms potentially would be and designing

6         them out.

7    Q.   Failure mode effects analysis is known as an

8         FMEA?

9    A.   Yes.

10   Q.   FMEAs were not used in the industry back in the

11        1971 time period; were they?

12   A.   Not by that name, not at all.  But the

13        engineers are thinking in those terms.

14   Q.   Now, did you have any knowledge that you

15        derived from any time in your life about any

16        engineer that has thought about squirrel

17        penetration into an air conditioner before

18        1971?

19   A.   Again, no, not before 1971.

20   Q.   When you worked at Carrier or for Carrier, was

21        there any consideration of squirrel penetration

22        into air conditioners that you're aware of?

23   A.   Sure.

24   Q.   What was that?

Page 171

1           was my understanding.

2    Q.    Well, the leave was more than 30 years old at

3           the time of the fire; right?

4    A.    Yes.

5    Q.    So in terms of a 15-year life span  --

6    A.    Yes.

7    Q.    -- it had exceeded the life span of two air

8           conditioning unit; right?

9    A.    Yes.  It had.

10   Q.    And is there any kind of standard that you

11          believe that violates, that it's not reasonable

12          for a sleeve to outlast double the life span of

13          the product it's going to be used with?

14   A.    That's not a contention or a claim that I am

15          making either way.

16   Q.    Okay.  Well, would you agree that it's

17          unreasonable for the sleeve and the exterior

18          grille to last for twice or more than twice the

19          life span of the product that it is designed

20          for?

21   A.    It would seem to me that if it's going to last

22          longer than the first life span of an air

23          conditioner and if I knew later on that there

24          was the risk of these things not meeting UL or

```
 1        data for nylon.
 2   Q.   Well, in the real world, with real grommets out
 3        there holding on real screens, do you have any
 4        evidence whatsoever of any failure of a nylon
 5        grommet in less than 15 years?
 6   A.   I don't.
 7   Q.   Do you know how the screw grommet was formed?
 8   A.   The process?
 9   Q.   Yes.
10   A.   Injection molding.
11   Q.   You don't think there was anything wrong with
12        the manufacturing process for any plastic part
13        that you have seen in this case; do you?
14   A.   I have no reason to believe that.
15   Q.   You have a publication that was in Plastics
16        Engineering in 1982 in which you apparently
17        identified some common design problems with
18        injection molded parts?
19   A.   Yes.
20   Q.   Do you have a copy of that article?
21   A.   Yes.  Not with me, but I have one.
22   Q.   You have one at home?
23   A.   Yes.
24   Q.   Do you remember what the design-initiated
```



1

Volume I
Pages 1 to 160
Exhibits 300 to 307

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10075 PBS

- - - - - - - - - - - - - - - - - - -x
                                      :
OCEAN TERRACE CONDOMINIUM TRUST,      :
            Plaintiff,                :
                                      :
                                      :
      vs.                             :
                                      :
GENERAL ELECTRIC COMPANY,             :
            Defendant.                :
                                      :
- - - - - - - - - - - - - - - - - - -x

        DEPOSITION OF SCOTT A. JONES, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Susan
E. DiFraia, Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Curley & Curley, P.C., 27 School
Street, Boston, Massachusetts, on Tuesday, October
10, 2006, commencing at 10:00 a.m.

PRESENT:

      Falk Metz LLC
            (by Paul T. Falk, Esq.)
            Two First National Plaza,
            20 South Clark Street,
            Suite 1900, Chicago, IL 60603,
            for the Plaintiff.

      Curley & Curley, P.C.
            (by Robert A. Curley, Jr., Esq.)
            27 School Street,
            Boston, MA 02108, for the Defendant.

                  *  *  *  *  *

3

PROCEEDINGS

MR. CURLEY:  We can waive the sealing, the filing and the notarization of the deposition.  The witness can read and sign under the pains and penalties of perjury.  We can reserve all objections, except as to form, and motions to strike until the time of trial.

MR. FALK:  That's fine.

SCOTT A. JONES

a witness called for examination by counsel for the Defendant, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CURLEY:

Q.   Could you state your name for the record, please.

A.   Scott A. Jones.

Q.   Mr. Jones, as you know, my name is Bob Curley.  I represent the General Electric Company in this case.  I'm going to ask you quite a few questions.  If there's anything that I ask you at any time that you don't understand, just let me

65

1    looks like I did not charge them for the travel.

