## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NUMBER: 05 10075 PBS

| | |
|---|---|
| OCEAN TERRACE CONDOMINIUM TRUST, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | ) <br> ) |
| GENERAL ELECTRIC COMPANY | ) <br> ) |
| Defendant. | ) <br> ) |

### BRIEF OF PLAINTIFF OCEAN TERRACE CONDOMINIUM TRUST
### IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### <u>INTRODUCTION</u>

This case arises from a fire caused by a defective General Electric through-the-wall air conditioner. The fire spread from the air conditioner to the Ocean Terrace Condominium build, resulting in the destruction of 42 homes. The plaintiff has alleged, and the evidence demonstrates, that the fire occurred because the plastic fasteners used by General Electric to attach the exterior grille to the sleeve failed, resulting in the grille falling off. A squirrel subsequently entered the air conditioner and chewed through a wire that was energized even though the air conditioner was turned off. Electricity arced from the wire through the squirrel's nesting material, igniting the material.

The plaintiff has alleged that General Electric breached its implied warranty of merchantability by designing, manufacturing and selling an air conditioner that was defective and unreasonably dangerous. The plaintiff further alleges that General Electric was negligent in

failing to evaluate the performance characteristics of the material it used for the fasteners, in failing to perform a risk analysis, in failing to monitor the field performance of its products and in failing to warn its customers of the risk of fire created when the plastic fasteners fail.

The plaintiff's motion for summary judgment should be denied. These are genuine issues of material fact regarding all of the issues raised that need to be resolved by a jury.


## I.    FACTS

### The Ocean Terrace Condominium Building

The Ocean Terrace Condominium building ("the building") was a three story, 42 unit building located in the Magnolia section of Gloucester, Massachusetts. A photograph of the building is attached as Exhibit 1. The parties agree that the building was constructed around 1971. Exhibit 2, Kotar deposition, page 16; Defendant's Brief in Support of its Motion for Summary Judgment, p. 4 ("Defendant's Brief").

All 42 homes had through-the-wall air conditioners. The air conditioners were installed as follows: a metal sleeve was installed in the wall of the unit, the air conditioner chassis was placed in the sleeve and an exterior grille and interior grille were attached to the ends of the sleeve. The air conditioner was plugged into a socket in the wall below the sleeve. For reference purposes, photos of an exemplar sleeve and air conditioner chassis are attached as Exhibit 3. The electrical wires in the air conditioner chassis were energized even when the air conditioner was turned off. Exhibit 4, Jones Rule 26 Report, pages 12-14.

### The Fire and Its Origin

A fire destroyed the building on June 1, 2002. Fire investigator Gordon Duquenoy investigated the fire's origin and cause. Investigator Duquenoy concluded that the fire started inside Unit 3A's air conditioner. Exhibit 5, Duquenoy Rule 26 report, page 7.

The parties agree that the unit 3A air conditioner wall sleeve was manufactured before 1974, and that it is reasonable to conclude that it was installed at the time of the building's construction. (Defendant's brief, page 4.)

### How the Air Conditioner Caused the Fire

Further investigation revealed that approximately eight months before the fire, the exterior grille fell off the unit 3A air conditioner. Exhibit 6, Hull deposition, page 45. Thereafter, the owner of unit 3A, Cathy Hull, and her roommate, Mark DeFelice, noticed a squirrel inside the air conditioner sleeve. Exhibit 6, Hull deposition, page 58. They attempted to replace the grille, but had limited success. Exhibit 6, Hull deposition, pages 52-53.

Once Fire Investigator Duquenoy identified the fire's origin, Electrical Engineer Evan Haynes inspected the air conditioner. Engineer Haynes' inspection revealed the following:

1. A wire inside the air conditioner showed signs of being chewed through;

2. Once the wire was chewed through, it would drop down and be able to come into contact with the bottom pan of the air conditioner;

3. There was a large burn mark on the bottom pan of the air conditioner precisely at the point where the chewed wire could come into contact with the pan. This burn mark was consistent with electrical arcing from the wire to the pan;

4. The chewed wire was energized even if the air conditioner was turned off;

5.    Charred remains of the squirrel's nesting material were found in the bottom of the

air conditioner.  The nesting material consisted of easily ignitable dried leaves,

twigs, grass, etc.

Exhibit 7, Haynes Rule 26 report, pages 5-6.

### The Failure of the Air Conditioner's Grille

The fire investigation revealed additional facts.  Fire Investigator Duquenoy and Engineer Haynes inspected air conditioning assemblies from other units and preserved as evidence the air conditioners from condominium units 1J and 2M. Exhibit 7, Haynes Rule 26 report, page 2. Squirrel nesting material was found in the 2M air conditioner. Exhibit 7, Haynes Rule 26 report, pages 7 and 39.  A close examination of the 1J and 2M air conditioners revealed how the exterior grilles were connected to the chassis.  Screws were inserted from the inside of the sleeve, and screwed through bosses on the sleeve, into nylon grommets and finally through the grille.  As the screw passed through the grommet, it caused "fingers" on the grommet to expand and lock into place, thus preventing the grille from falling off.  For reference purposes, photos of this attachment method are attached as Exhibit 7, Haynes Rule 26 report, page 38.  Once locked into place, the screw/grommet fastener could not be removed from the outside.

The examination of the 1J and 2M air conditioners revealed something else.  The grommets were made from nylon, and showed severe signs of weathering, including crazing, cracking, discoloration and brittleness.  Exhibit 8, Fallows Rule 26 report, photos on pages 2-3. As explained in detail below, the plaintiff's experts concluded that the exterior grille for the 3A air conditioner fell off because its nylon grommets failed.

