# Fallows Associates
## Plastics Consultants

May 15, 2006

Ron Harmeyer Esq.
Falk Johnson LLC
Chase tower
111 East Wisconsin Ave., Suite 1900
Milwaukee, WI 53202

FINAL REPORT

I have been retained to give an engineering opinion on the Ocean Terrace Condominiums v. G.E. case. My investigation consisted of the following:
1. Nylon property retention vs. weathering data from DuPont.
2. DuPont "Nylon" Design Guide (weather resistance data).
3. Material Identification data produced by Travelers Engineering Laboratory in Windsor CT.
4. Environmental Properties data from Bayer Corp.
5. Opinion of Dr. George Kriek (Bayer Corp.) regarding the need for UV stabilizers in white and natural unfilled Nylon applications for full time outdoor use.
6. Grille retention clips from an exemplar air conditioner in the subject building.
7. Thermo-oxidative Degradation, Photo-oxidation, and weather resistance data from "The Nylons Handbook". ("Nylon Handbook" published by Hanser/Gardner Publications 1995).
8. Depositions of H.D. Moore, Robert Ambrosi, Cathy Hull, Mark DiFelice, Barry McKay, James Welch, Ralph Hobbs, and Stephen Cooney, and Timothy Little (part 1) including all deposition exhibits.
9. Microscopic inspection and microphotographs of grille retention clips in the possession of St Paul Travelers Lab.
10. Inspection of the GE air conditioner that is believed to have started the fire.
11. Exemplar grille clips.
12. Friedrick "Through the wall unit" assembly instructions.
13. Frigidaire Owners Manual.
14. UL 484 – Standard For Room Air Conditioners, Sixth Edition March 29, 1982.
15. UL 746C – Polymeric Materials – Use in Electrical Equipment Evaluations
16. UL Testing file SA2141 issued 8-8-75 and revised 10-9-87.
17. Interview of Brad Haymond Fastex Div. Of Illinois Tool Works.
18. Photos of the fire scene, and accompanying opinions of Evan Haynes and Gordon Dupuenoy (Travelers Forensic Specialist and Fire Investigator respectively).
19. GE responses to plaintiff's first set of interrogatories.
20. GE response to plaintiff's first set of requests to produce documents and associated prints.
21. Information from DuPont Plastics website.
22. Discussions with UL HVAC group personnel.

Based upon this investigation I have made the following observations and I have formed the following opinions based upon a reasonable degree of engineering certainty.

The outdoor grille had fallen off of the GE air conditioner in the apartment of Hull / DiFelice. The Grille had fallen off because the plastic retaining clips had deteriorated and failed to engage the stamped metal grille. Subsequent nesting materials were found inside the air conditioner housing.


PLAINTIFF'S EXHIBIT 8

**Improper Material Selection**

Retaining clips from another condominium (with same air conditioning unit) were tested at Travelers Engineering Laboratory in Windsor CT and determined to be a non-reinforced, non-pigmented Nylon 6 (Polyamide). As a class of materials Nylon 6 is arguably one of the most sensitive polymers to moisture. This polymer absorbs moisture in humid environments, and swells. Dimensions change, and most structural properties deteriorate (tensile strength, flexural modulus, etc.).

Analysis of an exemplar grille-retaining clip purchased in 2004 from GE indicates that the replacements are now fabricated from Nylon 66. This has only slightly lower water adsorption and is still considered to be a very hygroscopic and UV sensitive polymer.

When Nylon 6 (or Nylon 66) is exposed to moisture, heat or Ultra Violet radiation, degradation of the polymer takes place. The mechanisms are hydrolysis, thermo-oxidative degradation, or photo-oxidation. If moisture, heat and UV are all combined a very rapid deterioration of the polymers mechanical properties will occur.

Photos indicate severe weathering on the outer surface of the clips (removed from unit 2M).




Photos also reveal crazing on the inside of the clips.




