## *Scott A. Jones, PE – Rule 26 Disclosure*

Per Federal Rules of Civil Procedure, the author, Scott A. Jones, P.E., C.F.E.I. and Senior Mechanical/Electrical Engineer of EFI Global, Inc. is disclosing opinions in the subject case. The author's curriculum vita is attached as Appendix A. The author's complete testimony history is attached as Appendix B.

The author was retained by Falk Johnson, LLC on behalf of Ocean Terrace Condominium Trust to evaluate the design and design processes implemented by General Electric in the design of the subject Room Air Conditioner (RAC). In performance of this assignment, I have performed the following:

1) Inspected the GE RAC Model Number AJC10DST1, Serial Number MS224676 and RAB21 wall sleeve that were removed from Unit 3A of the subject condominium structure.

2) Inspected the 240 Volt AC wall receptacle, attached conductors, and 2 pole 20 Amp circuit breaker that provided power to the subject GE RAC situated in Unit 3A.

3) Inspected a duplex receptacle and attached conductors that were situated to the right (oriented looking out the sliding door) in Unit 3A Living Room.

4) Inspected GE RAC Model Number AJC10DST1, Serial Number MS225841 that was removed from Unit 2M in the loss structure.

5) Reviewed the deposition transcripts, taken January 19 and 20, 2006, of Harold D. Moore including Exhibits 63 and 64 taken from the same.


PLAINTIFF'S
EXHIBIT
10

6)    Reviewed the deposition transcript, taken December 20, 2005, of Captain
      Ralph G. Hobbs.

7)    Reviewed the deposition transcript, taken December 20, 2005, of Fire Fighter
      Michael Chipperini along with Exhibits 12, 13 and 14 taken from the same.

8)    Reviewed the deposition transcript, taken December 20, 2005, of Fire Fighter
      Stephen L. Cooney along with Exhibit 16 taken from the same.

9)    Reviewed the deposition transcript, taken January 12, 2006, of Fire Chief
      Barry S. McKay along with Exhibits 20 through 34 taken from the same.

10)   Reviewed the deposition transcript, taken January 13, 2006, of Massachusetts
      State Trooper James M. Welch along with Exhibits 2-A, 6-A, 41, 35, 36, 37,
      38, 39, 42, 42-A, and  43 through 61.

11)   Reviewed Exhibits 1, 2, and 3 taken from Cathy Hull's deposition.

12)   Reviewed the deposition transcript, taken December 19, 2005, of Mr. Mark
      DiFelice along with Exhibit 11 taken from the same.

13)   Reviewed the deposition transcript, taken January 19, 2006, of Mr. Robert
      Ambrosi.

14)   Reviewed a DVD that was supplied by counsel of local news reports
      concerning the subject fire.

15)   Reviewed Defendant General Electric Company's Responses to Plaintiff's
      First Set of Interrogatories.

16)   Reviewed Defendant General Electric Company's Response to Plaintiff's First
      Set of Requests to Produce Documents.

17)    Reviewed photo macrographs produced by Mr. Joe Fallows of a failed grommet that was attached to the RAB21 enclosure in Unit 3A.

18)    Reviewed Bill of Materials Supplied by Defendant for Model AJC10DST1 RAC.

19)    Reviewed detailed piece part drawings supplied by Defendant that were manufactured for use in the subject Model AJC10DST1 assembly.

20)    Reviewed ITW Fastex (grommet manufacturer) cut sheets that were available on the Internet at www.itw-fastex.com/catalogue.

21)    Reviewed Underwriters Laboratories, Inc. (UL) Standard for Safety 484, *Room Air Conditioners*, Sixth Edition, date March 29, 1982.

22)    Reviewed GE/UL File Report SA 2141 with revisions.

Design

1)  It is believed by the author with a reasonable degree of engineering certainty that GE Appliances as the principle design agent for the subject room air conditioner created a defective design, which was unreasonably dangerous, for the exterior condenser structural grille retention means. As a direct consequence of the defective design, both nylon grommets that were used to attach the aluminum grille to the structural sleeve failed, which resulted in the release of the grille. Early failure of the nylon grommets, which were to be exposed to sunlight and moisture conditions in the given exterior application, was a foreseeable risk not appreciated by the consumer.

