10/10/2006  Jones, Scott A.

```
                        Volume I
                        Pages 1 to 160
                        Exhibits 300 to 307
         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
         Civil Action No. 05-10075 PBS
- - - - - - - - - - - - - - - - - - -X
                                     :
OCEAN TERRACE CONDOMINIUM TRUST,     :
         Plaintiff,                  :
                                     :
   vs.                               :
                                     :
GENERAL ELECTRIC COMPANY,            :
         Defendant.                  :
                                     :
- - - - - - - - - - - - - - - - - - -X
```

        DEPOSITION OF SCOTT A. JONES, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Curley & Curley, P.C., 27 School Street, Boston, Massachusetts, on Tuesday, October 10, 2006, commencing at 10:00 a.m.

PRESENT:
    Falk Metz LLC
        (by Paul T. Falk, Esq.)
        Two First National Plaza,
        20 South Clark Street,
        Suite 1900, Chicago, IL 60603,
        for the Plaintiff.
    Curley & Curley, P.C.
        (by Robert A. Curley, Jr., Esq.)
        27 School Street,
        Boston, MA 02108, for the Defendant.
               *  *  *  *  *



PLAINTIFF'S EXHIBIT
12

1   A.   I don't have any recollection if it was by
2   the fan, by the fan shroud, or actually part of the
3   aluminum architectural grille.
4   Q.   The next note says, "Jack Moore knows A/C."
5   A.   He emphatically said, "Jack Moore knows
6   A/C."
7   Q.   Did you bring up Mr. Moore's name?
8   A.   No, he offered.
9   Q.   Okay.  So --
10  A.   Mr. Moore was not known to me at the time I
11  discussed this with Mr. Daugherty.
12  Q.   So was Mr. Daugherty generally saying if
13  you want to know somebody who knows something about
14  air conditioners, talk to Jack Moore?
15  A.   He said what he said.
16  Q.   After that it says, "Air-Conditioning
17  contract."
18  A.   The top line is Charles Daugherty
19  continued.
20  Q.   We haven't finished --
21  A.   Sorry.  Yes.
22  Q.   It says, "Jack Moore" --
23  A.   Yes, "Took over for contract sales."
24  Q.   Okay.  So when you have "contract" there,

```
1       Q.   Compared to what?
2       A.   Other plastics.
3       Q.   All other plastics?
4       A.   I can't make that -- I don't have the data
5    in front of me.
6       Q.   Do you consider yourself an expert in
7    plastics?
8       A.   No.
9       Q.   While you were at SerVend International
10   from 1996 to 2000, did your work relate in any way
11   to air-conditioning units?
12      A.   Yes.
13      Q.   In what way did it relate --
14      A.   We did refrigeration units for countertop
15   bench dispensing, and some of our developmental
16   products that I did the engineering on we took from
17   room air conditioners, literally, compressors,
18   condensers, fans.
19      Q.   So the refrigeration part of countertop
20   dispensing was borrowed from air-conditioning
21   design?
22      A.   Yes.
23      Q.   Did your work at SerVend relate to any
24   air-conditioning units?
```

1    A.    No idea.

2    Q.    When you last knew about him?

3    A.    At SerVend International.

4    Q.    In Indiana?

5    A.    Yes, Sellersberg, Indiana.

6    Q.    And what was the nylon part that your
7    predecessor had selected?

8    A.    You go into a convenience store and you
9    pull your cup to collect ice, you push on a lever.
10   Well, with our units that lever was mounted with two
11   nylon brackets, and those brackets were failing, and
12   our ice chutes were falling out of the units all
13   over the nation.

