UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OCEAN TERRACE CONDOMINIUM TRUST,
    Plaintiff,

    v.                                      CIVIL ACTION NO.
                                            05-10075-PBS

GENERAL ELECTRIC COMPANY,
    Defendant.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 25)**

**August 15, 2007**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment (Docket Entry # 25) filed by defendant General Electric Company ("GE" or "defendant") on all counts of the complaint. Plaintiff Ocean Terrace ("Ocean Terrace" or "plaintiff") opposes the motion. (Docket Entry # 39). After conducting a hearing on April 3, 2007, this court took the motion (Docket Entry # 25) under advisement.

PROCEDURAL BACKGROUND

The complaint, filed December 6, 2004, by Ocean Terrace consists of three counts. In Count One, Ocean Terrace alleges GE negligently designed and manufactured an air conditioner and failed to warn of the hazards of the air conditioner. In Count Two, Ocean Terrace asserts that GE's allegedly negligent acts

constitute a breach of the implied warranty of merchantability under Massachusetts General Laws chapter 106, section 2-314 ("section 2-314").  Finally, in Count Three, Ocean Terrace alleges that these breaches of implied warranties are unfair and deceptive acts or practices in violation of Massachusetts General Laws chapter 93A ("chapter 93A").

STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Buchanan v. State of Maine, 469 F.3d 158, 166 (1st Cir. 2006).  A "genuine" factual issue exists where "the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party."  Blackie v. State of Maine, 75 F.3d 716, 721 (1st Cir. 1996).  A factual issue is "material" where it "has the potential to alter the outcome of the suit under the governing law."  Id.

The burden initially rests with moving party to demonstrate that "no genuine issue of material fact exists."  National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.

1995).  The nonmoving party "may not rest upon the mere allegations or denials of the . . . party's pleading."  Fed. R. Civ. P. 56(e).  The nonmovant, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Stonkus v. City of Brockton School Dept., 322 F.3d 97, 102 (1st Cir. 2003).  "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."  Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1999).  Factual disputes are resolved in a "light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).

FACTUAL BACKGROUND

A.   The Fire at the Ocean Terrace Condominium Building

On June 1, 2002, a fire broke out at the Ocean Terrace Condominium building at 2 Ocean Avenue in Gloucester, Massachusetts which resulted in the total loss of the 42 unit building.  (Docket Entry ## 27 & 40).  In his May 15, 2006 Report, plaintiff's fire investigator Gordon Duquenoy ("Duquenoy") concluded that the fire originated in unit 3A's air

conditioner.  (Docket Entry # 45, Ex. 5, p. 8).  Duquenoy based
his investigation on physical marks and fire patterns which were
found to be consistent with eyewitness statements by fire
department personnel and others.  (Docket Entry # 45, Ex. 5, p.
2).

Trooper James Welch ("Trooper Welch") of the State Fire
Marshal's office concurred that the fire originated in unit 3A,
but placed its origin in the corner of the living room opposite
the air conditioner.  More specifically, in his March 27, 2004
Fire Investigation Summary Report (Docket Entry # 27, Ex. 16),
Trooper Welch states that the point of origin was the exterior
wall facing Ocean Avenue between the interior sheetrock and the
mansard roof.  In this area, he observed dried tree leaves and
other particles of trees and/or brush.  (Docket Entry # 27, Ex.
16, p. 4).  This led Trooper Welch to report that animal
infestation could not be ruled out as a cause of the fire.
(Docket Entry # 27, Ex. 16, p. 4)  Although Trooper Welch stated
it was not possible that the air conditioner was the "area of
origin" (Docket Entry # 27, Ex. 15, p. 45), he declared the cause
of the fire undetermined.  (Docket Entry # 27, Ex. 16, p. 4).


B.  The Ocean Terrace Condominium Building

On August 13, 1971, the City of Gloucester issued a building
permit for the construction of an apartment building which later

4

became the Ocean Terrace Condominium building.  The building was originally constructed with a mansard roof made of wood shingles. (Docket Entry # 27, p. 2).

In late 1999, Schernecker Property Services Inc. ("SPS") rebuilt the mansard roof and decks under the direction of Noblin Associates, Inc. ("Noblin").  (Docket Entry # 29, Ex. 11, pp. 7-10; Docket # 27, p. 3).  As part of the roof replacement, Timothy Little ("Little"), a Senior Project Manager for Noblin, recommended replacing the flashing around the air conditioners. In a field report dated October 5, 1999, Little documented the need to coordinate the disconnection and removal of air conditioners on the third floor to allow for the installation of flashing.  (Docket Entry # 33, pp. 23-24).

