### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NUMBER: 05 10075 PBS

| | |
|---|---|
| OCEAN TERRACE CONDOMINIUM TRUST, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| GENERAL ELECTRIC COMPANY | ) ) |
| Defendant. | ) ) |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Ocean Terrace Condominium Trust responds to Defendant General Electric

Company's ("GE") Objections to Report and Recommendation regarding GE's Motion for

Summary Judgment as follows:

1.  GE objects to the statement of page 6 of the Report which states that Mr. Little "decided not to replace all of the flashing (Docket #92, Ex. 20, p. 60)". The exhibit referred to does not support the statement. Mr. Little's testimony at Ex. 20, p. 60 states that he decided not to replace "some pans" namely wall sleeves. His testimony affirmatively establishes that "new flashing" was to be installed around existing pans. This testimony is relevant and material because the installation of new flashing around the wall sleeve in issue not only involves the removal of the old flashing but the physical task of bending flashing and attaching it to the structure immediately adjacent to the wall sleeve and fasteners in issue provides an explanation for damage to the fasteners missing before the loss in issue.

### RESPONSE:

Mr. Little actually testified that his engineering specifications required all of the

air conditioner openings be made watertight. Defendant Ex 8, Little Deposition, page 39.

Counsel for defendant attempted to illicit an admission from Mr. Little that all of the air

conditioning units were reflashed in 1999 and Mr. Little refused to admit counsel's

leading question. Mr. Little repeated that the engineer simply wanted the air conditioners

to be watertight. Id. Mr. Little then explained to counsel for defendant that when some

of the air conditioners were removed, the sleeves (Mr. Little calls the sleeves "pans")

were inspected. The sleeves that were inspected were in good condition and watertight.

It was at that time that Mr. Little decided to allow the contractor to keep the existing

sleeves in place. Id at 39-40. The air conditioners would have to be removed to flash

around the sleeves. Id at 30, 38, 39. The Magistrate's statement that not all of the

flashing around all of the air conditioners was replaced is correct. The Magistrate's

reference to support this statement does not completely support the statement but the

record <u>does</u> support the statement so this is an objection without significance.

As to counsel's argument that reflashing of some air conditioner units other than

the one involved in this case explains damage to the fasteners that failed is not supported

by the record.

2. On page 8 of the Report, the source of almost all of the statements concerning the nylon
grommets is an unsigned and unverified report of Plaintiff's expert Joseph Fallows which
Plaintiff submitted as Ex. 8. This report does not meet the criteria of Fed. R. Civ. P. Rule
56 for materials which may be considered in opposition to a motion for summary
judgment. GE objects to the use of any information in Plaintiff's Ex. 8 in opposition to
the motion for summary judgment.

**RESPONSE:**

Page 8 of the Report discusses the testimony of Ms. Hull and Mr. DeFelice and

does not reference Mr. Fallows' report so Defendant must have made a mistake when

referencing Page 8 of the Report. The only references to Mr. Fallows' Rule 26 Report

are on 10, 11 and 14 of the Report. Plaintiff did inadvertently attach an unsigned copy of

Mr. Fallows' Rule 26 Report as Exhibit 8 and moves now to substitute a signed copy

which is attached as Exhibit 1. Defendant never raised this argument at the hearing on its

Motion for Summary Judgment and has not argued that, in fact, Exhibit 8 is not a true

and correct copy of Mr. Fallows' Rule 26 Report because the Report was properly served

upon Defendant and was marked as an Exhibit during Mr. Fallows' deposition.

Moreover, every material point made by Mr. Fallows in his Rule 26 Report that

the Magistrate used to support her Report was also supported by sworn testimony of Mr.

Fallows and properly made a part of the record. See Plaintiff's Brief in Opposition to

Defendant's Motion for Summary Judgment, pp 18-19, for a partial list of those

references, as well as Exhibit 9, Fallows' Deposition.

3.    On page 8 of the Report, the statement is made that these "grommets [referring to
grommets for condominium units 1J and 2M] are identical to those depicted in GE's part
drawing number 864C709 dated June 24, 1960 ..." The source of this information is
attributed to Plaintiff's Ex. 9 pp. 223-224. The only drawing referred to on these pages
was a drawing of the grommet "currently" used by GE. The drawing referenced in the
Report, 864C709, was not submitted as an Exhibit by Plaintiff in any form, and certainly
not in any verified or properly authenticated form. In fact, drawing 864C709 is not a part
drawing for a grommet. Said drawing references "grommets" generally but contains no
information about the grommets referenced which would permit a comparison with any
other document or object. GE objects to the inclusion in the Report of this material
which is not properly supported by the record in accordance with Rule 56.

**RESPONSE**:

This statement in the Report that "These grommets are identical to those depicted

in GE's part drawing number 864C709 dated June 24, 1960" is found on Page 10 of the

Report, not Page 8. The references supporting this statement in the record are Exhibit 12,

Jones Deposition, pages 62-63 and Exhibit 9, Fallows Deposition, pages 223-224. The

Report simply omitted the testimony of Mr. Jones. Mr. Jones specifically references this

drawing in his testimony and that the drawing refers to grommets. He specifically

testifies that this drawing shows grommets. Moreover, this drawing is only one of a

multitude of facts from which a jury could reasonably conclude that a GE grommet was used to attach the grill and that the GE grommet failed which resulted in this fire. This objection does not affect the integrity of the Magistrate's analysis that this case presents questions of fact that must be decided by a jury.

4.   The discussion in the Report, at page 11, of alternative means of grille attachment is irrelevant in the absence, at a minimum of admissible testimony that the alternative means would outlast the means selected by GE. Not only do Plaintiff's experts Joseph Fallows and Scott Jones fail to provide such testimony but the record affirmatively establishes that they cannot provide such testimony GE objects to the consideration by this court of assertions of the mere existence of alternative attachment methods in the absence of admissible evidence that, at a minimum, such alternative attachment methods would out perform the method selected by GE. GE again objects to the use of the unsigned and unverified Plaintiff's Ex. 8 as a basis for the discussion on page 11 of the Report.

**RESPONSE**:

The alternative means of grille attachment discussed by Plaintiff's expert all eliminate the use of nylon grommets that deteriorate due to exposure to sunlight and precipitation. The clear inference that arises from this testimony is that these alternative means of grille attachment would outlast the nylon grommets that failed in this case. A fair reading of Mr. Jones' Report, deposition and affidavit that were made a part of this record are that the alternative means of grille attachment are better means of attaching the grille. For example, GE uses metal screws to attach exterior grilles to some of its sleeves. Exhibit 14. Therefore, this objection is also without merit.

