UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10075 PBS

OCEAN TERRACE CONDOMINIUM
TRUST,                          Plaintiffs

vs.

GENERAL ELECTRIC COMPANY
                                Defendant

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GENERAL ELECTRIC
COMPANY'S MOTION IN LIMINE REGARDING
TESTIMONY OF JOSEPH FALLOWS**

I.      **Factual and Procedural Background:**

      A.      **The Rule 26(a)(2) disclosure of Joseph W. Fallows**

The only Rule 26(a)(2) disclosure of Joseph W. Fallows is a document entitled Final Report dated May 15, 2006.  A copy is attached as Exhibit A.  The report is not signed under oath. It is fundamentally flawed because Mr. Fallows misanalyzed the data available to him and mistakenly concluded that the wall sleeve in issue was designed at some unspecified time after 1976.  The parties are in agreement that the wall sleeve was installed in the building in issue in about 1971 and was obviously designed at some earlier time.

Any negligence or breach of warranty must be determined as of the time of sale of a product. Back v. The Wickes Corporation, 375 Mass. 633, 278 N.E. 2d 964 (1978).

Where Mr. Fallows not only failed to comply with Rule 26(a)(2) but related his opinions concerning the wall sleeve in issue to an entirely irrelevant time he should be precluded from offering any opinion testimony concerning the wall sleeve and rear grille.

**B.    The Deposition of Mr. Fallows:**

Mr. Fallows received a B.S. in mechanical engineering from Michigan State in 1976 . (Deposition of Joseph Fallows pertinent parties of which are attached hereto as Exhibit B, p. 21). He worked initially at Union Carbide where he had no experience with plastics (Exhibit, p. 22-23). He next worked at General Electric Plastics (Exhibit B, pp. 23-24). His job was to serve as a sales interface between the areas of GE Plastics which developed plastics and customers (Exhibit B, p. 26). GE Plastics did not sell nylon (Exhibit B, p. 26). He did not test plastics at GE (Exhibit B, p. 27). He had no direct contact with engineers designing air conditioners from General Electric and did not know of any such contact by anyone at GE Plastics (Exhibit B, p. 28). In 1986, Mr. Fallows took another marketing position with GE Plastics in Pittsfield (Exhibit B, pp. 28-29). He worked there until 1989. (Exhibit B, p. 29). He never had any contact with GE personnel involved in the design or manufacture of air conditioners. (Exhibit B, p. 29). Before this case he had no experience with GE air conditioners whatsoever. (Exhibit B, p. 29).

2

Mr. Fallows initially "assumed" that the wall sleeve was made in 1985 (Exhibit B, p. 44). Only after he read the disclosures of the defense experts did he learn that the wall sleeve was 31 years old (Exhibit B, p. 45). He is not aware of any evidence concerning the installation of any wall sleeve, grille or associated hardware (Exhibit B, p. 47). He did nothing to investigate the history of these components between 1971 and 2001 (Exhibit, p. 48). He had no evidence as to whether the screws were put in straight or crooked or torqued too much or too little (Exhibit B, p. 50).

He looked at some screw grommets from Apartment 2M but did nothing to determine their history (Exhibit B, p. 51).

He had no knowledge about the commercial context of the screw grommet market in 1971 (Exhibit B, p. 53). He had no knowledge of what was or was not commercially feasible for screw grommets in 1971 (Exhibit B, p. 53).

He did not know what the complete design of any screw grommet used in 1971 was (Exhibit B, p. 53). He did not know what the correct size screw was for the fasteners in 1971 (Exhibit B, p. 55).

He had no opinion as to how many years a wall sleeve and exterior grille should last (Exhibit B, p. 56).

There are different reasons for the failure of plastic parts including chemical contaminants, physical abuse and improper installation (Exhibit B, p. 57). He had no knowledge of whether the fasteners for the wall sleeve in Unit 3A had been subjected to chemical attack, physical abuse or misinstallation and could not rule out such events as a cause of failure (Exhibit B, p. 61). Never before has he

3

provided an opinion about the cause of a failure he did not see (Exhibit B, p. 62).
He was not aware of any scientific standard which provided that someone could
reach a determination as to the cause of a failure of something that is not in
existence or visible (Exhibit B, p. 63). Without seeing a failed part he could only
speculate about the cause of failure (Exhibit B, p. 63).

Mr. Fallow's "judgment" that grommets existed on the unit 3A wall sleeve
and rear grille, deteriorated and failed is based on assumptions about a proper
installation, an unknown part configuration, the use of correct screws, the absence
of physical abuse and the absence of chemical attack (Exhibit B, pp. 96-100).
There is no evidence to support such assumptions.

Mr. Fallows expressly admitted that he could not rule out misinstallation as
cause of failure, or pre-installation damage as a cause of failure (Exhibit B, p. 100).
He could not rule out replacement of any original hardware (Exhibit B, p. 100-101).

