UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10075 PBS

OCEAN TERRACE CONDOMINIUM
TRUST,                        Plaintiffs

vs.

GENERAL ELECTRIC COMPANY
                              Defendant

## DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION IN LIMINE REGARDING TESTIMONY OF SCOTT JONES

### I.    Factual and Procedural Background:

The Plaintiff has designated Scott A. Jones as an expert witness in this case. The unsigned and unverified Rule 26 disclosure of Mr. Jones is attached hereto as Exhibit A.

In his disclosure Mr. Jones revealed that he expected to offer testimony in the following areas:

1.    The material selection for fasteners of the rear grille.

2.    The use of a double line break in the electrical design of the air conditioner in issue.

3.    Warnings.

### B.    The Deposition of Scott Jones:

Scott Jones received a BS in Mechanical Engineering and in Nuclear Engineering in 1984 (Exhibit B, p. 9). His initial work at Knolls Atomic Power Laboratory after college did not involve air conditioners (Exhibit B, p. 10). He worked for GE Aircraft and Engines between 1987 and 1994 (Exhibit B, p. 10). He did not work on wall sleeves for air conditioners or any commercial air conditioner (Exhibit B, p. 12). He then worked between 1994 and 1996 at GE Appliances with respect to electric ranges (Exhibit B, p. 12). He did no work concerning air conditioners (Exhibit B, p. 12).

Mr. Jones did not consider himself an expert in plastics (Exhibit B, p. 32). Before this case he had no information about any animal infestation of an air conditioner (Exhibit B, p. 59)

Mr. Jones has admitted that he has never seen any grommets or the actual grille that was used in Unit 3A (Exhibit B, p. 65).

Mr. Jones had no idea of the installer of any grommets in the Unit 3A wall sleeve  (Exhibit B, p. 67). He did not know what happened in the installation (Exhibit B, p. 86).

He had no information about the expected useful life of the air conditioner in issue (Exhibit B, p. 73).

He had no familiarity with any standard relating to the expected useful life of an air conditioner (Exhibit B, p. 73).

2

He has never been involved in establishing the expected useful life of any product (Exhibit B, p. 76).  He never made a single decision on life of a single component (Exhibit B, p. 72).

He was not aware of any published data concerning the expected useful life for wall enclosures for through-the-wall air conditioners (Exhibit B, p. 76).

Apart from an enclosure which Mr. Jones saw concerning a Fredrick wall sleeve to use with a GE air conditioner he had not seen any other writing that relates to a wall sleeve such as the one installed in 1971 at Ocean Terrace (Exhibit B, p. 80).  He had received no oral information on this subject (Exhibit B, pp. 80-81).

He had no information about any failed screw grommet from the 1971 vintage anywhere (Exhibit B, p. 107).

He had no specific information about what any other air conditioner manufacturer used before 1971 for rear grille fasteners (Exhibit B, p. 110).  He has done no study concerning designs of wall sleeves for through the wall air conditioners which existed before the early 1970's (Exhibit B, p. 61-62).

Mr. Jones did not look for any literature in the scientific community that related to applications of nylon in screw grommets before 1971.  (Exhibit 23, p. 112).

He has never looked at any version of UL 484 the UL standard for air conditioners which was in existence before 1971 (Exhibit B, p. 116).

He has never done any testing on any nylon grommet (Exhibit B, p. 117).

3

Mr. Jones agrees that Kathy Hull and Mark DeFelice should have replaced their rear grille when it became missing (Exhibit B, p. 122).

Mr. Jones expressed the view that it would have been reasonable for GE to have used double pole contactors in the refrigeration power circuit to provide a double line break.  (Exhibit B, p. 130).

He did not know of any manufacturer of an air conditioner that has ever used such a design (Exhibit B, p. 130).  He did not know of any industry standard that required the use of such a design (Exhibit B, p. 130).

He was not aware of any other person who has expressed an opinion that double pole contactors to provide a double line break should be used for air conditioning units (Exhibit B, p. 133).  He was not aware of any scientific literature advocating such a device (Exhibit B, p. 133).

In Mr. Jones mind, a double pole contactor to provide a double line break addressed a problem of rodent infestation (Exhibit B, p. 133).

Mr. Jones offered the view that there was a wide selection of polymeric materials available before 1970 which he presumably thought GE could use for rear grille attachment hardware (Exhibit B, p. 135).

He admitted that he was not a plastics expert and that he had no firsthand knowledge of such materials (Exhibit B, p. 135).  He could not identify specific materials and did nothing to evaluate the failure modes of these materials (Exhibit B, pp. 135-136).

4

He expressed the thought that a device known as a Tinnerman clip might be used to attach the rear grille but he could not identify any manufacturer of an air conditioner which had utilized such a device (Exhibit B, p. 140).

He has never tested Tinnerman clips for use on a rear enclosure of an air conditioner (Exhibit B, p. 140).

He did not know of any Tinnerman clip application that had been successfully used for a period in excess of 30 years without repair or replacement of the clip (Exhibit B, p. 143).

He had not tried to identify any failure mode of plastic injection molded grilles and had no data on any plastic injection molded grilles which had been in the field for 30 years (Exhibit B, p. 144).

He was not aware of the availability of any plastic injection molded grilles before 1971 (Exhibit B, p. 145).

To the extent that Mr. Jones tried to draw conclusions from grommets present after the fire in units 1J and 2M, he did not try to determine the history of these grommets or whether they had been abused or mishandled at any time (Exhibit B, p. 148).

Mr. Jones did not perform a design review for any alternative fastening system for the rear grille (Exhibit B, p. 155).

When Mr. Jones formulated his opinions he did not think the age of the wall sleeve was a very relevant quantity (Exhibit B, p. 156).


II.    **ARGUMENT**


5

**A.** **Mr. Jones has no qualifications sufficient to permit him to testify about design chores for rear grille fasteners before 1970 and has no reliable basis to support any opinions concerning such design choices.**

Fed. R. Evid. Rule 702 requires that Mr. Jones have sufficient knowledge, skill, experience, training or education to qualify him to testify about scientific or technical matters of assistance to the jury and any testimony offered by Mr. Jones must be based upon sufficient facts or data and must be the product of reliable principles or methods reliably applied.

The Plaintiff has the burden of proving that the design of the wall sleeve, rear grille and fasteners was defective at the time of its sale, namely, before 1971. Back v. Wickes Corporation, 375 Mass. 633, 378 N.E.2d 964 (1978).

The Plaintiff has the burden of establishing the availability of a technologically and commercially feasible alternative design to GE before 1971. Gillespie v. Sears, Roebuck & Company, 376 F.3d 21, 26 (1st Cir. 2004); Marchant v. Dayton Tire & Rubber Company, 836 F.2d 695, 699 (1st Cir. 1988); Alves v. Mazda Motor of America, Inc., 448 F. Supp. 2d. 285, 299 (D. Mass. 2006); Back v. Wickes Corporation, supra.

Mr. Jones has repeatedly testified that he is not an expert in plastics. He has no experience with air conditioners before 1971 and, at best, a passing acquaintance with air conditioners after 1971. He has no knowledge about what manufacturers of air conditioners used before 1971 for rear grille fasteners before 1971 and has performed no study or research concerning designs of wall sleeves for air conditioners before the early 1970s.

6

In short the Plaintiff cannot demonstrate that Mr. Jones has sufficient knowledge, skill, experience, training or education which would qualify him to testify about design choices for a wall sleeve, rear grille or fasteners in the period of time when the products in issue were sold.

In Tokio Marine & Fier Ins. Co. v. Grove Manufacturing Co., 958 F.2d 1169 (1st Cir. 1992) the court affirmed the exclusion of proferred expert testimony concerning crane design civil engineer who had investigated over 60 crane accidents where the witness had never designed cranes or worked for a crane manufacturer and had no publications or in-depth study about cranes.

In Bogasion v. Mercedes-Benz of North America, Inc., 104 F.3d 472 (1st Cir. 1996) the court affirmed the exclusion of testimony concerning the design and operation of a transmission where the witness had a bachelors degree in industrial and vocational education and was a very well-qualified master mechanic but where his expertise did not extend to the design of a transmission parking mechanism.

In Trumps v. Toastmaster, Inc., 969 F. Supp. 247 (S.D.N.Y. 1997) a mechanical engineer who proferred no alternative design testimony was not permitted to testify concerning the design of an electric griddle.

A "mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering. Unless he is to testify only to general engineering principles that any mechanical engineer would know, the engineer must possess "some special skill, knowledge or experience,' Ancho, 157 F.3d at 517, concerning the particular issue before the court." Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 382 (D. Md. 2001).

7

One does not become an expert simply by accumulating experience in testifying. Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989).

In this case, Mr. Jones has no relevant experience concerning air conditioners or wall sleeves and certainly not with respect to the design of air conditioners before 1979. He has performed no study or research concerning air conditioners, never mind any in-depth research, at any time. He has admitted he is not an expert in plastics. He has not consulted any relevant standard in existence before 1971. He simply does not possess the qualifications necessary to offer of opinions about the products in issue and should not be permitted to do so.