2        Q.    Now, do you have notes of this inspection?

3        A.    Yes.    They should be part of that --

4        Q.    In the file that's being copied?

5        A.    Those are the -- yes.    Yes.

6        Q.    And you indicate that you performed a

7    compressor winding resistance measurement?

8        A.    Yes.

9        Q.    And how did you do that?

10       A.    I went between -- I used a volumeter, and I

11   went between the common and the start terminal and

12   the common and the run terminal.

13       Q.    And did you do the same thing with the

14   winding installation resistance?

15       A.    I used -- yes, the volumeter, and I went to

16   ground, between the windings and ground.

17       Q.    Now, you have never seen any grommets that

18   actually were used in Unit 3A; is that correct?

19       A.    That is correct.

20       Q.    And you have never seen the actual grille

21   that was used in Unit 3A?

22       A.    That is correct.

23       Q.    And is it your understanding -- strike

24   that.    Do you have any information as to what was

67

1    not been provided to me.  So I cannot answer your

2    question with any certainty outside of a photograph

3    which I do not have before the fire.

4        Q.    Do you know who installed the unit?

5        A.    I have no idea who installed the unit.

6        Q.    Did you try to identify any installer?

7        A.    No.

8        Q.    Did you try to determine what, in fact, the

9    installer used for hardware?

10       A.    That's kind of tough when I don't even have

11   the GE print which you have not provided or the

12   parts list.  And you're asking me questions about a

13   hypothetical situation where I've been clear on the

14   record I don't have the parts list.  Now you're

15   asking me assembly questions.

16       Q.    Do you understand that GE doesn't keep

17   records forever?

18       A.    No.  No.  No.  That's not true.  Their

19   products -- I mean, they sell parts for monitor top

20   refrigerators.

21       Q.    So you think somewhere there exists --

22       A.    No question.

23       Q.    Please let me finish.

24            MR. FALK:  So you get to interrupt him, but

86

1        Q.    Do you have any information as to who the

2    installer of Mr. Waite's air conditioner was?

3        A.    No.  I specifically asked, and the reply

4    was that the unit was in place by the time he

5    purchased it.

6        Q.    So it's your understanding that the unit in

7    issue had already been installed by the time Mr.

8    Waite purchased the unit?

9        A.    That is my understanding.

10       Q.    Okay.  And who had the air-conditioning

11   unit in issue installed, you simply don't know?

12       A.    I'm sorry.  Say that again.

13       Q.    Whoever it was who had the air conditioning

14   unit in issue installed, you don't know who that

15   person was?

16       A.    That is correct.

17       Q.    You don't know who the installer was or

18   what happened in the installation?

19       A.    That is correct.

20       Q.    Do you have any information as to whether

21   the rear grille was removed at any time before Kathy

22   Hull's ownership?

23       A.    I have no information that says it was or

24   was not.

73

1    was in discussion, and it was in a booklet, and it

2    had useful life pieces.  And I know I've seen

3    another one years back, but I don't remember which

4    insurance company it was from.

5        Q.    Okay.  And are you familiar with any

6    information specifically related to the air

7    conditioner model at issue in terms of its expected

8    useful life?

9        A.    I don't have any data for that.

10        Q.    Are you familiar with any standards that

11    relate to the expected useful life for an air

12    conditioner?

13        A.    No.

14        Q.    Okay.  Other than these insurance

15    brochures, are you familiar with any data from any

16    air conditioner manufacturer about expected useful

17    life?

18        A.    No.

19        Q.    These brochures, do you know when they were

20    formulated?

21        A.    No.

22        Q.    Do you know whether they related to a time

23    frame in the mid-1980s or not?

24        A.    This has been within the past two to three

76

1      A.    No.  Again, it's an economic end of life

2   condition where it's better to buy a new one than

3   replace the old one, and that's basically how you

4   establish an end of life condition and the expected

5   useful life.

6      Q.    Have you ever been involved in establishing

7   the expected useful life for any products?

8      A.    No.

9      Q.    All right.  Now, are you familiar with any

10  published data concerning the expected useful life

11  for wall enclosures for through the wall air

12  conditioners?

13     A.    No, not published.

14     Q.    Are you aware of any unpublished data

15  concerning the expected useful life for wall

16  enclosures for through the wall air conditioners?

17     A.    A wall enclosure as used in this particular

18  instance would be the life of the building.

19     Q.    So are you saying that there is some

20  unpublished data that states that?

21     A.    Typically when GE makes a sale or anybody

22  makes a sale on a packaged terminal air conditioner,

23  they attempt to make the sale on the condition that

24  they can reuse the wall sleeve.  So GE's practice

80

1    on what they call pedestals. You can buy -- the

2    major manufacturers all make a pedestal.