### The Nortu Jappah Fire

The investigation of this fire led the plaintiff's experts to Vernon, Connecticut, and the location of a second fire. This fire, known as the "Nortu Jappah fire", occurred on July 3, 2002, at the apartment of Nortu Jappah. Plaintiff's experts concluded that the Nortu Jappah fire also occurred inside a General Electric through-the-wall air conditioner after the grille fell off and a squirrel built a nest inside. Exhibit 7, Haynes Rule 26 report, page 8. Just as in the Ocean Terrace fire, in the Nortu Jappah fire, the fire spread from inside the air conditioner, through the sleeve and to the building. *Id.*

### The Product Defect Investigation

The multiple failures of the grille fasteners, and resulting fires, led the plaintiff to question whether the use of nylon grommets was appropriate for this application. The plaintiff consulted with two former General Electric employees on this issue. These consultants have since been identified as testifying experts. The first is Joe Fallows, who is a polymer engineer who worked for G.E. Plastics. The second is Scott Jones, who is an engineer who worked for General Electric in its appliance division as a product manager. As discussed below, Engineer Fallows concluded that the use of nylon in this application was not appropriate. The performance characteristics of nylon made it susceptible to failure over time, resulting in the exterior grilles falling off. This made the product defective and unreasonably dangerous. Engineer Jones concluded that the risk in question was foreseeable and that design alternatives existed. The opinions of the plaintiff's experts are discussed in more detail below.

Based on the opinions of its experts, the plaintiff filed a complaint against General Electric in which it alleged breach of warranty (i.e., strict product liability) and negligence in the design, testing and monitoring of the air conditioner. The complaint also alleges that General

Electric should have warned the plaintiff, both at the time of the sale and after the sale, that the nylon grommets were susceptible to failure and that if the grille fell off, it presented a fire hazard.

## II.    OPINIONS HELD BY PLAINTIFF'S EXPERTS

Pursuant to Trial Rule 26, the plaintiff produced four reports relating to liability. The conclusions and opinions held by these experts are discussed below.

### A.    FIRE INVESTIGATOR GORDON DUQUENOY

Gordon Duquenoy has an associate's degree in fire science. He is certified by the National Association of Fire Investigators as a Certified Fire and Explosion Expert. He is a graduate of the Rhode Island's State Fire Marshal Course, and was assigned as a Deputy State Fire Marshal. In 1996, he was awarded the Pawtucket Fire Chief's Award for Arson Investigation. He has testified in court as a fire investigation expert. Mr. Duquenoy's resume is at the end of his Rule 26 report, which is attached to this brief as Exhibit 5.

Mr. Duquenoy's report explains in detail the entire factual investigation that he conducted, so it will not be repeated here. His conclusions, however, are noted:

- "My investigation has determined that all physical marks/fire patterns are consistent with the fire originating within the subject air conditioner...." (Page 7.)

- "The fire's ignition has been determined to be within the subject air conditioner unit.... This area of ignition would be consistent with witness statements, fire patterns and analysis of arc evidence...." (Page 7.)

- "The fire growth is consistent with the fire originating within the subject air conditioner unit.... Fire department personnel and witness[es] observed the fire

originating in the subject air conditioner. The fire then extended to the wooden structural members around the air conditioner and then extended above into the ceiling directly above the subject air conditioner." (Page 8.)

### B.     ENGINEER EVAN HAYNES

Evan Haynes is a professional engineer who investigated the air conditioner and its potential role in the cause of the fire. Engineer Haynes received a bachelor of science degree in mechanical engineering in 1993, and a master of science degree in fire protection engineering in 1994. He has taken many continuing education classes. He not only is a registered professional engineer, he also is a certified fire and explosion investigator, and a certified fire investigation instructor. He has testified as an expert witness in court on numerous occasions. Since receiving his degrees, he has over a decade of experience as a fire protection engineer. Engineer Haynes' curriculum vitae is at the end of his report, which is attached to this brief as Exhibit 7.

Engineer Haynes stated in his report the following opinions relevant to General Electric's motion:

- "The only failure and competent ignition source in [the] area of origin was the electrical activity that occurred at the base of the air conditioner." (Page 8.)

- The electrical activity was due to a ground fault resulting from the damage to the tan wire… and its insulation by rodents prior to the fire  based on the wire having to be severed in order to come into contact with the base of the unit." (Page 8.)

- "[The Nortu Jappah fire] demonstrates that a fire in a General Electric A/C unit can transfer enough heat through the metal sleeve to the building structure surrounding the A/C unit to spread the fire." (Page 8.)

## C.    ENGINEER JOE FALLOWS

Joe Fallows is a mechanical engineer retained by the plaintiff's insurer. Mr. Fallows has very unique experience directly applicable to this case. He received his bachelor of science degree in mechanical engineering in 1976. In 1980, he was hired by General Electric in its Plastics Division. His responsibilities included Technical Marketing Design Manager, Design Services Manager and Application Development Manager. See Fallows' curriculum vitae at the end of his Rule 26 report, attached to this brief as Exhibit 8.

While at General Electric, he received training, education and experience relating to the use of plastics in appliances. Exhibit 9, Fallows deposition, page 17. He describes his job responsibilities while at GE Plastics as follows:

> As an individual contributor, I was charged with working with prospective clients who would submit drawings or blueprints of their to-be-developed products, and I would work with them to refine the design, select the most appropriate material and select the most appropriate processes from which to fabricate or produce that product. I became a supervisor of the group, and my responsibilities grew to include interviewing and finding new engineers and training those engineers.

During the last 17 years, most of his time has been spent on product design and development. Exhibit 9, Fallows deposition, page 17.

Mr. Fallows was given the assignment by one of General Electric's competitors (Carrier Corporation) of designing an exterior grille on a through-the-wall air conditioner. Carrier wanted to convert the grille from metal to polymer. Exhibit 9, Fallows deposition, page 17. As a result of his work on the design of this exterior grille, Mr. Fallows received two patents. See Fallows curriculum vitae at the end of his Rule 26 report, attached to this brief as Exhibit 8.

Given his education, training and experience, Mr. Fallows was retained to evaluate General Electric's use of nylon to secure the exterior grille to the sleeve of the subject air

conditioner in this case.  In his Rule 26 report, Mr. Fallows itemizes the factual investigation that
he conducted.  He then makes the following observations and conclusions:

- "The grille had fallen off because the plastic retaining clips (i.e., the grommets)
  had deteriorated and failed to engage the stamped metal grille." (Page 1.)