You can see a distinct difference in weathering around the outside of the block surfaces of the clip. One side has far more weathering and is assumed to be the topside where more UV exposure would occur.

 

The grille should stay on for the life of the product. H.D. Moore claims, as does GE (GE responses to Plaintiffs first set of interrogatories; page 7 interrogatory no. 11) that "GE room air conditioners have a useful life of approximately 15 years with normal usage, but the useful life may vary due to environmental and use conditions, which can decrease or increase the life of the product." Yet the weatherability data for Nylons show a stunningly rapid deterioration of mechanical properties. For example DuPont data for their un-reinforced, non UV stabilized, non-pigmented Nylon 66 (Zytel 101) shows after only 6 months of Florida exposure that the % elongation (ductility) drops from 300% to only 10%. Even DuPont Zytel 105 un-reinforced, UV stabilized black Nylon 66, shows a decrease in % Elongation from 160% to 60% in 6 months. Weathering of Nylon is generally less severe in Delaware than in Florida, and yet Zytel 105 un-reinforced, UV stabilized black Nylon 66 in Delaware shows a drop in % Elongation of 215% down to 70% in 12 months. Put differently, even UV stabilized Nylon 66 undergoes a ductility drop of 2/3 in 6 – 12 months on the east coast.

DuPont invented Polyamide and commercialized it in 1938 as Nylon. Polyamide performance characteristics have been known and well documented in resin supplier design guides at least as far back as the 70's. It would be reasonably foreseeable in the late 1970's, that Nylon being used in this application would result in part failure and dislocation of the grille all within the useful life of the product.

Kathy Hull's air conditioner was apparently not the only one experiencing failure of the grille retaining clips. The photos above were from the air conditioner in unit 2M. Exhibit No. 64 (reference Moore deposition part 2, page 17) shows failed clips still mounted in the air conditioner of unit 2M, as does Exhibit 3 (reference Hull Deposition) which shows similar failed clips on unit 1J. One missing clip and one failed clip can be seen on unit 3H, and the same can be seen on unit 1D as shown below.



One missing clip and one failed clip can be seen on unit 3H



One missing clip and one failed clip can be seen on unit 1D

It is my conclusion that Polyamide or "Nylon" is a poor choice of resin from which to manufacture the grille-retaining clip and that there were other choices available to the Appliance Park engineers. This is so because Nylon has been known for decades to be very susceptible to hydrolysis, and the effects of UV radiation. When both occur, mechanical properties deteriorate rapidly. It is generally recognized in the industry that Nylon of the type that GE used in this application is a poor choice for outdoor structural applications. For example, Bayer Corporation is one of the largest suppliers of Nylon in the world. Dr. George Kriek of the Bayer Corp.'s Polyamide (Nylon) Knowledge Center responded to the following question posted on their website: "Do I need a UV stabilized version of Durathane (Nylon) for a white or natural unfilled application that will be outdoors all the time? What happens if I don't use a UV stabilized version? From Dr. Kriek @ Bayer: "This is a very good question and very often asked. In many cases these two nylons can be substituted for each other. …. Almost all Nylon outdoor applications use <u>black</u> Nylon, and these grades usually have extra carbon black for added stability. Only the surface of the Nylon parts is typically affected, so change in physical properties is due more to the normal moisture absorption than to degradation. After several years, elongations and impacts will begin to decrease. Natural and light colored nylons will fairly quickly begin to turn yellow when exposed to sunlight. Properties will degrade at a much faster rate than with black. White pigment helps properties to some extent, perhaps by reflecting light. The addition of UV stabilizers will increase the time until property loss, but will only delay the color change of the natural nylon parts, not eliminate it."

UL applies a "(f1)" rating to those polymers that are "Suitable for outdoor use with respect to exposure to Ultraviolet Light, Water Exposure and Immersion in accordance with UL 746C."
There were no non-pigmented, non-reinforced Nylons approved by UL for outdoor use in 1974 (at 2 mm thickness, RTI for mechanical strength > 85C). In 1984 there were still no non-pigmented, non-reinforced Nylon 6 or 66 products that bore UL's (f1) rating.