Functionally, the grille was designed to prevent foreign object collection (e.g., leaves, etc.) during normal condenser cooling air flow, to direct discharge air flow from the condenser, to prevent foreign object invasion into the rotating condenser fan, and to prevent animal intrusion.

General Electric's designated expert regarding the design and function of the subject GE RAC, Mr. Harold D. Moore, stated that General Electric did not understand nor acknowledge the foreseeable risk of animal invasion and electrical insulation gnawing activity in the machinery compartment. Mr. Moore did not understand the unreasonably dangerous hazard created by the same.

Per Mr. Moore's Testimony:

> *Q.* [Direct Examination – Ronald Harmeyer, Esq.] *If a squirrel were to get inside* [the RAC], *would you consider that -- by inside, I mean inside the J series air conditioner, would you consider that to be a safety hazard?*
>
> *Mr. Curley: Objection*
>
> *The Witness: No – only for the squirrel*
>
> *Q. Is that because of the fan?*
>
> *A. Yes.*
>
> *Q. The fan is the safety hazard for the squirrel?*
>
> *A. The moving fan; yes.*

Q. So, other than noise and general nuisance of a squirrel getting inside of a

   J Series air conditioner, is that considered a risk, or hazard to design

   against?

A. I don't ever recall that being something that was discussed as being a risk.

Q. Is it something that was ever -- with a customer was ever warned about?

A. I'm not aware of any warnings associated with squirrels.

Q. What about birds?

A. There's no warning on birds, because we -- grills are designed to prevent

   birds from getting into the product.

Q. If the grill falls off, then birds can get in?

Mr. Curley: Objection

The Witness: Sure.

Q. Is there any, or has there been, to your knowledge, any warning to the

   consumer about safety hazards that may be created if the grill falls off?

A. I'm not aware of any.

Q. Would you expect the end consumer to be aware of safety hazards created

   by the grill falling off?

Mr. Curley: Objection

The Witness: Again, we would not consider it a safety – personal safety issue

with the grill falling off.

Q. I understand that if there isn't a hazard, you wouldn't expect the customer

   to be aware of a hazard.  I understand my question is a bit perhaps

   redundant, but I'll ask it again anyway.  Is there any safety issue which

*you would expect the end consumer to be aware of which would be caused*

*by the grill falling off?*

*Mr. Curley: Objection*

*The Witness: I'm not sure a customer would be aware of any safety issue*

*associated with that.*

As noted in prior sections of this disclosure, a large amount of post-fire evidence existed to confirm the pre-fire presence of animals and the consequential damage caused by the same. A product is unreasonably dangerous where it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics.

The known hazard of animal intrusion was evidenced in this case by gnaw marks upon the electrical conductors in the machinery compartment of the subject GE RAC. The risk, a squirrel chewing through an electrically energized conductor, was reasonably foreseeable to the product designer at the time of manufacture.

2) General Electric failed to use reasonable care in the design of the subject RAC. Beyond the thoughtful selection of designs, materials, and manufacturing processes to achieve the aesthetic and performance parameters of a new Original Equipment Manufacturer (OEM) product, the major appliance design process involves multiple steps to identify and abate risks. For the subject GE RAC

design, the risk of failure and consequences thereof were not identified during the following opportunities:

    a.   Materials Selection -- Non-reinforced unpigmented Nylon (Nylon) was improperly selected by GE Appliances in Dwg. No. 21B621270 as the resin for the subject failed grommet. The product designers could have easily foreseen that the subject grommet, in its intended application as an outdoor structural component in the RAC enclosure, would have been subject to direct water contact and ultraviolet radiation exposure from the sun. It is common practice in mechanical design to avoid the use of Nylon due to the rapid degradation of mechanical strength when exposed to ultraviolet radiation, and the phenomena of dimensional swelling and shrinkage due to the hygroscopic nature of the material relative to other available polymers.