14   Q.    And was that a supplied part?

15   A.    To our print.  We had -- we had it molded
16   to our print.  It was designed by us.

17   Q.    And the material was selected by Mr.
18   Sellers at SerVend?

19   A.    Mr. Landers, yes.

20   Q.    Mr. Landers.  Sorry.  And what was the part
21   for which you had selected nylon?

22   A.    It was a -- an experimental mechanism
23   having to do with the concept of what's called ice
24   transport, and it was a rotating sleeve inside a

1   believe I gave you a current copy.
2           MR. FALK:  Yes, you did.
3       Q.  Is that this (indicating)?
4       A.  That is correct.  And I'm looking at the
5   same copy.
6           MR. CURLEY:  Could we have this marked as
7   Exhibit 302, please.
8                   (Document marked as Jones
9                   Exhibit 302 for identification)
10      Q.  Is this a list of your cases where you've
11  given a deposition or you've testified at trial?
12      A.  That is correct.
13      Q.  Okay.
14      A.  You'll see an entry, "7/14/06".  I was with
15  EFI Global when this project was initiated.  It
16  became a project under my company before it was
17  transferred to me where I gave testimony at Jock's
18  Sports Bar versus Prudential Heating & Cooling,
19  Incorporated.  And that was an air-conditioning unit
20  that was serviced, and I was representing the
21  company that did the service, Prudential.  It was
22  distinguished that it was a rooftop heating unit and
23  not a through wall.
24      Q.  So combination heating, air-conditioning

10/10/2006  Jones, Scott A.

1   Q.  Did any of these other cases involve
2   air-conditioning units made by GE?
3   A.  No.
4   Q.  Did some of these cases involve
5   air-conditioning units made by others?
6   A.  Yes.
7   Q.  Which ones?
8   A.  The one I spoke of earlier, the 7/14/06
9   depo was a -- I believe, a Carrier unit.
10  Q.  Okay.  And you were not critical of the
11  design of that unit?
12  A.  Are you asking that as a question?
13  Q.  Yes.
14  A.  Yes, I was critical.  It caused a fire.
15  Q.  What were your criticisms of the design of
16  that Carrier air-conditioning unit?
17  A.  It had problems in the design of the damper
18  unit.
19  Q.  What kind of problems?
20  A.  It caused a fire.
21  Q.  What were the design problems that you
22  identified?
23  A.  We -- this is an ongoing case, and there
24  will be a subsequent inspection of the damper motor

10/10/2006 Jones, Scott A.

1  Q. Okay. And are those -- did you prepare
2  reports on those?
3  A. Some may have been with reports, yes.
4  Q. Okay. And were those the high-resistance
5  connections or the failed electrical contacts or the
6  cord arcing situations that you identified?
7  A. That is correct. And some may have had
8  reports associated, when some may have been just
9  oral between either an attorney or an adjuster and
10 myself.
11 Q. And in your present employment with
12 Investigation LLC, apart from this case and the case
13 that you've already referred to involving GE
14 air-conditioning units, are there any other cases
15 that you're involved in that involve GE
16 air-conditioning units?
17 A. Yes.
18 Q. How many?
19 A. Two. One where I've been retained by
20 Electric Insurance for GE, and that's just the
21 ongoing case we spoke of earlier, and then I have
22 one case right now in Ohio involving a GE air
23 conditioner that was causal to a fire.
24 Q. Do you know the name of the Ohio case?

1   scientific method?
2       A.   Again, it was a method created in the
3   mid-19th century, and we use an adaptation of it.
4       Q.   What does the scientific method involve
5   generally, putting aside any adaptation for fire
6   investigation?
7       A.   You identify a problem; you collect data
8   regarding the problem; you induce hypotheses
9   relating to the facts of the case; you test the
10  hypotheses and develop a lead hypothesis that can be
11  supported with the data, and that's the general
12  framework of it.
13      Q.   When you say that that has been adapted for
14  fire investigation, in what way do you say it's been
15  adapted?
16      A.   I believe it was first used for botanical
17  purposes and more esoteric things, and we put it
18  into the language we can use for fire
19  investigations, but the whole nature of the
20  inductive/deductive reasoning for testing is the
21  same as it's been since way back when.
22          MR. FALK:  Let's take a little break.
23          (Recess taken)
24

10/10/2006  Jones, Scott A.