At this time Ronda Ziner ("Ziner") was President of EP Management ("EP"), which was responsible for a number of building maintenance items pursuant to its management agreement with Ocean Terrace.  (Docket Entry # 28, Ex. 3, p. 27).  Ziner sent an October 18, 1999 memo to all third floor unit owners directing them to remove their air conditioners so the new flashing could be installed.  (Docket Entry # 27, p. 4).  Ziner did not know whether any action was taken in response to that memo, that is, whether the sleeves were actually removed.  (Docket Entry # 28, Ex. 5, p. 45).  Little did not recall the removal of any air conditioner or air conditioner cover or grille.  (Docket Entry #

33, pp. 20 & 72-73).  He testified that once reconstruction of
the roof began, he personally inspected some air conditioner
pans, also known as wall sleeves, and decided not to replace all
of the flashing.  (Docket # 92, Ex. 20, p. 60).

Catherine Hull ("Hull") was the owner of unit 3A at the time
of the fire in June 2002.  (Docket Entry # 29, Ex. 12, p. 43).
She had a roommate living with her in unit 3A named Mark DeFelice
("DeFelice").  (Docket Entry # 29, Ex. 12, p. 20).  Hull
testified that she bought unit 3A from Lloyd Waites ("Waites") in
either 1998 or 1999.  (Docket Entry # 29, Ex. 12, p. 14).  In his
affidavit, Waites stated that he did not sell unit 3A to Hull
until 2000.  (Docket Entry # 87, Ex. 15, p. 1).  During his
ownership of unit 3A from 1985 to 2000, Waites testified that the
air conditioner was never serviced and that the exterior grille
and fastening hardware were never removed or replaced.  In
addition, Waites specifically testified that during the Noblin
work in 1999 the air conditioner was not removed from its sleeve
and the exterior grille was not removed.  (Docket Entry # 87, Ex.
15, p. 1).


C.  The Air Conditioner at Unit 3A

Like most units at the Ocean Terrace Condominium building,
unit 3A had a through the wall air conditioner consisting of
three parts:  the wall sleeve or pan; the air conditioner core

6

containing the electrical components; and an exterior grille.
The air conditioner core was a GE "J Series" model, manufactured
in July 1985.  (Docket Entry # 27, p. 9).  Unit 3A's wall sleeve
was the type used by GE in the late 1960s and early 1970s.
(Docket Entry # 31, Ex. 19, p. 1).  The core and wall sleeve of
unit 3A's air conditioner were recovered after the fire, but the
exterior grille and mounting hardware were not.  (Docket Entry #
51, Ex. 7, pp. 5-6; Docket Entry # 31, Ex. 19, p. 1).  The
exterior grilles and mounting hardware for units 1J and 2M,
however, were recovered.  The evidence shows that the exterior
grilles of the through the wall air conditioners of units 1J and
2M were attached to wall sleeves of similar vintage to that of
the air conditioner in unit 3A by a fastening system consisting
of a metal screw, clip and nylon grommet.  (Docket Entry # 51,
Ex. 7, p. 38).

Due to the fact that the exterior grille and hardware for
the air conditioner in unit 3A could not be recovered, this court
must rely on eyewitness and expert testimony regarding the grille
and hardware's manufacture, design and alleged failure.  When
Hull bought unit 3A the air conditioner's exterior grille was
attached and did not appear to be loose.  At this time she did
not take any special note of the fastening hardware.  (Docket
Entry # 29, Ex. 12, p. 19-20).

In October 2001 Hull noticed that the rear grille for the

7

air conditioner was missing after a windy day. (Docket Entry #
29, Ex. 12, p. 25). At some point that autumn, Hull's roommate
DeFelice duct taped the exterior grille to the wall sleeve to
prevent it from falling off again. (Docket Entry # 30, Ex. 13,
p. 14). This stopgap solution was not very effective as the
grille fell off a few more times. (Docket Entry # 30, Ex. 13, p.
17). After considering getting a grille fabricated, Hull created
a grille from a metal mesh screen that she "tucked" inside the
sleeve. The screen was not secured by any mounting hardware.
(Docket Entry # 29, Ex. 12, pp. 53-56). Neither Hull nor
DeFelice attempted to contact GE to order a replacement grille.
Hull thought that the sleeve and grille were too old to get
replacement parts and DeFelice was unsure of the manufacturer of
the grille. (Docket Entry # 29, Ex. 12, p. 54; Docket Entry #
30, Ex. 13, p. 40).