5.   At page 14 of the Report the statement appears, "GE disputes this, pointing to Fallows' testimony that one function of a grille is to protect internal wires from the known risk of rodents (Docket entry #50, Ex. 8, pp. 6-7). First, GE believes there is a typo in this statement and "GE" should be replaced with "plaintiff." Second, GE again objects to the use of the unsigned, unverified Ex. 8. Third, the content of Ex. 8 does not establish  any recognition by manufacturers or designers of air conditioners before 1985 that a function of rear grilles on air conditioning units was to keep

rodents out. The references contained in Ex. 8 pp. 6-7 are from 1990 to 2006 and relate to underground cables, and railroad and traffic signals, not to air conditioners.

**RESPONSE**:

Plaintiff has moved to substitute Mr. Fallows' signed report for the unsigned

report that was inadvertently attached to its Response to the Motion For Summary

Judgment. As set forth in its motion, a manufacturer like GE must anticipate the

environment in which its product will be used and must design against the reasonably

foreseeable risks attending the product's use in that setting." Back v. Wickes Corp., 375

Mass. 633, 640-41, 378 N.E.2d 964, 969 (Mass. 1978). Moreover, Engineer Jones, after

explaining the design process GE should have followed, in his Rule 26 Report, concludes

that, "The risk, a squirrel chewing through an electrically energized conductor, was

reasonably foreseeable to the product designer at the time of manufacturer." Exhibit 14,

page 6.

6. The reference to an alleged "Nortu Jappah" air conditioner fire on page 15 of the Report is based on an unsigned, unverified "report" of Evan Haynes which does not meet the requirements of Fed. R. Civ. P. Rule 56. The description and analysis of the fire is based at least in part on inadmissible hearsay. The fire happened after the fire in issue and the cause of the fire was attributed to arcing inside a motor, not to rodent activity. Consideration of the alleged "Nortu Jappah" fire has no relevance to the issues before the court.


**RESPONSE**:

GE is mistaken. Mr. Haynes' report is verified. See Exhibit 13, page 1,

paragraph 4 and attached report. A fair reading of Mr. Haynes' report establishes that the

Nortu Jappah fire is simply being used by him as a basis of his opinions in the case.

7. The Report, page 16, references an opinion of Scott Jones for the use of "double pole contactors" to provide a double line break in the refrigeration power circuit. This is an inadmissible ipse dixit opinion in view of Jones admissions that he knew of no air conditioner manufacturer that ever used such a design, any industry standard that

required the use of such a design, any other person who had expressed an opinion on the subject and no scientific literature advocating such a design. (See: Report, page 17) <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d. (1993); <u>Kumho Tire Company, Ltd. v. Carmichael,</u> 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d. 238 (1999). The record does affirmatively establish that the air conditioner unit in issue waslisted by Underwriter's Laboratory (GE Ex. 17, pp. 83-89).

**RESPONSE**:

As the Magistrate correctly determined on page 24 of the Report, the Plaintiff need only convince the jury that a safer alternative design was feasible, not that any other manufacturer in the industry employed it or even contemplated it. <u>Haglund v. Philip Morris,</u> Inc., 847 N.E.2d 315, 323 (Mass. 2006). Plaintiff stands on the arguments raised in its brief regarding this issue.

8.   GE objects to the conclusion in the Report, at page 19, that the Plaintiff has sufficient evidence to sustain its burden of proving that the hardware, which disappeared along with the grille 9 months before the fire, was sold by GE and sold in a defective condition. The Report states two bases for its conclusion that there is a triable issue on this point. First, it refers to testimony of Fallows that on the wall sleeve in issue there were shadow marks "consistent" with the dimensions of a pre-1975 GE grommet. At best this contention may warrant an inference that for some time during its 31 year life there was an object with at least one dimension of the same size as the pre-1975 grommet used by GE in contact with wall sleeve. The shadow marks provide no information about the material of the object or any of its other dimensions and the shadow marks provide no information about what was present at the time the grille disappeared. The second basis relied on in the Report is that Hull saw "plasticy" screws holding the grille in place. With respect to the plastic screws which were the subject of Hull's testimony she repeatedly stated that they had threads like a screw. (GE Ex. 12, pp. 48-50) A screw is the opposite of a grommet. A screw has threads on the outside. A grommet has threads on the inside! There is no reasonable basis for a jury to infer that was described as a screw was in fact the opposite!

Inferences must be reasonable. They must be based on probability rather than possibility and may not be the result of speculation or guess work. <u>Alholm v. Wareham,</u> 371 Mass. 621, 627, 358 NE2d 788 (1976); <u>Poirier v. Plymouth,</u> 374 Mass. 20b, 212, 372 NE2d 212 (1978). <u>Ferragamo v. Mass Bay Transportation Authority,</u> 395 Mass. 581, 481 NE2d 477 (1985).

At best a jury could only speculate what fasteners were present when the rear grille disappeared and can only speculate whether any such fasteners were in a condition

for which GE had any responsibility. Summary Judgment should enter for GE under
such circumstances.

**RESPONSE**:

Plaintiff stands on the numerous facts, many of them omitted by the Defendant in
this objection, in the record before this Court, which raise a fact question for the jury
whether GE grommets failed in this case which resulted in the fire. In addition to the
shadow marks on the sleeve that did survive the fire, plaintiff has the testimony of its
experts that there is no evidence on the sleeve of alternative means of attachment, the
testimony of Ms Hull that, in fact, the grille was attached to the sleeve in the same
manner as an exemplar grille from the building as well as numerous other facts set forth
in Plaintiff's Exhibits presented in opposition to GE's Motion.