Mr. Fallow's admitted that he could not tell the level of deterioration in any
plastic grommet at any defined moment in time (Exhibit B, p. 107).

Mr. Fallows did not know how much tensile strength the application in issue
required (Exhibit B, p. 111).

Mr. Fallows had done no reading concerning the properties of nylon in 1971
(Exhibit B, p. 113).

He did no testing to determine how screw grommets would lose mechanical
properties over time (Exhibit B, p. 120). He could not say how much mechanical
strength a screw grommet would lose over time (Exhibit B, p. 120). He had no

opinion as to how much tensile strength would meet the requirements of the application in issue (Exhibit B, p. 126).

He admitted he did not know the history of the air conditioners in units 2M or 1J (Exhibit B, pp. 128-129) which he seeks to compare with the non-existent fasteners for unit 3A.

He referred to a missing grommet in unit 3H but had no basis for concluding it was ever installed (Exhibit B, p. 129).

He did not know if correct size screws were used (Exhibit B, p. 130). An oversized screw could damage the part but Mr. Fallows never explored this (Exhibit B, p. 130).

He did not know what choices were available in 1971 to an engineer seeking a plastic part for this application (Exhibit B, p. 138). he did not know if anyone made a screw grommet from anything other than nylon in 1971 (Exhibit B, p. 138). He did not know how nylon was being used in outdoor environments in 1971 (Exhibit B, p. 139).

He admits he is not an expert on screw grommets or this design (Exhibit B, p. 143).

Mr. Fallows was not aware of any air conditioner manufacturer that was molding  plastic bosses onto a plastic grille in 1971 (Exhibit B, p. 146).

He admits he is not an expert on useful product life (Exhibit B, p. 150-152).

He could not rule out impact as the cause of the damage to the fasteners for units 2M and 1J.

Before this case Mr. Fallows had no knowledge of rodents chewing on wires inside appliances (Exhibit B, p. 164). He had no knowledge of what information concerning rodents chewing on wires of appliances was available before 1971 (Exhibit B, p. 167). He had no information about any engineer that considered squirrel penetration into an air conditioner before 1971 (Exhibit B, pp. 167-168). Any literature he identified about rodents was post 1971 and not involve air conditioners (Exhibit B, pp. 173-174).

Mr. Fallows was not aware of any standard which would be violated where an air conditioner wall sleeve outlasted double the life span of an air conditioner as here (Exhibit B, p. 171).

Other than himself he did not know of any other person in the world who thought that nylon was an inappropriate part for the application in issue (Exhibit B, p. 190).

Although he contented in his Rule 26 report that Valox was an available alternative material, he admitted that Valox was not available in 1971 (Exhibit B, p. 206).

II.    **ARGUMENT**

      A.    **Mr. Fallows lacks scientific, technical or specialized knowledge and his proposed testimony is not based on sufficient facts or data, or the application of any reliable principles or methods concerning the design selection of fasteners for an air conditioner wall sleeve before 1971.**

Fed. R. Evid. Rule 702 requires that an expert be qualified by "knowledge, skill, experience, training or education" concerning the matters on which the expert will testify. Rule 702 further requires that his testimony be based on sufficient facts

or data, that his testimony be the product of reliable principles and methods, which have been applied reliably to the facts of the case.

It is axiomatic that the design of the wall sleeve, rear grille and fasteners in issue must be judged as of the time of sale, here, 1971 or earlier. <u>Back v. The Wickes Corporation</u>, 375 Mass. 633, 278 N.E. 2d 964 (1978).

Mr. Fallows has unequivocally admitted that he had no knowledge of the commercial context of the screw grommet market in 1971 and no knowledge of what was or was not commercially feasible for screw grommets in 1971 (Exhibit B, p. 53). Mr. Fallows had done no reading concerning the properties of nylon in 1971 (Exhibit B, p. 11). He did not know what choices were available to an engineer seeking a plastic part for a screw grommet in 1971 (Exhibit B, p. 138). He did not know of any screw grommet made from anything other than nylon in 1971 (Exhibit B, p. 138). He did not know how nylon was being used in outdoor environments in 1971 (Exhibit B, p. 139). He admitted he was not an expert on screw grommets (Exhibit B, p. 143). Other than himself he did not know if any other person in the world who thought that nylon was an inappropriate part for the application in issue (Exhibit B, p. 190).

In short, Mr. Fallows has no qualifications which would permit him to offer any opinion concerning what was reasonable or not as a design choice for fasteners for a wall sleeve made in 1971 or earlier. He had no experience at that time. He was still in high school. He has done no reading or study about the design environment before 1971 and cited no literature from that time period. He has followed no method of identification of fasteners available before 1971 or

7

testing an analysis of their useful life. He has done no testing. He has not identified any fastener which he can reliably say would have out performed the fastener he assumes was used. In short, he cannot offer reliable helpful testimony to a jury concerning the design in issue. Pursuant to Rule 702, his testimony should not be admitted.