In this case Mr. Jones has not employed any reliable method to evaluate design choices available to GE before 1971 for fasteners for the rear grille of the wall sleeve. He has not consulted any standard in effect before 1971. He has done no research or study concerning air conditioner design before 1971. He has not relied on any relevant published literature concerning air conditioner design. He has not done any testing. He admits he has not identified any fastener choice which would out perform the fastener choice made by GE. He did not perform a design review for any alternative fastener system or try to identify failure modes in any alternative fastening system.

In short, Mr. Jones testimony is sheer ipse dixit testimony which is not admissible. Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1983); Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376 (1st Cir. 2000).

In <u>Demaree v. Toyota Motor Corp.</u>, 37 F. Supp. 2d 959, 966 (W.D. Dy 1999) the testimony of an expert who failed to address the risks of a proposed alternative design was excluded.  In <u>Dancy v. Hyster Co.</u>, 127 F.3d 649, 653 (8th Cir. 1997) expert testimony was excluded where the expert assumed away potential problems with alternative design.

There is no reliable basis which satisfies the requirements of Fed. R. Evid. Rule 702 from Mr. Jones testimony and it should be excluded.

**B.**   **Mr. Jones has no qualifications sufficient to permit him to testify about his proposed use of a double line break in the design of the air conditioner in issue and no reliable basis to support any opinions concerning such a design.**

As set forth above Mr. Jones lacks any specialized knowledge about air conditioner design sufficient to permit him to offer testimony that a double line break (essentially an extra on-off switch) should have been used in the design of the air conditioner in issue before 1985.

Mr. Jones has testified that he proposed a double line break to address a problem of rodent infestation.  His design proposal is consequently based on an assumption of a problem of rodent infestation of air conditioners before 1985 about which there is absolutely no evidence.

Mr. Jones again seeks to offer sheer inadmissible <u>ipse</u> <u>dixit</u> testimony.  He admits that there never has been and is not now any standard requiring such a device.  He did not know of any air conditioner manufacturer that has ever used such a design.  He knew of no technical literature advocating such a device.  He was not aware of any other person who has expressed an opinion that such a

9

device should be used.  He has done no testing.  He has no knowledge of the commercial feasibility of such a device.

As discussed in the case authority cited above, his proposed testimony does not meet the criteria for admissibility under Fed. R. Evid. Rule 702 and should be excluded.

### C.    Mr. Jones as no qualifications and no reliable basis for providing any testimony concerning warning which meets the criteria of Rule 702.

In his Rule 26 disclosure (Exhibit A, p. 16) Mr. Jones makes a one sentence statement which reads:

Based on my review of the entire record in this case and the testimony of GE employees, which indicates GE did not consider the risks which caused the fire in issue in this case, GE was negligent in failing to clearly warn customers about hazards of the grille falling off and instructing customers what to do if the grille does fall off.

Mr. Jones agreed in his deposition that the grill should have been replaced by Cathy Hull and Mark DeFelice when it fell off.

Mr. Jones has no disclosed qualifications concerning the formulation of warnings for either air conditioner wall sleeves made before 1971 or air conditioners made before 1985.

He has not revealed where any warning should be placed, what its content would be or how it would come to the attention of a user of a wall sleeve over 30 years after it was made or the use of an air conditioner over 16 years after it was made.

Before the law imposes any duty to warn the Plaintiff would need evidence that GE knew or should have known of a non-obvious, unreasonably dangerous condition.  Anderson v. Owens Illinois, Inc. , 799 F.2d 1 (1st Cir. 1986).  There is no duty to warn unless GE had some reason to believe a warning was needed.  Carney v. Bereault, 348 Mass. 502 (1965).

There is no evidence in this case that GE had any knowledge that a bizarre and unforeseeable event such as the allegations of the Plaintiff involved would ever occur.  Indeed, today GE does not accept Plaintiff's contention that the fire even began in the air conditioner in issue.

There is no standard requiring whatever the undisclosed warning Mr. Jones proposes may be.  There is no industry practice concerning warnings about events such as the Plaintiff's allegations.  There is no technical literature which addresses such a topic.  There is no one other than Mr. Jones who has ever proposed such a warning.

Mr. Jones has not made a sufficient disclosure under Rule 26 to permit him to testify about some vague warning which he alone contends GE should have given.  He has no qualifications in the warnings area.  There is no evidentiary basis which supports a duty to warn.  The proposed testimony of Mr. Jones fails to meet the requirements of Rule 702 and should be excluded.

### III.    CONCLUSION

The Defendant General Electric Company respectfully requests this court to exclude the testimony of Plaintiff's expert Scott Jones as he does not meet the

criteria of Fed. R. Evid. Rule 702 either in terms of qualifications or possession of a reliable basis for offering opinion testimony.

Respectfully submitted,

GENERAL ELECTRIC COMPANY,
By its attorneys,

**CURLEY & CURLEY, P.C.**

Robert A. Curley, Jr., Esq.
BBO# 109180
27 School Street, 6th Floor
Boston, MA  02108
(617) 523-2990

Dated:    11/2/07

12

## CERTIFICATE OF SERVICE

I, Robert A. Curley, Jr., Esq., hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid to the following counsel of record:

Paul T. Falk, Esq.
Falk Johnson LLC
20 South Clark Street
Suite 1990
Chicago, IL   60603

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA    02110

Ronald W. Harmeyer, Esq.
Falk Johnson, LLC
Bank One Plaza
111 East Wisconsin Avenue
Suite 1370
Milwaukee, WI    53202

_____
Robert A. Curley, Jr.

Dated:    11/7/07

13

Exhibit A

# *Scott A. Jones, PE – Rule 26 Disclosure*

Per Federal Rules of Civil Procedure, the author, Scott A. Jones, P.E., C.F.E.I. and Senior
Mechanical/Electrical Engineer of EFI Global, Inc. is disclosing opinions in the subject
case. The author's curriculum vita is attached as Appendix A. The author's complete
testimony history is attached as Appendix B.

The author was retained by Falk Johnson, LLC on behalf of Ocean Terrace
Condominium Trust to evaluate the design and design processes implemented by General
Electric in the design of the subject Room Air Conditioner (RAC). In performance of
this assignment, I have performed the following:

1) Inspected the GE RAC Model Number AJC10DST1, Serial Number
   MS224676 and RAB21 wall sleeve that were removed from Unit 3A of the
   subject condominium structure.

2) Inspected the 240 Volt AC wall receptacle, attached conductors, and 2 pole 20
   Amp circuit breaker that provided power to the subject GE RAC situated in
   Unit 3A.

3) Inspected a duplex receptacle and attached conductors that were situated to
   the right (oriented looking out the sliding door) in Unit 3A Living Room.

4) Inspected GE RAC Model Number AJC10DST1, Serial Number MS225841
   that was removed from Unit 2M in the loss structure.

5) Reviewed the deposition transcripts, taken January 19 and 20, 2006, of Harold
   D. Moore including Exhibits 63 and 64 taken from the same.



EXHIBIT 307
Jones
10-16-06 SLD

6)      Reviewed the deposition transcript, taken December 20, 2005, of Captain
        Ralph G. Hobbs.

7)      Reviewed the deposition transcript, taken December 20, 2005, of Fire Fighter
        Michael Chipperini along with Exhibits 12, 13 and 14 taken from the same.

8)      Reviewed the deposition transcript, taken December 20, 2005, of Fire Fighter
        Stephen L. Cooney along with Exhibit 16 taken from the same.

9)      Reviewed the deposition transcript, taken January 12, 2006, of Fire Chief
        Barry S. McKay along with Exhibits 20 through 34 taken from the same.

10)     Reviewed the deposition transcript, taken January 13, 2006, of Massachusetts
        State Trooper James M. Welch along with Exhibits 2-A, 6-A, 41, 35, 36, 37,
        38, 39, 42, 42-A, and  43 through 61.

11)     Reviewed Exhibits 1, 2, and 3 taken from Cathy Hull's deposition.

12)     Reviewed the deposition transcript, taken December 19, 2005, of Mr. Mark
        DiFelice along with Exhibit 11 taken from the same.

13)     Reviewed the deposition transcript, taken January 19, 2006, of Mr. Robert
        Ambrosi.

14)     Reviewed a DVD that was supplied by counsel of local news reports
        concerning the subject fire.

15)     Reviewed Defendant General Electric Company's Responses to Plaintiff's
        First Set of Interrogatories.

16)     Reviewed Defendant General Electric Company's Response to Plaintiff's First
        Set of Requests to Produce Documents.

17) Reviewed photo macrographs produced by Mr. Joe Fallows of a failed grommet that was attached to the RAB21 enclosure in Unit 3A.

18) Reviewed Bill of Materials Supplied by Defendant for Model AJC10DST1 RAC.

19) Reviewed detailed piece part drawings supplied by Defendant that were manufactured for use in the subject Model AJC10DST1 assembly.

20) Reviewed ITW Fastex (grommet manufacturer) cut sheets that were available on the Internet at www.itw-fastex.com/catalogue.

21) Reviewed Underwriters Laboratories, Inc. (UL) Standard for Safety 484, *Room Air Conditioners*, Sixth Edition, date March 29, 1982.

22) Reviewed GE/UL File Report SA 2141 with revisions.