3        Q.    So there was no wall sleeve?

4        A.    There was, but the wall sleeve sits on top

5    of that, and I didn't go outside to look at the

6    external grille.

7        Q.    Okay.

8        A.    On the GE unit that I mentioned that I'm

9    currently investigating in Sycamore Township, it

10   had, I believe, what they call the aluminum

11   architectural grille on it that did not use

12   grommets. It did the same things as this standard

13   aluminum grille but without grommets.

14       Q.    Now, apart from the literature that you

15   referred to about how to convert a Frederick wall

16   sleeve for use with a GE air conditioner, have you

17   seen anything else in writing that you believe

18   relates to the expected useful life of a wall sleeve

19   such as the one in issue that was installed in 1971?

20       A.    No.

21       Q.    Have you received any oral information from

22   anybody concerning the expected useful life of a

23   wall sleeve such as the one in issue that was

24   installed in 1971?

81

1    A.    No.

2    Q.    Now, is it possible to missinstall a screw

3    grommet?

4    A.    In what fashion, when you say

5    "missinstall"?

6    Q.    Can you improperly install a screw grommet?

7    A.    Well, they come already mounted to the

8    grille, so no.

9    Q.    Okay.  Do you think you can overtorque the

10    screws?

11    A.    In this particular case?  The GE grommet?

12    Is that what we're speaking specifically?

13    Q.    All right.  Is there a difference between

14    the screw grommet that was used or you understand

15    was used in 1971 from the one that was used in 1985?

16    A.    I know the exemplar units 1J and 2M had a

17    grommet that was similar, and Evan Haynes took

18    dimensional measurements.  So we have matched

19    markings that do match the case of 3A, so I can

20    speak to them.  Okay.  What was the question with

21    that reference?

22    Q.    Actually, the question was:  Was there a

23    difference between the screw grommet that was used

24    in 1985 on GE wall cases and the screw grommet that

107

1     Q.   Have you read Mr. Moore's deposition?

2     A.   Yes, I have.

3     Q.   Have you ever had any contact with Mr.

4 Moore?

5     A.   I do not believe so.

6     Q.   Now, apart from the Ocean Terrace

7 Condominium Trust building, do you have any other

8 information about any failed screw grommets from the

9 1971 vintage anywhere?

10    A.   No.

11    Q.   And have you read the testimony of the GE

12 employees that were responsible for handling any

13 service calls in that regard?

14    A.   You would have to mention by specific name

15 and go against my list.

16    Q.   Okay.  You don't recall in general reading

17 the depositions of people with that function?

18    A.   I gave you an answer.  I simply asked that

19 you give me a name, and we'll compare it to the

20 list.  There's a lot of people and a lot of

21 depositions.  I think that's fair.

22    Q.   You reviewed some information about screw

23 grommets from ITW Fastex?

24    A.   Yes, I did.

110

Q.    The architectural units you're referring to
are GE units?

A.    There's been a mix of zone lines, and I
believe they give the model.  The large one is like
5,100, and there's a large number of Amana units,
too.  Goodman Manufacturing/Amana.

Q.    Did you try to identify when any of these
units or associated wall sleeves was made?

A.    I've done a large number of Goodman unit
failures.  They have a pretty disastrous fire
failure mode, and they tend to fall into the 1997 to
2002 range.

Q.    Have you identified any of these units that
you've looked at that were manufactured before 1971?

A.    Well, we talked about the 1J unit was 1995
that I looked at, the Sycamore Township.  I don't
recollect earlier ones, making specific mention of
that.

Q.    All right.  Can you tell me what any other
manufacturer of an air conditioner used before 1971
for rear grille fasteners?

A.    I don't know the specifics.

Q.    Other than yourself and your fellow experts
in this case, are you aware of anybody that has

112

1      Q.    Have you identified any such literature

2    that existed prior to 1971?

3      A.    No.   I have not looked, either.   I

4    attempted to understand, to your question, what GE

5    would know with regard to that.   GE typically

6    designs in the newest, most expensive materials and

7    tends to be at the forefront of it.   I wanted to see

8    by our request to GE what data, what studies they

9    had done to address that very question, but, again,

10   I was unable to get any data back from GE.

11           And the presumption was they did no studies

12   on nylon even though it would have been most

13   probably, to their appliance application, one of the

14   newer materials.   GE has a tendency to do a lot of

15   design studies on materials it doesn't understand.