- The grommets from an exemplar unit were tested, and confirmed to be non-
  reinforced, non-pigmented Nylon 6.  "As a class of materials, Nylon 6 is arguably
  one of the most sensitive polymers to moisture.  This polymer absorbs moisture in
  humid environments and swells.  Dimensions change, and most structural
  properties deteriorate." (Page 2.)

- "When Nylon 6… is exposed to moisture, heat or ultraviolet radiation,
  degradation of the polymer takes place." (Page 2.)

- The unit 3A air conditioner was not the only one that experienced failed nylon
  grommets.  Mr. Fallows shows photos of failed grommets from unit 2M.  He
  notes that Exhibit 3 to the Hull deposition shows failed grommets in unit 1J.
  "One missing clip and one failed clip can be seen on unit 3H, and the same can be
  seen on unit 1D as shown above." (Page 3.)  Mr. Fallows also shows photos of
  the air conditioners form units 3H and 1D.  Both of them also show failed
  grommets. (Page 4.)

- "It is my conclusion that Polyamide, or 'Nylon', is a poor choice from which to
  manufacture the grille retaining clip and that there were other choices available to
  the Appliance Park engineers." (Page 5.)

- Citing the deposition of General Electric employee Harold Moore, Fallows
  concludes, "GE recognizes that the grille retaining clips need to withstand a

variety of weather conditions (Exhibit 11, Moore deposition, part 2, page 20) but GE clearly failed to specify appropriate materials from which to fabricate them." (Page 5.)

- Mr. Fallows identifies several possible alternatives to the use of nylon grommets. GE could have used polyester or polypropylene. GE could have used an alternative design, as is used by its competitors. Friedrich and Frigidaire use four metal screws directly to bosses on the sleeve. (Page 6.)

- Cathy Hull's observation regarding the grille "was consistent with the expected performance of a Nylon clip. The snap finger ends of the two grille retaining clips, being severely weathered and embrittled had broken off. The bottom of the grille then fell off the ends of the two retaining clips. (Page 6.)

- "I have designed and received a patent for an air conditioner grille. One of the functions of an exterior grille is to protect the interior wiring and components from damage caused by rodents. Any competent product designer must anticipate all potential situations that the product could experience…. Even if some level of risk assessment had been conducted [by General Electric on the subject grille's design], it was insufficient and failed to identify and provide for this foreseeable risk." (Page 6.)

- To this day, General Electric does not consider a squirrel inside one if its air conditioners a safety risk to the owner. Mr. Moore did not "ever recall that being something that was discussed as being a risk." Mr. Moore did not recall any warning ever being issued to consumers about the risks associated with a grille falling off. (Page 6.)

### D.    ENGINEER SCOTT JONES

Scott Jones, like Joe Fallows, is an engineer who formerly was employed by General Electric.  He worked for GE Aircraft Engines from 1987 to 1994, and at GE Appliances from 1994 to 1996.  Mr. Jones' curriculum vitae is at the end of his Rule 26 report, attached to this brief as Exhibit 10.  Mr. Jones is a registered professional engineer and a certified fire and explosion investigator.

Mr. Jones was retained to evaluate the design of the subject air conditioner.  His Rule 26 report details the work he performed.  He reaches the following conclusions and opinions:

- "[General Electric] created a defective design, which was unreasonably dangerous, for the exterior condenser structural grille retention means…. Early failure of the nylon grommets, which were to be exposed to sunlight and moisture conditions in the given exterior application, was a foreseeable risk not appreciated by the consumer."  (Page 3.)

- Quoting the testimony of General Electric's designated witness regarding the design of the air conditioner, Harold Moore, Mr. Jones concludes that "General Electric did not understand or acknowledge the foreseeable risk of animal invasion and electrical insulation gnawing activity in the machinery compartment."  (Page 4.)

- "General Electric failed to use reasonable care in the design of the [air conditioner]…. [T]he major appliance design process involves multiple steps to identify and abate risks."  (Page 6.)  Mr. Jones then identifies and discusses in detail the following five failures: materials selection, formal assessment of risks, short and long term development testing, third party testing, and monitoring the

11

use of spare parts to identify a defective design. General Electric failed to do any of these. Mr. Jones discusses how doing these would have identified and eliminated the risk.

- Mr. Jones also reaches the conclusion that General Electric could have prevented this fire by using an alternative wiring design in the air conditioner. "The alternative design presented no technological challenge, little to no increase in per unit cost, and no changes to the operation or aesthetics of the subject [air conditioner]… Had this design alternative been used, this fire would not have occurred." (Pages 12, 14.)

- Mr. Jones also identifies alternatives to the grommet design. "By rotating the screw attachment points between the aluminum grille and the steel enclosure, the need for polymer grommets would be obviated." (Page 15.)

### III.    GENERAL ELECTRIC IS LIABLE UNDER PLAINTIFF'S BREACH OF WARRANTY CLAIM

Pursuant to Massachusetts General Law c. 106 §2-314, the plaintiff has asserted a breach of implied warranty claim against General Electric. The Massachusetts Supreme Court has "recognized that in the Commonwealth the theory of implied warranty… is 'congruent in nearly all respects with the principles expressed in *Restatement (Second) of Torts* §402A (1965) which defines the strict liability of a seller for physical harm to a user of consumer of the seller's product." *Correia v. Firestone Tire & Rubber Co.,* 446 N.E.2d 1033, 1039, 388 Mass. 342, 353 (Mass. 1983). Section 402A states:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

    (2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The facts stated above, and the opinions held by plaintiff's experts, at a minimum, raise a genuine issue of material fact as to whether the air conditioner was in a "defective condition unreasonably dangerous to the user". The facts show that General Electric used nylon grommets to fasten the grille to the sleeve, the nylon degraded over time resulting in the grille falling off and the sleeve becoming infested with rodents. The rodent chewed on a wire which resulted in electricity igniting the rodent's nesting material. Electrical arcing ignited the nesting material even though the user had turned off the air conditioner. The use of the nylon grommets made the air conditioner defective and unreasonably dangerous to its user.