In 1976 from GE alone, there were 6 grades of non-pigmented, non-reinforced PBT (Valox) given a UL rating of (f1) and by 1977 there were 14 grades!

**Failure to Consider Alternate Materials**
GE recognizes that the grille retaining clips need to withstand a variety of weather conditions (Moore deposition part 2, page 20) but GE clearly failed to specify appropriate materials from which to fabricate them.

GE Plastics is a leader in the production of engineering thermoplastics. Harold Moore (page 25 part 2 of deposition) stated that it would be natural for GE Appliance Park to go to GE Plastics for assistance. And yet, GE Plastics engineers were apparently never contacted by GE Appliance engineers for help in selecting a suitable polymer for the grille retaining clips.

GE has had a plastics group since the early 60's. While GE Plastics has never produced Nylon, they have produced a viable, weather resistant alternative to Nylon called Valox (Polyester). GE has produced UV stabilized versions of Valox since the mid 70's. UV stabilized polyester is often used in outdoor applications such as swimming pool pump housings and Network Interface Devices ("NIDs" are the junction box for telephone service on the outside of every residential house).

At the time of this air conditioning product manufacture Nylon performance data was readily available to, and used by engineers at GE Plastics. Those same engineers would have recommended alternative materials for fabrication of the grille-retaining clip for the reasons stated above. GE had the internal knowledge to say this material should not be chosen. I know this because I worked within the GE Plastics Division. I worked with other GE divisions to identify the most appropriate materials for their applications.

There were several options for grille retaining clip materials at the time Kathy Hull's air conditioner was manufactured, but apparently none were ever explored by GE Appliance Park engineers. They could have utilized a UV stabilized Polyester from GE or other plastics suppliers. It is also likely that the clip could have been cost reduced by utilization of a black pigmented or UV stabilized Polypropylene (lawn furniture).

**Failure to consider Alternate Attachment Options**
Not only were there alternate material options that were never explored, but there were also other design options that could have been used by the product designer. Instead of using the grille retaining clips, the designer could have molded plastic bosses onto a plastic grille. Such an approach is offered today on the Zone line air conditioner. Examination of competitor's grille attachment techniques would point out alternate design options as well. For example Friedrich uses four screws directly into bosses on the sleeve. Frigidaire uses four metal screws and washers to attach their grille to the inside surface of the sleeve.

What Cathy Hull saw was consistent with expected performance of a Nylon clip. The snap finger ends of the two grille retaining clips, being severely weathered and embrittled had broken off. The bottom of the grille then fell off the ends of the two retaining clips.

I have designed and received a patent for an air conditioner grille. One of the functions of an exterior grille is to protect the interior wiring and components from damage caused by rodents. Any competent product designer must anticipate all potential situations that the product could experience. It is standard practice to go through extensive "what if scenarios" while designing a product. What happens if the fan fails? What happens if the grille falls off? What are the risks associated with each of these scenarios? This is known as a "risk assessment", and is performed in a theoretical manner so that dangers can be "designed out". Even if some level of risk assessment had been conducted on grille and retention system, it was insufficient and failed to identify and provide for this foreseeable risk.

Harold Moore inappropriately considers a squirrel in the AC unit, as only creating a safety hazard to it's self. He states that the moving fan is the safety hazard for the squirrel. (Pages 79, 80, and 81; part 1 of deposition). When asked if a squirrel inside a J series air conditioner was considered a risk, or hazard to design against Mr. Moore stated that he didn't "..ever recall that being something that was discussed as being a risk." When asked if it was something that a customer was ever warned about, his response was "I'm not aware of any warnings associated with squirrels." Mr. Moore goes on to state "Again, we would not consider it a safety -- personal safety issue with the grill falling off."