    b.   Formal Assessment of Risks -- OEM manufacturers are obliged to ensure product safety prior to placing the product into the stream of commerce. Prior to rigorous short and long term testing of the product (i.e., development testing), it is common practice to subject the proposed design to a formal intellectual process involving: 1) the identification of possible failure modes, 2) quantitative assessment of the probability of each of the failure modes, and 3) quantitative assessment of the consequences (e.g., loss of life, major fire, etc.) of each of the identified failure modes. Such studies are referred to as Failure Modes Effects Analyses (FMEAs). It is

common practice to invite cross-discipline experts to participate in product FMEAs to ensure that all relevant risks are identified and abated.

The formal assessment of risk was not performed by General Electric on the subject RAC. There has been no documentation or testimony provided by General Electric that a systematic evaluation of the risks arising from the grill falling off has ever been attempted or completed. Even if a risk assessment was conducted by GE, it was insufficient and failed to identify and provide for this readily determinable risk.

Since the 1980's, FMEAs were known to GE at GE Aircraft Engines and were in use there. When I arrived at GE Appliances in the mid 1990's, I assisted in the formal development of the FMEA process. Had such a process been in place when the subject GE RAC was manufactured, it is my opinion that the risks from the grill falling off would have been identified and abated.

c. Short and Long Term Development Testing – OEM manufacturers are obliged to establish a rigorous physical testing program of developmental products to ensure that all performance and safety parameters are met in the new design. Typically, OEM designers develop a battery of testing on developmental products in accordance with their internal standard for the New Product Introduction (NPI) process.

As part of the developmental testing, OEM designers are obliged to test under normal use conditions and foreseeable abusive conditions of operation to discover latent defects in the design that adversely affect performance and safety of the unit under test.

In the present RAC design, there has been no documentation or testimony provided by General Electric that a systematic evaluation of any risk arising from long term developmental product testing with regard to the structural integrity of the RAC cabinet was attempted or completed. Such testing, both short term and long term, was well known in the appliance industry.

d. Third Party Testing – As a means to assure a new or altered OEM design will perform per the design intent in a safe manner, OEM manufacturers often elect to have an independent (i.e., third party) entity perform performance and safety testing (e.g., Underwriters Laboratory (UL), Intertek Testing Services (ETL), etc.). The testing is performed to peer-reviewed standards and often involves testing under nominal and abusive (e.g., single failure) conditions.

The subject GE RAC was submitted to UL for third party evaluation under the criteria contained within UL 484, *Standard for Safety Room Air*

*Conditioners, Sixth Edition,* dated March 29, 1982. The author was provided a copy of the document by counsel, labeled Ocean Terrace Condominium Trust v. General Electric, Bates stamp GE 069 through GE 163. The UL project file for the subject RAC, UL File SA2141, dated August 8, 1975 with subsequent revisions, was provided to the author by counsel and Bates stamped UL 00001 through UL 01016.

Section 8, Enclosures, specifically cites the testing criteria for a safe RAC enclosure design. Paragraph 8.2 reads:

> *"8.2 Among the factors which are taken in consideration when evaluating an enclosure are 1) mechanical strength, 2) resistance to impact, 3) moisture- absorptive properties, 4) flammability, 5) resistance to distortion at temperature to which the material may be subjected under conditions of use, and 6) resistance to corrosion. For a non-metallic enclosure or part of an enclosure, all of these factors, including the effect of exposure to weathering if for outdoor use, are considered with respect to aging. See Polymer Materials, Section 9."*

As clearly noted in the paragraph, the aging effects of exposure to weathering is a key requirement for the development of a safe enclosure design using nonmetallic material (e.g., plastic). The Nylon grommet

utilized in the subject RAC enclosure design consequently had to be tested
and compared to the success criteria of UL 484.