1      A.   Yes.
2      Q.   And in how many cases have you testified
3  about General Electric dryers?
4      A.   Two.
5      Q.   Now, on Exhibit 303, that time entry for
6  March 17 indicated that you discussed conditions
7  leading to loss with a technical representative.
8  Was that Mr. Haynes?
9      A.   I believe so, yes.
10     Q.   Do you remember what Mr. Haynes told you
11 were the conditions leading to the loss?
12     A.   He, at the time, I'm sure -- well, I can't
13 say that.  He did mention animal infestation and --
14 may have been a causative factor, and outside of
15 that I really don't remember any specific points,
16 but I believe he did mention animal infestation.
17     Q.   Prior to that time, did you have any
18 knowledge about animal infestation of any
19 air-conditioning unit?
20     A.   Appliances of any type in general.
21     Q.   If you can stick to my question.  Prior to
22 that time did you have any information about animal
23 infestation of an air-conditioning unit?
24          MR. FALK:  Counsel, I'm going to object.

10/10/2006  Jones, Scott A.

```
 1   were using for screens or fasteners for wall
 2   sleeves?
 3       A.   That is correct.
 4       Q.   Okay.  Now, have you made a determination
 5   as to what GE was using for fasteners before the
 6   1970s?
 7       A.   They were using grommets.
 8       Q.   Have you ever seen one of those grommets?
 9       A.   No.  The parts list was missing, and the
10   print was illegible.
11       Q.   Would you be able to draw the design of the
12   grommet?
13       A.   I can only draw the representation that GE
14   put on its drawing.
15       Q.   Well, what drawing are you referring to?
16       A.   There's a specific drawing number which I
17   brought along.  It was created in 1960.  It uses
18   grommets.  Again, I don't have the parts list, and
19   so until GE comes up with the parts list I can't
20   answer your question.  The drawing is a GE drawing.
21   The drawing number is 864C709.  It was created June
22   8, 1960.  It was issued June 24, 1960.  And very
23   specifically they have grommets down at the bottom.
24   It's a louver design.  It has the slab corner.  It's
```

1  very similar to what we're doing today, what GE is
2  doing today.
3      Q.   How many grommets were there at the bottom?
4      A.   They're showing three grommets.  They have
5  three.
6      Q.   Let me see that for a minute.
7      A.   Yes.  And there's revisions clear through
8  the 1960s, so it was a very accurate drawing.  And
9  again, it has a separate parts list which was not
10  given to us.
11      Q.   And is it your understanding that this
12  drawing shows grommets or shows openings for
13  grommets?
14      A.   No, it shows grommets.  It's specifically
15  part of the record.  It says the word "grommets,"
16  which is GE's nomenclature for a molded part.
17      Q.   Now, did you ever try to obtain from the
18  Ocean Park Condominium building or otherwise any
19  grommet that existed at Ocean Terrace Condominium
20  that was installed in the original installation?
21      A.   I guess I don't understand.  What do you
22  mean "obtain"?  That is not my evidence to obtain.
23      Q.   So you did nothing to try to obtain a
24  grommet from the Ocean Terrace Condominium Trust

10/10/2006  Jones, Scott A.

```
 1    history of the screw grommets that were in Unit 3A
 2    from the time of installation up through the time
 3    the grille went missing?
 4         A.   Yes.
 5         Q.   And what have you done?
 6         A.   I read the depositions of Kathy Hull and
 7    her friend Mark DeFelice to try to learn that
 8    history.  I've had a conversation with Gordon
 9    Dukenoi (sic) with regard to Mr. Waite (sic), I
10    believe it was, who was the previous owner of that
11    structure.  I have attempted, as I have discussed
12    before, to take a look at the prints and provide a
13    factual history from GE of what these grommets would
14    have been at that time.  Those are the things I can
15    think of.
16         Q.   Okay.  In the Kathy Hull deposition, she
17    was not able to provide a description of the
18    fasteners; is that correct?
19         A.   No, she was.  She provided quite a bit of
20    information about the fasteners.
21         Q.   What is your understanding of what Kathy
22    Hull said about the fasteners?
23         A.   She kept making the statement that they
24    were white and plasticky, and that is consistent
```