    During these attempts to replace the missing grille, Hull
and DeFelice became more familiar with how the exterior grille
was mounted to the wall sleeve. Their testimony regarding the
mounting hardware, however, differs in some important ways from
each other and from that of GE. Hull testified that the grille
was secured by what appeared to be white "plasticy" (sic) screws
that she "assumed" were mounted from the outside towards the
inside. (Docket Entry # 29, Ex. 12, pp. 49-51, 110). DeFelice
testified that the grille was rusted around the edges and that it

8

was secured by quarter inch hex head sheet metal screws mounted
from the outside towards the inside.  DeFelice did not recall
seeing any plastic hardware.  (Docket Entry # 30, Ex. 13, pp. 9-
10 & 20-21).  Defendant's expert H.D. Moore ("Moore"), a GE
engineer involved in air conditioner operations, testified that
the hardware described by Hull and DeFelice in their depositions
did not match components designed manufactured or sold by GE.  GE
grilles were made of rust proof, stamped aluminum and the screws
attaching the grilles to wall sleeves were installed from the
inside out.  (Docket Entry # 31, Ex. 19, pp. 2-3).

On the other hand, there is evidence on the record to
suggest that the exterior grille of unit 3A was attached to the
wall sleeve in a manner identical to that of units 1J and 2M,
i.e. via the three-part system consisting of a metal screw, clip
and nylon grommet.  W. Joseph Fallows III ("Fallows"),
plaintiff's plastics expert, stated in his May 15, 2006 report
that "shadow marks" of grommets remained on the sleeve of unit 3A
that were identical in shape and size to the "shadow marks" left
by the nylon grommets on units 1J and 2M.  (Docket Entry # 67,
Ex. 9, p. 277-279).  Based on these comparisons, Fallows assumed
that a GE grille and nylon grommets were installed in unit 3A
around 1971.  Fallows never examined the actual grille or
fasteners from unit 3A.  (Docket Entry # 67, Ex. 9, p. 246-248).

The grommets on units 1J and 2M were constructed of white

nylon six according to a pre-1975 design.  (Docket Entry # 65,
Ex. 8, p. 2; Docket Entry # 67, Ex. 9, p. 247).  These grommets
are identical to those depicted in GE's part drawing number
864C709 dated June 24, 1960.  (Docket Entry # 67, Ex. 9, pp. 223-
224).  Nylon six is hygroscopic and known to degrade when exposed
to ultraviolet radiation and the 1J and 2M exterior grommets were
exposed to sunlight and precipitation.  (Docket Entry # 65, Ex.
8, pp. 2 & 5-6).  When the air conditioners for units 1J and 2M
were removed from the building after the fire, some nylon
grommets were cracked, "severely weathered" and "crazed" on the
inside.  (Docket Entry # 65, Ex. 8, p. 2).  In his May 15, 2006
report, plaintiff's expert Fallows opines that the unit 3A nylon
grommets had similarly deteriorated and failed to engage the
exterior grille.

Fallows further concluded that GE failed to identify the
appropriate materials from which to manufacture grille hardware
or to consider the risks associated with using a grommet made of
nylon six.  (Docket Entry # 65, Ex. 8, pp. 5-6 & 9-10).  Because
Fallows did not have the opportunity to inspect the grille in
question, however, he could not rule out the possibility that the
failure was due to abuse, misinstallation or chemical attack.
(Docket Entry # 67, Ex. 9, pp. 281-88).  Fallows could also not
state whether any alternative means of attaching a rear grille
would last longer than 31 years.  (Docket Entry # 27, Ex. 22, pp.

10

150-153).

Plaintiff's expert Scott A. Jones ("Jones") also offered testimony regarding the air conditioner grille design.  Jones is a professional engineer and certified fire and explosion expert. In addition, Jones worked at GE Aircraft Engines from 1987 to 1994 and at GE Appliances from 1994 to 1996.  (Docket Entry # 39, p. 11).