9.  GE objects to the conclusion of the Report, at page 20, that a jury might reasonably
    infer that the failure of missing grommets, assumed to be supplied by GE, was due to
    unspecified degradation due to UV radiation resembling the post-fire condition of
    grommets in units 1J and 2M. This proposition involves pure speculation. The
    undisputed evidence submitted by GE established:

    a.  The condition of any grommets for the wall sleeve in unit 3A at the time of
        installation in the late 60's or 1971 is unknown. (Ex. 3, pp. 18-21; Ex. 22, pp. 47-
        50) Whether the assumed grommets were damaged or the screws were
        overtorqued is unknown.

    b.  There was substantial construction work around the wall sleeve for Unit 3A in
        1999 involving the removal of shingles and flashing. (Ex. 8, pp. 30, 38-42) This
        work had resulted in known damage to at least one air conditioner grille (Ex. 8, p.
        133) Whether the assumed grommets were damaged in this or other activities in
        the 31 years of their assumed use is unknown and cannot be ruled out.

    c.  Plaintiff's expert Fallows has admitted that he had no knowledge or evidence of
        whether any assumed grommets were physically or chemically abused and that he
        could not rule out such abuse or improper installation as possible causes for any
        hardware becoming missing (Ex. 22, p. 60-61)

    d.  Fallows admitted there was no other case in which he has provided on opinion
        about the failure of something he never saw! (Ex. 22, p. 62) Fallows admitted

that he was not aware of any scientific standard that would permit someone to reach a determination as to the cause of a failure of something that is not in existence or visible. (Ex. 22, p. 62)

e.   The statements of Plaintiff's expert Fallows, relied upon in the Report, of degradation of nylon grommets are meaningless in the absence of data showing an effect on the performance of a grommet in the particular application in issue. Essentially all materials degrade. In the building in issue every material around the wall sleeve in issue (the roof, the sheathing, the shingles, the flashing and other outside ducts) had degraded to the point where they were actually replaced.

The mere existence of degradation of strength does not establish a product defect or a cause for a missing grille. Fallows has admitted that he does not know the necessary tensile strength for the application in issue. By way of example if the tensile strength of the assumed grommets when new degraded by 50% but if only 5% of the tensile strength was needed for the application the degradation is meaningless.

The cause of the assumed grommets becoming missing is entirely unknown. The Plaintiff is not entitled to meet its burden of proof through the speculation of a hired expert who never even saw the assumed grommets, who is not following any scientific method and who admits that multiple other causes cannot be ruled out. Those causes include misinstallation, post-sale damage to either the screw or grommet, chemical attack to the screw or grommet or a loose screw. At best Plaintiff can show a mere possibility based on speculation of some degradation of a grommet which may have played a role in the grille becoming missing.

**RESPONSE**:

The simple fact is that Plaintiff has qualified evidence, in the form of facts developed during a comprehensive investigation, as well as evidence in the form of comprehensive expert testimony, including two former GE Engineers (Fallows and Jones), that establish a question of fact with respect to whether GE nylon grommets failed in this case which proximately caused the fire. The shadow marks, condition of the sleeve, fact witness testimony from former owners of the air conditioner, fact witness testimony from Ms Hull and the deteriorated condition of the GE grommets on the grilles from air conditioners which were not burned up in the fire all raise a material issue of fact

that a jury must decide. Plaintiff will not repeat the voluminous amount of record and

facts but will stand on that record and simply states that this objection is not really an

objection but, rather, a rehash of argument that the Magistrate rejected. GE's swipes at

Mr. Fallows, its former employee, who is not a professional testifier, but all of his

statements are explained in his deposition testimony, which was made a part of the

record. See Exhibit 9, pages 274-290.

10. GE objects to the conclusion in the Report, on page 24, and the analysis preceding that
    conclusion "that damage to the air conditioner was foreseeable and consequently, GE
    owed a duty to Ocean Terrace." This statement is factually and legally incorrect for the
    following reasons:

    a. The analysis of either negligence or breach of warranty with respect to
    product design must relate to the time the design was adopted. Back v. The
    Wickes Corp., 375 Mass. 633, 278 N.E.2d. 964 (1978); Ward v. Hobart
    Manufacturing Co., 450 F.2d 1176, 1183 n. 16 (5th Cir. 1971).

    Here, the wall sleeve and rear grille were made at least 31 years before the
    time in issue and the air conditioner unit was made 17 years before the fire. The
    Plaintiff has produced no evidence that, at either time, an event of even the
    general nature of the event in issue was reasonably foreseeable.

    There is no evidence of the occurrence of any rodent damage to an air
    conditioner prior to the design of either the wall sleeve or air conditioner. Indeed
    the first known occurrence of alleged rodent damage to an air conditioner is the
    incident in issue.

    The Report relies on the statement of Fallows "that the danger of rodents
    chewing electrical wires was widely known." This conclusion is derived from the
    unsigned and unverified Report of Joseph W. Fallows, Plaintiff's Ex. 8, p. 6
    where Mr. Fallows states, "It is commonly understood by product designers
    across a wide range of markets that rodents will chew on wiring insulation. If
    rodents are allowed to enter areas with electrical wiring the product is often
    rendered non-functional and in many scenarios a dangerous situation results. The
    degree to which this understanding is wide spread can be displayed by various
    bulletins and publications from a variety of markets." Mr. Fallows then cites a
    1990 study of underground electric cables, a 2004 or later study of railroad
    signals, a 1997 study of rodents nesting in electrical equipment, a 2000 Canadian
    study of rodent control in horse stables, a 2006 NASA study, an undated study of
    traffic signals and an undated marketing brochure for fiber optic cables.

None of this data existed prior to the manufacture of either the wall sleeve or the air conditioner. None of this data pertains to air conditioners. The Plaintiff has not provided any evidence of pre-manufacture knowledge of anyone of rodent damage to wiring in air conditioners.

There is no evidence in the record before this court that an accident of the nature in issue was even remotely possible never mind reasonably foreseeable at the time of the relevant dates of manufacture.

b.    GE objects to the statement of the report that GE's expert Moore testified that "the danger of small birds getting into the air conditioner was factored into the grille design but that squirrels were not considered." The relevant testimony of Mr. Moore appears at Plaintiff's Ex. 12, p. 81. He said nothing about birds presenting a "danger" under any circumstances.

c.    The Report again references, at p. 23, a contention of Plaintiff that double pole contactors could have been used to prevent the assumed and extremely remote danger of a squirrel entering an air conditioner if a grille falls off and the assumed possibility of a fire as a result. GE incorporates by reference its prior objection above in Paragraph 7 with respect to the admissibility of this contention. There is no evidence in the record to establish that at the time of manufacture any reasonable designer or manufacturer of an air conditioner would have used a double pole contactor.[1] The evidence affirmatively establishes that no known manufacturer of an air conditioner has used such a device.

d.    The statement, "the damage to the air conditioner was foreseeable, and consequently, GE owed a duty to Ocean Terrace" is not legally correct because the danger must be <u>reasonably</u> foreseeable. The Plaintiff has no evidence that it was.