**B.    Mr. Fallows cannot provide any reliable admissible testimony about the failure of an assumed nylon fastener which he has never seen or tested.**

Whatever fasteners were holding the rear grille for the unit 3A wall sleeve disappeared approximately 9 months before the fire in issue. The witness testimony of the only persons with any memories of these fasteners provided vague descriptions which were not consistent with any parts ever sold by GE (GE respectfully refers to its Motion for Summary Judgment and supporting Exhibits herein). There is no evidence of who supplied any such fasteners who installed them, whether any installation was proper, whether they were removed or replaced, whether they were damaged or of any history of events including such fasteners over the course of 30 plus years.

Mr. Fallows has admitted that he has never seen the fasteners for the rear grille of unit 3A and does not know their history (Exhibit B, p. 45-47). He did nothing to investigate their history (Exhibit B, p. 48-50). He was not aware of any scientific standard which provided that someone could reach a determination as to the cause of a failure of something that is not in existence or visible (Exhibit B, p. 63). Without seeing a failed part he could only speculate about the cause of failure

(Exhibit b, p. 63). He has never before provided an opinion about the cause of a failure he did not see (Exhibit B, p. 62).

He admitted he could not rule out misinstallation, physical abuse or chemical attack as causes for the fasteners to leave missing (Exhibit B, p. 61). He could not rule out replacement of original hardware (Exhibit B, pp. 100-101).

Mr. Fallow's "method" was to assume that the condition of the fasteners for the wall sleeve in unit 3A 9 months before the fire was the same as the post-fire condition of the fasteners for units 2M and 1J. Mr. Fallows admits that he does not know the history of the fasteners for the air conditioners in units 2M and 1J (Exhibit B, pp. 128-129).

To the extent that a comparison between non-existent parts (assumed screws and grommets) with an unknown history and other parts with an unknown history can even be called a method or principle for the purposes of Rule 702 it cannot conceivably be regarded as "reliable" in view of the host of assumptions that must be made to indulge in such a "comparison" especially where there is no evidence to support the assumptions. Such a "method" is not science. It is pure speculation.

Any opinions of Joseph Fallows concerning the cause for the hardware for the unit 3A wall sleeve to become missing do not met the criteria of Rule 702 and should be excluded.

      **C.**   **Mr. Fallows should not be permitted to offer any testimony about the useful life of a wall sleeve and rear grille for an air conditioner where he has admitted he has no expertise in this area.**

He has testified that he has no opinion as to how many years a wall sleeve and exterior grille should last (Exhibit B, p. 56). He has admitted that he is not an expert in useful product life (Exhibit B, p. 150-152).

Mr. Fallows lacks both the qualifications and the facts, data and reliably applied methods or principles to provide any opinion testimony concerning useful product life. He should be precluded from offering any such testimony pursuant to Rule 702.

D.     **Mr. Fallows should not be permitted to offer any testimony about consideration of product behavior by designers of air conditioners.**

Mr. Fallows has testified that before this case he had no knowledge of rodents chewing on wires inside appliances (Exhibit B, p. 164). He had no knowledge about what information was available before 1971 concerning rodents chewing on wires inside appliances (Exhibit B, p. 167). He had no information about any engineer that considered squirrel penetration into an air conditioner before 1971 (Exhibit B, pp. 167-168). He identified a few articles written long after the sale of the wall sleeve and the air conditioner about rodents chewing primarily on underground electrical conduits and not involving appliances (Exhibit B, pp. 173-179).

Mr. Fallows has no education, experience or training which would qualify him to express opinions about consideration of rodents in the design of air conditioners before 1971 (or at any other time). Making one internet search for articles on rodents does not provide sufficient qualification to meet the requirements of Rule 702.

The identification of a few hearsay articles about rodents and electrical mechanisms other than air conditioners does not provide any reliable data or facts or any reliable method validly applied to permit Mr. Fallows to provide testimony on the subject of rodent behavior and air conditioner design.

## III.   **CONCLUSION**

For the foregoing reasons, General Electric Company respectfully requests this court to exclude any opinion testimony from Mr. Fallows in this case.

Respectfully submitted,

GENERAL ELECTRIC COMPANY,
By its attorneys,

**CURLEY & CURLEY, P.C.**

Robert A. Curley, Jr., Esq.
BBO# 109180
27 School Street, 6th Floor
Boston, MA  02108
(617) 523-2990

Dated:   11\7\07

## CERTIFICATE OF SERVICE

I, Robert A. Curley, Jr., Esq., hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Paul T. Falk, Esq.
Falk Johnson LLC
20 South Clark Street
Suite 1990
Chicago, IL   60603

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA    02110

Ronald W. Harmeyer, Esq.
Falk Johnson, LLC
Bank One Plaza
111 East Wisconsin Avenue
Suite 1370
Milwaukee, WI    53202

_____
Robert A. Curley, Jr.

Dated:

12