<u>Design</u>

1) It is believed by the author with a reasonable degree of engineering certainty that GE Appliances as the principle design agent for the subject room air conditioner created a defective design, which was unreasonably dangerous, for the exterior condenser structural grille retention means. As a direct consequence of the defective design, both nylon grommets that were used to attach the aluminum grille to the structural sleeve failed, which resulted in the release of the grille. Early failure of the nylon grommets, which were to be exposed to sunlight and moisture conditions in the given exterior application, was a foreseeable risk not appreciated by the consumer.

Functionally, the grille was designed to prevent foreign object collection (e.g., leaves, etc.) during normal condenser cooling air flow, to direct discharge air flow from the condenser, to prevent foreign object invasion into the rotating condenser fan, and to prevent animal intrusion.

General Electric's designated expert regarding the design and function of the subject GE RAC, Mr. Harold D. Moore, stated that General Electric did not understand nor acknowledge the foreseeable risk of animal invasion and electrical insulation gnawing activity in the machinery compartment. Mr. Moore did not understand the unreasonably dangerous hazard created by the same.

Per Mr. Moore's Testimony:

> *Q.* [Direct Examination – Ronald Harmeyer, Esq.] *If a squirrel were to get inside* [the RAC], *would you consider that -- by inside, I mean inside the J series air conditioner, would you consider that to be a safety hazard?*
>
> *Mr. Curley: Objection*
>
> *The Witness: No – only for the squirrel*
>
> *Q. Is that because of the fan?*
>
> *A. Yes.*
>
> *Q. The fan is the safety hazard for the squirrel?*
>
> *A. The moving fan, yes.*

*Q.  So, other than noise and general nuisance of a squirrel getting inside of a*

*J Series air conditioner, is that considered a risk, or hazard to design*

*against?*

*A.  I don't ever recall that being something that was discussed as being a risk.*

*Q.  Is it something that was ever – with a customer was ever warned about?*

*A.  I'm not aware of any warnings associated with squirrels.*

*Q.  What about birds?*

*A.  There's no warning on birds, because we – grills are designed to prevent*

*birds from getting into the product.*

*Q.  If the grill falls off, then birds can get in?*

*Mr. Curley: Objection*

*The Witness: Sure.*

*Q.  Is there any, or has there been, to your knowledge, any warning to the*

*consumer about safety hazards that may be created if the grill falls off?*

*A.  I'm not aware of any.*

*Q.  Would you expect the end consumer to be aware of safety hazards created*

*by the grill falling off?*

*Mr. Curley: Objection*

*The Witness: Again, we would not consider it a safety – personal safety issue*

*with the grill falling off.*

*Q.  I understand that if there isn't a hazard, you wouldn't expect the customer*

*to be aware of a hazard.  I understand my question is a bit perhaps*

*redundant, but I'll ask it again anyway.  Is there any safety issue which*

*you would expect the end consumer to be aware of which would be caused*

*by the grill falling off?*

*Mr. Curley: Objection*

*The Witness: I'm not sure a customer would be aware of any safety issue*

*associated with that.*

As noted in prior sections of this disclosure, a large amount of post-fire evidence existed to confirm the pre-fire presence of animals and the consequential damage caused by the same. A product is unreasonably dangerous where it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics.

The known hazard of animal intrusion was evidenced in this case by gnaw marks upon the electrical conductors in the machinery compartment of the subject GE RAC. The risk, a squirrel chewing through an electrically energized conductor, was reasonably foreseeable to the product designer at the time of manufacture.

2) General Electric failed to use reasonable care in the design of the subject RAC. Beyond the thoughtful selection of designs, materials, and manufacturing processes to achieve the aesthetic and performance parameters of a new Original Equipment Manufacturer (OEM) product, the major appliance design process involves multiple steps to identify and abate risks. For the subject GE RAC

design, the risk of failure and consequences thereof were not identified during the

following opportunities:

a.  Materials Selection – Non-reinforced unpigmented Nylon (Nylon) was

improperly selected by GE Appliances in Dwg. No. 21B621270 as the

resin for the subject failed grommet.  The product designers could have

easily foreseen that the subject grommet, in its intended application as an

outdoor structural component in the RAC enclosure, would have been

subject to direct water contact and ultraviolet radiation exposure from the

sun.  It is common practice in mechanical design to avoid the use of Nylon

due to the rapid degradation of mechanical strength when exposed to

ultraviolet radiation, and the phenomena of dimensional swelling and

shrinkage due to the hygroscopic nature of the material relative to other

available polymers.

b.  Formal Assessment of Risks – OEM manufacturers are obliged to ensure

product safety prior to placing the product into the stream of commerce.

Prior to rigorous short and long term testing of the product (i.e.,

development testing), it is common practice to subject the proposed design

to a formal intellectual process involving: 1) the identification of possible

failure modes, 2) quantitative assessment of the probability of each of the

failure modes, and 3) quantitative assessment of the consequences (e.g.,

loss of life, major fire, etc.) of each of the identified failure modes.  Such

studies are referred to as Failure Modes Effects Analyses (FMEAs).  It is

common practice to invite cross-discipline experts to participate in product FMEAs to ensure that all relevant risks are identified and abated.

The formal assessment of risk was not performed by General Electric on the subject RAC. There has been no documentation or testimony provided by General Electric that a systematic evaluation of the risks arising from the grill falling off has ever been attempted or completed. Even if a risk assessment was conducted by GE, it was insufficient and failed to identify and provide for this readily determinable risk.

Since the 1980's, FMEAs were known to GE at GE Aircraft Engines and were in use there. When I arrived at GE Appliances in the mid 1990's, I assisted in the formal development of the FMEA process. Had such a process been in place when the subject GE RAC was manufactured, it is my opinion that the risks from the grill falling off would have been identified and abated.

c.  Short and Long Term Development Testing – OEM manufacturers are obliged to establish a rigorous physical testing program of developmental products to ensure that all performance and safety parameters are met in the new design. Typically, OEM designers develop a battery of testing on developmental products in accordance with their internal standard for the New Product Introduction (NPI) process.

As part of the developmental testing, OEM designers are obliged to test under normal use conditions and foreseeable abusive conditions of operation to discover latent defects in the design that adversely affect performance and safety of the unit under test.

In the present RAC design, there has been no documentation or testimony provided by General Electric that a systematic evaluation of any risk arising from long term developmental product testing with regard to the structural integrity of the RAC cabinet was attempted or completed. Such testing, both short term and long term, was well known in the appliance industry.

d. Third Party Testing – As a means to assure a new or altered OEM design will perform per the design intent in a safe manner, OEM manufacturers often elect to have an independent (i.e., third party) entity perform performance and safety testing (e.g., Underwriters Laboratory (UL), Intertek Testing Services (ETL), etc.). The testing is performed to peer-reviewed standards and often involves testing under nominal and abusive (e.g., single failure) conditions.

The subject GE RAC was submitted to UL for third party evaluation under the criteria contained within UL 484, *Standard for Safety Room Air*

*Conditioners, Sixth Edition,* dated March 29, 1982. The author was provided a copy of the document by counsel, labeled Ocean Terrace Condominium Trust v. General Electric, Bates stamp GE 069 through GE 163. The UL project file for the subject RAC, UL File SA2141, dated August 8, 1975 with subsequent revisions, was provided to the author by counsel and Bates stamped UL 00001 through UL 01016.

Section 8, Enclosures, specifically cites the testing criteria for a safe RAC enclosure design. Paragraph 8.2 reads:

> *"8.2 Among the factors which are taken in consideration when evaluating an enclosure are 1) mechanical strength, 2) resistance to impact, 3) moisture- absorptive properties, 4) flammability, 5) resistance to distortion at temperature to which the material may be subjected under conditions of use, and 6) resistance to corrosion. For a non-metallic enclosure or part of an enclosure, all of these factors, including the effect of exposure to weathering if for outdoor use, are considered with respect to aging. See Polymer Materials, Section 9."*

As clearly noted in the paragraph, the aging effects of exposure to weathering is a key requirement for the development of a safe enclosure design using nonmetallic material (e.g., plastic). The Nylon grommet

utilized in the subject RAC enclosure design consequently had to be tested and compared to the success criteria of UL 484.

The testing requirements for polymer materials used in the design of RAC enclosures were contained in UL 484, Table 9.1. Table 9.1 required the following minimum battery of tests:

| Characteristics to be Evaluated | Applies to Enclosures? |
|---|---|
| Flammability | Yes |
| Heat Deflection | Yes |
| Water Absorption | Yes |
| Air Oven Aging | Yes |
| Ultraviolet Light | Yes |
| Water Exposure | Yes |
| Water Immersion | Yes |
| Tensile Strength | Yes |
| Flexural Strength | Yes |
| Izod or Tensile Impact Strength | Yes |
| Impact | Yes |
| Volume Resistivity | Yes |

The applicability of the requirements of Table 9.1 testing requirements was invoked upon the subject Nylon grommet as read in Paragraph 9.1:

> The requirements in paragraphs 9.2-9.19 cover polymeric materials used to form outer enclosures, structural or functional parts, thermal and acoustic insulation, and miscellaneous parts of a room air conditioner."