16   I know that from being with GE for years and years.

17     Q.    Have you looked for literature in the

18   scientific community outside of GE that related to

19   the use of nylon in applications such as the screw

20   grommet that existed before 1971?

21     A.    Have I?

22     Q.    Yes.

23     A.    I have not done that.

24     Q.    I take it you have no criticisms of the

116

1    at, is this one that's been produced by your

2    counsel?

3         A.    Yes.

4         Q.    And this was produced by GE?

5         A.    No.

6         Q.    No?

7         A.    Oh, I'm sorry.  It's an Underwriters

8    Laboratory document.  But you mean produced in the

9    legal sense, yes.

10        Q.    Yes.  And is it your understanding that

11   this standard is the one that was published as of

12   March -- I'm sorry -- April 11, 1986?

13        A.    Yes.  I saw that, yes.

14        Q.    Did you look at any earlier versions of

15   UL484?

16        A.    I specifically made the request, and we

17   made the request to GE for all pertinent versions

18   back to 1970.  But I did not review those.  I did --

19   I have not seen any prior versions.

20        Q.    Have you tried to locate any prior version

21   yourself?

22        A.    No.

23        Q.    And have you ever looked at any version of

24   UL484 that was in existence in the period before

117

1    1971?

2        A.    No.

3        Q.    Now, on Page 7 of your Rule 26 Disclosure,

4    in Paragraph A on "Material Selection," you make a

5    statement about, "It is common practice in

6    mechanical design to avoid the use of nylon."  Do

7    you see that?

8        A.    Okay.  Yes.  Go ahead.

9        Q.    All right.  Do you have any experience with

10   any design engineer who avoided the use of nylon?

11       A.    Myself.

12       Q.    Okay.  Other than yourself?

13       A.    No.

14       Q.    And when you avoided the use of nylon, was

15   that after your bad experience at SerVend?

16       A.    Yes.  With regard to ultraviolet exposure,

17   yes.

18       Q.    Have you ever done any testing on any nylon

19   grommet?

20       A.    No, not on a grommet.

21       Q.    Have you ever done any testing on nylon?

22       A.    As put into assemblies, yes.

23       Q.    Have you ever done any testing concerning

24   exposure of nylon to ultraviolet light?

122

1    standard that addresses animal infestation as a

2    design item for air-conditioning manufacturers

3    before 1971?

4         A.    No.

5         Q.    Do you think that air conditioning unit

6    owners that somehow have a rear grille go missing

7    should replace it?

8         A.    Yes.

9         Q.    And did Kathy Hull and Mark DeFelice over

10   the course of nine months or so have the opportunity

11   to do that?

12        A.    And they did.

13        Q.    You say that Kathy Hull and Mark DeFelice

14   got a replacement grille for --

15        A.    No.   No.   You said, "Should they repair

16   it?"   Yes.   They attempted repairs multiple times.

17        Q.    I think I actually said "replace."   But at

18   some point after their initial repairs, is it your

19   understanding that the grille became totally

20   missing?

21        A.    That is correct.

22        Q.    And for how long did you understand that it

23   became missing?

24        A.    Approximately nine months.

130

1      Q.    You haven't expressed any opinions on the

2   timing sequence of arcs in your Rule 26 Disclosure?

3      A.    That is correct.

4      Q.    Now, you have expressed the view that GE

5   should have utilized double pole contactors in the

6   refrigeration compressor power circuit to provide a

7   double line break, correct?

8      A.    That is reasonable, yes.

9      Q.    Do you know of any manufacturer of an air

10  conditioner that has ever done that?

11     A.    I don't know of any.

12     Q.    In the refrigeration units that you're

13  familiar with, has that been done?

14     A.    No.   No.   We did not have the same exposure

15  as this unit has to the outdoors on the condenser

16  side.

17     Q.    Is there any industry standard that

18  requires the use of double pole contactors to

19  provide a double line break?

20     A.    No.   That's not what they would typically

21  specify anyway.   It's a design practice and a

22  decision that people would make as an OEM designer.

23     Q.    Is it a design practice that any air

24  conditioning manufacturer has ever followed?

133

Q.    So you determined that the electrical design of the air-conditioning unit in issue actually met NFPA70?

A.    You cannot say that.  NFPA70 provides no guidance on how to design an air conditioning unit. It's how do you connect the unit to a premises distribution system.

Q.    Okay.  Other than yourself or any fellow expert in this case, are you aware of any other person that has offered the opinion that double pole contactors to provide a double line break should be used for an air-conditioning units?