    Much of General Electric's brief is devoted to the argument that there was no reason for it to know any better in 1971. This argument is not relevant to a breach of warranty claim. In *Correia v. Firestone Tire & Rubber Co*, 446 N.E.2d 1033, 388 Mass. 342 (Mass. Sup. 1983), the court held that under a breach of warranty claim, "[t]he defendant may be liable 'even though he has exercised all possible care in the preparation and sale of the product.' *Restatement (Second) of Torts §402A*, comment a (1965)." *Id.* at 1039. The court explained:

        The liability issue focuses on whether the product was defective and unreasonably dangerous and <u>not on the conduct of the user or the seller</u>.

*Id.* at 1040 (emphasis added).   The facts show that the air conditioner was defective and unreasonably dangerous.

## IV.    GENERAL ELECTRIC IS LIABLE UNDER PLAINTIFF'S NEGLIGENCE CLAIM

In addition to asserting a breach of warranty claim against General Electric, the plaintiff has asserted a negligence claim.  Discussed below are the reasons why the negligence claim should survive General Electric's motion for summary judgment.

### A.    GENERAL ELECTRIC WAS NEGLIGENT IN FAILING TO ANALYZE THE EFFECT OF A GROMMET FAILURE

General Electric was asked, both in written discovery and during depositions, whether it ever considered what dangers would be presented if a grille fell off one of its air conditioner sleeves.  As it turns out, General Electric's design engineers never asked this question.  Exhibit 11,  Harold Moore deposition, part 1, pages 79-81.

During his deposition, Engineer Jones (who led appliance design teams for the defendant) testified that the federal government developed the "failure modes effect analysis" in the 1940s, and that air conditioner manufacturers were using this analysis when the subject air conditioner was manufactured in 1971 (although it was not called this at the time).  Exhibit 12, Jones deposition, page 48.

Engineer Fallows has stated that it was foreseeable that if the exterior grille were to fall off, the sleeve could become infested with rodents such as squirrels, and that if so infested, there was a foreseeable risk that the rodents would chew the wires in the air conditioner.  Exhibit 8, Fallows Rule 26 report, pages 6-7.  He lists seven different references to published material that discusses the fact that rodents like to chew on wires.  It was only because General Electric never did an analysis of what would happen if the grommets failed that it never considered what would

happen if a squirrel got inside the air conditioner. The consequences were foreseeable, and General Electric was negligent for failing to consider them.

B.     GENERAL ELECTRIC WAS NEGLIGENT IN FAILING TO UTILIZE DOUBLE POLE CONTACTORS IN THE DESIGN OF THE AIR CONDITIONER

The plaintiff's investigation revealed that the fire was caused when a squirrel chewed through a wire in the air conditioner, and the wire arced to the bottom of the air conditioner. The electrical arc ignited the squirrel's nesting material. Exhibit 7, Haynes' Rule 26 report, page 8, opinion 4).     After studying the design of the air conditioner, Engineer Jones concluded that this fire could have been prevented if the defendant had designed the air conditioner with "double pole contactors". In laymen's language, such a design would have resulted in no electricity being present in the chewed wire at the time it caused the fire. Without electricity, it could not have caused the fire. Engineer Jones states that such a design feature was technologically feasible in 1971 and was not cost prohibitive. Exhibit 10, Jones' Rule 26 report, pages 12-14.

Had the defendant considered the effect of the failure of the grommet, it would have foreseen the possibility of squirrel infestation and the risk that a squirrel would have chewed through a wire. Such realization would have revealed the reasonableness of double pole contactors. But since the defendant never analyzed the risk of the grommets failing, it failed to see the safety benefit of double pole contactors. Nonetheless, the risk was foreseeable and the defendant was negligent in its failure to recognize it and protect against it.

C.     GENERAL ELECTRIC WAS NEGLIGENT IN FAILING TO WARN OF THE FIRE HAZARD CREATED BY ITS PRODUCT.

In the case of *Vassallo v. Baxter Healthcare Corp.*, 428Mass. 1, 696 N.E.2d 909 (Mass. 1998), the court held that:

> ...[A] defendant will not be held liable under an implied warranty of merchantability for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product. A manufacturer will be held to the standard of knowledge of an expert in the appropriate field, and will remain subject to a continuing duty to warn (at least purchasers) of risks discovered following the sale of the product at issue.

*Id.* at 23, 696 N.E.2d 923-24. While General Electric argues that it did not know of nylon's performance characteristics in 1971, it does not – and cannot – argue that it could not have "discovered by way of reasonable testing prior to marketing the product" the performance characteristics of nylon. Nor does it – nor can it – argue that after the sale it was unable to discover them by way of reasonable testing.

Engineer Falllows explains in detail in his Rule 26 report the test data on nylon that existed prior to this loss:

> DuPont data for their un-reinforce, non UV stabilized, non-pigmented Nylon 66 (Zytel 101) shows after only 6 months of Florida exposure that the % elongation (ductility) drops from 300% to 10%.... Nylon 66 after only 600 hours of weatherometer testing shows a drop in tensile strength form 10,100 psi to 7,650 psi and continues to fall to 4,740 psi at 2,000 hours.

*Id.* at pp. 3, 9. Fallows concludes that nylon "performance characteristics have been known as well documented in resin supplier guides at least as far back as the 70's. It would be reasonably foreseeable in the late 1970's that nylon being used in this application would result in part failure and dislocation of the grille all within the useful life of the product." *Id.* at 3.

These facts establish a factual foundation for the jury to find that General Electric was negligent when it failed to warn, either at the time of sale or at any time prior to the fire, that the exterior grille may fall off, permitting rodents to enter the air conditioner and chew the wires.

## V.    RESPONSE TO GENERAL ELECTRIC'S SPECIFIC ARGUMENTS

In its brief in support of its motion, General Electric makes the following five arguments:

16

A.    The plaintiff cannot show that the exterior grille and fasteners were designed, manufactured or sold by General Electric;

B.    General Electric had no duty to design a sleeve that was squirrel-proof for 30 years;

C.    The plaintiff has no evidence of a technologically and commercially feasible alternative available before 1971;

D.    There is no evidence that the fasteners failed for any reason attributable to General Electric; and

E.    The plaintiff cannot sustain its burden of proving that General Electric was negligent in failing to warn that the grille could fall off.