Not only does a missing grille present a safety hazard to any child or adult who would put their hand in there, it allows small animals to enter. Raccoons, squirrels and mice are known to chew on wiring. GE failed to recognize and design against the hazards resulting from the exterior grill falling off. Absence of the exterior grille for only a short period of time could result in serious laceration or amputation, small animal incursion into the AC unit interior along with flammable nesting materials, wire insulation being chewed away, subsequent fire, and most certainly reduced product performance. GE failed to address these dangers with a proper grille retention design.

**Designer Awareness of Rodent Danger**
It is commonly understood by product designers across a wide range of markets that rodents will chew on wiring insulation. If rodents are allowed to enter areas with electrical wiring, the product is often rendered non functional and in many scenarios a dangerous situation results. The degree to which this understanding is wide spread can be displayed by various bulletins and publications from a variety of markets.

Naval Facilities Engineering Command – Electric Power Distribution Systems Operations, Apr 1990
"2.4.5 Direct Burial. Cables may be buried directly in the ground where permitted by codes and only in areas that are rarely disturbed. The cables used must be suitable for this purpose, that is, resistant to moisture, crushing, soil contaminants, and insect and <u>rodent damage</u>."

Federal Railroad Administration – False Proceed Signal Database,
All Reports – Cause: Maintenance – Wiring Chewed by Rodents; Jan1, 1995 – May 3, 2004
Page 1, item 130 "…Investigation revealed that the signal control wires for this signal had been damaged by rodents."
Page 1, item 582 "…False energy on the 432HGP circuit was caused by rodents chewing through the insulation of the conductors which control the signal mechanism."
Page 3, item 614 "…Through further investigation, it was determined that a rodent had chewed into one of two four-conductor unshielded cables used between the junction box at the bottom of the home signal pole and the SA signal head at the top."
Page 4, item 264 "…It was discovered through ground testing that the wire insulation in the south signal had been removed by rodents causing battery to energize the search light signal, resulting in the false signal."
Page 12 for State of Texas, item 219 "…An investigation revealed a rodent had chewed through the wire insulation in the signal mast which resulted in shorting the voltage from the red signal head wiring to the lunar signal head wiring."
Page 18 for State of Texas, item 421 "An investigation revealed rodent damage to the circuit wiring causing a battery wire to intermittently false pick the EDR relay giving a Green signal."

North Dakota State University Extension Service Newsletter – Water Spouts, No. 160, May 1997
"With the amount of snow we received, rodents were probably working very hard to find safe places to nest. Accessible electrical control boxes, motors, and electrical conduits were most likely inhabited. Rodents do a lot of damage to wiring in these situations so check these places very carefully for any damage such as chewed off wires or wire insulation."

Ontario Ministry of Agriculture Food and Rural Affairs – Rodent Control in Horse Stables, Feb 2000
"Rodents can cause damage to building structures and may cause irreparable losses due to fire as a result of gnawing through wire insulation, exposing the live wires."

NASA – Systems Engineering Processes and Requirements, March 13, 2006
Pg. 65, note 2 "…Particular emphasis needs to be on protecting surfaces from physical damage; preventing corrosion, rodent damage to electronic wiring or cabling, shock or stress damage, heat warping or cold fractures, and moisture and other particulate intrusion that would damage moving parts."

From the Nebraska Dept of Roads - Traffic Signal construction,
Page 3 "The pole bases for towers should not be grouted. The pole bases for galvanized steel poles may be grouted at the Project Manager's discretion to prevent rodent damage to wires."

EMS Grivory – Engineering Plastics Product Review  (Plastics supplier marketing brochure)
Discusses Grilamid TR 55 Application Examples "..sheathing for fiber-optic cables, cable sheathing providing particular protection against rodent damage."

Given this known hazard, GE Appliance Park should have realized that the grille served a safety function of preventing squirrels and other rodents from chewing wires, and bringing flammable nesting materials into the internal workings of the air conditioning unit. As revealed by Harold Moore's deposition, GE still fails to recognize this hazard, and failed to design the product in order to avoid the risk.