The testing requirements for polymer materials used in the design of RAC
enclosures were contained in UL 484, Table 9.1. Table 9.1 required the
following minimum battery of tests:

| Characteristics to be Evaluated | Applies to Enclosures? |
|---|---|
| Flammability | Yes |
| Heat Deflection | Yes |
| Water Absorption | Yes |
| Air Oven Aging | Yes |
| Ultraviolet Light | Yes |
| Water Exposure | Yes |
| Water Immersion | Yes |
| Tensile Strength | Yes |
| Flexural Strength | Yes |
| Izod or Tensile Impact Strength | Yes |
| Impact | Yes |
| Volume Resistivity | Yes |

The applicability of the requirements of Table 9.1 testing requirements
was invoked upon the subject Nylon grommet as read in Paragraph 9.1:

> The requirements in paragraphs 9.2-9.19 cover polymeric
> materials used to form outer enclosures, structural or functional
> parts, thermal and acoustic insulation, and miscellaneous parts of
> a room air conditioner."

Per UL File SA2141, Volume 1, Section 44, page 4 (i.e., Bates stamp UL 00120) the subject RAC, Model AJC10DST, was required to be installed in the subject enclosure:

> *"This Chassis to be Installed in Wall Sleeve RAB21"*

From the author's review of UL File SA2141, which documented the testing and revision history of the subject RAC, there were no records that indicated that General Electric or Underwriters Laboratory had executed any testing to understand the long-term aging characteristics of the Nylon grommets resulting from anticipated outdoor use in the RAB21 enclosure. It is believed that the subject GE RAC, when mounted in the RAB21 enclosure, does not meet the requirements of UL 484.

    e.  Spares Utilization – OEM Manufacturers often monitor the use of spare parts to determine frequent failure items as a key indicator for parts to be redesigned. There has been no documentation or testimony provided by General Electric that a systematic evaluation of spares utilization was in place to guide re-design activities on the subject GE RAC.

3) It is believed with a reasonable degree of engineering certainty that an alternative design for the control circuitry existed at the time of production of the subject GE RAC. The alternative design presented no technological challenge, little to no

increase in per unit material cost, and no changes to the operation or aesthetics of the subject GE RAC operating within the RAB21 enclosure.

It is believed by the author with a reasonable degree of engineering certainty that the subject GE RAC experienced an electrical arcing event between the either the compressor motor RUN or START 16 American Wire Gauge (AWG) conductor and the (grounded) GE RAC chassis pan. The arcing event occurred with the GE RAC not operating.

The heat released during the arcing event caused sufficient heat transfer through the steel pan at the point of contact with the conductor to cause consumption of paint and oxidation of the outside (i.e., the side facing the through-wall sleeve) surface.

One end of a parted compressor electrical conductor, identified as conductor segment "4" during an inspection of the electrical conductors at the St Paul Travelers Engineering Laboratory in Windsor, Connecticut, revealed melted copper strands. The subject conductor was parted in the mid-section of the GE RAC machinery compartment (i.e., the area between the evaporator and condenser heat exchangers that contained the compressor). The live conductor end subsequently arced to the (grounded) RAC chassis pan.

Per GE wiring diagram 21D620710, Revision O, which was provided to the author by counsel as Ocean Terrace Condominium Trust v. General Electric, Bates stamped document UL00774, the tan and orange conductors attached to the run capacitor and served as power sources for the compressor RUN and START windings on the refrigeration compressor. The conductors proceeded from the front section of the GE RAC (i.e., the area in front of the evaporator) to the machinery compartment. Per the GE wiring diagram, the subject conductors were connected to the "L2" side of the GE RAC receptacle and consequently would have maintained a 120 Volt AC nominal potential difference with the grounded chassis at all times, even if the unit was not operating. The "L1" side of power supply system interrupted power to the compressor for normal start/stop operation.

A reasonable alternative to the foregoing design problem is to use a double line break. This is a well known technology used by General Electric on its kitchen range product. General Electric should have utilized double pole contactors in the refrigeration compressor power circuit to provide a double line break (i.e., interrupt the continuity of power lead L2 as well as L1 when the refrigeration compressor is shut off). Had this design alternative been used, this fire would not have occurred.

4) It is believed with a reasonable degree of engineering certainty that an alternative design for the exterior grille attachment means existed at the time of production of

the subject GE RAC. The alternative design presented no technological challenge, little to no increase in per unit material cost, and no changes to the operation or aesthetics of the subject GE RAC operating within the RAB21 enclosure.