83

1   with our observations of 1J and 2M.
2       Q.   Okay.  Do you remember anything else that
3   Kathy Hull said other than "white and plasticky"?
4       A.   Those were the key observations.
5       Q.   Do you remember observations that Mark
6   DeFelice made about any hardware?
7       A.   He was explaining that the grille went over
8   the exterior of the sleeve unit, and I believe he
9   said eight points of fastening, and factually that's
10  not what I saw at this particular unit at 3A.  There
11  were no markings along the exterior of the unit, so
12  I didn't know how to interpret his remarks.
13      Q.   There were no holes in the side of the wall
14  case that would indicate any fasteners going in
15  there the way he suggested?
16      A.   That is correct.  He had claimed that there
17  were fasteners through.
18      Q.   And what was reported to you about Mr.
19  Waite by Mr. Dukenoi?
20      A.   Mr. Waite, I believe, purchased the unit in
21  1985 after the conversion to condos, and he was the
22  sole owner.  He was a frequent user of the
23  air-conditioning unit.  He remembered no anomalies
24  about the grille.  He would frequently use his deck.

10/10/2006  Jones, Scott A.

1   rhetorical.

2       Q.   Do you plan on doing that?

3       A.   No.

4            MR. FALK:  Didn't burn down a building with
5   old people in it and younger families either,
6   Counsel.  So we're trying to get out of here and get
7   the job done.

8            MR. CURLEY:  I'm trying to get out of here.
9   Why do I need to listen to this?

10           MR. FALK:  Go ahead.

11      Q.   All right.  You ordered an entire
12  replacement case?

13      A.   I tried to order the grommets, but they
14  didn't sell them that way.

15      Q.   Did you understand that you could order
16  just a rear grill that would come with grommets?

17      A.   I asked them and they said no.

18      Q.   Who did you ask?

19      A.   GEcares.

20      Q.   Someone told you that when they answered
21  the phone?

22      A.   They said you have to buy the entire case.
23  You cannot order the grommets alone or the grille
24  alone.  You have to buy the entire case.  That

10/10/2006  Jones, Scott A.

157

1   Q.  Are there any grounds for your opinions
2   that you've expressed in your Rule 26 Disclosure
3   that we haven't already discussed?
4   A.  Not to my knowledge.
5       MR. CURLEY:  I don't think I have any other
6   questions.
7       MR. FALK:  Just one follow-up question.
8                   CROSS EXAMINATION
9   BY MR. FALK:
10  Q.  Sir, you were asked a question concerning
11  whether or not you had any information or knowledge
12  whether the rear grille on Unit 3A had been replaced
13  before Kathy Hull purchased the condominium, and I
14  wasn't quite sure of your answer at the time.  I was
15  a little bit confused.
16      Do you have any information whether the
17  rear grille on 3A was replaced before Kathy Hull
18  purchased Unit 3A?
19  A.  I had no indication whatsoever it was
20  replaced.  Ms. Hull did not indicate any maintenance
21  action or any action that would have required or, in
22  fact, that it was replaced, and then with the
23  information that I recently obtained from the prior
24  owner over the 14 years that he owned it, there was

1   no indication that the unit was ever out or the
2   grille was ever replaced, the actual
3   air-conditioning unit. So overall I had no
4   indication whatsoever that the grille had been taken
5   out or replaced.
6       Q.   You do have some information about that
7   topic. You just have no indication that it was ever
8   replaced before Kathy Hull purchased it, correct?
9       A.   That is correct.
10      Q.   Okay.
11      A.   I had no indication --
12      Q.   I thought we were a little confused earlier
13  in the record. I just wanted to clear that up.
14          MR. CURLEY: Nothing else.
15             (Whereupon, the deposition was
16              concluded at 3:42 p.m.)
17
18
19
20
21
22
23
24