In his February 9, 2007 report Jones concluded that an alternative design for the exterior grille attachment existed at the time of production.  This alternative presented no technical challenge, was cost-effective and would not affect the operation or aesthetics of the air conditioner.  (Docket Entry # 85, Ex. 14, p. 15).  Specifically, Jones opined that the screw attachment points could be rotated between the grille and the steel enclosure to obviate the need for grommets and "Tinnerman" clips could be used to capture the screws.  Similarly, a plastic injection molded grille would have also removed the need for grommets.  (Docket Entry # 85, Ex. 14, p. 15).  Fallows also points to alternative designs of competitors Friedrich and Frigidaire who do not use nylon grommets in their designs. (Docket Entry # 65, Ex. 8, pp. 5-6 & 9-10).  GE disputes this alternative design testimony, pointing to Jones' testimony that he did not know of any air conditioner manufacturer which used Tinnerman clips.  Jones also did not know of any Tinnerman clip

11

application that had been used successfully for over 30 years without repair or replacement. (Docket Entry # 26, p. 11). GE did not dispute the evidence of its competitors' alternative designs.

Despite their efforts to fashion a replacement for the missing grille at unit 3A in late 2001, Hull and DeFelice continued to have problems. Hull testified that she believed the wire mesh "grille" she installed in the fall 2001 was torn and destroyed by squirrels. Although she did not see any squirrels actively damaging the mesh, they were often on her deck near the air conditioner. After the mesh grille was destroyed she actually saw them inside the air conditioner. (Docket Entry # 50, Ex. 6, pp. 56-57). Furthermore, DeFelice testified that he removed nesting material from the air conditioner by hand after the wire mesh was destroyed. (Docket Entry # 30, Ex. 13, p. 27). Although Hull covered the air conditioner with mesh a few days later, it was destroyed again in a similar fashion. (Docket Entry # 29, Ex. 12, pp. 42-43).

It is not clear from the record whether the exterior of the air conditioner was covered from early winter 2001 until the fire in June 2002. While Hull testified that she could not recall if the exterior was covered during this period, she stated that, "I wouldn't have liked it just left like that all winter." (Docket Entry # 29, Ex. 12, p. 43). Hull was unsure whether squirrels

were living in the air conditioning unit throughout the winter of 2002. (Docket Entry # 29, Ex. 12, p. 44). On the other hand, DeFelice testified that no matter what was done during this period, the squirrels kept coming back. He continually heard animal noises in the air conditioning unit and in the walls and ceiling. (Docket Entry # 30, Ex. 13, pp. 25 & 28).

During this approximately eight month period without a proper grille on the air conditioner both Hull and DeFelice were concerned about possible damage to the unit. Hull worried that dirt and debris were going to get into the unit and the mechanics would rust. (Docket Entry # 29, Ex. 12, p. 41). She was also concerned that animals would chew the wiring in the air conditioner. (Docket Entry # 29, Ex. 12, p. 45). Plaintiff does not dispute this testimony but disputes any implication that Hull knew or should have known of the risk of fire from chewed wires. (Docket Entry # 40, p. 14). DeFelice, a journeyman electrician since 1988, had known of animals chewing on and damaging electrical wires before the time of the fire. (Docket Entry # 30, Ex. 13, pp. 6-9 & 104-105). Plaintiff does not dispute the foregoing fact, but disputes any implication that Hull or DeFelice acted in an unreasonable manner. Furthermore, plaintiff disputes that Hull or DeFelice's awareness of the risk of chewed wires is a defense to the breach of warranty claim or relieves GE of its duty to make safe products and warn consumers of known

13

dangers.  (Docket Entry # 40, p. 14).

While Hull and DeFelice's testimony highlights their concern of physical damage to the air conditioner due to lack of a grille, GE's expert Moore testified that a grille's primary function is aesthetics and proper air distribution.  (Docket Entry # 31, Ex. 17, p. 22).  Moore did, however, testify that GE grille openings are designed to ensure that small birds do not get into or nest in the air conditioning units.  He stated that the only danger resulting from an animal getting into a GE air conditioner would be to that animal, not to the end consumer.  (Docket Entry # 31, Ex. 17, pp. 24-27).  GE disputes this, pointing to Fallows' testimony that one function of a grille is to protect internal wires from the known risk of rodents.  (Docket Entry # 50, Ex. 8, pp. 6-7).  Moore did not know if anyone at GE considered the risk of a squirrel inside an air conditioner and he did not consider it personally.  (Docket Entry # 31, Ex. 17, p. 25).  He was not aware of consumers ever being warned about the hazard of squirrels getting into GE air conditioners.  (Docket Entry # 31, Ex. 17, pp. 28-29).  While plaintiff does not dispute Moore's lack of knowledge on this point, it disputes the implication that this lack of knowledge is a defense to the breach of warranty claim or that GE is relieved in any way of the duty to design a safe product and warn users of dangers known in the industry.  (Docket Entry # 40, p. 18).