The report fails to take into account GE's argument that it had no duty to design a wall sleeve and rear grille to last for more than 31 years. Plaintiff's expert Fallows initially said the wall sleeve and grille should last for 15 years. (GE Ext. 22, p. 53) After he read the disclosure of the defense experts he changed his opinion to the wall sleeve should last longer than the air conditioner but he could not say how long. (GE Ex. 22, p. 56) Plaintiff's expert Jones had no information on the expected useful life of the air conditioner or wall sleeve. (GE Ex. 23, pp. 73, 76) The life expectancy of the air conditioner was 15 years (GE Ex. 17, pp. 67-68) Mr. Little, the engineer supervising the 1999 construction, recommended the replacement of the wall sleeves (Ex. 8, p. 134).

---

[1] As GE understands this contention a double pole contactor would serve as an extra on-off switch. Pulling the plug out of the wall serves the same function. Once the double pole contactor is placed in the "on" position, arcing can occur.

The wall sleeve in issue performed as anticipated for more than 30 years and more than twice the span of time of the useful life of the air conditioners it was used with. There is no standard or other basis upon which a jury could conclude that GE should reasonably foresee that a product, such as a wall sleeve, made by it should be designed to last more than twice the useful life of the product it was used with. Such a contention places an unreasonable standard of perfection on a manufacturer and is not a rational rule of law.

Furthermore, both Plaintiff's experts Fallows and Jones agreed that the condo unit owner should have replaced the rear grille (GE Ex. 22, p. 145; GE Ex. 23, p. 122) The condo unit owner knew the grille was missing for 9 months. They did nothing to obtain a replacement grille.

It was not reasonably foreseeable to GE that it should undertake design duties to make a product which would last more than twice the useful life of the air conditioner it was used with and that after 31 years of use an owner would not make a reasonable repair.

The Plaintiff produced no evidence that GE had any duty to design its wall sleeve, and rear grille and attaching hardware for more than 31 years!

**RESPONSE**:

The record supporting the Magistrate's determination that the damages to the air conditioner was foreseeable and consequently, GE owed a duty to Ocean Terrace is solid in this case and will not be repeated. The fact is, squirrels, birds and other rodents, make their nests in these air conditioners when the cover is off. GE can dispute this and a jury will listen, but these air conditioners are installed in buildings that are erected on earth, where squirrels and rodents are known to populate and where squirrels and rodents are known to interface with human beings and the structures they create. Plaintiff's experts are merely stating the obvious when they conclude that GE must design its products to be safe in the environment they are to be used in but it is plaintiff's burden, a burden plaintiff takes seriously. The fact is that the wires in the back of the GE air conditioner remain energized even though the air conditioner is turned off. The fact is that a consumer would not expect an air conditioner to start a fire if it is turned off any more

that a consumer would expect a toaster or a television set to start a fire if it is turned off.

Plaintiff does not dispute that GE will be able to argue at trial that the grille lasted 31

years. However, Plaintiff will be able to counter in part that this length of time makes no

difference because, when the grille comes off, the product poses a deadly fire hazard

because wires in the back of the air conditioner can arc and ignite nesting material when

the appliance is off and burn homes to the ground. In this case, it is fortunate that this

fire happened during the day and not during the evening when the families were asleep.

Nevertheless, these are all issues for a jury, not the Court. Much of the remainder of

GE's objection is a repeat of argument and unsubstantiated assertion by GE.

11.   GE objects to the conclusion in the report at p. 24-25, that the Plaintiff sustained its
      burden of showing the existence of a feasible safer alternative design. The report
      correctly states the law that the alternative design must be <u>safer</u> but there is no
      admissible evidence of a safer design. With respect to the hardware for the grille, the
      record before this court specifically establishes that Plaintiff's experts had no opinion
      or evidence that the hardware alternatives they say existed for the rear grille would
      have lasted longer than the grommets and screw used by GE. In the absence of such
      evidence the proposed alternative designs cannot be viewed as safer.

          GE again notes that the report appears to contain a typo at the end of the first
      paragraph of p. 25. "GE" should be "the plaintiff."

          The report again refers to double pole contactors at p. 25. GE incorporates by
      reference its earlier objections to Mr. Jones <u>ipse</u> <u>dixit</u> thought about double pole
      contactors. Furthermore, a double pole contactor will not prevent an arc if one is to
      occur. If an arcing condition exists the arc will occur as soon as the double pole
      contractor is placed in the "on" position. A circuit breaker was the electrical device used
      to address arcs (Ex. 18, pp. 17-18).

          The Plaintiff did not and cannot satisfy its burden of proving the existence of safer
      alternative feasible designs which existed at the time of manufacture, and summary
      judgment should enter for GE.

**RESPONSE**:

          See Response to Objection Number 4.

12.    GE objects to the conclusion of the report at p. 26 and 27 that the Plaintiff has evidence which would support the existence of a duty to warn by GE.

"The duty to warn assumes some reason to suppose a warning is needed, Carney v. Bereault, 348 Mass. 502, 506, 204 N.E.2d 448 (1965); Haley v. Allied Chem. Corp., 353 Mass. 325, 330, 231 N.E.2d 549 (1967); McNeill v. American Cynamid Company, 3 Mass. App. 738, 326 N.E.2d 366 (1975).

The duty to warn is not imposed by law as a mindless ritual. Killeen v. Harmon Grain Products, Inc., 11 Mass. App. Ct. 20, 413 N.E.2d 767 (1980).

In circumstances where a warning would not reduce the likelihood of injury, no duty to warn is imposed. Colter v. Barber-Green Company, 403 Mass. 50, 525 N.E.2d 1305 (1988); Uloth v. City Tank Corporation, 376 Mass. 875, 384 N.E.2d 1188 (1978).

The Plaintiff has never stated what the warning is that GE supposedly should have provided, where it should appear or how it would come to the attention of someone 31 years after the manufacture of the wall sleeve and 17 years after the manufacture of the air conditioner. The Plaintiffs have not disclosed expert testimony about such matters.

The Plaintiff has failed to produce any evidence of any latent danger known by GE prior to the manufacture of the wall sleeve or air conditioner. The Plaintiff has failed to produce any evidence of facts about which GE should have known before 1985 which would give rise to any duty to warn.

Indeed the first and only "dangerous" occurrence which Plaintiff can point to involving the wall sleeve or air conditioner in issue is the fire in issue which GE, the State Fire Marshall, and GE's expert do not attribute to the air conditioner. There is no evidence that GE knew or should have known of any reason to provide a warning about grilles falling off or rodent activity prior to the time of any sale or the fire.