Per UL File SA2141, Volume 1, Section 44, page 4 (i.e., Bates stamp UL 00120) the subject RAC, Model AJC10DST, was required to be installed in the subject enclosure:

*"This Chassis to be Installed in Wall Sleeve RAB21"*

From the author's review of UL File SA2141, which documented the testing and revision history of the subject RAC, there were no records that indicated that General Electric or Underwriters Laboratory had executed any testing to understand the long-term aging characteristics of the Nylon grommets resulting from anticipated outdoor use in the RAB21 enclosure. It is believed that the subject GE RAC, when mounted in the RAB21 enclosure, does not meet the requirements of UL 484.

e. Spares Utilization – OEM Manufacturers often monitor the use of spare parts to determine frequent failure items as a key indicator for parts to be redesigned. There has been no documentation or testimony provided by General Electric that a systematic evaluation of spares utilization was in place to guide re-design activities on the subject GE RAC.

3) It is believed with a reasonable degree of engineering certainty that an alternative design for the control circuitry existed at the time of production of the subject GE RAC. The alternative design presented no technological challenge, little to no

increase in per unit material cost, and no changes to the operation or aesthetics of the subject GE RAC operating within the RAB21 enclosure.

It is believed by the author with a reasonable degree of engineering certainty that the subject GE RAC experienced an electrical arcing event between the either the compressor motor RUN or START 16 American Wire Gauge (AWG) conductor and the (grounded) GE RAC chassis pan.  The arcing event occurred with the GE RAC not operating.

The heat released during the arcing event caused sufficient heat transfer through the steel pan at the point of contact with the conductor to cause consumption of paint and oxidation of the outside (i.e., the side facing the through-wall sleeve) surface.

One end of a parted compressor electrical conductor, identified as conductor segment "4" during an inspection of the electrical conductors at the St Paul Travelers Engineering Laboratory in Windsor, Connecticut, revealed melted copper strands.  The subject conductor was parted in the mid-section of the GE RAC machinery compartment (i.e., the area between the evaporator and condenser heat exchangers that contained the compressor).  The live conductor end subsequently arced to the (grounded) RAC chassis pan.

Per GE wiring diagram 21D620710, Revision O, which was provided to the author by counsel as Ocean Terrace Condominium Trust v. General Electric, Bates stamped document UL00774, the tan and orange conductors attached to the run capacitor and served as power sources for the compressor RUN and START windings on the refrigeration compressor. The conductors proceeded from the front section of the GE RAC (i.e., the area in front of the evaporator) to the machinery compartment. Per the GE wiring diagram, the subject conductors were connected to the "L2" side of the GE RAC receptacle and consequently would have maintained a 120 Volt AC nominal potential difference with the grounded chassis at all times, even if the unit was not operating. The "L1" side of power supply system interrupted power to the compressor for normal start/stop operation.

A reasonable alternative to the foregoing design problem is to use a double line break. This is a well known technology used by General Electric on its kitchen range product. General Electric should have utilized double pole contactors in the refrigeration compressor power circuit to provide a double line break (i.e., interrupt the continuity of power lead L2 as well as L1 when the refrigeration compressor is shut off). Had this design alternative been used, this fire would not have occurred.

4) It is believed with a reasonable degree of engineering certainty that an alternative design for the exterior grille attachment means existed at the time of production of

the subject GE RAC. The alternative design presented no technological challenge, little to no increase in per unit material cost, and no changes to the operation or aesthetics of the subject GE RAC operating within the RAB21 enclosure.

A wide selection of polymeric materials with physical properties capable of withstanding the environmental conditions for the subject grill retention application were available to product designers at the time of the design and manufacture of the subject GE RAC. Had a thoughtful design process for polymer selection been in place at GE, it is believed that the conditions that led to the loss would have been eliminated.

By rotating the screw attachment points between the aluminum grille and the steel enclosure into the enclosure, the need for polymer grommets would be obviated. With internal attachment, simple Tinnerman clips could be utilized to capture the screws. Had the grill been plastic injection molded, screw bosses could have been added to the injection mold, thus obviating the need for grommets. Both technologies were available at the time of the design and manufacture of the subject GE RAC.

5) Based on my review of the entire record in this case and the testimony of GE employees, which indicated GE did not consider the risks which caused the fire in

this case, GE was negligent in failing to clearly warn customers about hazards of the grill falling off and instructing customers what to do if the grill does fall off.

# Appendix A

# Curriculum Vitae of Scott A. Jones, P.E., C.F.E.I.



(812) 945-3820
(877) 271-8486
scott_jones@efiglobal.com

## Scott A. Jones, P.E.

Professional Engineer – Mechanical Engineering
Professional Engineer – Electrical Engineering
B.S. Degree – Mechanical Engineering, University of California, Berkeley
B.S. Degree – Nuclear Engineering, University of California, Berkeley
Masters Degree Business Administration
Certified Fire and Explosion Investigator
Certified Vehicle Fire Investigator

### PROFESSIONAL SUMMARY

- Bachelor of Science Degrees: Mechanical Engineering and Nuclear Engineering; University of California, Berkeley, 1984
- Masters of Business Administration; Union College, Schenectady, New York, 1987

### PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2000 - Present | ENGINEERING AND FIRE INVESTIGATIONS<br>Lexington, Kentucky<br><u>Senior Mechanical Engineer</u><br>Investigate, analyze, and provide complete technical reporting on fire, failure, and defect causation. Specialties include: industrial and residential fires/explosions, heavy equipment and automotive systems, major appliances including gas and electric ranges, LP and natural gas systems, water heaters, HVAC systems, fireplaces, aircraft nacelle/EBU systems, sprinkler and fire detection systems, kitchen fire suppression systems, and industrial/OEM product failure. |
| 1996 - 2000 | SERVEND INTERNATIONAL<br>Sellersburg, Indiana<br><u>Director of Engineering</u><br>Served as Engineering Department Leader for Design Engineering, R&D, Manufacturing Engineering, Tooling and Consumer Service. Conducted design, safety and Underwriter's Laboratories reviews to protect product integrity. |

Resume                        Scott A. Jones                        —— Page 2

1994 - 1996          GE APPLIANCES
                     Louisville, Kentucky
                     <u>Design Manager - Ranges</u>
                     Provided engineering leadership to a group of 31 engineering
                     professionals in the Range product line.  Provided design
                     leadership for the GE, Profile, RCA, Hotpoint, and Kenmore
                     brands in electric and gas.  In addition, provided design guidance
                     for the Calrod heater line.

1987 - 1994          GE AIRCRAFT ENGINES
                     Cincinnati, Ohio
                     <u>Staff Engineer – New Engine Development</u>
                     Served as the staff engineer for the development, testing, and
                     manufacture of components for military (F-14, F16, B2, and TR-2)
                     and commercial (Boeing 777) aircraft engines.  Designed EBU
                     (fuel, hydraulic, pneumatic) systems within nacelle structures.
                     Tested design adequacy through flight test for turboprop and
                     turbofan engines.

1984 - 1987          KNOLLS ATOMIC POWER LABORATORY
                     Schenectady, New York
                     <u>Design Engineer – Power Plant Systems</u>
                     Developed nuclear and steam plant maintenance and operating
                     procedures for 3 land-based naval nuclear plants.  Wrote system
                     specifications and developed budgetary analyses for major
                     modification work.  Participated in design evaluation and system
                     performance testing for all contracted work.

1975 - 1981          USS ALEXANDER HAMILTON (SSBN-617)
                     New London, CT
                     <u>Electrician</u>
                     Served as an electrician and power plant operator aboard the
                     submarine.  Scheduled and performed preventive maintenance for
                     the ship's power generation, propulsion and crew support
                     equipment.  Diagnosed and repaired ships' turbo-generators, high
                     kW AC/DC motor-generators, and ships' single and 3-phase
                     distribution switchgear and motor controllers.  Received 5 US
                     Navy Letters of Commendation for "…attention to detail,
                     expedient problem solving, and dedication to duty."

Resume                              Scott A. Jones                        —Page 3

## CERTIFICATIONS

Registered Professional Engineer, License Numbers PE10200078 (IN); E67726 (OH);
    062-056115 (IL); 22984 (KY); 16252 (MS); 6201053251 (MI); Pending (PA);
    Pending (NY); Pending (TN)
Certified Fire and Explosion Investigator - National Association of Fire Investigators
Certified Vehicle Fire Investigator - National Association of Fire Investigators
Licensed Private Investigator: License Number 0046 (KY); License Number 2005008857
    (OH)

## PROFESSIONAL ORGANIZATIONS

National Society of Professional Engineers (NSPE)
National Association of Fire Investigators (NAFI)
National Fire Protection Association (NFPA)
National Society of Professional Insurance Investigators (NSPII)

## CONTINUING LEARNING

*2005 IASIU Insurance Fraud Seminar* – Kentucky Chapter IASIU – Louisville, Kentucky
- May 12 & 13, 2005

*2004 National Seminar on Fire Analysis Litigation* – Sarasota, FL – National Association
of Fire Investigators – August 12-13, 2004

*2003 IASIU Seminar* – Elizabeth, Indiana – May 19-20, 2003

*2003 World Tire Expo* – Seminar series presented by Tire Industry Association –
Louisville, Kentucky – March 27 & 28, 2003

*2002 Vehicle Fire, Arson & Explosion Investigation Science & Technology Seminar* –
Eastern Kentucky University, Richmond, Kentucky – September 30 – October 2, 2002

*Insurance Fraud Seminar* – Elizabeth, Indiana – May 13-14, 2002

*2001 Advanced Insurance Fraud Seminar* – Cincinnati, Ohio – November 14-15, 2001

*Overview of the 2000 International Residential Code* – Indianapolis, IN – October 30,
2001

*Indiana Fire and Arson Conference 2001* – Indianapolis, Indiana – August 20-22, 2001

Resume                          Scott A. Jones                          ___Page 4

*2000 Advanced Insurance Fraud Seminar* – National Society of Professional Insurance
Investigators – Cincinnati, Ohio – November 14-16, 2000

*Arson Investigation for the Second Millennium* – Kentucky Chapter International
Association of Arson Investigators – Somerset, KY – May 2-6, 2000

Appendix B

Testimony History for Scott A. Jones, P.E., C.F.E.I.