A.    Not to my knowledge.

Q.    Are you aware of any scientific literature that's expressed that view?

A.    If you deenergize the unit that is subject to rodent infestation, you can prevent fire.  That's common sense.

Q.    Are you aware of any scientific literature that indicates that double pole contactors to provide a double line break should be used for an air-conditioning unit?

A.    No.

Q.    You've indicated that there are any number

135

1    properties capable of withstanding the environmental

2    conditions for the subject grille retention

3    application were available to product designers at

4    the time of the design and manufacture of the

5    subject GE RAC."  Did I read that correctly?

6        A.   That is correct.

7        Q.   Okay.  Now, can you tell me what polymeric

8    materials you're referring to?

9            MR. FALK:  Now we have the question.

10       A.   Well, I don't have firsthand knowledge nor

11   am I a plastics expert, but in these cases where GE

12   would attempt to use a plastic especially with

13   unknown properties, they would set up a full test

14   program to evaluate the properties.

15       Q.   Just sticking with "a wide selection of

16   polymeric materials," what polymeric materials apart

17   from nylon are you referring to?

18       A.   There's a wide variety.

19       Q.   Tell me what you can think of.

20       A.   Once again, I don't know the specific

21   materials, but by 1970 there was a wide selection of

22   materials out there.  They had lamellate that you

23   could put in nylon to improve the ultraviolet

24   properties.  How's that?

136

1    Q.    That's one.  Anything else?

2    A.    That's the one I know of.

3    Q.    All right.  Did you try to identify any

4    failure modes that any of these other polymeric

5    materials were subject to?

6    A.    No.  Neither did GE.

7    Q.    You actually don't know what GE did in the

8    materials selection process, do you?

9    A.    GE did not present any data that it did

10   anything in the material selection process.

11   Q.    You understand the material selection

12   process occurred more than 35 years ago?

13   A.    My presumption is design record books are

14   kept forever, so --

15   Q.    But you do understand that the material

16   selection process occurred more than 35 years ago?

17   A.    I understand that.

18   Q.    Now, in the next paragraph one of the

19   things you propose would be to rotate the screw

20   attachment points?

21   A.    Yes.  Use some thoughtful design to

22   eliminate this concern altogether.

23   Q.    Is there an actual design you've come up

24   with?

140

1    architectural.  I don't know how they form their

2    threads.

3        Q.    For what unit did you say GE does it?

4        A.    The one I just installed had Tinnerman

5    clips on the front of the enclosure.

6        Q.    On the inside?

7        A.    Yes, for the attachment of the actual front

8    unit.  You slide the unit in and you --

9        Q.    The plastic piece that's on the front of

10   the air conditioner --

11       A.    Well, I think it had metal flanges and you

12   screwed it in and put in the clip.

13       Q.    But that wasn't for the rear enclosure?

14       A.    No.  That is correct.  I think for the rear

15   enclosure the architectural may use the clips.  I'm

16   not quite sure.

17       Q.    So other than thinking that maybe the

18   architectural uses the Tinnerman clips to hold the

19   rear enclosure, are you aware of any other

20   manufacturer that uses the Tinnerman clips?

21       A.    No.

22       Q.    Have you ever tested the Tinnerman clips on

23   a rear enclosure for an air conditioner?

24       A.    No.

143

1  through them.

2      Q.    And how does that produce a failure mode?

3      A.    Nonretention.  The screw will fall out.

4      Q.    And how did you become familiar with that

5  failure mode?

6      A.    Doing it myself on other products.  Life

7  experience.

8      Q.    Do you know of any Tinnerman clip

9  application that has been successfully used for a

10  period in excess of 30 years without repair or

11  replacement of the clip?

12      A.    No, I do not have that data.

13      Q.    Now, moving on to the plastic injection

14  molded grills.  Are you aware of any such grills

15  other than the ones from GE that you've mentioned?

16      A.    I know Amana and competitors have

17  architectural grills.

18      Q.    Have you tried to identify any failure

19  modes with the mounting system of those plastic

20  molded grills?

21      A.    Me personally, no.  Once again, I'm given

22  to OME designers doing a good job of understanding

23  what attachment means; longevity of putting inserts

24  into the mold; you can put threaded inserts into the

144

1    mold; different things of a thoughtful design to

2    produce a design that will last.

3        Q.    Are you aware of any data on failure modes

4    for any plastic injected molded grills that have

5    been in the field for more than 30 years?

6        A.    No.

7        Q.    Have you tried to identify in any way

8    failure modes for screw bosses in plastic injection

9    molded grills?