Each of these arguments is addressed in succeeding sections below.

## A.    THE GRILL AND FASTENERS WERE MANUFACTURED BY GENERAL ELECTRIC.

In its brief in support of its motion for summary judgment, General Electric makes the argument that there is no evidence that the exterior grille/grommets on the unit 3A air conditioner that failed and fell off approximately eight months before the fire were, in fact, the original grille and grommets that came with the product. General Electric argues that if the grille and grommets had been replaced at some point in time, then their failure in October 2001 was not the result of a defective product manufactured by General Electric. Notwithstanding its argument, the factual record supports the plaintiff's contention that it was the original General Electric grille/grommets that failed in October 2001.

As mentioned above, after the fire, Engineer Evan Haynes removed three air conditioner sleeves from the remains of the condominium building. These sleeves came from units 1J, 2M and 3A. 3A is the unit where the fire began. Photos documenting the grommets on additional air

conditioners were taken.  An examination of these three sleeves and the photos revealed the
following:

1.  On all three sleeves, the exterior screen was connected to the sleeve with a metal
screw that was screwed into a nylon grommet.  As the screw was inserted, it
caused "fingers" on the grommet to expand and lock into place, thus preventing
the screen from falling off.  Engineer Fallows explains "I can conclude from the
circumstantial evidence that [the unit 3A grille] was assembled just like 2M and
1J."  Exhibit 9, Fallows deposition, page 284.

2.  The grommet was placed between the sleeve and the exterior grille.  On all three
sleeves, the grommets left "shadow marks" where the nylon had been pressed
against the sleeve.  These shadow marks are clear and distinctive in size and
shape.  Exhibit 9, Fallows deposition, pages 246-48, 275-89.  Engineer Fallows
explained "The grommet and screw combinations in 2M and 1J are extremely
deteriorating, extremely old, had the same Footprints or same dimensions as the
shadow mark on the sleeve of 3A.  Exhibit 9, Fallows deposition, pages 281-82.

3.  The size of the shadow is significant in that the evidence is undisputed that in
1975, General Electric switched to a different sized grommet.  Thus, if a post-
1975 grommet had been used on the unit 3A air conditioner, it would have left a
different sized shadow.  Exhibit 9, Fallows deposition, page 293.

4.  When the sleeves were removed from the building, the 1J and 2M sleeves were
still connected to their exterior grilles.  According to Cathy Hull (the owner of
unit 3A), the grille fell off her air conditioner sleeve about 8 months before the
fire.  Exhibit 6, Hull deposition, page 45.

5. The plaintiff's experts compared the size and shape of the grommet shadow marks from the 3A unit with those of the 1J and 2M units. They concluded that the grommets on all three sleeves were of identical shape and size. Exhibit 9, Fallows deposition, pages 246-48, 275-89.

6. The grommets on the 1J and 2M sleeves were recovered and visually inspected by Engineer Evan Haynes and Engineer Joe Fallows. Based upon their inspection of the grommets, as well as the age of the building and air conditioners, they both independently concluded that the grommets removed from the 1J and 2M sleeves were the original grommets installed in 1971. Exhibit 9, Fallows deposition, pages 246-48, 275-89.

7. Engineer Haynes and Engineer Fallows further concluded that, based on the size and shape of the 1J and 2M grommets, the shadow marks left on the 3A sleeve, and the history of the 3A sleeve as provided by Cathy Hull, the 3A exterior grille was connected to the 3A sleeve with grommets identical to those removed from 1J and 2M. They further concluded that from the time of installation until the time the grille fell off approximately 8 months before the fire, no alternative grommets were used. Exhibit 9, Fallows deposition, pages 246-48, 275-89.

8. During her deposition, Cathy Hull described her recollection of the exterior grille fastening mechanism. Exhibit 6, Hull deposition, pages 48-49. Her description, while vague, is consistent with the conclusions of Engineer Haynes and Engineer Fallows. Exhibit 12, Jones deposition, page 34.

9. Hull testified that her grille was not painted. Exhibit 6, Hull deposition, page 22. This is consistent with the defendant's original grille.

10.    Hull was shown a photograph of the exterior grille and fasteners to the air

conditioner in unit 1J. She confirmed, first, that the broken fasteners in the photo

were the same as the broken fasteners she observed in her own unit after her

exterior grille fell off, and, second, the grille in the photo was the same as the

grille on her own air conditioner until eight months before the fire. Exhibit 6,

Hull deposition, pages 110, 114. The fact that the photo shown to Ms. Hull is of

the exterior grille to unit 15 is established by Exhibit 13, the Affidavit of Evan

Haynes. Hull's testimony confirms that her own grille and fasteners were not

after-market products, but were the same as the other General Electric grilles and

fasteners installed throughout the building.

11.    There is no credible evidence consistent with the physical facts to support the

conclusion that, prior to the time the 3A exterior grille fell off eight months before

the fire, the grille was attached to the sleeve by any method other than with the

original manufacturer's grommets. Exhibit 12, Jones deposition, page 34.

12.    Engineer Jones interviewed the individual who owned condominium unit 3A prior

to Cathy Hull. That owner never removed the exterior grille:

> "Ms. Hull did not indicate any maintenance action or any action that
> would have required or, in fact, that it was replaced, and then with the
> information that I recently obtained from the prior owner over 14 years
> that he owned it, there was no indication that the unit was ever out or the
> grille was ever replaced, the actual air conditioning unit. So overall I had
> no indication whatsoever that the grille had been taken out or replaced."

Exhibit 12, Jones deposition, pages 157-58.