**Inability to Comply with UL 484**
UL 484 is the standard for room air conditioners.  Section 6.1 states "Openings in the enclosure of a room air conditioner shall be designed or located to reduce the risk of unintentional contact with (1) un-insulated high-voltage live parts; (2) moving parts such as fan blades and blower wheels; and (3) parts within the

enclosure which exceed the temperature permitted by item E4 of table 37.1" A missing grille would most certainly violate this clause.

UL 484 paragraph 3.7 defines ENCLOSURE as "That part of a room air conditioner which by itself or in conjunction with barriers (1) renders inaccessible all or any parts of the unit that may otherwise present risk of electric shock, (2) reduces the risk of contact with parts which may cause injury to persons, and / or (3) prevents propagation of flame initiated by electrical disturbances occurring within the unit."

UL 484 paragraph 3.12 defines STRUCTURAL PART as "A part used in such manner that failure of that part may present a risk of electric shock or unintentional contact with moving parts."

The outdoor section of the enclosure for a through the wall air conditioner is defined by the sleeve which wraps underneath, along the sides and over the top of the compressor, fan, condenser coil, etc. and the outdoor metal grille which is attached to that sleeve. The grille is secured to the sleeve by two of the plastic clips previously discussed. The clips hold the grille securely to the outer surface of the sleeve. When the clips are installed, molded-in snap fingers capture the grille by passing through a hole in the stamped steel. The snap fingers prevent the steel grill from sliding back off the clip, and the larger domed cap captures the steel grille on the other side of the snap finger. A metal screw passes through the sleeve back surface or "lip" from inside to outside, and inserts into the large rectangular end of the grille retaining clip. As the screw rotates it is drawn down into the clip and prevents the flex fingers from retracting. The screw also mounts the clip on the sleeve back surface. The clip structurally attaches the grill to the sleeve and prevents breach of the enclosure. The screw does not capture the grille nor does the screw contact the grille.

If the grille retaining clip structural integrity should fail, the grille would no longer be secured to the sleeve. The grille is defined as part of the enclosure and the retaining clip is defined as a "polymeric structural component". Discussions with a UL (HVAC group) engineer confirm that the clip is considered a <u>structural polymeric component</u>.

UL 484 chapter 9 calls out the requirements for <u>polymeric materials used to form</u> outer enclosures, <u>structural</u> or functional <u>parts</u>, thermal and acoustical insulation, and miscellaneous parts of a room air conditioner. Table 9.1 indicates the properties to be evaluated, depending on the material application.

Table 9.1

| Characteristic to be evaluated | Structural parts | Reference |
|---|---|---|
| Heat deflection | yes | Section 64 |
| Water absorption | yes | Section 65 (not more than 1.5% by weight) |
| *Environmental exposure* | | |
| Air oven aging | yes | Paragraphs 66.1, 66.2 (212F, 1,440 hours) |
| Ultraviolet Light | (where exposed to the effects of weathering) | |
| And | (Per UL 746C then run mechanical tests) | |
| Water exposure | yes | Paragraphs 66.3, 66.4 (360,720hrs per746C) |
| Water Immersion | yes | Paragraphs 66.5 - 66.7 |
| Tensile Strength | yes | Section 67 (*) |
| Flexural Strength | yes | Section 68 (*) |
| Izod or | | |
| Tensile Impact | yes | Section 69 or 70 (*) |
| Impact | yes | section 71 (5 ft-lbs, no break) (repeat after 24Hr, @ -40F) |
| Volume Resistivity | yes | Paragraph 9.2, section 72 (*) |

\* Note that for mechanical properties, after exposure to weatherometer, properties cannot decrease more than 50 percent after 360 hrs, and be essentially stabilized and no longer significantly changing with exposure time out to 720 hrs.

In particular section 66 of UL 484 clearly calls out UV and water exposure testing requirements for structural polymeric components that are exposed to the outdoors.