A wide selection of polymeric materials with physical properties capable of withstanding the environmental conditions for the subject grill retention application were available to product designers at the time of the design and manufacture of the subject GE RAC. Had a thoughtful design process for polymer selection been in place at GE, it is believed that the conditions that led to the loss would have been eliminated.

By rotating the screw attachment points between the aluminum grille and the steel enclosure into the enclosure, the need for polymer grommets would be obviated. With internal attachment, simple Tinnerman clips could be utilized to capture the screws. Had the grill been plastic injection molded, screw bosses could have been added to the injection mold, thus obviating the need for grommets. Both technologies were available at the time of the design and manufacture of the subject GE RAC.

5) Based on my review of the entire record in this case and the testimony of GE employees, which indicated GE did not consider the risks which caused the fire in

this case, GE was negligent in failing to clearly warn customers about hazards of
the grill falling off and instructing customers what to do if the grill does fall off.

Appendix A

Curriculum Vitae of Scott A. Jones, P.E., C.F.E.I.



Telephone: (812) 944-9988
Fax: (812) 944-9977
combustion@insightbb.com

## Scott A. Jones, PE CFEI

Professional Engineer – Mechanical Engineering
Professional Engineer – Electrical Engineering
B.S. Degree – Mechanical Engineering, University of California, Berkeley
B.S. Degree – Nuclear Engineering, University of California, Berkeley
Masters Degree Business Administration
Certified Fire and Explosion Investigator
Certified Vehicle Fire Investigator

PROFESSIONAL SUMMARY

- Bachelor of Science Degrees: Mechanical Engineering and Nuclear Engineering; University of California, Berkeley, 1984
- Masters of Business Administration; Union College, Schenectady, New York, 1987

PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2006 – Present | ENGINEERING INVESTIGATION, LLC<br>New Albany, Indiana<br><u>Senior Mechanical & Electrical Engineer</u><br>Investigate, analyze, and provide complete technical reporting on fire, failure, and defect causation.  Specialties include: industrial and residential fires/explosions, heavy equipment and automotive systems, major appliances including gas and electric ranges, LP and natural gas systems, water heaters, HVAC systems, fireplaces, aircraft nacelle/EBU systems, sprinkler and fire detection systems, kitchen fire suppression systems, and industrial/OEM product failure. |
| 2000 - 2006 | ENGINEERING AND FIRE INVESTIGATIONS<br>Lexington, Kentucky<br><u>Senior Mechanical & Electrical Engineer</u><br>Responsibilities the same as Engineering Investigation, LLC. |

Curriculum Vitae Scott A. Jones, PE                                    Page 2

| | |
|---|---|
| 1996 - 2000 | **SERVEND INTERNATIONAL**<br>Sellersburg, Indiana<br>Director of Engineering<br>Served as Engineering Department Leader for Design Engineering, R&D, Manufacturing Engineering, Tooling and Consumer Service. Conducted design, safety and Underwriter's Laboratories reviews to protect product integrity. |
| 1994 - 1996 | **GE APPLIANCES**<br>Louisville, Kentucky<br>Design Manager - Ranges<br>Provided engineering leadership to a group of 31 engineering professionals in the Range product line. Provided design leadership for the GE, Profile, RCA, Hotpoint, and Kenmore brands in electric and gas. In addition, provided design guidance for the Calrod heater line. |
| 1987 - 1994 | **GE AIRCRAFT ENGINES**<br>Cincinnati, Ohio<br>Staff Engineer – New Engine Development<br>Served as the staff engineer for the development, testing, and manufacture of components for military (F-14, F16, B2, and TR-2) and commercial (Boeing 777) aircraft engines. Designed EBU (fuel, hydraulic, pneumatic) systems within nacelle structures. Tested design adequacy through flight test for turboprop and turbofan engines. |
| 1984 - 1987 | **KNOLLS ATOMIC POWER LABORATORY**<br>Schenectady, New York<br>Design Engineer – Power Plant Systems<br>Developed nuclear and steam plant maintenance and operating procedures for 3 land-based naval nuclear plants. Wrote system specifications and developed budgetary analyses for major modification work. Participated in design evaluation and system performance testing for all contracted work. |
| 1975 - 1981 | **USS ALEXANDER HAMILTON (SSBN-617)**<br>New London, CT<br>Electrician<br>Served as an electrician and power plant operator aboard the submarine. Scheduled and performed preventive maintenance for the ship's power generation, propulsion and crew support equipment. Diagnosed and repaired ships' turbo-generators, high kW AC/DC motor-generators, and ships' single and 3-phase distribution switchgear and motor controllers. Received 5 US |