14

Ocean Terrace's experts Jones and Evan K. Haynes ("Haynes") testified as to how the unit 3A air conditioner, without its exterior grille, could have started the fire. Haynes is a mechanical engineer with a master's degree in fire protection engineering currently employed by plaintiff's insurer, St. Paul Travelers Insurance ("Travelers"). (Docket Entry # 39, p. 7; Docket Entry # 85, Ex. 13, p. 1). As mentioned above, Jones is a professional engineer and certified fire and explosion expert. (Docket Entry # 39, p. 11).

In a May 15, 2006 report for Ocean Terrace, Haynes reviewed documents and testimony related to the fire and examined the air conditioners of Ocean Terrace unit numbers 1J, 2M and 3A. (Docket Entry # 85, Ex. 13, pp. 1-3). Haynes' found chewed electrical wires and botanical materials in the unit 3A air conditioner core that were consistent with the chewed wires and animal nesting materials also found in the air conditioner of unit 2M. On the base of the 3A air conditioner, Haynes located a "hot spot" which is indicative of electrical arcing. (Docket Entry # 85, Ex. 13, p. 6).

Haynes also testified regarding the "Nortu Jappah" air conditioner fire at an apartment in Vernon, Connecticut. The "Jappah" fire involved a GE through the wall air conditioner that transferred enough heat through the wall sleeve to set fire to the surrounding building structure. In the "Jappah" unit there

15

was also evidence of electrical arcing and botanical materials consistent with nesting materials. (Docket Entry # 85, Ex. 13, p. 8). Haynes concluded that the ignition source of the Ocean Terrace fire was the electrical activity resulting from a chewed wire at the base of the 3A air conditioner and that the nesting material acted as fuel. (Docket Entry # 85, Ex. 13, pp. 8-9).

In addition to his testimony regarding air conditioner grille and hardware design mentioned above, plaintiff's expert Jones testified regarding the wiring of the 3A air conditioner core. (Docket Entry # 85, Ex. 14, pp. 12-14). Jones' testimony is consistent with that of Haynes with respect to the opinion that the arcing event occurred while the air conditioner was turned off. (Docket Entry # 85, Ex. 14, p. 13; Docket Entry # 85, Ex. 13, pp. 8-9). Additionally, Jones concluded that GE could have prevented the fire by using an alternate wiring design know as "double pole contactors" to provide a double line break in the refrigeration power circuit. (Docket Entry # 85, Ex. 14, pp. 12-14). Jones testified that this is a well known technology used by GE in its kitchen range products. (Docket Entry # 85, Ex. 14, p. 14). In his report Jones also stated that this alternative design "presented no technological challenge, little to no increase in per unit material cost and no changes to the operation or aesthetics" of the air conditioner. (Docket Entry # 85, Ex. 14, pp. 12-13). In contrast to this testimony, GE points

to Jones' deposition in which he testified that he did not know
of:  any air conditioner manufacturer that used double pole
contactors; any industry standard that required the use of this
design; any other person who had expressed an opinion on the
subject; or any scientific literature advocating this design.
(Docket Entry # 32, Ex. 23, pp. 130 & 133).

---

### DISCUSSION

In moving for summary judgment, GE puts forth several
theories as to why the instant case should be decided as a matter
of law.  As this case is based on diversity, Massachusetts law
applies to all substantive issues.  B & T Masonry Constr. Co. v.
Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 38 (1st Cir. 2004).  GE
first argues that Ocean Terrace cannot sustain the burden of
proving that the rear grille and fasteners for the unit 3A air
conditioner were designed, manufactured or sold by GE.  Second,
GE states arguendo that if the fasteners that failed were
supplied by GE, there is insufficient evidence on the record that
their failure is attributable in any way to GE.  Third, GE argues
that it had no duty to provide a rear grille, sleeve and hardware
that would be "squirrel-proof" after 30 years.  Fourth, GE
maintains that the plaintiff has no evidence of a technologically
and commercially feasible safer alternative design available to
GE before 1971.  Fifth, GE argues that plaintiff cannot sustain

17

its burden of proving that GE was negligent in failing to provide warnings that the exterior grille could fall off.