The report refers at p. 27 to other grills missing at the Ocean Terrace building. GE believes the only evidence in the record relating to missing grilles before the fire is in GE Ex. 5, p. 45 and GE Ex. 6. There is no evidence that the two grilles referred to were GE grilles or that the grilles were missing for any reason attributable to GE. Indeed the 11/10/2000 letter to Thomas Brancaleone (GE Ex. 6) strongly suggests a mismatched air conditioner and sleeve not attributable to GE. Both missing grilles were noted in late 2000 and no one observed or commented on any danger. There is no evidence that GE knew or should have known that these grilles were missing and nothing about this evidence remotely creates a post-sale duty to warn.

GE has affirmatively established that it monitored field quality complaints and that there were no known complaints about grilles falling off. (GE Ex. 17, pp. 5-9, 20-22, 27, 71-72; GE Ex. 20 pp. 6, 24-25, 36).

The post-fire, post-lawsuit complaints of Plaintiff's experts about nylon grommets which have not been made by any other person before or after the fire cannot create a duty to warn.

In the absence of evidence of some fact about a latent, non-obvious danger which GE knew or should have known before the time of any sale of the products in issue it had not duty to warn. There is no such evidence.

In the absence of evidence of post-sale knowledge of GE of a discovered defect which existed at the time of any sale there is no post-sale duty to warn. There is no evidence of any such defect or any such knowledge. Furthermore, a post-sale duty to warn extends to the original purchaser as the Report observes. The condo unit owner was not the original purchaser of either the wall sleeve or the air conditioner.

There is no evidence to support any failure to warn theory and summary judgment should enter for GE on this issue.

**RESPONSE**:

The Magistrate considered all of the facts and expert testimony presented by both sides and determined that, "This evidence suggests that if GE did not know of the risks related to the grille and hardware, it should have. ...Viewing this evidence in the light most favorable to plaintiff, summary judgment is inappropriate on the duty to warn issue." See Report, Page 27. In this case, GE has taken the position that there is no risk in rodents or squirrels getting into these air conditioners. Plaintiffs' experts have concluded that the risks are huge. If the jury concludes that the risks are huge, then the jury could reasonably conclude that GE should have warned consumers about this risk.

Respectfully submitted
By its Attorneys,

**FALK METZ LLC**

Dated: September 4, 2007

Paul T. Falk
20 South Clark Street, Suite 1900
Chicago IL 60603
(312) 922-5800

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA  02110

### _CERTIFICATE OF SERVICE_

I, Paul T. Falk, hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Robert A. Curley, Esq.
CURLEY & CURLEY P.C.
27 School Street
Boston, MA 02108
BBO #109180


Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA  02110


Dated: September 4, 2007

Paul T. Falk

# Fallows Associates
Plastics Consultants

May 15, 2006

Ron Harmeyer Esq.
Falk Johnson LLC
Chase tower
111 East Wisconsin Ave., Suite 1900
Milwaukee, WI 53202

FINAL REPORT

I have been retained to give an engineering opinion on the Ocean Terrace Condominiums v. G.E. case.  My investigation consisted of the following:

1. Nylon property retention vs. weathering data from DuPont.
2. DuPont "Nylon" Design Guide (weather resistance data).
3. Material Identification data produced by Travelers Engineering Laboratory in Windsor CT.
4. Environmental Properties data from Bayer Corp.
5. Opinion of Dr. George Kriek (Bayer Corp.) regarding the need for UV stabilizers in white and natural unfilled Nylon applications for full time outdoor use.
6. Grille retention clips from an exemplar air conditioner in the subject building.
7. Thermo-oxidative Degradation, Photo-oxidation, and weather resistance data from "The Nylons Handbook". ("Nylon Handbook" published by Hanser/Gardner Publications 1995).
8. Depositions of H.D. Moore, Robert Ambrosi, Cathy Hull, Mark DiFelice, Barry McKay, James Welch, Ralph Hobbs, and Stephen Cooney, and Timothy Little (part 1) including all deposition exhibits.
9. Microscopic inspection and microphotographs of grille retention clips in the possession of St Paul Travelers Lab.
10. Inspection of the GE air conditioner that is believed to have started the fire.
11. Exemplar grille clips.
12. Friedrick "Through the wall unit" assembly instructions.
13. Frigidaire Owners Manual.
14. UL 484 – Standard For Room Air Conditioners, Sixth Edition March 29, 1982.
15. UL 746C – Polymeric Materials – Use in Electrical Equipment Evaluations
16. UL Testing file SA2141 issued 8-8-75 and revised 10-9-87.
17. Interview of Brad Haymond Fastex Div. Of Illinois Tool Works.
18. Photos of the fire scene, and accompanying opinions of Evan Haynes and Gordon Dupuenoy (Travelers Forensic Specialist and Fire Investigator respectively).
19. GE responses to plaintiff's first set of interrogatories.
20. GE response to plaintiff's first set of requests to produce documents and associated prints.
21. Information from DuPont Plastics website.
22. Discussions with UL HVAC group personnel.

Based upon this investigation I have made the following observations and I have formed the following opinions based upon a reasonable degree of engineering certainty.

The outdoor grille had fallen off of the GE air conditioner in the apartment of Hull / DiFelice.  The Grille had fallen off because the plastic retaining clips had deteriorated and failed to engage the stamped metal grille.  Subsequent nesting materials were found inside the air conditioner housing.



**Improper Material Selection**

Retaining clips from another condominium (with same air conditioning unit) were tested at Travelers Engineering Laboratory in Windsor CT and determined to be a non-reinforced, non-pigmented Nylon 6 (Polyamide). As a class of materials Nylon 6 is arguably one of the most sensitive polymers to moisture. This polymer absorbs moisture in humid environments, and swells. Dimensions change, and most structural properties deteriorate (tensile strength, flexural modulus, etc.).

Analysis of an exemplar grille-retaining clip purchased in 2004 from GE indicates that the replacements are now fabricated from Nylon 66. This has only slightly lower water adsorption and is still considered to be a very hygroscopic and UV sensitive polymer.

When Nylon 6 (or Nylon 66) is exposed to moisture, heat or Ultra Violet radiation, degradation of the polymer takes place. The mechanisms are hydrolysis, thermo-oxidative degradation, or photo-oxidation. If moisture, heat and UV are all combined a very rapid deterioration of the polymers mechanical properties will occur.

Photos indicate severe weathering on the outer surface of the clips (removed from unit 2M).

 

Photos also reveal crazing on the inside of the clips.

 

2

You can see a distinct difference in weathering around the outside of the block surfaces of the clip. One side has far more weathering and is assumed to be the topside where more UV exposure would occur.