**Scott Jones, P.E.**
**Testimony Experience**

Boldface for party represented

| Date | Project No. | Venue (County) | Case | Attorney | Type |
|---|---|---|---|---|---|
| 1/16/2001 | 94509-80194 | Hamilton Co., OH | Liberty Mutual v Bill Wilkes v Ted Jones and Cincinnati Insurance Company | Dennis W. Van Houten, Esq. | Deposition |
| 11/8/2000 | 94506-00314 | Cuyahoga Co., OH | Allstate Insurance Company v. General Electric | Dave Chernosky, Esq. | Deposition |
| 10/4/2002 | 94506-20101 | Shelby Co., TN | KLLM Transport Services v. Freightliner, LLC and Empire Truck Sales | David Dunbar, Esq. | Deposition |
| 12/3/2002 | 94506-20061 | Fayette Co., KY | Ronald D. Perry v. Jackson Enterprises | William Tooms, Esq. | Trial |
| 5/29-30/03 | 94506-20109 | Ashland, KY | Texas Road House v. A-1-A Electric | Cathy Hughes, Esq. | Deposition |
| 6/30/03 | 94506-10090 | Floyd Co., IN | Cotton States v. Jim Walter Homes | David Cornelius, Esq. | Deposition |
| 7/1/2003 | 94506-10066 | Clark Co., IN | Murphy v. GuideOne and Thomas | Jeffery Oberlies, Esq. | Deposition |
| 10/29/03 | 94506-20099 | Rochester, NY | NAS Quick Signs, Inc./Labrador Building Systems | Daniel Coffey, Esq. | Arbitration |
| 10/31/03 | 94506-10222 | Coles Co., IL | Ohio Casualty v. Deere & Co. | Anthony Morrone, Esq. | Deposition |
| 11/3/03 | 94506-20068 | Madison Co., AL | Capital Investors Property Group, Inc. v. Three Springs, Inc. | David Allred, Esq. | Deposition |
| 11/24/04 | 94506-00311 | Cook Co., IL | Janco Composites, Inc. v. Acra Electric Corporation | Robert Gilmartin, Esq. | Deposition |
| 11/26/04 | 94506-00237 | Fayette Co., KY | Maggard v. Johnson Controls, Inc. | Patrick Moores, Esq. | Deposition |
| 4/27/04 | 94506-40060 | Cook Co., IL | State Farm v. Voegtle's Auto Service, Inc. | Michael P. Stanczak | Deposition |
| 7/29/04 | 94506-30160 | Fayette Co., KY | Louisville/Jefferson County Metro v. Sterling Truck Corporation/Freightliner, LLC | B. Frank Radmacher, III | Deposition |
| 8/25/04 | 94506-10222 | Coles Co., IL | Ohio Casualty v. Deere & Co. | Anthony Morrone, Esq. | Re-Deposition |
| 12/13/04 | 94506-00237 | Shelby Co., TN | Ivan & Elaine Rugless v. Home Care Services, Inc. | William Larsha, Esq. | Deposition |
| 1/28/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Deposition |
| 2/7/05 | 94506-20082 | Cook Co., IL | Indianapolis Wood Products, Inc. v. Honeywell, Inc. | Klint Bruno, Esq. | Deposition |
| 3/16/05 | 94506-20082 | St. Clair Co., IL | Mark Lohman v. Arctic Cat, Inc. | Larry Eaton, Esq. | Deposition |
| 3/18/05 | 94506-30331 | Baltimore, MD | Penn National Mutual Casualty v. Maytag Corporation | Dan Hogan, Esq. | Deposition |
| 4/13/05 | 94506-20199 | Fayette Co., KY | Demolition Disposal Services v. Vermeer Manufacturing Co. | William Clark, Esq. | Deposition |
| 5/12/05 | 94506-20082 | Floyd Co., IN | Indianapolis Wood Products, Inc. v. Honeywell, Inc. | Klint Bruno, Esq. | Daubert/Rule 702 |
| 5/27/05 | 94506-30085 | Moore County, NC | Catholic Health East v. Cam-Ful Industries, Inc. and Phoenix Fire Protection, Inc. | Michael T. Smith. Esq. | Deposition |

| 8/25/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Motion in Limine |
| 8/30/05 | 94506-10225 | Fayette Co., KY | Helen Bayless (Deceased) v. Hamilton-Beach/Proctor Silex | Patrick Moores, Esq. | Re-Deposition |
| 10/31/05 | 94506-30232 | Pike Co., KY | Kentucky School Boards Insurance Trust v. Elliot Contracting, Inc. and Watts regulator | Zanda Gillock, Esq. | Deposition |
| 12/2/05 | 94508-14478 | Cook Co., IL | Kappy's Restaurant v. Fox Valley Fire & Safety Co. and PROTECTCO | James Schultz, Esq. | Deposition |
| 1/9/06 | 94506-20032 | Fayette Co., KY | Kentucky Farm Bureau Mutual v. Ford Motor Company | Edward Brutscher, Esq. | Deposition |

*Exhibit B*

1

Volume I
Pages 1 to 160
Exhibits 300 to 307

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10075 PBS

- - - - - - - - - - - - - - - - - - -x
                               :

OCEAN TERRACE CONDOMINIUM TRUST,   :
        Plaintiff,             :
                               :
      vs.                       :
                               :

GENERAL ELECTRIC COMPANY,        :
        Defendant.            :
                               :
- - - - - - - - - - - - - - - - - - -x

        DEPOSITION OF SCOTT A. JONES, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Susan
E. DiFraia, Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Curley & Curley, P.C., 27 School
Street, Boston, Massachusetts, on Tuesday, October
10, 2006, commencing at 10:00 a.m.

PRESENT:

    Falk Metz LLC
        (by Paul T. Falk, Esq.)
        Two First National Plaza,
        20 South Clark Street,
        Suite 1900, Chicago, IL 60603,
        for the Plaintiff.

    Curley & Curley, P.C.
        (by Robert A. Curley, Jr., Esq.)
        27 School Street,
        Boston, MA 02108, for the Defendant.

               * * * * *

3

P R O C E E D I N G S

1

2          MR. CURLEY:  We can waive the sealing, the

3    filing and the notarization of the deposition.  The

4    witness can read and sign under the pains and

5    penalties of perjury.  We can reserve all

6    objections, except as to form, and motions to strike

7    until the time of trial.

8          MR. FALK:  That's fine.

9                SCOTT A. JONES

10   a witness called for examination by counsel for the

11   Defendant, having been satisfactorily identified by

12   the production of his driver's license and being

13   first duly sworn by the Notary Public, was examined

14   and testified as follows:

15                DIRECT EXAMINATION

16      BY MR. CURLEY:

17      Q.    Could you state your name for the record,

18   please.

19      A.    Scott A. Jones.

20      Q.    Mr. Jones, as you know, my name is Bob

21   Curley.  I represent the General Electric Company in

22   this case.  I'm going to ask you quite a few

23   questions.  If there's anything that I ask you at

24   any time that you don't understand, just let me

9

1    industry refers to this where you have a separate

2    unit and a wall sleeve is a packaged terminal air

3    conditioner, commonly called a PTAC.  We did not

4    study these.

5        Q.    Do you remember the rating of the air

6    conditioners that you studied?

7        A.    We studied large centrifugal units from

8    175-ton units clear down to one-ton window units.

9        Q.    Any other educational work that you did

10   that specifically related to the design or

11   manufacture of air-conditioning units?

12       A.    That is all I recollect.

13       Q.    Okay.  When did you get your BS in

14   mechanical engineering?

15       A.    1984.

16       Q.    And when did you get your BS in nuclear

17   engineering?

18       A.    1984.

19       Q.    Was that a joint program of study?

20       A.    Yes.  They called it the dual major

21   program.  There were 75 people admitted and allowed

22   for the double major.

23       Q.    Did you spend four years in the University

24   of California in that program?

10

1     A.    No, two years and nine months.  I went year

2  round with a lot of classes.

3     Q.    Okay.  Was it the equivalent of four years

4  compressed into two years and nine months?

5     A.    Yes, it was.

6     Q.    Okay.  And after graduating, you worked for

7  the Knolls Atomic Power Laboratory?

8     A.    Yes.

9     Q.    Did your work there have anything to do

10  with the design or manufacture of air-conditioning

11  units?