10        A.    I've done tests on screw bosses in plastic

11    injection molds.   I've done pullout tests; I've done

12    endurance tests.   I've done a lot with that, but not

13    in grills.

14        Q.    And in the course of that testing, did you

15    identify any failure modes?

16        A.    None in the use that we were using them.

17        Q.    And what was the use you were using them

18    for?

19        A.    In Flomatic injection molded beverage

20    mixing valves.

21        Q.    So those would be used inside?

22        A.    Yes.   That's where you get your pop out of

23    in a convenience store.

24        Q.    Not exposed to wind or environmental

145

1    conditions on the outside?

2        A.    They have horrible environmental

3    conditions.  They're exposed to carbonated water and

4    raw syrup, which is tremendously acidic.

5        Q.    When did plastic injection molded grills

6    first become made available by GE?

7        A.    I have the data point from the one fellow

8    that we discussed very early on, and he was there

9    back in the '70s, '80s.

10       Q.    Is that Mr. Moore?

11       A.    No.  Hold on.  I think I've got it.

12       Q.    Mr. Thaler or --

13       A.    Daugherty.

14            MR. FALK:  It's Exhibit 301, I think.

15       Q.    Daugherty.  Okay.

16       A.    Yes.  Mid-'70s to '87, had the standard

17   grille, aluminum architectural and Lexan

18   architectural.

19       Q.    He told you in the mid-'70s?

20       A.    Well, his time at the helm was mid-'70s to

21   '87.

22       Q.    Are you aware of the availability of any

23   plastic injection molded grills before 1971?

24       A.    No.

148

1     Q.   With respect to Unit 2M, did you try to

2  determine the history of the grommets for that unit?

3     A.   No.

4     Q.   Did you have any information from any

5  owners of that particular unit concerning the

6  air-conditioning unit at any time?

7     A.   No.

8     Q.   Did you try to determine whether the

9  grommet in Apartment 2M had been subject to any

10  mishandling, misuse, or any form of improper

11  treatment at any time?

12     A.   No.

13     Q.   It was not your role to make a

14  determination as to the cause of any breakage of the

15  grommets in Apartment 2M or 1J?

16     A.   That is correct.

17     Q.   And you did not do that?

18     A.   I did not do that.

19     Q.   Did you understand that the fire in issue

20  generated a lot of heat?

21     A.   Most of them do.

22     Q.   Have you quantified in any way the heat

23  that would have been experienced by the grommets in

24  the air-conditioning unit at 2M or 1J?

155

1      Q.    You haven't done such a design review with

2    any type of alternative fastening system for the

3    rear grille?

4      A.    No, I have not, but it's easily done.  That

5    is the process of design.  If I was at GE I would do

6    that very test as I'm sure they would do in

7    thoughtful testing.

8      Q.    You have some materials that bear the title

9    "Table 3 Chemical Resistant Temperature 70 degrees"?

10     A.    Yes.  These were 70 degree tests.  I just

11   wanted to see the effect of chlorine, probably, on

12   nylon, on Nylon 6.  And both in wet and dry it's not

13   recommended to use that.

14     Q.    And why did you want to see the effect of

15   chlorine?

16     A.    This was a seaside environment.  Chlorine

17   is very prevalent in all places.  It's just

18   especially prevalent in this particular location.

19     Q.    You have a chart that falls down on "Life

20   Jacket Fabrics"?

21     A.    Yes.

22     Q.    And where did you obtain that?

23     A.    The Web site is down at the bottom.

24     Q.    Okay.  And you got this in April of 2003?

156

1    A.    Yes, I did.

2    Q.    The exposure parameter that is called out

3    at the bottom, "MJ/M squared." What does that stand

4    for?

5    A.    Megajoules per meter squared.

6    Q.    Do you have any personal familiarity with

7    any such testing?

8    A.    No.

9    Q.    You have an exemplar room air conditioner

10   as well?

11   A.    No, I do not.

12   Q.    There's a set of notes that starts with

13   3/19/03.

14   A.    Yes. I was using the Unit 2M as an

15   exemplar at that point.

16   Q.    Okay. At the time you formulated your Rule

17   26 Disclosure, did you believe that the wall sleeve

18   was the same age as the air conditioner?

19   A.    I really hadn't thought about it when I

20   made that disclosure.

21   Q.    So at the time you expressed your opinions

22   you hadn't thought about the age of the wall sleeve?

23   A.    Correct. I didn't see it as a very

24   relevant quantity.