13.    General Electric has produced a parts drawing, number 864C709, which gives the

specifications for a grommet. Exhibit 12, Jones deposition, page 25. The

drawing was created June 24, 1960 – 11 years before General Electric

manufactured the air conditioner which caused the fire in question. Engineer Jones and Engineer Fallows both have reached the conclusion that the grommet specified in the drawing is consistent with the grommets removed from the 1J and 2M units and is consistent with the shadow marks on the 3A sleeve.

14.    The General Electric parts drawing specifies that the grommet in question be supplied by a company called ITW. Exhibit 12, Jones deposition, page 43. In fact, the drawing actually references ITW's own part number. Exhibit 14, Jones affidavit. ITW continues to sell that identical part number today. Exhibit 14, Jones affidavit. The size, shape and material of the grommet specified in GE's 1960 parts drawing is identical to what ITW sells today under the same part number. It also is consistent with the shadow marks left on the three air conditioner sleeves examined by the plaintiff's experts. Exhibit 14, Jones affidavit.

These facts and expert opinions provide the jury with a sufficient basis for them to conclude that the exterior grille fasteners that failed on the 3A unit eight months before the fire were the original grommets supplied by the defendant in 1971.

The defendant raises the fact that in 1999, the mansard roof on the building was re-shingled. It then suggests, without citing any evidence, that during this re-roofing, the 3A exterior grille may have been removed and reinstalled with different grommets. However, the following facts demonstrate that General Electric's argument is nothing more than hopeful speculation:

1.    There is no evidence that the 3A exterior sleeve was removed during the 1999 re-roofing. Not a single witness testified that the unit 3A grille was removed. In

fact, Cathy Hull (the owner of unit 3A at the time of the fire) was asked: "At any time while you owned Unit 3A before the time of the fire on June 1st, 2002, had the air conditioner been removed from the wall?" She answered "No." Exhibit 6, Hull deposition, page 15.

2.    During the re-roofing project, the contractor wanted to examine the air conditioner sleeves to make sure they were water-tight.

3.    While the contractor did request the opportunity to examine the sleeves, Cathy Hull denied that she ever removed her air conditioner from the sleeve. Exhibit 6, Hull deposition, page 13. In fact, Hull denied ever personally receiving any such request. Id at 104. This would explain why she did not remove her grille.

4.    As explained by Engineer Haynes, the exterior grilles could not have been removed from the outside. The only way to remove them would be to remove the interior grille and remove the air conditioner chassis. From inside the condominium, the unit owner then would have to reach inside the sleeve to unscrew the grommets. However, once the interior grille and air conditioner chassis are removed, the contractor would be able to inspect the sleeve without having to remove the exterior grille. Thus, there would be no reason to remove the exterior screen during the 1999 exterior re-roofing.

5.    Given the complete lack of evidence that the 3A grille was removed in 1999, and the lack of any logical reason for the grille to be removed, the fact that the mansard roof was re-shingled in 1999 provides no basis to conclude the fasteners that failed were not the original General Electric grommets.

Thus, it is undisputed that not one witness can testify that he or she removed or replaced the unit 3A exterior grille prior to it falling off in October 2001, that all known owners of unit 3A deny that it ever was removed or replaced, that all physical evidence (shadow marks, Hull's recollection of "white, plasticky" fasteners, grille material, louver patterns) is consistent with the exterior grille being the original grille, and there is no physical evidence that the grille had been replaced. Compare her description – "it appeared to be a plasticy, white plastic to me" (Exhibit 6, Hull deposition, page 49) – to the artifacts found at the scene (Exhibit 7, Haynes' Rule 26 report, page 47).

B.    GENERAL ELECTRIC HAD A DUTY TO DESIGN THE
AIR CONDITIONER SO THAT IT DID NOT CREATE
AN UNREASONABLE RISK OF FIRE.

In its brief in support of its motion for summary judgment, General Electric argues that it did not have a duty to design a sleeve that was "squirrel-proof for 30 years". It claims the facts of this case amount to a bizarre, unforeseeable accident. Two responses are in order. First, there is no statute of repose on products in Massachusetts. Second, the manufacturer of a product does have a duty to:

> …anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting.

*Back v. Wickes Corp.*, 375 Mass. 633, 640-41, 378 N.E.2d 964, 969 (Mass. 1978). The *Back* court held that "[t]he risk that a motor home may collide with a highway guardrail clearly is foreseeable." *Id.* Whether a product is fit for the ordinary purposes for which such goods are used is a question of fact for the jury. *Id.*

The following facts demonstrate that General Electric's through-the-wall air conditioner was not fit for the purpose for which air conditioners are used. Engineer Fallows explains that, as designed by General Electric, the exterior grille is dependent upon the nylon grommets: if the

grommets fail, the grille falls off. The sleeve could have been designed so that this was not the case. "By rotating the screw attachment points between the aluminum grille and the steel enclosure, the need for polymer grommets would be obviated." Exhibit 10, Jones Rule 26 Report, page 15. General Electric could have designed the product so that it did not need nylon grommets, thus eliminating the risk that they would fail. It chose not to do so.

Nylon is known to degrade when exposed to UV radiation. It will swell and shrink when exposed to water. Both of these performance characteristics lead to the degradation of the nylon's strength. It certainly was foreseeable that the exterior grille on the sleeve would be exposed to UV radiation (sunlight) and water (rain).

General Electric claims that it did not know about nylon's performance characteristics in 1971. If this is the case, it only is because it failed to test its product before placing it into the stream of commerce. The molecular structure, and therefore the performance characteristics, of nylon has not changed in the past 36 years. Any test that has been performed since 1971 could have been done in 1971. General Electric's deliberate indifference to the durability of a critical part of its product is not a defense to a breach of warranty action.

When taken together, these facts (the exterior grille is dependent upon the grommet and nylon degrades when exposed to water and sunlight) show that it was foreseeable that the exterior grille to unit 3A's air conditioner inevitably would fall off. Once the grille fell off, it was foreseeable that the sleeve could be come infested with rodents, and it is known that rodents chew wires. Exhibit 8, Fallows Rule 26 report, pages 6-7.