Section 66 of UL 484 - Ultraviolet Light and Water Exposure
66.3 Polymeric materials, which are used for enclosures or for structural parts and which are affected by sunlight are to be exposed to ultraviolet light and water for periods of 360 and 720 hours (using Xenon Arc). The apparatus and method of exposure is to be in accordance with the procedure employed in evaluation of polymeric materials for use in electrical equipment, UL 746C.
66.4 Following exposure, the specimens are to be subjected to the burning test required for the material application (see sections 60 – 63) and individually to the (1) <u>Tensile Strength Test</u>, Section 67; (2) <u>Flexural Strength Test</u>, Section 68; and (3<u>) Izod Impact Test</u>, Section 69, or <u>Tensile Impact Test</u>, Section 70.

67. Tensile Strength Test – "The tensile strength of a polymeric material used as an enclosure or as a structural part shall (1) <u>not decrease more than 50 percent</u> and (2) be essentially stabilized <u>and no longer significantly changing with exposure time.</u>

Same measures for Flexural Strength Test (section 68)

Same measures for Izod Impact Test (section 69)

This means that the Tensile Strength, Flexural Strength, and Izod Impact or Tensile Impact values must not decrease more than 50% from the "as received" condition to the values after 360 hours of exposure to UV and water. In addition these properties cannot continue to significantly change (+/- 5%) from the 360 hour test values to the 720 hour test values.

The Nylon used to mold the grille retention clips would not pass these tests. DuPont Zytel 101 (unfilled, un-pigmented, non UV stabilized) Nylon 66 after only 600 hours of weatherometer testing shows a drop in tensile strength from 10,100 psi to 7,650 psi and continues to fall to 4,740 psi at 2,000 hours (Pg 84, Table 24 of DuPont Zytel Design Guide). Clearly the material is not "stabilized and no longer significantly changing with exposure time". (CALL DUPONT AND FIND OUT IF THIS WAS XENON ARC)

As well the same material shows a drop in "Elongation %" at 600 hours from 300% down to 10%. This is a huge drop (97%) in ductility. As ductility increases, impact resistance will also improve. The opposite relationship also holds true, that is as ductility decreases the impact resistance drops, and the material becomes more brittle.

The Foreword to UL 484 states in Item C "A product which complies with the text of this standard will not necessarily be judged to comply with the Standard if, when examined and tested, it is found to have other features which impair the level of safety contemplated by these requirements."

Materials such as Valox UV stabilized polyesters would pass these tests. Given the foregoing it is my opinion that the subject air conditioner DOES NOT comply with UL 484 listing requirements.

**No Apparent Testing of Grille Retaining Clips**
As previously stated, the grille-retaining clips are considered a structural polymeric component of the enclosure. Upon review of UL testing file SA 2141 there does not appear to have been any testing of the grille retaining clips. While this unit carries a UL approval, it would not meet the full requirements for that approval if the clips had been tested as required by UL 484. Data for accelerated weathering generated by weatherometer testing for non-UV stabilized Nylons should have been a red flag for any designer. The material clearly would not meet structural requirements throughout the life of the product. Use of inadequate materials eventually results in deficient products, and the creation of obviously hazardous situations.

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email -> joef100@comcast.net

9

In summary, the GE air conditioner plastic grille retaining clips as currently designed are inappropriate from a material selection standpoint. They clearly will not pass UL 484 requirements for structural polymeric components. The clips can be expected to fail before the typical end of air conditioner product life, and the grille can be expected to fall off resulting in an unreasonably dangerous product. When this occurs a laceration / amputation hazard exists, subsequent intrusion by rodents is likely and a fire risk created. The potential dangers that this product presents before the expected end of product life would be substantially reduced or eliminated by utilization of a UV stabilized and weather resistant polymer or alternate attachment techniques. All of these opinions are given within a reasonable degree of engineering certainty. I reserve the right to change my opinion should new evidence arise.

My curriculum vita is attached.

Sincerely,


W. Joseph Fallows III