Navy Letters of Commendation for "…attention to detail, expedient problem solving, and dedication to duty."

## CERTIFICATIONS

Registered Professional Engineer, License Numbers PE10200078 (IN); E67726 (OH); 062-056115 (IL); 22984 (KY); 16252 (MS); 6201053251 (MI); PE073499 (PA); Pending (NY); 110614 (TN)
Certified Fire and Explosion Investigator - National Association of Fire Investigators
Certified Vehicle Fire Investigator - National Association of Fire Investigators
Licensed Private Investigator: License Number 0046 (KY); License Number 2005008857 (OH)

## PROFESSIONAL ORGANIZATIONS

National Society of Professional Engineers (NSPE)
National Association of Fire Investigators (NAFI)
National Fire Protection Association (NFPA)
National Society of Professional Insurance Investigators (NSPII)

## CONTINUING LEARNING

*2006 International Symposium on Fire Investigation Science and Technology* – National Association of Fire Investigators – University of Cincinnati, Ohio - June 26-28, 2006

*2005 IASIU Insurance Fraud Seminar* – Kentucky Chapter IASIU – Louisville, Kentucky - May 12 & 13, 2005

*2004 National Seminar on Fire Analysis Litigation* – Sarasota, FL – National Association of Fire Investigators – August 12-13, 2004

*2003 IASIU Seminar* – Elizabeth, Indiana – May 19-20, 2003

*2003 World Tire Expo* – Seminar series presented by Tire Industry Association – Louisville, Kentucky – March 27 & 28, 2003

*2002 Vehicle Fire, Arson & Explosion Investigation Science & Technology Seminar* – Eastern Kentucky University, Richmond, Kentucky – September 30 – October 2, 2002

*Insurance Fraud Seminar* – Elizabeth, Indiana – May 13-14, 2002

*2001 Advanced Insurance Fraud Seminar* – Cincinnati, Ohio – November 14-15, 2001

Curriculum Vitae Scott A. Jones, PE                                          Page 4

*Overview of the 2000 International Residential Code* – Indianapolis, IN – October 30, 2001

*Indiana Fire and Arson Conference 2001* – Indianapolis, Indiana – August 20-22, 2001

*2000 Advanced Insurance Fraud Seminar* – National Society of Professional Insurance Investigators – Cincinnati, Ohio – November 14-16, 2000

*Arson Investigation for the Second Millennium* – Kentucky Chapter International Association of Arson Investigators – Somerset, KY – May 2-6, 2000

Appendix B

Testimony History for Scott A. Jones, P.E., C.F.E.I.