Turning to the first argument, "Identification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action." Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982). Likewise, "[a] plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer." Mathers v. Midland-Ross Co., 532 N.E.2d 46, 49 (Mass. 1989). A similar requirement adheres to a breach of warranty claim. See, e.g., Garcia v. Kusan, Inc., 655 N.E.2d 1290, 1291 & 1294 (Mass.App.Ct. 1995) (affirming summary judgment on breach of warranty and negligence claims given the plaintiff's failure to identify manufacturer of hockey stick); accord Spencer v. Baxter International, Inc., 163 F.Supp.2d 74, 77 (D.Mass. 2001) (recognizing causation as essential element in breach of warranty claim and stating that the plaintiff "generally must identify the specific defendant responsible for an actionable harm"). Moreover, in breach of warranty claims, the plaintiff must also "show that the product was in a defective condition when it left the defendant's possession." Makuc v. American Honda Motor Co., Inc., 835 F.2d 389, 392-393 (1st Cir. 1987) (citing Walsh v. Atamian Motors, Inc., 406 N.E.2d 733, 734

(Mass.App.Ct. 1980)).

The evidence regarding the provenance of the grille and hardware for the unit 3A air conditioner is not overwhelming. The grille and hardware were missing before the fire and were never recovered after the fire. Despite these facts, there is sufficient evidence on the record that would permit a reasonable jury, making inferences in the nonmovant's favor, to find for plaintiff.

Ocean Terrace's plastics expert Fallows testified that "shadow marks" of grommets remained on the sleeve of unit 3A that were identical in shape and size to the "shadow marks" left by the white nylon six grommets on units 1J and 2M. Additionally, Fallows testified that these shadow marks were consistent with the dimensions of the pre-1975 GE nylon grommet depicted in GE's part drawing number 864C709, dated June 24, 1960. Although Hull and DeFelice's eyewitness testimony is somewhat inconsistent regarding the grille and hardware for the air conditioner, Hull did testify that she saw white "plasticy" (sic) screws holding the grille in place. When shown a photo of the unit 1J air conditioner with an attached GE grille, Hull testified that it was the same as the grille on her air conditioner at unit 3A. Given this eyewitness and expert testimony, summary judgment is inappropriate based on the argument that the grille and hardware were not designed, manufactured or sold by GE.

19

GE argues in the alternative that, if the nylon grommets were manufactured by GE, there is insufficient evidence on the record to support that their failure is in any way attributable to GE. The evidence shows that the compound used to construct the grommets, nylon six, degrades when exposed to UV radiation and that its hygroscopic qualities cause it to expand and contract, further weakening it. When the nylon six grommets for units 1J and 2M were examined some of them were "severely weathered" and "crazed" on the inside. A reasonable jury, inferring that the grommets in unit 3A were the same as those on units 1J and 2M, could find that the 3A grommets degraded in a similar manner. GE argues that improper installation or physical and/or chemical abuse cannot be ruled out as causes for the failure of the grommets. These genuine and materially differing versions of the facts are exactly what must be resolved by a factfinder at trial and therefore summary judgment is inappropriate based on this argument.

Third, GE argues that it had no duty to provide a rear grille, sleeve and hardware that would be "squirrel-proof" after 30 years. To succeed in a negligence action, "the plaintiff must satisfy the elements of duty, breach, causation and damages." Coughlin v. Titus & Bean Graphics, Inc., 767 N.E.2d 106, 110-111 (Mass.App.Ct. 2002). Absent a duty of care, there can be no liability for negligence. See Remy v. MacDonald, 801 N.E.2d 260,

20

262 (Mass. 2004); accord Coughlin v. Titus & Bean Graphics, Inc., 767 N.E.2d at 111 ("person is not negligent toward another unless he owes the other a duty to be careful").