 

The grille should stay on for the life of the product. H.D. Moore claims, as does GE (GE responses to Plaintiffs first set of interrogatories; page 7 interrogatory no. 11) that "GE room air conditioners have a useful life of approximately 15 years with normal usage, but the useful life may vary due to environmental and use conditions, which can decrease or increase the life of the product." Yet the weatherability data for Nylons show a stunningly rapid deterioration of mechanical properties. For example DuPont data for their un-reinforced, non UV stabilized, non-pigmented Nylon 66 (Zytel 101) shows after only 6 months of Florida exposure that the % elongation (ductility) drops from 300% to only 10%. Even DuPont Zytel 105 un-reinforced, UV stabilized black Nylon 66, shows a decrease in % Elongation from 160% to 60% in 6 months. Weathering of Nylon is generally less severe in Delaware than in Florida, and yet Zytel 105 un-reinforced, UV stabilized black Nylon 66 in Delaware shows a drop in % Elongation of 215% down to 70% in 12 months. Put differently, even UV stabilized Nylon 66 undergoes a ductility drop of 2/3 in 6 – 12 months on the east coast.

DuPont invented Polyamide and commercialized it in 1938 as Nylon. Polyamide performance characteristics have been known and well documented in resin supplier design guides at least as far back as the 70's. It would be reasonably foreseeable in the late 1970's, that Nylon being used in this application would result in part failure and dislocation of the grille all within the useful life of the product.

Kathy Hull's air conditioner was apparently not the only one experiencing failure of the grille retaining clips. The photos above were from the air conditioner in unit 2M. Exhibit No. 64 (reference Moore deposition part 2, page 17) shows failed clips still mounted in the air conditioner of unit 2M, as does Exhibit 3 (reference Hull Deposition) which shows similar failed clips on unit 1J. One missing clip and one failed clip can be seen on unit 3H, and the same can be seen on unit 1D as shown below.

54 Woodland Dr • Hanover MA • 01060
Phone (413) 584-1951
Email • joel1981@comcast.net



One missing clip and one failed clip can be seen on unit 3H



One missing clip and one failed clip can be seen on unit 1D

4

It is my conclusion that Polyamide or "Nylon" is a poor choice of resin from which to manufacture the grille-retaining clip and that there were other choices available to the Appliance Park engineers. This is so because Nylon has been known for decades to be very susceptible to hydrolysis, and the effects of UV radiation. When both occur, mechanical properties deteriorate rapidly. It is generally recognized in the industry that Nylon of the type that GE used in this application is a poor choice for outdoor structural applications. For example, Bayer Corporation is one of the largest suppliers of Nylon in the world. Dr. George Kriek of the Bayer Corp.'s Polyamide (Nylon) Knowledge Center responded to the following question posted on their website: "Do I need a UV stabilized version of Durathane (Nylon) for a white or natural unfilled application that will be outdoors all the time? What happens if I don't use a UV stabilized version? From Dr. Kriek @ Bayer: "This is a very good question and very often asked. In many cases these two nylons can be substituted for each other. .... Almost all Nylon outdoor applications use black Nylon, and these grades usually have extra carbon black for added stability. Only the surface of the Nylon parts is typically affected, so change in physical properties is due more to the normal moisture absorption than to degradation. After several years, elongations and impacts will begin to decrease. Natural and light colored nylons will fairly quickly begin to turn yellow when exposed to sunlight. Properties will degrade at a much faster rate than with black. White pigment helps properties to some extent, perhaps by reflecting light. The addition of UV stabilizers will increase the time until property loss, but will only delay the color change of the natural nylon parts, not eliminate it."

UL applies a "(f1)" rating to those polymers that are "Suitable for outdoor use with respect to exposure to Ultraviolet Light, Water Exposure and Immersion in accordance with UL 746C."
There were no non-pigmented, non-reinforced Nylons approved by UL for outdoor use in 1974 (at 2 mm thickness, RTI for mechanical strength > 85C). In 1984 there were still no non-pigmented, non-reinforced Nylon 6 or 66 products that bore UL's (f1) rating.

In 1976 from GE alone, there were 6 grades of non-pigmented, non-reinforced PBT (Valox) given a UL rating of (f1) and by 1977 there were 14 grades!

**Failure to Consider Alternate Materials**
GE recognizes that the grille retaining clips need to withstand a variety of weather conditions (Moore deposition part 2, page 20) but GE clearly failed to specify appropriate materials from which to fabricate them.

GE Plastics is a leader in the production of engineering thermoplastics. Harold Moore (page 25 part 2 of deposition) stated that it would be natural for GE Appliance Park to go to GE Plastics for assistance. And yet, GE Plastics engineers were apparently never contacted by GE Appliance engineers for help in selecting a suitable polymer for the grille retaining clips.

GE has had a plastics group since the early 60's. While GE Plastics has never produced Nylon, they have produced a viable, weather resistant alternative to Nylon called Valox (Polyester). GE has produced UV stabilized versions of Valox since the mid 70's. UV stabilized polyester is often used in outdoor applications such as swimming pool pump housings and Network Interface Devices ("NIDs" are the junction box for telephone service on the outside of every residential house).

At the time of this air conditioning product manufacture Nylon performance data was readily available to, and used by engineers at GE Plastics. Those same engineers would have recommended alternative materials for fabrication of the grille-retaining clip for the reasons stated above. GE had the internal knowledge to say this material should not be chosen. I know this because I worked within the GE Plastics Division. I worked with other GE divisions to identify the most appropriate materials for their applications.

5

There were several options for grille retaining clip materials at the time Kathy Hull's air conditioner was manufactured, but apparently none were ever explored by GE Appliance Park engineers. They could have utilized a UV stabilized Polyester from GE or other plastics suppliers. It is also likely that the clip could have been cost reduced by utilization of a black pigmented or UV stabilized Polypropylene (lawn furniture).

**Failure to consider Alternate Attachment Options**
Not only were there alternate material options that were never explored, but there were also other design options that could have been used by the product designer. Instead of using the grille retaining clips, the designer could have molded plastic bosses onto a plastic grille. Such an approach is offered today on the Zone line air conditioner. Examination of competitor's grille attachment techniques would point out alternate design options as well. For example Friedrich uses four screws directly into bosses on the sleeve. Frigidaire uses four metal screws and washers to attach their grille to the inside surface of the sleeve.

What Cathy Hull saw was consistent with expected performance of a Nylon clip. The snap finger ends of the two grille retaining clips, being severely weathered and embrittled had broken off. The bottom of the grille then fell off the ends of the two retaining clips.