12     A.    No.

13     Q.    Did your work there relate to

14  air-conditioning units at all?

15     A.    No.

16     Q.    Okay.  You then went to GE Aircraft Engines

17  from 1987 to 1994 in Cincinnati, Ohio?

18     A.    That's correct.

19     Q.    Did your work there have anything to do

20  with the design or manufacture of air-conditioning

21  units?

22     A.    Yes, it did.

23     Q.    In what way?

24     A.    The program was classified; it was part of

12

1    commercial or residential applications?

2        A.    Very much so.

3        Q.    All right.  Now then, in 1994 you went to

4    GE Appliances and you stayed there until 1996?

5        A.    That is correct.

6        Q.    And your work was a design manager for

7    ranges?

8        A.    That is correct.

9        Q.    All right.  Did you do any work concerning

10   air-conditioning units while you worked at GE in

11   Louisville, Kentucky?

12       A.    No.

13       Q.    Okay.  Did you have any discussion of any

14   sort with anybody that was working on the design or

15   manufacture of air-conditioning units in Louisville,

16   Kentucky?

17       A.    No.

18       Q.    Have you talked with anybody who is or was

19   employed by General Electric Company concerning the

20   design or manufacture of air-conditioning units?

21       A.    Yes.

22       Q.    Who did you speak to?

23       A.    I would have to get out the list.  Hold on.

24   These are prior employees of GE.

32

1      Q.    Compared to what?

2      A.    Other plastics.

3      Q.    All other plastics?

4      A.    I can't make that -- I don't have the data

5  in front of me.

6      Q.    Do you consider yourself an expert in

7  plastics?

8      A.    No.

9      Q.    While you were at SerVend International

10  from 1996 to 2000, did your work relate in any way

11  to air-conditioning units?

12      A.    Yes.

13      Q.    In what way did it relate --

14      A.    We did refrigeration units for countertop

15  bench dispensing, and some of our developmental

16  products that I did the engineering on we took from

17  room air conditioners, literally, compressors,

18  condensers, fans.

19      Q.    So the refrigeration part of countertop

20  dispensing was borrowed from air-conditioning

21  design?

22      A.    Yes.

23      Q.    Did your work at SerVend relate to any

24  air-conditioning units?

59

1    the design review of an air conditioner?

2        A.    I don't have a specific recollection of

3    that.

4        Q.    Okay.  Now, do you have any specific

5    information about animal infestation in any

6    air-conditioning unit that, in fact, occurred, that

7    you knew of before you got this case?

8        A.    Not specifically air conditioning.  Range,

9    yes, air conditioning, no.

10       Q.    All right.  Now, the information you had

11   pertained to -- concerning animal infestation

12   related to which appliance products?

13       A.    Range, specifically.

14       Q.    Okay.  And ranges are indoor products?

15       A.    Indoor products.

16       Q.    And what type of animal infestation were

17   you aware of with respect to ranges?

18       A.    Mice and cockroaches.

19       Q.    And did the subject of mice and cockroaches

20   come up with design review?

21       A.    No.  In real life we've had problems of

22   making sure that our cabinet integrity was such that

23   any rodents whatsoever could not get into the

24   control area of the unit and attempting ways of

65

1    looks like I did not charge them for the travel.

2        Q.    Now, do you have notes of this inspection?

3        A.    Yes.  They should be part of that --

4        Q.    In the file that's being copied?

5        A.    Those are the -- yes.  Yes.

6        Q.    And you indicate that you performed a

7    compressor winding resistance measurement?

8        A.    Yes.

9        Q.    And how did you do that?

10       A.    I went between -- I used a volumeter, and I

11   went between the common and the start terminal and

12   the common and the run terminal.

13       Q.    And did you do the same thing with the

14   winding installation resistance?

15       A.    I used -- yes, the volumeter, and I went to

16   ground, between the windings and ground.

17       Q.    Now, you have never seen any grommets that

18   actually were used in Unit 3A; is that correct?

19       A.    That is correct.

20       Q.    And you have never seen the actual grille

21   that was used in Unit 3A?

22       A.    That is correct.

23       Q.    And is it your understanding -- strike

24   that.  Do you have any information as to what was

67

1   not been provided to me.  So I cannot answer your

2   question with any certainty outside of a photograph

3   which I do not have before the fire.

4       Q.   Do you know who installed the unit?

5       A.   I have no idea who installed the unit.

6       Q.   Did you try to identify any installer?

7       A.   No.

8       Q.   Did you try to determine what, in fact, the

9   installer used for hardware?

10      A.   That's kind of tough when I don't even have

11  the GE print which you have not provided or the

12  parts list.  And you're asking me questions about a

13  hypothetical situation where I've been clear on the

14  record I don't have the parts list.  Now you're

15  asking me assembly questions.

16      Q.   Do you understand that GE doesn't keep

17  records forever?

18      A.   No.  No.  No.  That's not true.  Their

19  products -- I mean, they sell parts for monitor top

20  refrigerators.

21      Q.   So you think somewhere there exists --

22      A.   No question.

23      Q.   Please let me finish.

24           MR. FALK:  So you get to interrupt him, but

86

1      Q.    Do you have any information as to who the

2   installer of Mr. Waite's air conditioner was?

3      A.    No.   I specifically asked, and the reply

4   was that the unit was in place by the time he

5   purchased it.

6      Q.    So it's your understanding that the unit in

7   issue had already been installed by the time Mr.

8   Waite purchased the unit?

9      A.    That is my understanding.

10     Q.    Okay.   And who had the air-conditioning

11  unit in issue installed, you simply don't know?

12     A.    I'm sorry.   Say that again.

13     Q.    Whoever it was who had the air conditioning

14  unit in issue installed, you don't know who that

15  person was?

16     A.    That is correct.

17     Q.    You don't know who the installer was or

18  what happened in the installation?

19     A.    That is correct.

20     Q.    Do you have any information as to whether

21  the rear grille was removed at any time before Kathy

22  Hull's ownership?

23     A.    I have no information that says it was or

24  was not.

73

1    was in discussion, and it was in a booklet, and it

2    had useful life pieces.  And I know I've seen

3    another one years back, but I don't remember which

4    insurance company it was from.

5         Q.    Okay.  And are you familiar with any

6    information specifically related to the air

7    conditioner model at issue in terms of its expected

8    useful life?

9         A.    I don't have any data for that.

10        Q.    Are you familiar with any standards that

11   relate to the expected useful life for an air

12   conditioner?

13        A.    No.

14        Q.    Okay.  Other than these insurance

15   brochures, are you familiar with any data from any

16   air conditioner manufacturer about expected useful

17   life?

18        A.    No.

19        Q.    These brochures, do you know when they were

20   formulated?

21        A.    No.

22        Q.    Do you know whether they related to a time

23   frame in the mid-1980s or not?

24        A.    This has been within the past two to three

72

 1       A.    I can't remember making a single decision

 2  on life on a single component.  So no to your

 3  question.

 4       Q.    Do you have any information as to any

 5  expected useful life of the GE air conditioner at

 6  issue?

 7       A.    You'll see air conditioners cited -- I've

 8  seen them as low as 12 to 18 years.

 9            MR. FALK:  Are you talking about the sleeve

10  and the grille, or are you talking about the air

11  conditioner?

12            THE WITNESS:  No, I'm talking about just

13  the air conditioner, the active unit.  The sleeve's

14  another matter.

15       Q.    I asked you about expected useful life for

16  the GE air conditioner, and you said you've seen it

17  cited.  Where have you seen it cited?

18       A.    Just in the insurance industry.  Various

19  insurance brochures that SIU investigators would

20  use.  That would be the main source for those

21  numbers.

22       Q.    Can you identify any such document?

23       A.    I know I've seen an Allstate brochure.  I

24  don't have it, but it was presented anecdotally.  I

80

1    on what they call pedestals.  You can buy -- the

2    major manufacturers all make a pedestal.

3        Q.    So there was no wall sleeve?

4        A.    There was, but the wall sleeve sits on top

5    of that, and I didn't go outside to look at the

6    external grille.

7        Q.    Okay.

8        A.    On the GE unit that I mentioned that I'm

9    currently investigating in Sycamore Township, it

10   had, I believe, what they call the aluminum

11   architectural grille on it that did not use

12   grommets.  It did the same things as this standard

13   aluminum grille but without grommets.

14       Q.    Now, apart from the literature that you

15   referred to about how to convert a Frederick wall

16   sleeve for use with a GE air conditioner, have you

17   seen anything else in writing that you believe

18   relates to the expected useful life of a wall sleeve

19   such as the one in issue that was installed in 1971?

20       A.    No.

21       Q.    Have you received any oral information from

22   anybody concerning the expected useful life of a

23   wall sleeve such as the one in issue that was

24   installed in 1971?

81

1      A.    No.

2      Q.    Now, is it possible to missinstall a screw

3   grommet?

4      A.    In what fashion, when you say

5   "missinstall"?

6      Q.    Can you improperly install a screw grommet?

7      A.    Well, they come already mounted to the

8   grille, so no.

9      Q.    Okay.  Do you think you can overtorque the

10  screws?