Thus, this fire was not caused by a bizarre, unforeseeable accident. Rather, it was caused by a series of events that were foreseeable to anyone who bothered to properly analyze, test and monitor the product. However, this fire occurred because General Electric conducted no such

analysis, testing or monitoring.  It is not surprising that since no one at General Electric ever

considered whether nylon would last or what would happen if the grille fell off, no one ever

discovered the defect in the product.

<b><u>Cathy Hull's actions do not relieve General Electric<br>of its duty to design a safe product.</u></b>

The case of *Allen v. Chance Mfg. Co.*, 494 N.E.2d 1324, 398 Mass. 32 (Mass. 1986), is of

particular relevance to the court's consideration of General Electric's duty.  In *Allen*, the plaintiff

was hammering a metal pin into a mounting hole when the pin fractured and a piece went into

the plaintiff's eye.  The plaintiff was not wearing goggles notwithstanding the fact that he had

chipped off metal pieces from pins in the past.  The court analyzed the scope of a defendant's

duty under the implied warranty of fitness for a particular purpose.  The court explained that the

implied warranty covers claims in which at the time of the injury, the plaintiff "was using the

product in a manner that the defendant seller, manufacturer or distributor reasonably could have

foreseen."  *Id.* at 1326.  The warranty does not cover "unforeseeable misuses of a product".  *Id.*

General Electric argues that Cathy Hull should have purchased a new grille from General

Electric, and blames Hull for the fire.  But Hull's response to the grille falling off – through no

fault of her own – was both reasonable and foreseeable.  The court in *Back* found that driving a

motor home into a guard rail was foreseeable.  The court in *Allen* explained that the defendant

has a duty to guard against dangers created by the foreseeable use of the product.  This is true

even if the defendant can foresee the plaintiff's <u>misuse</u> of the product.  494 N.E.2d at 1327 FN 2.

Cathy Hull's use of the air conditioner clearly was foreseeable.  During her deposition,

Hull explained that she repeatedly tried to reattach the grille with duct tape, but it kept falling

off.  Then she tried to cover the sleeve with window screen material, but the squirrel kept ripping

it off.  Exhibit 6, Hull deposition, pages 54-56.  It is easy for one of the world's largest appliance

manufacturers to scoff at this response, but for the average consumer, it is both was reasonable and foreseeable. In any event, the question is one for the jury.

The foreseeability of Hull's response is highlighted by the fact that Engineer Jones attempted to purchase replacement grommets from General Electric, but was told that he could not simply buy replacement grommets. Instead, he needed to buy an entire replacement case! Exhibit 12, Jones deposition, page 152. Given such a practice on the part of General Electric, it is foreseeable that an owner would not purchase the replacement case, but rather would attempt other means to secure a screen on the sleeve.

In the case of *Gillespie v. Sears Roebuck & Co.*, 386 F3d 21 (1st Cir. 2004), the court held that in order for the defendant in a product liability case to assert a defense of unreasonable misuse:

> [I]t is not enough that the plaintiff be aware that the machine is dangerous; rather, he must have a reasonably specific awareness both that the product is defective... and the extent of harm to which this exposes him.

*Id.* at 32. The plaintiff's awareness must be a subjective awareness. *Id.* at 33. It is undisputed that there is no evidence whatsoever that anyone living in the Ocean Terrace Condominium building had any awareness that if a grille were to fall off of a General Electric air conditioner, it could result in the building burning down. No one in the building had any knowledge that certain wires remained energized even when the air conditioner was turned off (as was the case with Cathy Hull's air conditioner at the time of the fire). In sum, General Electric's reliance on Cathy Hull's behavior provides no basis at all to grant its motion.

C.    TECHNOLOGICALLY AND COMMERCIALLY FEASIBLE ALTERNATIVES TO
THE NYLON GROMMET
WERE AVAILABLE PRIOR TO 1971.

**Plaintiff does not have to prove the availability of alternative designs**

In its brief, General Electric claims that it should be granted summary judgment because the plaintiff cannot demonstrate the availability of technologically and commercially feasible alternatives. While the plaintiff can demonstrate this (see the following section of this brief), it does not have to.

On page 10 of its brief, General Electric states "The Plaintiff has the burden of establishing the availability of a technologically and commercially feasible alternative design to GE before 1971." It then sites several cases, including *Backs v. Wickes.* General Electric joins other product liability defendants in misunderstanding the law:

> This is not, however, the holding of *Back v. Wickes.* The question which prompted the listing of relevant factors in that case was whether evidence *could* be introduced to show what the trade practices were at the time. The Supreme Judicial Court ruled that such evidence was relevant, because it was probative of the reasonableness of the challenged design. *Id.* 375 Mass. at 642-43, 378 N.E.2d 964. Even this evidence, however, is not dispositive, and "counsel may argue that industry standards can and should be more stringent." *Id.* at 643, 378 N.E.2d 964. Thus, plaintiff's case is not automatically defeated merely because the alternative design was not being used at the material time.

> The trial judge properly instructed the jury here that the "competing factors" should be balanced when deciding reasonableness of design.[FN3] Such an instruction is all that *Back v. Wickes* requires. There is no authority for the proposition that these factors must be introduced by the plaintiff, nor that the plaintiff must prove that the alternative design was efficient on a cost/benefit basis.

> ...

> Defendant's theory on the burden of proof is further belied by the Supreme Judicial Court's dispositions in *Smith v. Ariens Co.,* 375 Mass. 620, 377 N.E.2d 954 (1978), and *doCanto v. Ametek, Inc.,* 367 Mass. 776, 328 N.E.2d 873 (1975). In those cases, the SJC specifically held that in some circumstances, the plaintiff need not present any expert testimony at all in order to demonstrate unreasonable design. A jury might be able to find that the challenged design breaches the duty of reasonable care in design simply on the basis of its own lay knowledge. 375 Mass. at 625, 377 N.E.2d 954; 367 Mass. at 782-83, 328 N.E.2d 873. In *Smith,* decided the same day that the *Back v. Wickes* catalogue of factors was announced, the SJC upheld a verdict that a snowmobile was designed such that an "unreasonable risk of harm" was created, where the only evidence relied upon by

the jury was the snowmobile itself. *Id.* Not only did the plaintiff in *Smith* fail to address the costs and efficiencies of alternative designs, but no alternatives were even suggested. *See also Raney v. Honeywell, Inc.,* 540 F.2d 932, 935 (8th Cir.1976) (reiterating "relevant factors to be considered," but upholding jury verdict even without plaintiff evidence of alternatives' costs and benefits).

*Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695 at 699-700 (USCA 1st Cir 1988). Thus, while the plaintiff can introduce evidence regarding alternative designs, it is not required to.

### Available Alternative Designs

Notwithstanding the foregoing, the plaintiff does offer the following evidence relating to the fact that there were technologically and commercially feasible alternatives to nylon grommets in 1971.

Scott Jones is consulting with General Electric on another air conditioner fire in Sycamore Township, Ohio. In that case, the General Electric air conditioner had an "aluminum architectural grille" that was installed without the use of nylon grommets. Exhibit 12, Jones deposition, page 32. According to Jones, the method used by General Electric to connect the aluminum architectural grille to its sleeve could have been used in the air conditioner that is the subject of this case. Exhibit 14, Jones Affidavit.

Jones further testified that today the defendant itself uses "Tinnerman clips" to fasten the interior grille to the sleeve. Exhibit 12, Jones deposition, page 56. Jones opines that there is no technological or commercial reason it could not have used Tinnerman clips in 1971 to fasten the exterior grille to the sleeve. Exhibit 14, Jones Affidavit.

Engineer Fallows also identifies feasible alternatives. "Examination of competitors' grille attachment techniques would point out alternative design options as well. For example, Friedrich uses four screws directly into bosses on the sleeve. Frigidaire uses four metal screws

and washers to attach their grille to the inside surface of the sleeve." Exhibit 8, Fallows Rule 26 report, page 6.

These facts establish that there were technologically and commercially feasible alternatives to nylon grommets.

### D.    THE FASTENERS FAILED DUE TO REASONS ATTRIBUTABLE TO GENERAL ELECTRIC.

General Electric chose to use a nylon grommet to fasten the exterior grille to the sleeve. As explained by Engineer Fallows, the type of nylon specified and used by General Electric degrades over time when exposed to UV radiation. It also absorbs water, which causes it to expand and contract. This further weakens it.

The performance characteristics of un-reinforced, untreated nylon make it particularly inappropriate to use in outdoor applications. If GE had ever bothered to:

1.     Ascertain the performance characteristics of nylon prior to using it; or

2.     Monitored the performance of the nylon grommets once it started using them;

it would have discovered long ago that the grommets would fail over time. Yet, the plaintiff asked the defendant to produce all documents relating to its decision to use nylon grommets, and the defendant responded by claiming that it did not have any such documents. Exhibit 12, Jones deposition, page 45. Thus, the defendant cannot produce any evidence that it has ever either tested for, or otherwise determined, the performance characteristics of the nylon grommets.

The plaintiff's experts have examined the nylon grommets from units 1J and 2M. This examination allows them to conclude that the grommets performed as predicted: they degraded due to UV exposure and hygroscopy. This caused them to become brittle and crack. In the case

of the 3A grille, the failure was complete and the grille fell off. Exhibit 8, Fallows Rule 26 Report, page 6.

In its brief, the defendant proffers several imaginable ways the grille might have failed, as if this exercise establishes on the part of the plaintiff a duty to disprove anything the defense can think of. It does not. Furthermore, the evidence does disprove it. Cathy Hull testified that she never used cleaning chemicals on the air conditioner. Exhibit 6, Hull deposition, page 104. She denies ever having washed the inside of the air conditioner. Exhibit 6, Hull deposition, page 104. She denies ever repairing the air conditioner. Exhibit 6, Hull deposition, page 105. She denies ever replacing the original grille with a replacement grille. Exhibit 6, Hull deposition, page 105.

The failure of the grommets was the responsibility of General Electric and General Electric alone.

### E.    GENERAL ELECTRIC HAD A DUTY TO WARN OF THE HAZARD CREATED BY ITS PRODUCT

The case of *Cigna Insurance Co. v. Oy Saunatec, Ltd.*, 241 F3d 1 (U.S.C.A. 1st Cir. 2001), is particularly applicable to the facts of this case. In that case, the court recognized that there is a post-sale duty to warn if "the product at issue was negligently designed as originally sold.... When the design defect is present at the time of sale, the manufacturer 'has a duty to take reasonable steps to warn at least the purchaser of the risk' as soon as it 'learns or should have learned of the risk created by its fault.'" *Id.* at 12. Further, "the manufacturer of a negligently designed product also has a duty 'to warn at least the purchaser of changes which eliminate or tend to eliminate the risk created by the manufacturer's initial fault.'" *Id.* at 13.

In the case at bar, General Electric argues that when the subject air conditioner was manufactured in 1971, it had no reason to believe that nylon was an inappropriate material. The

30

facts Plaintiff has set forth raise an issue of fact concerning whether General Electric should have known that nylon grommets would degrade and cause the grilles to fall off. Furthermore, a consumer or user of General Electric's air conditioners would not know that a fire could occur if the air conditioners were turned off. The reports of Engineer Fallows and Engineer Jones discuss in detail the factual record to support the conclusion that the performance characteristics of nylon were known decades before this fire, and that competitors were using alternative materials and/or designs. By the time of the fire, General Electric should have learned of the hazard created by using nylon, and should have warned its customers of that risk.

## CONCLUSION

For the foregoing reasons, General Electric's motion for summary judgment should be denied.

Respectfully submitted
By its Attorneys,

**FALK METZ LLC**

Dated: **2 - 9** , 2007

Paul T. Falk
20 South Clark Street, Suite 1900
Chicago IL 60603
(312) 922-5800

## *CERTIFICATE OF SERVICE*

I, Paul T. Falk, hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Robert A. Curley, Esq.
CURLEY & CURLEY P.C.
27 School Street
Boston, MA 02108
BBO #109180

Dated: **2 - 9**_____, 2007

_____
Paul T. Falk