Scott Jones, P.E.
Testimony Experience

Boldface for party represented

| Date | Project No. | Venue (County) | Case | Attorney | Type |
|---|---|---|---|---|---|
| 1/16/2001 | 94509-80194 | Hamilton Co., OH | Liberty Mutual v Bill Wilkes & Ted Jones and Cincinnati Insurance Company | Dennis W. Van Houten, Esq. | Deposition |
| 11/8/2000 | 94506-00314 | Cuyahoga Co., OH | Allstate Insurance Company v. General Electric | Dave Chernosky, Esq. | Deposition |
| 10/4/2002 | 94506-20101 | Shelby Co., TN | KLLM Transport Services v. Freightliner, LLC and Empire Truck Sales | David Dunbar, Esq. | Deposition |
| 12/3/2002 | 94506-20061 | Fayette Co., KY | Ronald D. Perry v. Jackson Enterprises | William Tooms, Esq. | Trial |
| 5/29-30/03 | 94506-20109 | Ashland, KY | Texas Road House v. A-1-A Electric | Cathy Hughes, Esq. | Deposition |
| 6/30/03 | 94506-10090 | Floyd Co., IN | Cotton States v. Jim Walter Homes | David Cornelius, Esq. | Deposition |
| 7/1/2003 | 94506-10066 | Clark Co., IN | Murphy v. GuideOne and Thomas | Jeffery Oberlies, Esq. | Deposition |
| 10/29/03 | 94506-20099 | Rochester, NY | NAS Quick Signs, Inc./Labrador Building Systems | Daniel Coffey, Esq. | Arbitration |
| 10/31/03 | 94506-10222 | Coles Co., IL | Ohio Casualty v. Deere & Co. | Anthony Morrone, Esq. | Deposition |
| 11/3/03 | 94506-20068 | Madison Co., AL | Capital Investors Property Group, Inc. v. Three Springs, Inc. | David Allred, Esq. | Deposition |
| 11/24/03 | 94506-00311 | Cook Co., IL | Janco Composites, Inc. v. Acra Electric Corporation | Robert Gilmartin, Esq. | Deposition |
| 11/26/03 | 94506-30302 | Fayette Co., KY | Maggard v. Johnson Controls, Inc. | Patrick Moores, Esq. | Deposition |
| 4/27/04 | 94506-40060 | Cook Co., IL | State Farm v. Voegtle's Auto Service, Inc. | Michael P. Stanczak | Deposition |
| 7/29/04 | 94506-30160 | Fayette Co., KY | Louisville/Jefferson County Metro v. Sterling Truck Corporation/Freightliner, LLC | B. Frank Radmacher, III | Deposition |
| 8/25/04 | 94506-10222 | Coles Co., IL | Ohio Casualty v. Deere & Co. | Anthony Morrone, Esq. | Re-Deposition |
| 12/13/04 | 94506-00237 | Shelby Co., TN | Ivan & Elaine Rugless v. Home Care Services, Inc. | William Larsha, Esq. | Deposition |
| 1/28/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Deposition |
| 2/7/05 | 94506-20082 | Cook Co., IL | Indianapolis Wood Products, Inc. v. Honeywell, Inc. | Klint Bruno, Esq. | Deposition |
| 3/16/05 | 94506-20280 | St. Clair Co., IL | Mark Lohman v. Arctic Cat, Inc. | Larry Eaton, Esq. | Deposition |
| 3/18/05 | 94506-30331 | Baltimore, MD | Penn National Mutual Casualty v. Maytag Corporation | Dan Hogan, Esq. | Deposition |
| 4/13/05 | 94506-20199 | Fayette Co., KY | Demolition Disposal Services v. Vermeer Manufacturing Co. | William Clark, Esq. | Deposition |
| 5/12/05 | 94506-20082 | Floyd Co., IN | Indianapolis Wood Products, Inc. v. Honeywell, Inc. | Klint Bruno, Esq. | Daubert/Rule 702 |
| 5/27/05 | 94506-30085 | Moore County, NC | Catholic Health East v. Cam-Ful Industries, Inc. and Phoenix Fire Protection, Inc. | Michael T. Smith, Esq. | Deposition |

| 8/25/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Motion in Limine |
|---------|-------------|-----------------|----------------------------------------------------------|----------------------|------------------|
| 8/30/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Re-Deposition |
| 10/31/05 | 94506-30232 | Pike Co., KY | Kentucky School Boards Insurance Trust v. Elliot Contracting, Inc. and Watts regulator | Zanda Gillock, Esq. | Deposition |
| 12/2/05 | 94508-14478 | Cook Co., IL | Kappy's Restaurant v. Fox Valley Fire & Safety Co. and PROTECTCO | James Schultz, Esq. | Deposition |
| 1/9/06 | 94506-20032 | Fayette Co., KY | Kentucky Farm Bureau Mutual v. Ford Motor Company | Edward Brutscher, Esq. | Deposition |