Unlike warranty liability, "the focus of the negligence inquiry is on the conduct of the defendant." Colter v. Barber-Greene Co., 525 N.E.2d 1305, 1313 (Mass. 1988).  Liability thereby enures "when a product's manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." Id. Accordingly, the manufacturer must anticipate the environment in which the product will be used and then design the product against the reasonably foreseeable risks attending the product's use in that setting. Simmons v. Monarch Mach. Tool Co., Inc., 596 N.E.2d 318, 322 (Mass. 1992), abrogated on other grounds, Vassallo v. Baxter Healthcare Corp., 696 N.E.2d 909 (Mass. 1998). The manufacturer's duty, however, is one of reasonable care, not perfection, and there is no duty to design a product that is completely risk free. Morrell v. Precise Engineering, Inc., 630 N.E.2d 291, 293 (Mass.App.Ct. 1994); Wasylow v. Glock, Inc., 975 F.Supp. 370, 379 (D.Mass. 1996).

Furthermore, a manufacturer does not have to develop safety devices to protect against every remotely possible danger. DoCanto v. Ametek, Inc., 328 N.E.2d 873, 878 (Mass. 1975) ("Ametek had no obligation to develop safety devices to protect

against every remotely possible danger"). In evaluating whether a product was designed with reasonable care to eliminate avoidable dangers, several factors must be considered. These factors include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." Cigna Ins. Co. v. Oy Saunatec Ltd., 241 F.3d, 1, 15-16 (1st. Cir. 2001) (citing Back v. Wickes Corp., 378 N.E.2d 964, 970 (Mass. 1978)).

     In the case at bar, a reasonable jury could find that there was a foreseeable risk of danger that, if the air conditioner grille was detached, the internal mechanisms could be damaged by a small animal, which in turn could cause greater damage. While the exact animal and type of damage in this case may not have been predicted by GE at the time of manufacture, the fire at Ocean Terrace was not completely unforeseeable. GE's expert Moore testified that the danger of small birds getting into the air conditioner was factored into the grille design but that squirrels were not considered. Moore further testified that the only danger resulting from an animal getting into a GE air conditioner would be to that animal, not to the end consumer. Ocean Terrace, on the other hand, maintains that one purpose of a

grille is to protect the electrical components of an air conditioner and that the danger of rodents chewing electrical wires was widely known.

Moreover, considering the Cigna/Back factors listed above, the gravity of the danger posed by an electrical fire in a condominuim complex is extreme, even if the likelihood that the event would occur is small.  Ocean Terrace's expert testified that double pole contactors could have removed this danger with no technological issues, little to no increase in per unit cost and no changes to the operation or aesthetics of the air conditioner.  In opposition, GE points to evidence that Ocean Terrace's expert knew of no air conditioner manufacturers that used double pole contactors or any industry or scientific literature advocating this design.

Moving briefly to the duty issue in the breach of warranty claim, the analysis is similar, but the focus of the analysis shifts.  Whereas negligence focuses on the actions of the manufacturer, a claim for breach of warranty focuses on the product.  Correia v. Firestone Tire & Rubber Co., 446 N.E.2d 1033, 1039 (Mass. 1983).  Manufacturers impliedly warrant that "'their products will be fit for the ordinary purposes for which such goods are used,' and, as in negligent design claims, ordinary purposes include both intended and foreseeable uses of the product."  Id. (quoting Mass. Gen. Laws ch. 106 § 2-314(2)(c)).

23

Because the duty analysis for breach of warranty is essentially the same as in a negligence action, see Back v. Wickes Corp., 378 N.E.2d at 970, the previous duty discussion applies.

Viewing the evidence in favor of the nonmovant, a reasonable jury could find that the damage to the air conditioner was foreseeable and consequently, GE owed a duty to Ocean Terrace. Therefore, summary judgment is inappropriate.

GE's fourth argument is that Ocean Terrace has no evidence of a technologically and commercially feasible safer alternative design available to GE before 1971. GE contends that plaintiff has the burden of establishing the availability of a pre-1971 reasonable alternative design. The Cigna/Back factors discussed above are to be balanced and although they are probative of the reasonableness of the challenged design, they are not dispositive. See Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 699 (1st Cir. 1988). "The plaintiff need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it." Haglund v. Philip Morris, Inc., 847 N.E.2d 315, 323 (Mass. 2006). In some circumstances, a jury can find that a challenged design breaches the duty of reasonable care based on lay knowledge, without any expert testimony. See Smith v. Ariens Co., 377 N.E.2d 954, 957 (Mass. 1978); see also DoCanto v. Ametek, Inc., 328 N.E.2d at 877.