I have designed and received a patent for an air conditioner grille. One of the functions of an exterior grille is to protect the interior wiring and components from damage caused by rodents. Any competent product designer must anticipate all potential situations that the product could experience. It is standard practice to go through extensive "what if scenarios" while designing a product. What happens if the fan fails? What happens if the grille falls off? What are the risks associated with each of these scenarios? This is known as a "risk assessment", and is performed in a theoretical manner so that dangers can be "designed out". Even if some level of risk assessment had been conducted on grille and retention system, it was insufficient and failed to identify and provide for this foreseeable risk.

Harold Moore inappropriately considers a squirrel in the AC unit, as only creating a safety hazard to it's self. He states that the moving fan is the safety hazard for the squirrel. (Pages 79, 80, and 81; part 1 of deposition). When asked if a squirrel inside a J series air conditioner was considered a risk, or hazard to design against Mr. Moore stated that he didn't "..ever recall that being something that was discussed as being a risk." When asked if it was something that a customer was ever warned about, his response was "I'm not aware of any warnings associated with squirrels." Mr. Moore goes on to state "Again, we would not consider it a safety -- personal safety issue with the grill falling off."

Not only does a missing grille present a safety hazard to any child or adult who would put their hand in there, it allows small animals to enter. Raccoons, squirrels and mice are known to chew on wiring. GE failed to recognize and design against the hazards resulting from the exterior grill falling off. Absence of the exterior grille for only a short period of time could result in serious laceration or amputation, small animal incursion into the AC unit interior along with flammable nesting materials, wire insulation being chewed away, subsequent fire, and most certainly reduced product performance. GE failed to address these dangers with a proper grille retention design.

**Designer Awareness of Rodent Danger**
It is commonly understood by product designers across a wide range of markets that rodents will chew on wiring insulation. If rodents are allowed to enter areas with electrical wiring, the product is often rendered non functional and in many scenarios a dangerous situation results. The degree to which this understanding is wide spread can be displayed by various bulletins and publications from a variety of markets.

Naval Facilities Engineering Command – Electric Power Distribution Systems Operations, Apr 1990
"2.4.5 Direct Burial. Cables may be buried directly in the ground where permitted by codes
and only in areas that are rarely disturbed. The cables used must be suitable for this purpose, that is, resistant to moisture, crushing, soil contaminants, and insect and <u>rodent damage</u>."

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email – jgell00@comcast.net

Federal Railroad Administration – False Proceed Signal Database,
All Reports – Cause: Maintenance – Wiring Chewed by Rodents; Jan1, 1995 – May 3, 2004
Page 1, item 130 "…Investigation revealed that the signal control wires for this signal had been damaged by rodents."
Page 1, item 582 "…False energy on the 432HGP circuit was caused by rodents chewing through the insulation of the conductors which control the signal mechanism."
Page 3, item 614 "…Through further investigation, it was determined that a rodent had chewed into one of two four-conductor unshielded cables used between the junction box at the bottom of the home signal pole and the SA signal head at the top."
Page 4, item 264 "…It was discovered through ground testing that the wire insulation in the south signal had been removed by rodents causing battery to energize the search light signal, resulting in the false signal."
Page 12 for State of Texas, item 219 "…An investigation revealed a rodent had chewed through the wire insulation in the signal mast which resulted in shorting the voltage from the red signal head wiring to the lunar signal head wiring."
Page 18 for State of Texas, item 421 "An investigation revealed rodent damage to the circuit wiring causing a battery wire to intermittently false pick the EDR relay giving a Green signal."

North Dakota State University Extension Service Newsletter – Water Spouts, No. 160, May 1997
"With the amount of snow we received, rodents were probably working very hard to find safe places to nest. Accessible electrical control boxes, motors, and electrical conduits were most likely inhabited. Rodents do a lot of damage to wiring in these situations so check these places very carefully for any damage such as chewed off wires or wire insulation."

Ontario Ministry of Agriculture Food and Rural Affairs – Rodent Control in Horse Stables, Feb 2000
"Rodents can cause damage to building structures and may cause irreparable losses due to fire as a result of gnawing through wire insulation, exposing the live wires."

NASA – Systems Engineering Processes and Requirements, March 13, 2006
Pg. 65, note 2 "…Particular emphasis needs to be on protecting surfaces from physical damage; preventing corrosion, rodent damage to electronic wiring or cabling, shock or stress damage, heat warping or cold fractures, and moisture and other particulate intrusion that would damage moving parts."

From the Nebraska Dept of Roads - Traffic Signal construction,
Page 3 "The pole bases for towers should not be grouted. The pole bases for galvanized steel poles may be grouted at the Project Manager's discretion to prevent rodent damage to wires."

EMS Grivory – Engineering Plastics Product Review  (Plastics supplier marketing brochure)
Discusses Grilamid TR 55 Application Examples "..sheathing for fiber-optic cables, cable sheathing providing particular protection against rodent damage."

Given this known hazard, GE Appliance Park should have realized that the grille served a safety function of preventing squirrels and other rodents from chewing wires, and bringing flammable nesting materials into the internal workings of the air conditioning unit.  As revealed by Harold Moore's deposition, GE still fails to recognize this hazard, and failed to design the product in order to avoid the risk.

**Inability to Comply with UL 484**
UL 484 is the standard for room air conditioners.  Section 6.1 states "Openings in the enclosure of a room air conditioner shall be designed or located to reduce the risk of unintentional contact with (1) un-insulated high-voltage live parts; (2) moving parts such as fan blades and blower wheels; and (3) parts within the

58 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email - joef100@comcast.net

enclosure which exceed the temperature permitted by item E4 of table 37.1" A missing grille would most certainly violate this clause.

UL 484 paragraph 3.7 defines ENCLOSURE as "That part of a room air conditioner which by itself or in conjunction with barriers (1) renders inaccessible all or any parts of the unit that may otherwise present risk of electric shock, (2) reduces the risk of contact with parts which may cause injury to persons, and / or (3) prevents propagation of flame initiated by electrical disturbances occurring within the unit."

UL 484 paragraph 3.12 defines STRUCTURAL PART as "A part used in such manner that failure of that part may present a risk of electric shock or unintentional contact with moving parts."

The outdoor section of the enclosure for a through the wall air conditioner is defined by the sleeve which wraps underneath, along the sides and over the top of the compressor, fan, condenser coil, etc. and the outdoor metal grille which is attached to that sleeve. The grille is secured to the sleeve by two of the plastic clips previously discussed. The clips hold the grille securely to the outer surface of the sleeve. When the clips are installed, molded-in snap fingers capture the grille by passing through a hole in the stamped steel. The snap fingers prevent the steel grill from sliding back off the clip, and the larger domed cap captures the steel grille on the other side of the snap finger. A metal screw passes through the sleeve back surface or "lip" from inside to outside, and inserts into the large rectangular end of the grille retaining clip. As the screw rotates it is drawn down into the clip and prevents the flex fingers from retracting. The screw also mounts the clip on the sleeve back surface. The clip structurally attaches the grill to the sleeve and prevents breach of the enclosure. The screw does not capture the grille nor does the screw contact the grille.