11     A.    In this particular case?  The GE grommet?

12  Is that what we're speaking specifically?

13     Q.    All right.  Is there a difference between

14  the screw grommet that was used or you understand

15  was used in 1971 from the one that was used in 1985?

16     A.    I know the exemplar units 1J and 2M had a

17  grommet that was similar, and Evan Haynes took

18  dimensional measurements.  So we have matched

19  markings that do match the case of 3A, so I can

20  speak to them.  Okay.  What was the question with

21  that reference?

22     Q.    Actually, the question was:  Was there a

23  difference between the screw grommet that was used

24  in 1985 on GE wall cases and the screw grommet that

107

```
1      Q.    Have you read Mr. Moore's deposition?

2      A.    Yes, I have.

3      Q.    Have you ever had any contact with Mr.

4  Moore?

5      A.    I do not believe so.

6      Q.    Now, apart from the Ocean Terrace

7  Condominium Trust building, do you have any other

8  information about any failed screw grommets from the

9  1971 vintage anywhere?

10     A.    No.

11     Q.    And have you read the testimony of the GE

12 employees that were responsible for handling any

13 service calls in that regard?

14     A.    You would have to mention by specific name

15 and go against my list.

16     Q.    Okay.  You don't recall in general reading

17 the depositions of people with that function?

18     A.    I gave you an answer.  I simply asked that

19 you give me a name, and we'll compare it to the

20 list.  There's a lot of people and a lot of

21 depositions.  I think that's fair.

22     Q.    You reviewed some information about screw

23 grommets from ITW Fastex?

24     A.    Yes, I did.
```

110

1    Q.   The architectural units you're referring to

2    are GE units?

3    A.   There's been a mix of zone lines, and I

4    believe they give the model.  The large one is like

5    5,100, and there's a large number of Amana units,

6    too.  Goodman Manufacturing/Amana.

7    Q.   Did you try to identify when any of these

8    units or associated wall sleeves was made?

9    A.   I've done a large number of Goodman unit

10   failures.  They have a pretty disastrous fire

11   failure mode, and they tend to fall into the 1997 to

12   2002 range.

13   Q.   Have you identified any of these units that

14   you've looked at that were manufactured before 1971?

15   A.   Well, we talked about the 1J unit was 1995

16   that I looked at, the Sycamore Township.  I don't

17   recollect earlier ones, making specific mention of

18   that.

19   Q.   All right.  Can you tell me what any other

20   manufacturer of an air conditioner used before 1971

21   for rear grille fasteners?

22   A.   I don't know the specifics.

23   Q.   Other than yourself and your fellow experts

24   in this case, are you aware of anybody that has

61

1    Q.    Other than the issues that were addressed

2  with respect to Sanyo, do you recall any design

3  review of any product where the subject of animal

4  infestation came up?

5    A.    No.

6    Q.    With respect to this case, have you had any

7  communications with any designer or manufacturer of

8  air conditioners other than the GE employees that

9  you've identified?

10    A.    No.

11    Q.    Have you done any study concerning the

12  designs of wall sleeves for through the wall air

13  conditioners that existed before the early 1970s?

14    A.    No.

15    Q.    Do you know what any other manufacturer was

16  using for screen or wall sleeves for through the

17  wall air conditioners before the 1970s?

18    A.    I know what GE was using before the 1970s

19  but no other manufacturer.

20    Q.    I think I was only asking about other

21  manufacturers.

22    A.    Oh, I didn't catch that.

23    Q.    So you have no information about

24  manufacturers other than GE concerning what they

62

1    were using for screens or fasteners for wall

2    sleeves?

3        A.    That is correct.

4        Q.    Okay.  Now, have you made a determination

5    as to what GE was using for fasteners before the

6    1970s?

7        A.    They were using grommets.

8        Q.    Have you ever seen one of those grommets?

9        A.    No.  The parts list was missing, and the

10   print was illegible.

11       Q.    Would you be able to draw the design of the

12   grommet?

13       A.    I can only draw the representation that GE

14   put on its drawing.

15       Q.    Well, what drawing are you referring to?

16       A.    There's a specific drawing number which I

17   brought along.  It was created in 1960.  It uses

18   grommets.  Again, I don't have the parts list, and

19   so until GE comes up with the parts list I can't

20   answer your question.  The drawing is a GE drawing.

21   The drawing number is 864C709.  It was created June

22   8, 1960.  It was issued June 24, 1960.  And very

23   specifically they have grommets down at the bottom.

24   It's a louver design.  It has the slab corner.  It's

112

1      Q.    Have you identified any such literature

2   that existed prior to 1971?

3      A.    No.   I have not looked, either.    I

4   attempted to understand, to your question, what GE

5   would know with regard to that.   GE typically

6   designs in the newest, most expensive materials and

7   tends to be at the forefront of it.   I wanted to see

8   by our request to GE what data, what studies they

9   had done to address that very question, but, again,

10  I was unable to get any data back from GE.

11          And the presumption was they did no studies

12  on nylon even though it would have been most

13  probably, to their appliance application, one of the

14  newer materials.   GE has a tendency to do a lot of

15  design studies on materials it doesn't understand.

16  I know that from being with GE for years and years.

17     Q.    Have you looked for literature in the

18  scientific community outside of GE that related to

19  the use of nylon in applications such as the screw

20  grommet that existed before 1971?

21     A.    Have I?

22     Q.    Yes.

23     A.    I have not done that.

24     Q.    I take it you have no criticisms of the

116

1  at, is this one that's been produced by your

2  counsel?

3      A.   Yes.

4      Q.   And this was produced by GE?

5      A.   No.

6      Q.   No?

7      A.   Oh, I'm sorry.  It's an Underwriters

8  Laboratory document.  But you mean produced in the

9  legal sense, yes.

10     Q.   Yes.  And is it your understanding that

11 this standard is the one that was published as of

12 March -- I'm sorry -- April 11, 1986?

13     A.   Yes.  I saw that, yes.

14     Q.   Did you look at any earlier versions of

15 UL484?

16     A.   I specifically made the request, and we

17 made the request to GE for all pertinent versions

18 back to 1970.  But I did not review those.  I did --

19 I have not seen any prior versions.

20     Q.   Have you tried to locate any prior version

21 yourself?

22     A.   No.

23     Q.   And have you ever looked at any version of

24 UL484 that was in existence in the period before

117

1971?

    A.    No.

    Q.    Now, on Page 7 of your Rule 26 Disclosure, in Paragraph A on "Material Selection," you make a statement about, "It is common practice in mechanical design to avoid the use of nylon."  Do you see that?

    A.    Okay.  Yes.  Go ahead.

    Q.    All right.  Do you have any experience with any design engineer who avoided the use of nylon?

    A.    Myself.

    Q.    Okay.  Other than yourself?

    A.    No.

    Q.    And when you avoided the use of nylon, was that after your bad experience at SerVend?

    A.    Yes.  With regard to ultraviolet exposure, yes.

    Q.    Have you ever done any testing on any nylon grommet?

    A.    No, not on a grommet.

    Q.    Have you ever done any testing on nylon?

    A.    As put into assemblies, yes.

    Q.    Have you ever done any testing concerning exposure of nylon to ultraviolet light?

122

1    standard that addresses animal infestation as a

2    design item for air-conditioning manufacturers

3    before 1971?

4        A.    No.

5        Q.    Do you think that air conditioning unit

6    owners that somehow have a rear grille go missing

7    should replace it?

8        A.    Yes.

9        Q.    And did Kathy Hull and Mark DeFelice over

10   the course of nine months or so have the opportunity

11   to do that?

12       A.    And they did.

13       Q.    You say that Kathy Hull and Mark DeFelice

14   got a replacement grille for --

15       A.    No.  No.  You said, "Should they repair

16   it?"  Yes.  They attempted repairs multiple times.

17       Q.    I think I actually said "replace."  But at

18   some point after their initial repairs, is it your

19   understanding that the grille became totally

20   missing?

21       A.    That is correct.

22       Q.    And for how long did you understand that it

23   became missing?

24       A.    Approximately nine months.

130

1     Q.    You haven't expressed any opinions on the

2   timing sequence of arcs in your Rule 26 Disclosure?

3     A.    That is correct.

4     Q.    Now, you have expressed the view that GE

5   should have utilized double pole contactors in the

6   refrigeration compressor power circuit to provide a

7   double line break, correct?

8     A.    That is reasonable, yes.

9     Q.    Do you know of any manufacturer of an air

10   conditioner that has ever done that?

11     A.    I don't know of any.

12     Q.    In the refrigeration units that you're

13   familiar with, has that been done?

14     A.    No.   No.   We did not have the same exposure

15   as this unit has to the outdoors on the condenser

16   side.

17     Q.    Is there any industry standard that

18   requires the use of double pole contactors to

19   provide a double line break?

20     A.    No.   That's not what they would typically

21   specify anyway.   It's a design practice and a

22   decision that people would make as an OEM designer.

23     Q.    Is it a design practice that any air

24   conditioning manufacturer has ever followed?

133

1      Q.    So you determined that the electrical

2   design of the air-conditioning unit in issue

3   actually met NFPA70?

4      A.    You cannot say that.   NFPA70 provides no

5   guidance on how to design an air conditioning unit.