24

From the evidence on the record, a rational jury could find that a reasonable alternative design was available to GE at the time of manufacture.  Ocean Terrace submitted evidence that alternative screw configurations, Tinnerman clips, or a plastic grille would have obviated the need for nylon grommets.  In addition, Ocean Terrace points to other air conditioner manufacturers who use alternate means to attach exterior grilles. GE refutes much of this alternative design evidence by stating that Ocean Terrace has no evidence whether these alternatives would last over 30 years.  While this argument has some merit, it does not overcome the evidence that GE has put forth.

Ocean Terrace also offered evidence about double pole contactors, technology that, even if the grille had failed, would have prevented the fire.  Ocean Terrace contends that this wiring method was well known to GE at the time of manufacture.  GE argues in reply that there is no industry standard or technical literature that requires or advocates the use of this technology. GE also points to the fact that plaintiff's expert Jones could not name an air conditioner manufacturer who has ever used double pole contactors.  On both the grille fastening and wiring issues, genuine issues of material fact remain that must be weighed by a jury and therefore summary judgment is inappropriate.

GE's fifth and final argument is that Ocean Terrace cannot sustain its burden of proving that GE was negligent in failing to

provide warnings that the exterior grille could fall off.  In
general, negligent failure to warn and failure to warn under a
breach of warranty claim are judged by the same standard, i.e.,
the reasonableness of the defendant's actions under the
circumstances.  <u>Carrel v. National Cord & Braid Corp.</u>, 852 N.E.2d
100, 109 n. 12 (Mass. 2006).  The manufacturer must provide
adequate warnings of foreseeable latent dangers involved in the
product's normal and intended use.  <u>Fiorentino v. A.E. Stanley
Mfg.</u>, 416 N.E.2d 998, 1002 (Mass.App.Ct. 1981).  Additionally,
the manufacturer must communicate adequate warnings and
instructions about the forseeable *misuse* of the product it knows
or should have known.  <u>See</u> <u>Venezia v. Miller Brewing Co.</u>, 626
F.2d 188, 190 (1st Cir. 1980) (emphasis added).

A post sale duty to warn may also arise if a design defect
is present at the time of sale.  <u>Cigna Ins. Co. v. Oy Saunatec
Ltd.</u>,241 F.3d, at 12 ("when the design defect is present at the
time of sale, the manufacturer has a duty to warn at least the
purchaser of the risk as soon as it learns or should have learned
of the risk created by its fault").  The manufacturer also has a
duty to take reasonable steps to warn at least the purchaser of
changes which "eliminate or tend to eliminate the risk created by
the manufacturer's initial fault."  <u>Id.</u> at 13.

In the instant case, the duty to warn hinges on a very
similar foreseeability inquiry to the discussion regarding the

duty to provide a "squirrel proof" grille and fasteners.  GE's
experts contend that there was no known history of rear grilles
falling off wall sleeves due to grommet failure and no known
danger associated with such an event.  GE also argues that Hull
and DeFelice should have replaced the grille.  Ocean Terrace, on
the other hand, has submitted evidence that other grilles had
fallen off of wall sleeves at the condominium building.  Ocean
Terrace's experts also testified that nylon six was a poor choice
for outdoor applications and that other designs were available
both before and after the time of manufacture.  This evidence
suggests that if GE did not know of the risks related to the
grille and hardware, it should have known.  A reasonable jury
could also conclude that Hull and DeFelice leaving the air
conditioner uncovered during the typically cool winter and spring
months was a forseeable misuse of the product.  Viewing this
evidence in the light most favorable to plaintiff, summary
judgment is inappropriate on the duty to warn issue.


                          CONCLUSION

     Accordingly, in light of the above discussion, this court
**RECOMMENDS**[1] that defendant's motion for summary judgment (Docket

---

     [1] Any objections to this Report and Recommendation must be
filed with the Clerk of Court within ten days of receipt of the
Report and Recommendation to which objection is made and the
basis for such objection.  Any party may respond to another

Entry # 25) be **DENIED** on all counts.

       /s/  Marianne B. Bowler

**MARIANNE B. BOWLER**

United States Magistrate Judge

---

party's objection within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  <u>United States v. Escoboza Vega</u>, 678 F.2d 376, 378-379 (1st Cir. 1982); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).