If the grille retaining clip structural integrity should fail, the grille would no longer be secured to the sleeve. The grille is defined as part of the enclosure and the retaining clip is defined as a "polymeric structural component". Discussions with a UL (HVAC group) engineer confirm that the clip is considered a structural polymeric component.

UL 484 chapter 9 calls out the requirements for polymeric materials used to form outer enclosures, structural or functional parts, thermal and acoustical insulation, and miscellaneous parts of a room air conditioner. Table 9.1 indicates the properties to be evaluated, depending on the material application.

Table 9.1

| Characteristic to be evaluated | Structural parts | Reference |
|---|---|---|
| Heat deflection | yes | Section 64 |
| Water absorption | yes | Section 65 (not more than 1.5% by weight) |
| | | |
| Environmental exposure | | |
| Air oven aging | yes | Paragraphs 66.1, 66.2 (212F, 1,440 hours) |
| Ultraviolet Light | (where exposed to the effects of weathering) | |
| And | (Per UL 746C then run mechanical tests) | |
| Water exposure | yes | Paragraphs 66.3, 66.4 (360,720hrs per746C) |
| Water Immersion | yes | Paragraphs 66.5 - 66.7 |
| Tensile Strength | yes | Section 67 (*) |
| Flexural Strength | yes | Section 68 (*) |
| Izod or | | |
| Tensile Impact | yes | Section 69 or 70 (*) |
| Impact | yes | section 71 (5 ft-lbs,no break) |
| | | (repeat after 24Hr, @ -40F) |
| Volume Resistivity | yes | Paragraph 9.2, section 72 (*) |

* Note that for mechanical properties, after exposure to weatherometer, properties cannot decrease more than 50 percent after 360 hrs, and be essentially stabilized and no longer significantly changing with exposure time out to 720 hrs.

In particular section 66 of UL 484 clearly calls out UV and water exposure testing requirements for structural polymeric components that are exposed to the outdoors.

Section 66 of UL 484 - Ultraviolet Light and Water Exposure

66.3  Polymeric materials, which are used for enclosures or for structural parts and which are affected by sunlight are to be exposed to ultraviolet light and water for periods of 360 and 720 hours (using Xenon Arc).  The apparatus and method of exposure is to be in accordance with the procedure employed in evaluation of polymeric materials for use in electrical equipment, UL 746C.

66.4  Following exposure, the specimens are to be subjected to the burning test required for the material application (see sections 60 – 63) and individually to the (1) <u>Tensile Strength Test</u>, Section 67; (2) <u>Flexural Strength Test</u>, Section 68; and (3) <u>Izod Impact Test</u>, Section 69, or <u>Tensile Impact Test</u>, Section 70.

67. Tensile Strength Test – "The tensile strength of a polymeric material used as an enclosure or as a structural part shall (1) <u>not decrease more than 50 percent</u> and (2) be essentially stabilized <u>and no longer significantly changing with exposure time.</u>

Same measures for Flexural Strength Test (section 68)

Same measures for Izod Impact Test (section 69)

This means that the Tensile Strength, Flexural Strength, and Izod Impact or Tensile Impact values must not decrease more than 50% from the "as received" condition to the values after 360 hours of exposure to UV and water.  In addition these properties cannot continue to significantly change (+/- 5%) from the 360 hour test values to the 720 hour test values.

The Nylon used to mold the grille retention clips would not pass these tests.  DuPont Zytel 101 (unfilled, un-pigmented, non UV stabilized) Nylon 66 after only 600 hours of weatherometer testing shows a drop in tensile strength from 10,100 psi to 7,650 psi and continues to fall to 4,740 psi at 2,000 hours (Pg 84, Table 24 of DuPont Zytel Design Guide). Clearly the material is not "stabilized and no longer significantly changing with exposure time".  (CALL DUPONT AND FIND OUT IF THIS WAS XENON ARC)

As well the same material shows a drop in "Elongation %" at 600 hours from 300% down to 10%.  This is a huge drop (97%) in ductility. As ductility increases, impact resistance will also improve.  The opposite relationship also holds true, that is as ductility decreases the impact resistance drops, and the material becomes more brittle.

The Foreword to UL 484 states in Item C "A product which complies with the text of this standard will not necessarily be judged to comply with the Standard if, when examined and tested, it is found to have other features which impair the level of safety contemplated by these requirements."

Materials such as Valox UV stabilized polyesters would pass these tests. Given the foregoing it is my opinion that the subject air conditioner DOES NOT comply with UL 484 listing requirements.

**No Apparent Testing of Grille Retaining Clips**
As previously stated, the grille-retaining clips are considered a structural polymeric component of the enclosure.  Upon review of UL testing file SA 2141 there does not appear to have been any testing of the grille retaining clips.  While this unit carries a UL approval, it would not meet the full requirements for that approval if the clips had been tested as required by UL 484.  Data for accelerated weathering generated by weatherometer testing for non-UV stabilized Nylons should have been a red flag for any designer.  The material clearly would not meet structural requirements throughout the life of the product.  Use of inadequate materials eventually results in deficient products, and the creation of obviously hazardous situations.

58 Woodland Dr • Florence, MA • 01062
Phone (413) 584-1531
Email • joel1009.comcast.net

In summary, the GE air conditioner plastic grille retaining clips as currently designed are inappropriate from a material selection standpoint. They clearly will not pass UL 484 requirements for structural polymeric components. The clips can be expected to fail before the typical end of air conditioner product life, and the grille can be expected to fall off resulting in an unreasonably dangerous product. When this occurs a laceration / amputation hazard exists, subsequent intrusion by rodents is likely and a fire risk created. The potential-dangers that this product presents before the expected end of product life would be substantially reduced or eliminated by utilization of a UV stabilized and weather resistant polymer or alternate attachment techniques. All of these opinions are given within a reasonable degree of engineering certainty. I reserve the right to change my opinion should new evidence arise.

My curriculum vita is attached.

Sincerely,

W. Joseph Fallows III

55 Woodland Dr. • Florence, MA • 01062
Phone (413) 584-1531
Email – joef100@comcast.net