6   It's how do you connect the unit to a premises

7   distribution system.

8      Q.    Okay.   Other than yourself or any fellow

9   expert in this case, are you aware of any other

10  person that has offered the opinion that double pole

11  contactors to provide a double line break should be

12  used for an air-conditioning units?

13     A.    Not to my knowledge.

14     Q.    Are you aware of any scientific literature

15  that's expressed that view?

16     A.    If you deenergize the unit that is subject

17  to rodent infestation, you can prevent fire.   That's

18  common sense.

19     Q.    Are you aware of any scientific literature

20  that indicates that double pole contactors to

21  provide a double line break should be used for an

22  air-conditioning unit?

23     A.    No.

24     Q.    You've indicated that there are any number

135

1    properties capable of withstanding the environmental

2    conditions for the subject grille retention

3    application were available to product designers at

4    the time of the design and manufacture of the

5    subject GE RAC."  Did I read that correctly?

6        A.    That is correct.

7        Q.    Okay.  Now, can you tell me what polymeric

8    materials you're referring to?

9            MR. FALK:  Now we have the question.

10       A.    Well, I don't have firsthand knowledge nor

11   am I a plastics expert, but in these cases where GE

12   would attempt to use a plastic especially with

13   unknown properties, they would set up a full test

14   program to evaluate the properties.

15       Q.    Just sticking with "a wide selection of

16   polymeric materials," what polymeric materials apart

17   from nylon are you referring to?

18       A.    There's a wide variety.

19       Q.    Tell me what you can think of.

20       A.    Once again, I don't know the specific

21   materials, but by 1970 there was a wide selection of

22   materials out there.  They had lamellate that you

23   could put in nylon to improve the ultraviolet

24   properties.  How's that?

136

1     Q.   That's one.  Anything else?

2     A.   That's the one I know of.

3     Q.   All right.  Did you try to identify any

4 failure modes that any of these other polymeric

5 materials were subject to?

6     A.   No.  Neither did GE.

7     Q.   You actually don't know what GE did in the

8 materials selection process, do you?

9     A.   GE did not present any data that it did

10 anything in the material selection process.

11     Q.   You understand the material selection

12 process occurred more than 35 years ago?

13     A.   My presumption is design record books are

14 kept forever, so --

15     Q.   But you do understand that the material

16 selection process occurred more than 35 years ago?

17     A.   I understand that.

18     Q.   Now, in the next paragraph one of the

19 things you propose would be to rotate the screw

20 attachment points?

21     A.   Yes.  Use some thoughtful design to

22 eliminate this concern altogether.

23     Q.   Is there an actual design you've come up

24 with?

140

1  architectural.  I don't know how they form their

2  threads.

3      Q.    For what unit did you say GE does it?

4      A.    The one I just installed had Tinnerman

5  clips on the front of the enclosure.

6      Q.    On the inside?

7      A.    Yes, for the attachment of the actual front

8  unit.  You slide the unit in and you --

9      Q.    The plastic piece that's on the front of

10 the air conditioner --

11     A.    Well, I think it had metal flanges and you

12 screwed it in and put in the clip.

13     Q.    But that wasn't for the rear enclosure?

14     A.    No.  That is correct.  I think for the rear

15 enclosure the architectural may use the clips.  I'm

16 not quite sure.

17     Q.    So other than thinking that maybe the

18 architectural uses the Tinnerman clips to hold the

19 rear enclosure, are you aware of any other

20 manufacturer that uses the Tinnerman clips?

21     A.    No.

22     Q.    Have you ever tested the Tinnerman clips on

23 a rear enclosure for an air conditioner?

24     A.    No.

143

1    through them.

2        Q.    And how does that produce a failure mode?

3        A.    Nonretention.  The screw will fall out.

4        Q.    And how did you become familiar with that

5    failure mode?

6        A.    Doing it myself on other products.  Life

7    experience.

8        Q.    Do you know of any Tinnerman clip

9    application that has been successfully used for a

10   period in excess of 30 years without repair or

11   replacement of the clip?

12       A.    No, I do not have that data.

13       Q.    Now, moving on to the plastic injection

14   molded grills.  Are you aware of any such grills

15   other than the ones from GE that you've mentioned?

16       A.    I know Amana and competitors have

17   architectural grills.

18       Q.    Have you tried to identify any failure

19   modes with the mounting system of those plastic

20   molded grills?

21       A.    Me personally, no.  Once again, I'm given

22   to OME designers doing a good job of understanding

23   what attachment means; longevity of putting inserts

24   into the mold; you can put threaded inserts into the

144

1    mold; different things of a thoughtful design to

2    produce a design that will last.

3         Q.    Are you aware of any data on failure modes

4    for any plastic injected molded grills that have

5    been in the field for more than 30 years?

6         A.    No.

7         Q.    Have you tried to identify in any way

8    failure modes for screw bosses in plastic injection

9    molded grills?

10        A.    I've done tests on screw bosses in plastic

11   injection molds.  I've done pullout tests; I've done

12   endurance tests.  I've done a lot with that, but not

13   in grills.

14        Q.    And in the course of that testing, did you

15   identify any failure modes?

16        A.    None in the use that we were using them.

17        Q.    And what was the use you were using them

18   for?

19        A.    In Flomatic injection molded beverage

20   mixing valves.

21        Q.    So those would be used inside?

22        A.    Yes.  That's where you get your pop out of

23   in a convenience store.

24        Q.    Not exposed to wind or environmental

145

1    conditions on the outside?

2        A.    They have horrible environmental

3    conditions.  They're exposed to carbonated water and

4    raw syrup, which is tremendously acidic.

5        Q.    When did plastic injection molded grills

6    first become made available by GE?

7        A.    I have the data point from the one fellow

8    that we discussed very early on, and he was there

9    back in the '70s, '80s.

10       Q.    Is that Mr. Moore?

11       A.    No.  Hold on.  I think I've got it.

12       Q.    Mr. Thaler or --

13       A.    Daugherty.

14            MR. FALK:  It's Exhibit 301, I think.

15       Q.    Daugherty.  Okay.

16       A.    Yes.  Mid-'70s to '87, had the standard

17   grille, aluminum architectural and Lexan

18   architectural.

19       Q.    He told you in the mid-'70s?

20       A.    Well, his time at the helm was mid-'70s to

21   '87.

22       Q.    Are you aware of the availability of any

23   plastic injection molded grills before 1971?

24       A.    No.

148

1    Q.    With respect to Unit 2M, did you try to

2    determine the history of the grommets for that unit?

3    A.    No.

4    Q.    Did you have any information from any

5    owners of that particular unit concerning the

6    air-conditioning unit at any time?

7    A.    No.

8    Q.    Did you try to determine whether the

9    grommet in Apartment 2M had been subject to any

10   mishandling, misuse, or any form of improper

11   treatment at any time?

12   A.    No.

13   Q.    It was not your role to make a

14   determination as to the cause of any breakage of the

15   grommets in Apartment 2M or 1J?

16   A.    That is correct.

17   Q.    And you did not do that?

18   A.    I did not do that.

19   Q.    Did you understand that the fire in issue

20   generated a lot of heat?

21   A.    Most of them do.

22   Q.    Have you quantified in any way the heat

23   that would have been experienced by the grommets in

24   the air-conditioning unit at 2M or 1J?

155

1    Q.    You haven't done such a design review with

2    any type of alternative fastening system for the

3    rear grille?

4    A.    No, I have not, but it's easily done.    That

5    is the process of design.    If I was at GE I would do

6    that very test as I'm sure they would do in

7    thoughtful testing.

8    Q.    You have some materials that bear the title

9    "Table 3 Chemical Resistant Temperature 70 degrees"?

10    A.    Yes.    These were 70 degree tests.    I just

11    wanted to see the effect of chlorine, probably, on

12    nylon, on Nylon 6.    And both in wet and dry it's not

13    recommended to use that.

14    Q.    And why did you want to see the effect of

15    chlorine?

16    A.    This was a seaside environment.    Chlorine

17    is very prevalent in all places.    It's just

18    especially prevalent in this particular location.

19    Q.    You have a chart that falls down on "Life

20    Jacket Fabrics"?

21    A.    Yes.

22    Q.    And where did you obtain that?

23    A.    The Web site is down at the bottom.

24    Q.    Okay.    And you got this in April of 2003?

156

1    A.    Yes, I did.

2    Q.    The exposure parameter that is called out

3 at the bottom, "MJ/M squared." What does that stand

4 for?

5    A.    Megajoules per meter squared.

6    Q.    Do you have any personal familiarity with

7 any such testing?

8    A.    No.

9    Q.    You have an exemplar room air conditioner

10 as well?

11    A.    No, I do not.

12    Q.    There's a set of notes that starts with

13 3/19/03.

14    A.    Yes. I was using the Unit 2M as an

15 exemplar at that point.

16    Q.    Okay. At the time you formulated your Rule

17 26 Disclosure, did you believe that the wall sleeve

18 was the same age as the air conditioner?

19    A.    I really hadn't thought about it when I

20 made that disclosure.

21    Q.    So at the time you expressed your opinions

22 you hadn't thought about the age of the wall sleeve?

23    A.    Correct. I didn't see it as a very

24 relevant quantity.