**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NUMBER: 05 10075 PBS**

| | |
|---|---|
| OCEAN TERRACE CONDOMINIUM TRUST, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | ) <br> ) |
| GENERAL ELECTRIC COMPANY | ) <br> ) |
| Defendant. | ) |

**JOINT PRETRIAL MEMORANDUM**

Plaintiff Ocean Terrace Condominium Trust and Defendant General Electric Company hereby submits its Joint Pretrial Memorandum as follows:

1.  **Summary Of The Evidence**

**Plaintiff**

The plaintiff will prove that General Electric breached its implied warranty of merchantability by designing, manufacturing and selling an air conditioner that was defective and unreasonably dangerous. The plaintiff will further prove that General Electric was negligent in failing to evaluate the performance characteristics of the material it used for the fasteners, in failing to perform a risk analysis, in failing to monitor the field performance of its products and in failing to warn its customers of the risk of fire created when the plastic fasteners fail and the electric wires remain energized even though the product is turned off by the customer. The plaintiff will also establish that General Electric is liable to plaintiff under Massachusetts General Law, Chapter 93A.

This case arises from a fire caused by a defective General Electric through-the-wall air conditioner. Through the testimony of witnesses, including first in firefighters and expert testimony, the plaintiff will prove that the fire started in the defective air conditioner and spread from the air conditioner to the Ocean Terrace Condominium building, resulting in the destruction of 42 homes. The plaintiff will introduce evidence that the fire occurred for two reasons. First, General Electric used plastic fasteners to attach the exterior grille to the sleeve. Second, General Electric designed the air conditioner such that the electric wires remained energized when the air conditioner was turned off. The grille fell off because the plastic fasteners failed. A squirrel subsequently entered the air conditioner and chewed through a wire that was energized even though the air conditioner was turned off. Electricity arced from the wire through the squirrel's

nesting material, igniting the material. The ensuing fire caused $2,891,109.69 in damages, excluding prejudgment interest.

## How the Air Conditioner Caused the Fire

The fact witnesses will testify that approximately eight months before the fire, the exterior grille fell off the unit 3A air conditioner. Thereafter, the witnesses noticed a squirrel inside the air conditioner sleeve. The homeowners attempted to replace the grille, but had limited success.

Plaintiff's liability expert, Fire Investigator Duquenoy, will testify that fire started in the Unit 3A air conditioner. Plaintiff's Electrical Engineer, Evan Haynes, inspected the air conditioner. Engineer Haynes' inspection revealed the following:

1.    A wire inside the air conditioner showed signs of being chewed through;

2.    Once the wire was chewed through, it would drop down and be able to come into contact with the bottom pan of the air conditioner;

3.    There was a large burn mark on the bottom pan of the air conditioner precisely at the point where the chewed wire could come into contact with the pan. This burn mark was consistent with electrical arcing from the wire to the pan;

4.    The chewed wire was energized even if the air conditioner was turned off;

5.    Charred remains of the squirrel's nesting material were found in the bottom of the air conditioner. The nesting material consisted of easily ignitable dried leaves, twigs, grass, etc.

Fire Investigator Duquenoy and Engineer Haynes will also testify that they inspected air conditioning assemblies from other units and preserved as evidence the air conditioners from condominium units 1J and 2M. Squirrel nesting material was found in the 2M air conditioner. A close examination of the 1J and 2M air conditioners revealed how the exterior grilles were connected to the chassis. Screws were inserted from the inside of the sleeve, and screwed through bosses on the sleeve, into nylon grommets and finally through the grille. As the screw passed through the grommet, it caused "fingers" on the grommet to expand and lock into place, thus preventing the grille from falling off. Once locked into place, the screw/grommet fastener could not be removed from the outside.

The examination of the 1J and 2M air conditioners revealed additional evidence. The grommets were made from nylon, and showed severe signs of weathering, including crazing, cracking, discoloration and brittleness.

## The Nortu Jappah Fire

The investigation of this fire led the plaintiff's experts to Vernon, Connecticut, and the location of a second fire. This fire, known as the "Nortu Jappah fire", occurred on July 3, 2002,

2

at the apartment of Nortu Jappah. Plaintiff's experts concluded that the Nortu Jappah fire also occurred inside a General Electric through-the-wall air conditioner after the grille fell off and a squirrel built a nest inside. The evidence will show that, just as in the Ocean Terrace fire, in the Nortu Jappah fire, the fire spread from inside the air conditioner, through the sleeve and to the building.

## The Product Defect Investigation

The plaintiff retained two former General Electric employees as testifying experts. The first is Joe Fallows, who is a polymer engineer who worked for G.E. Plastics. The second is Scott Jones, who is an engineer who worked for General Electric in its appliance division as a product manager. Engineer Fallows concluded that the use of nylon in this application was not appropriate. The performance characteristics of nylon made it susceptible to failure over time, resulting in the exterior grilles falling off. This made the product defective and unreasonably dangerous. Engineer Jones concluded that the risk in question was foreseeable and that design alternatives existed.

## Fire Investigator Gordon Duquenoy

Gordon Duquenoy has an associate's degree in fire science. He is certified by the National Association of Fire Investigators as a Certified Fire and Explosion Expert. He is a graduate of the Rhode Island's State Fire Marshal Course, and was assigned as a Deputy State Fire Marshal. In 1996, he was awarded the Pawtucket Fire Chief's Award for Arson Investigation. He has testified in court as a fire investigation expert.

Mr. Duquenoy will testify in detail regarding his forensic investigation. His conclusions are summarized:

- All physical marks/fire patterns are consistent with the fire originating within the air conditioner.

- This area of origin is consistent with the witness statements, fire patterns and analysis of arc evidence.

- The fire's growth is consistent with the fire originating within the subject air conditioner unit.

## Engineer Haynes

Evan Haynes is a professional engineer who investigated the air conditioner and its potential role in the cause of the fire. Engineer Haynes received a Bachelor of Science degree in mechanical engineering in 1993, and a Master of Science degree in fire protection engineering in 1994. He has taken many continuing education classes. He not only is a registered professional engineer, he also is a certified fire and explosion investigator, and a certified fire investigation

3

instructor. He has testified as an expert witness in court on numerous occasions. Since receiving his degrees, he has over a decade of experience as a fire protection engineer.

Engineer Haynes testimony is summarized below:

- The only failure and competent ignition source in the area of origin was the electrical activity that occurred at the base of the air conditioner.

- The electrical activity was due to a ground fault resulting from the damage to the tan wire… and its insulation by rodents prior to the fire.

- The Nortu Jappah fire demonstrates that a fire in a General Electric A/C unit can transfer enough heat through the metal sleeve to the building structure surrounding the A/C unit to spread the fire.

### Engineer Joe Fallows

Joe Fallows is a mechanical engineer retained by plaintiff. Mr. Fallows has very unique experience directly applicable to this case. He received his Bachelor of Science degree in mechanical engineering in 1976. In 1980, he was hired by General Electric in its Plastics Division. His responsibilities included Technical Marketing Design Manager, Design Services Manager and Application Development Manager.
While at General Electric, he received training, education and experience relating to the use of plastics in appliances. During the last 17 years, most of his time has been spent on product design and development.

Mr. Fallows was given the assignment by one of General Electric's competitors (Carrier Corporation) of designing an exterior grille on a through-the-wall air conditioner. Carrier wanted to convert the grille from metal to polymer. As a result of his work on the design of this exterior grille, Mr. Fallows received two patents.

Given his education, training and experience, Mr. Fallows was retained to evaluate General Electric's use of nylon to secure the exterior grille to the sleeve of the subject air conditioner in this case. Mr. Fallows testimony is summarized as follows:

- The grille had fallen off because the plastic retaining clips (i.e., the grommets) had deteriorated and failed to engage the stamped metal grille.

- The grommets from an exemplar unit were tested, and confirmed to be non-reinforced, non-pigmented Nylon 6. As a class of materials, Nylon 6 is arguably one of the most sensitive polymers to moisture. This polymer absorbs moisture in humid environments and swells. Dimensions change, and most structural properties deteriorate.

4

- When Nylon 6 is exposed to moisture, heat or ultraviolet radiation, degradation of the polymer takes place.

- The unit 3A air conditioner was not the only one that experienced failed nylon grommets. Other identical General Electric air conditioners recovered from Ocean Terrace during the course of the investigation show failed grommets.

- He concludes that Nylon is a poor choice from which to manufacture the grille retaining clip and that there were other choices available to the General Electric engineers.

- Citing the testimony of General Electric employee Harold Moore, Fallows concludes, "GE recognizes that the grille retaining clips need to withstand a variety of weather conditions but GE clearly failed to specify appropriate materials from which to fabricate them.

- Mr. Fallows identifies several possible alternatives to the use of nylon grommets. GE could have used polyester or polypropylene. GE could have used an alternative design, as is used by its competitors. Friedrich and Frigidaire use four metal screws directly to bosses on the sleeve.

- Cathy Hull's observation regarding the grille "was consistent with the expected performance of a Nylon clip. The snap finger ends of the two grilles retaining clips, being severely weathered and embrittled had broken off. The bottom of the grille then fell off the ends of the two retaining clips.

- He has designed and received a patent for an air conditioner grille. One of the functions of an exterior grille is to protect the interior wiring and components from damage caused by rodents. Any competent product designer must anticipate all potential situations that the product could experience…. Even if some level of risk assessment had been conducted by General Electric, it was insufficient and failed to identify and provide for this foreseeable risk.

### Engineer Scott Jones

Scott Jones, like Joe Fallows, is an engineer who formerly was employed by General Electric. He worked for GE Aircraft Engines from 1987 to 1994, and at GE Appliances from 1994 to 1996. Mr. Jones is a registered professional engineer and a certified fire and explosion investigator.

Mr. Jones was retained to evaluate the design of the subject air conditioner. He reaches the following conclusions and opinions:

- General Electric created a defective design, which was unreasonably dangerous, for the exterior condenser structural grille retention means. Early failure of the

nylon grommets, which were to be exposed to sunlight and moisture conditions in the given exterior application, was a foreseeable risk not appreciated by the consumer.

- Quoting the testimony of General Electric's designated witness regarding the design of the air conditioner, Harold Moore, Mr. Jones concludes that "General Electric did not understand or acknowledge the foreseeable risk of animal invasion and electrical insulation gnawing activity in the machinery compartment.

- General Electric failed to use reasonable care in the design of the air conditioner. The major appliance design process involves multiple steps to identify and abate risks. Mr. Jones then identifies and discusses in detail the following five failures: materials selection, formal assessment of risks, short and long term development testing, third party testing, and monitoring the use of spare parts to identify a defective design. General Electric failed to do any of these. Mr. Jones will testify that doing these would have identified and eliminated the risk.

- Mr. Jones also reaches the conclusion that General Electric could have prevented this fire by using an alternative wiring design in the air conditioner. The alternative design presented no technological challenge, little to no increase in per unit cost, and no changes to the operation or aesthetics of the air conditioner. Had this design alternative been used, this fire would not have occurred.

- Mr. Jones also identifies alternatives to the grommet design. By rotating the screw attachment points between the aluminum grille and the steel enclosure, the need for polymer grommets would be obviated.

## Damages

Plaintiff retained two damages experts, Arthur Sarcione and Peter T. Vadala from Vadala Real Estate Appraisals. Based upon their testimony, Ocean Terrace suffered damages in the amount of $3,014,421. Travelers paid $2,891,988 and damages will be limited to this amount plus prejudgment interest and attorneys' fees under M.G.L.A. Chapter 93A upon a verdict for breach of warranty.

## Defendant

On June 1, 2002 there was a fire at the Ocean Terrace Condominium building in Gloucester, MA which resulted in the total loss of the building. This case involves a claim for money damages for that property damage. The Plaintiff claims that the fire started in a through-the-wall air conditioner unit installed in condominium Unit 3A.

The Ocean Terrace building was constructed in 1971 as an apartment building. The through-the-wall air conditioner in Unit 3A consists of two principal structures for the purposes of this case. One structure is a wall sleeve which is a metal box inserted into and attached to the

wall in order to hold the air conditioner unit. The wall sleeve has a rear grille on its exterior side attached by hardware. The wall sleeve for Unit 3A was part of the original construction of the building in 1971. The second structure is the air conditioner present in Unit 3A on 6/1/02 which was manufactured in July 1985 and inserted into the wall sleeve.

The Plaintiff claims that after 30 years of use the rear grille for the wall sleeve fell off and was not replaced for approximately 9 months before the fire and that during this period a squirrel entered the air conditioner unit. The Plaintiff claims that electrical wires were damaged due to squirrel bites and that this damage led to an arc which ignited nesting materials allegedly introduced into the air conditioner unit in issue.

A building permit for the construction of an apartment building which later became the Ocean Terrace Condominium building was issued on August 13, 1971. When the building was originally built it had a mansard roof made of wood shingles. The mansard roof was replaced by a roof with asphalt shingles before the time of the fire in issue. The decks and some sliding doors and windows as well as support beams on the concrete slab were also replaced before the time of the fire.

There is no information about any construction or installation activities concerning through the wall air conditioner units at the time the building was originally built.

Before the time of the fire in issue, there is no evidence that the Condominium Trust did anything to maintain or inspect the air conditioner wall sleeves.

Ocean Terrace has no information concerning:

a.    the identity of the builder of the Ocean Terrace building;

b.    the identity of the original installer of the wall sleeves for the air conditioner;

c.    how the wall sleeves were installed;

d.    the hardware that was originally used to install the wall sleeves or the exterior grilles.

Ocean Terrace has no knowledge of the air conditioner unit installed in Unit 3A before the time of the condominium conversion.

The Ocean Terrace trustees regarded the replacement of the exterior screens for air conditioners as a unit owner responsibility.

The Trustees have admitted that they lack any personal knowledge of any basis for a claim against General Electric Company (GE) in this case.

Before the time of the fire Ocean Terrace had a management agreement with EP Management which was responsible for many maintenance items.

Ocean Terrace was not aware of anything EP Management did to maintain the wall sleeves for the air conditioners.

Ronda Ziner, the president of EP Management will testify that she had no knowledge from any source about the original construction of the Ocean Terrace building or the original installation of wall sleeves for air conditions or any air conditioner unit. (Exhibit 5, p. 17).

According to Ms. Ziner the unit owners were responsible for air conditioners.

Ms. Ziner recalled the inspection of air conditioner sleeves in the late 1990s in conjunction with work performed by Noblin Associates. She recalled that some air conditioner sleeves were to be removed and reflashed but could not say which ones.

Ms. Ziner had no knowledge concerning hardware used to fasten exterior grilles to wall sleeves for air conditioners.

Ms. Ziner was not aware of anyone who ever inspected exterior hardware for air conditioner wall sleeves at Ocean Terrace.

In November 2000, Ms. Ziner noticed that air conditioner grilles were missing on two units and she wrote to the unit owners directing them to replace the grilles.

Ms. Ziner had no information as to how the grilles on those two units came to be missing or the kind of hardware used to secure the grille to the sleeve.

In 1999, Shernecker Property Services rebuilt the mansard roof under the direction of Noblin Associates.

On October 18, 1999 Ms. Ziner sent a memo to all third floor unit owners directing that they remove their air conditioners so that flashing around the sleeves could be installed.

Timothy Little is a Senior Project Manager for Noblin Associates, Inc. He will testify about the condition of the Ocean Terrace building in 1998.

Mr. Little had no information about the original construction of the building which he believed was in the 1960s.

Mr. Little photographed a missing cover on an air conditioner in 1998 but he was not familiar with the make of the air conditioner.

The air conditioner sleeves were one of Mr. Little's concerns in his 1998 study but he never looked into the type of hardware used with the cover (grilles) on the sleeves.

The exterior decks had deteriorated by 1998 to the point where they had lost some of their structural integrity.

Mr. Little recommended the complete replacement of the mansard roof including the installation of flashing around all sides of the air conditioners.

The contractor was given discretion as to how to accomplish the flashing of the air conditioner wall sleeves. Acceptable methods included work involving the air conditioners and the sleeves.

All of the third floor air conditioners were to be reflashed in 1999.

Covers (grilles) on openings where air conditioners were removed would need to be removed.

Doors and windows were replaced as part of the project.

Old flashing around air conditioners needed to be removed.

In a Field Report dated 10/5/99, Mr. Little documented the need to coordinate the disconnection and removal of air conditioners on the third floor to allow for installation of flashing.

The inspection of the air conditioner sleeves required by Mr. Little would have been done from the outside and would have required the covers (grilles) to be removed.

The 1999 work involved the removal of shakes and flashing around the third floor air conditioner units and the addition of additional plywood sheathing, asphalt saturated felt underlayment, metal flashings and asphalt shingles all around the third floor air conditioner wall sleeves.

There was damage to at least one air conditioner grille during the demolition for the 1999 construction work.

On November 1, 1999 Mr. Little recommended the replacement of air conditioner "pans," i.e. wall sleeves as air conditioner units were installed in the future.

Fred Schernecker, designated representative of Schernecker Property Services, Inc. recalled performing the construction at Ocean Terrace in 1999 with respect to rebuilding the decks and replacing the mansard roof. He had no memory of how the air conditioner units were installed or of the condition of any hardware or exterior screens. He had no memory of how the flashing was accomplished around the air conditioning units.

Katherine Hull was the owner of Unit 3A at Ocean Terrace. She purchased it in 1998. She did not move in until February 1999.

There was an air conditioner in Unit 3A which Ms. Hull thought was "old," "at least 13 years old" when she bought the unit.

Ms. Hull had a roommate Mark DeFelice an electrician who was living in Unit 3A at the time of the fire.

When she bought the condominium the grille cover on the outside of the air conditioner was attached. It did not appear to be loose. She paid no attention to the fasteners.

In October 2001 Ms. Hull noticed that the rear grille for her air conditioner was missing. She had no recollection of the grille being loose or rattling before it became missing. It was missing after a Fall rain and wind storm which she described as a Northeaster.

Ms. Hull believed the grille had four attachment points. She knew that one or two screws "sheared off" and maybe one screw was missing. She thought that all four fastening points were the same.

She noticed that the top of the screw had sheared off. She had seen that the screw heads were outside of the grille.

The screws were made of a white plastic. The threaded part of the screw was left. The threads were normal, coarse and far apart.

The sheared off screw was still in the hole and it appeared to go from the outside toward the inside.

She last saw the grille on the ground and the next day it was gone. The hardware described by Ms. Hull was never used by General Electric.

She tried to cover the back of the air conditioner with home screening due to what she thought were exposed electrical parts. She did not bother to go to a hardware store to get screws to attach the screen but just squeezed the screen into the opening.

She made no effort to try to order a replacement grille because she did not think she could find one due to the age of the unit.

Mark DeFelice contacted a friend in the HVAC trade to fabricate a replacement screen. He did this after the screen Ms. Hull put up was damaged and removed by squirrels after 3 or 4 days.

Ms. Hull saw a squirrel inside the air conditioner.

The air conditioner was uncovered for a few days until Ms. Hull again replaced the screen.

She thought that the air conditioner unit itself would be damaged if the new grille was off.

The second screen did not last long.

Ms. Hull could not recall any other cover or device that was on the back of the air conditioner between the winter of 2001-2002 and the fire on June 1, 2002.

Ms. Hull was afraid a squirrel would chew the wires and cause damage.

Ms. Hull never contacted GE.

Before the grille fell off Ms. Hull was aware of an animal infestation problem in the building itself. She heard digging from squirrels or mice in the ceiling above her master bedroom.

On the day of the fire, Ms. Hull's cat was focused on the wall beside the slider door where the State Fire Marshall determined the fire started. This was not the area where the air conditioner was located.

Ms. Hull could not testify that the remains of the plastic screw she saw were similar to a photograph of hardware for a grille in another unit. She did not remember ever seeing any white plastic on the outside of her air conditioner's rear grille before this fire.

Mark DeFelice was a licensed journeyman electrician since 1988.

Mr. DeFelice lived in Ocean Terrace, Unit 3A for 13 to 14 months before the fire.

Mr. DeFelice stated that he observed that this grille was rusty. He thought the grille was a capstyle which slid over the top. It was rusted probably an inch to an inch and a half around the edges. He drew a sketch of the grille showing the amount of rust which is attached as Exhibit 15.

Mr. DeFelice observed the heads of two sheet metal screws on each side of the grille. He did not observe any white plastic material which the sheet metal screws went through.

Mr. DeFelice remembers the grille coming off in early Fall 2001. He never saw it loose. He retrieved it and determined that he could not use the screws to reinstall it due to rust. Consequently he used duct tape to reattach the grille.

Mr. DeFelice was aware that aluminum does not rust as opposed to steel.

The grille which he observed had a 90° flange and had parts that were rusted all the way through. The hardware described by Mr. DeFelice was never used by General Electric.

The duct tape held the grille in place for only a couple of weeks. Mr. DeFelice found the grille on the deck and reattached it with duct tape.

Mr. DeFelice contacted a friend to fabricate a grille but it never got done.

Mr. DeFelice remembered removing 8 quarter inch hex head screws from the box (wall sleeve) and throwing them out.

When he took the screws out, he saw no plastic.

The screws went from the outside of the box toward the inside.

The grille fell off again by early winter 2001.

Mr. DeFelice attempted to buy a grille from an appliance store but could not do so. He never attempted to contact GE or a GE appliance dealer although he knew the air conditioner was a GE product.

Mr. DeFelice believes either he or Cathy Hull threw the grille out.

Mr. DeFelice had heard noises from the air conditioner unit and at one point pounded on the front of the air conditioner and saw a squirrel take off. He also heard noises in the ceiling and attic which he attributed to squirrel activity.

Ms. Hull used window screen material to try to cover the back of the air conditioner but it got chewed out. Mr. DeFelice saw the starting of a nest.

The squirrels always came back to the air conditioner no matter what was done between the Fall of 2001 and 6/1/02. Mr. DeFelice heard them inside the air conditioner and heard the noises of squirrels in the walls and the ceiling.

As an electrician Mark DeFelice had known of animals chewing on and damaging electric wires before the time of the fire.

Mr. DeFelice was shown a photograph of a rear grille from an air conditioner at another unit at Ocean Terrace. He said the rear grille for the air conditioner at Unit 3A was different from this other grille because it had a flange. He was shown a photograph of a screw with a white piece of material on it used to attach a rear grille for another unit at Ocean Terrace. He saw no fasteners like this used for the air conditioner in Unit 3A.

On 6/1/02 there was a fire at Ocean Terrace which was investigated by State Trooper James Welch of the State Fire Marshall's office.

The area of the origin of the fire determined by Trooper Welch was the corner of the living room of Unit 3A on the opposite side of the room where the air conditioner was located. He determined that it was not possible that the air conditioner caused the fire.

Jack Moore is expected to testify. GE has used stamped aluminum rear grilles for its through-the-wall air conditioner products since before 1961.

The air conditioner in issue is a model J series. It has used a stamped aluminum grille since 1959. The physical dimensions of the grille have not changed although the louvers of the grille have been modified.

GE stopped producing J series air conditioners in 1987. After that time Sanyo produced J series air conditions for GE from 1987 to 1997 and Sharp has produced them since 1997.

The life expectancy of a model J series air conditioner is 15 years but that does not mean that everything will last for 15 years because there are many factors involved including maintenance and the environment.

Mr. Moore was involved in GE air conditioner operations from 1963 to the present exclusive of his military service. Between 1987 and 1998 Mr. Moore was a field quality engineer who monitored and resolved any field complaints concerning air conditioners.

Mr. Moore did not know of any case in which he was involved where an outdoor grille fell off. He never got a call about grilles falling off.

The primary function of the grille is aesthetics and proper air distribution.

The openings in the grille are designed to make sure small birds do not get in and nest in the air conditioner.

Mr. Moore was not aware that squirrels getting inside an air conditioner had ever been considered a risk in anyway.

He was not aware of any occurrence of a squirrel or bird getting into an air conditioner. Robert Crabb also monitored field reports concerning air conditioners and he was not aware of any such occurrence.

All GE rear grilles for air conditioners are designed so that they have to be installed from inside. This is done for security and for ease of installation in multi-story buildings.

The nuisance of a squirrel getting inside an air conditioner was never discussed at GE as a risk.

The J series air conditioner in issue including the wall sleeve and rear grille is a U.L. listed product.

GE did not introduce products without a U.L. listing. GE policy was for every product to be listed by U.L.

The model air conditioner in issue was last sold in 1987. When Sanyo started to make the product the exterior grille wall sleeve and grille fasteners were not changed. The sleeves, grilles and fasteners were listed by U.L. and subject to independent tests.

In the event of a short circuit involving the wiring of the model air conditioner in issue the circuit breaker in the home should trip.

Mr. Moore will testify that the descriptions of the rear grille and hardware on the air conditioner in Unit 3A provided by Ms. Hull and Mr. DeFelice do not describe a component designed, manufactured or sold by GE. Kathy Hull described four identical attachment points for the rear grille with the attachments made with plastic screws inserted from the outside toward the inside. Mr. DeFelice described a rusty grille with a flange around the side with eight attachment points with 8 quarter inch hex head screws which went from the outside toward the inside. The grille provided by GE for the type of wall case in issue was made of stamped aluminum which would not rust. It had two attachment points for clips at the top of the wall case and two attachment points for screws to be inserted from the inside of the wall case toward the outside.

The wall case for the air conditioner in Unit 3A was of a type sold by GE in the 1960's and early 1970's.

The air conditioner in Unit 3A was manufactured in July 1985.

Robert Crabb, Jr. is a GE employee whose duties have included monitoring field reports concerning the performance of air conditioner units. Mr. Crabb has never seen any comments about failed fasteners for exterior grilles of J series air conditioners in any of his daily queries.

At the Time of the Fire smoke was seen venting from the area where the air conditioner wall sleeve was located. Firefighter Chipperini along with Firefighter Cooney broke into unit 3A. There was little if any smoke in the unit. They removed the air conditioner unit from the wall sleeve and put it on the back deck. Firefighter Chipperini used an axe to open an area of the wall near the wall sleeve and saw fire. Neither Firefighter Chipperini nor Firefighter Cooney recalls seeing fire inside the air conditioner cover when they moved it. They did not recall seeing damage to the inside of the air conditioner. Hull thought the air conditioner was unplugged. Firefighter Chipperini did not recall that it was plugged in. They pulled the ceiling down and saw fire in the attic. Firefighter Chipperini did not recall seeing any nesting materials.

Photographs will demonstrate that the area of unit 3A where the air conditioner was located was substantially intact. Wood on top of the wall sleeve was intact over the air conditioner but had been attacked on one end, from the right and down from a fire spreading from that direction.

Photographs will demonstrate that the area of most severe burn in unit 3A was in the living room corner where both the State Fire Marshall and GE's cause and origin expert Donald Hoffman have concluded was the place of origin in the fire.

There was evidence of electrical arcing which occurred during the fire along the ceiling of unit 3A in the wires which led to the receptacle for the air conditioner. This arcing demonstrates that the circuit breaker for the air conditioner circuit did not trip until the fire in the attic attacked the wiring. The evidence will show that this was a concealed space fire which did

not have its origin in the air conditioner. The concealed space was provided by the mansard roof system.

Donald Hoffman is expected to testify with respect to cause and origin issues and the design of the air conditioner and wall sleeve as set forth in the extensive disclosure provided pursuant to Rule 26 and as set forth in his deposition. In summary, he will testify that the origin of the fire was on the opposite side of the living room from the air conditioner and that the cause of the fire is undetermined. He will testify that the air conditioner, wall sleeve and grille are not defective in design and there is no evidence that any failure of these components contributed to the cause of the fire. Dr. John Moalli and Dr. Maureen Reitman will testify in accordance with their Rule 26 disclosure and will testify that nylon was a reasonable material for use in the fasteners for the wall sleeve.

## 2.    **Facts Established by Pleadings or by Stipulations or Admissions of Counsel**

1.    Ocean Terrace Condominium Trust ("Ocean Terrace") is a trust organized under Chapter 183A of the General Laws of Massachusetts, and, on June 1, 2002, Ocean Terrace owned the property commonly known as 2 Ocean Avenue, Magnolia, Essex County, Massachusetts.

2.    On June 1, 2002, Ocean Terrace was a three-story, 42 Unit condominium building.

3.    A fire started at Ocean Terrace on June 1, 2002.

4.    Unit 3A contained a through-the-wall air conditioner.

5.    General Electric designed and manufactured the wall sleeve for the Unit 3A air conditioner that was in place at the time of the June 1, 2002 fire. The exterior grille was missing from the wall sleeve at the time of the June 1, 2002 fire.

6.    General Electric designed and manufactured the air conditioner that was in the wall sleeve of Unit 3A at the time of the June 1, 2002 fire.

## 3.    **Contested Issues of Fact**

The parties agree that there are multiple contested issues of fact relating to the history and construction of the building, the history the air conditioner, wall sleeve, rear grille and fasteners in issue, observations of the fire, the progress of the fire, the firefighting efforts, the post-fire loss of evidence and the post-fire investigations, as well as liability issues related to the design of the product.

## 4.    **Jurisdictional Questions**

None.

5.    **Questions Raised by Pending Motions**

Plaintiff has filed the following Motions in Limine:

- Ocean Terrace Condominium Trust Motion in Limine to Exclude Certain Testimony of General Electric's Expert Witnesses John E. Moalli, Maureen T. F. Reitman and Donald J. Hoffman.

- Plaintiff's Motion in Limine to Bar Any and All Reference of Collateral Source Payments Made by Travelers to Ocean Terrace and to Bar Any and All Reference to Travelers at Trial.

- Plaintiff's Motion in Limine to Bar Any and All Reference to the Non-Existence or Any Alleged Deficiency in Fire Protection or Prevention Devices of any Kind as it Pertains to the Subject Building.

Defendant General Electric Company has submitted motions-in-limine concerning spoliation of evidence, the testimony of Joseph Fallows, the testimony of Scott Jones and the admissibility of testimony and documents relating to the Nortu Jappah fire.

6.    **Issues of Law, Including Evidentiary Questions, Together with Supporting Authority**

Issues of law have been addressed by the parties in the Motion for Summary Judgment, previously acted upon by the court, in their Motions in Limine and Requests with Jury Instructions.

7.    **Requested Amendments to Pleadings**

None at this time. The parties reserve the right to amend the pleadings to conform to the proofs at trial.

8.    **Additional Matters to Aid in the Disposition of the Action**

General Electric stipulates that Ocean Terrace suffered $2,891,109.69 in damages as a result of the June 1, 2002 fire. Plaintiff accepts this stipulation.

9.    **Probable Length of Trial**

Two to three weeks.

10.    **Names, Addresses and Telephone Numbers of Witnesses to be Called (Expert and Others) and Whether the Testimony of any such Witness is Intended to be Presented by Deposition**

**Witnesses the Plaintiff Expects to be Present at Trial**

1.    **Kerry Kotar**
       12 Ledgewood Road
       Manchester, Massachusetts
       Cell: (513) 484-9570

2.    **Ryan Kotar**
       Unit 1D
       2 Ocean Avenue
       Magnolia, MA
       Cell: (508) 831-5350

3.    **Catherine M. Hull**
       Digitas, Inc.
       Prudential Tower
       18th Floor
       800 Boylston Street
       Boston, MA
       (617) 867-1674

4.    **Brian Richardson**
       5 Ocean Drive
       Magnolia, MA

5.    **Frank and Joan Luchart**
       19 Flume Road
       Magnolia, MA
       (978) 525-3885

6.    **Steven Latassa**
       9 Ocean Avenue
       Magnolia, MA

7.    **Lloyd Waites**
       2 Moses Lane
       Essex, MA
       Tel: (978) 768-0127

8.    **Ronda Ziner**
      E.P. Management Corp.
      7 Tozer Road
      Beverly, MA  01915
      Work:  (978) 232-1126


9.    **Mr. Harold D. Moore**, as an adverse witness
      General Electric Company
      4905 West Batalina Court
      Louisville, KY


10.   **Firefighter Steven L. Cooney**
      Gloucester Fire Department
      8 School Street
      Gloucester, MA


11.   **Firefighter Michael Chipperini**
      Gloucester Fire Department
      8 School Street
      Gloucester, MA


12.   **Patrol Officer Mark Foote**
      Gloucester Police Department
      197 Main St # 1
      Gloucester, MA 01930


13.   **Deputy Chief Densch**
      Gloucester Fire Department
      8 School Street
      Gloucester, MA


14.   **Gordon Duquenoy**
      Fire Investigator
      30 Forest View Drive
      Cumberland, RI 02864
      Tele:  (401) 333-3951


15.   **Evan K. Haynes  P.E. CFEI**
      Forensics Engineering
      HAYNES ENGINEERING
      83 Lovers Lane
      East Lyme, CT 06333

Tel:  (800) 739-0778
Office Tel:  (860) 739-0778

16. **W. Joseph Fallows III**
Fallows Associates Plastics Consultants
58 Woodland Drive
Florence, MA  01062
Office Tel:  (413) 584-1531

17. **Scott A. Jones, P.E. CFEI**
Senior Mechanical & Electrical Engineer
ENGINEERING INVESTIGATION, LLC
3925 Chapel Lane
New Albany, IN  47150
Tele:  (812) 944-9988 (Office/Cell)

18. **Arthur G. Sarcione**
Building Valuations Consultant
SARCIONE & ASSOCIATES
100 Cummings Ctr., Suite 432 C
Beverly, MA 01915
Tele:  (978) 927-4431

19. **Peter T. Vadala, RA**
Mass. Certified Residential #3174
Vadala Real Estate Appraisals, Inc.
9D Dr. Osman Babson Road
Mill Pond Professional Building
Gloucester, MA 01930
(978) 281-1111

**Witnesses Plaintiffs May Call if Needed**

20. **Mark DiFelice**
31 Dexter Street
Peabody, MA 019608
(978) 532-3979

21. **Dennis Berbaum**
18 Sumac Street
Billerica, MA 01821
(978) 670-6084

22. **Judy Ann Andonian**
5 Heritage
Sedona, AZ 86351

(928) 284-1977

23. **Timothy Little**
Noblin & Associates
680 Central Avenue
Dover, NH 03820
(603) 740-9400

24. **Captain Ralph Hobbs**
5 Salt Marsh Lane
Gloucester, MA 01930 (or 31)

25. **Charles O'Reilly**
Travelers Property Casualty
4350 Haddonfield Road
Pennsauken, NJ 08109
(856) 488-2332 (main)
(856) 488-6013 (direct)


## Witnesses the Defendant General Electric Company (GE) Expects to Be Present at Trial

1. Catherine M. Hull
Ocean Terrace Condominiums, Unit 3A
Gloucester, MA
(617) 867-1674

2. Mark DiFelice
31 Dexter Street
Peabody, MA
(978) 532-3979

3. Timothy Little
21 Pondview Drive
Dover, NY
(603) 740-9400

4. Harold D. Moore
4905 West Batalina Court
Louisville, KY

5. Rhonda Ziner
201 South Bradford Street
North Andover, MA

6.  Fire Chief Barry S. McKay
    Gloucester Fire Department
    8 School Street
    Gloucester, MA
    (978) 281-9780

7.  State Fire Marshall James M. Welch
    Massachusetts State Police
    State Road
    Box 1025
    Stow, MA 01775
    (978) 567-3324

8.  Steven L. Cooney
    Gloucester Fire Department
    8 School Street
    Gloucester, MA

9.  Michael Chipperirii
    Gloucester Fire Department
    8 School Street
    Gloucester, MA

10. William Sanborn
    35 Brierwood Street
    Gloucester, MA

11. Kerry Kotar
    12 Ledgewood Road
    Manchester, MA

12. Fire Captain Ralph Hobbs
    5 Salt Marsh Lane
    Gloucester, MA

13. Charles Mahoney
    24 Lookout Street
    Gloucester, MA

14. Donald J. Hoffman
    Safety Engineering Laboratories, Inc.
    27803 College Park Drive
    Warren, MI 48088-4879

15. John E. Moalli, Sc. D.
    Exponent

149 Commonwealth Avenue
Menlo Park, CA 94025

16.   Maureen T.F. Reitman, Sc.D.
Exponent
4901 Telsa Drive, Suite L
Bowie, MD 20715

**Witnesses GE May Call If Needed**

None expected at this time.

**Witnesses Expected to be Present by Means of a Deposition**

1.   Robert Crabb
8805 Brook Willow Drive
Louisville, KY

2.   Fred Schernecker
SPS, Inc.
107 Morse Street
Watertown, MA 02172

11.   **Proposed Exhibits**

**Exhibits the Plaintiff Expects to Offer**

1.   Floor Plan – Two Bedroom Unit marked as Exhibit 1 during Ms. Hull's Deposition.

2.   Copy of Ms. Hull's photographs, 14 pages – 27 pages, marked as Exhibit 2 during Ms. Hull's Deposition.

3.   Photograph of rear grill on A/C unit marked as Exhibit 3 in Ms. Hull's Deposition.

4.   7 Photographs marked as Exhibit 5 through 11 during Mr. DiFelice's Deposition.

5.   Fire Department records marked as Exhibit 12 during Firefighter Chipperini's Deposition.

6.   Two photographs marked as Exhibits 14 and 15 during Firefighter Chipperini's Deposition.

7.    Fire Chief's notes marked as Exhibit 16 during Firefighter Cooney's Deposition (to refresh recollection only, if necessary).

8.    Floor plan, third floor of building (one page) marked as Exhibit 17 during Ralph Hobbs' Deposition.

9.    Enlarged view of Unit 3A (one page) marked as Exhibit 18 during Ralph Hobbs' Deposition.

10.    List of fire apparatus and responding crews (one page) marked as Exhibit 19 during Ralph Hobbs' Deposition.

11.    Photograph marked as Exhibit 27 during Barry McKay's Deposition.

12.    Photograph marked as Exhibit 28 during Barry McKay's Deposition.

13.    Photograph marked as Exhibit 29 during Barry McKay's Deposition.

14.    Photograph - South End, Unit 3A top floor, right side marked as Exhibit 33 during Barry McKay's Deposition.

15.    Report of fire investigation by James M. Welch (four pages) marked as Exhibit 36 during Trooper Welch's Deposition (to refresh recollection only, if necessary).

16.    Handwritten notes regarding interview with Judy Andondian (two pages) marked as Exhibit 37 during Trooper Welch's Deposition.

17.    Handwritten notes regarding interview with Catherine Hull (seven pages) marked as Exhibit 38 during Trooper Welch's Deposition.

18.    Handwritten notes regarding interview with Mark DiFelice (four pages) marked as Exhibit 39 during Trooper Welch's Deposition.

19.    CD of news broadcast regarding fire marked as Exhibit 40 during Trooper Welch's Deposition.

20.    Handwritten notes regarding interview with Rhonda Ziner marked as Exhibit 45 during Trooper Welch's Deposition.

21.    Floor plans regarding 2 Ocean Terrace (three pages) marked as Exhibit 47 during Trooper Welch's Deposition.

22.    2001 NFPA 921 marked as Exhibit 48 during Trooper Welch's Deposition.

23.    25 Photographs marked as Exhibit 50 during Trooper Welch's Deposition.

24.    Photographs marked as Exhibits 51 through 61 during Trooper Welch's Deposition.

25.    UL 484 Standard for Safety of Room Air Conditioners and its predecessors, part of which was marked as Exhibit 62 in H.D. Moore Deposition, Part I.

26.    2 wiring diagrams marked as Exhibit 63 during H.D. Moore's Deposition, Part II.

27.    Photograph marked as Exhibit 64 during H.D. Moore's Deposition, Part II.

28.    Declaration Trust [Pages Bate Stamped OTC1426 - OTC1452] marked as Exhibit 64 during Kerry Kotar's Deposition.

29.    Master Deed [Pages Bate Stamped OTC1408 – OTC1425] marked as Exhibit 65 during Kerry Kotar's Deposition.

30.    Condominium Management Agreement [Pages Bate Stamped OTC1648 - OTC1659] marked as Exhibit 66 during Kerry Kotar's Deposition.

31.    Documents – Invoice Nos. 3595, 3649, 3652, 3664, 3684, 3767.  Comm. of Mass. Permit No. 00NA12, Handwritten Letter to John Collins with City of Gloucester heading, North Shore Arborists Complete Tree Service invoice marked as Exhibit 68 during Ronda Ziner's Deposition.

32.    Letter from Ronda Ziner dated 11/10/2000 to Thomas & Carmela Brancaleone marked as Exhibit 69 during Ronda Ziner's Deposition.

33.    Letter from Ronda Ziner dated 11/10/2000 to Fitz O. Lufkin marked as Exhibit 70 during Ronda Ziner's Deposition.

34.    Photographs marked during Ronda Ziner's Deposition.

35.    Amendments marked as Exhibit 77 during Ronda Ziner's Deposition.

36.    25 Photographs (Disc) marked as Exhibit 82 during Timothy Little's Deposition.

37.    Plans marked as Exhibit 103 during Timothy Little's Deposition, Part II.

38.    Noblin & Associates Field Report marked as Exhibit 201 during Fred Schernecker's Deposition.

39.    Final Report, dated 5/15/06, marked as Exhibit 203 during Joseph Fallows' Deposition Vol. 1.

40.    All photographs referenced in Joseph Fallows' Deposition Vol. 1.

41.    Mr. Haynes' Report marked as Exhibit 206 during Evan Haynes' Deposition.

42.    3-Ring Binder marked as Exhibit 207 during Evan Haynes' Deposition.

43.    Sketch marked as Exhibit 207A during Evan Haynes' Deposition.

44.    Nortu Jappah Case File marked as Exhibit 208 during Evan Haynes' Deposition.

45.    Analytical lab file for the scanning electronic microscope work that was done marked as Exhibit 209 during Evan Haynes' Deposition.

46.    Analytical lab file for the FTIR work that was done on plastic samples marked as Exhibit 210 during Evan Haynes' Deposition.

47.    Envelope containing X-rays marked as Exhibit 211 during Evan Haynes' Deposition.

48.    Folder and its contents marked as Exhibit 212 during Evan Haynes' Deposition.

49.    Structural Fire (Federal) Report, origin determination, dated May 15, 2006 marked as Exhibit 222 during Gordon Duquenoy's Deposition.

50.    Handwritten notes regarding Gordon Duquenoy's review of the physical evidence marked as Exhibit 223 during Gordon Duquenoy's Deposition.

51.    PowerPoint presentation marked as Exhibit 224 during Gordon Duquenoy's Deposition.

52.    Certificates from various attended presentations marked as Exhibit 228 during Gordon Duquenoy's Deposition.

53.    Condo 3A "LR floor joists" marked as Exhibit 229 during Gordon Duquenoy's Deposition.

54.    Foote and Photo Web Photos marked as Exhibit 230 during Gordon Duquenoy's Deposition.

55.    Photo marked as Exhibit 230A during Gordon Duquenoy's Deposition.

56.    Photo showing the air conditioner on the left marked as Exhibit 230B during Gordon Duquenoy's Deposition.

57.    Notes regarding Firefighters Cooney, Chipperini, and Chief Hobbs depositions marked as Exhibit 231 during Gordon Duquenoy's Deposition.

58.    Smoke weeping photos marked as Exhibit 232 during Gordon Duquenoy's Deposition.

59.    Copy of two photos and weather records marked as Exhibit 233 during Gordon Duquenoy's Deposition.

60. "Low Burn Pattern" photos marked as Exhibit 234 during Gordon Duquenoy's Deposition.

61. "Foote/Fire Progression" photos from Office Foote's photos marked as Exhibit 235 during Gordon Duquenoy's Deposition.

62. Photo marked as Exhibit 235A during Gordon Duquenoy's Deposition.

63. Photo marked as Exhibit 235B during Gordon Duquenoy's Deposition.

64. Timeline and photo of Office Foote and two seated firemen and one standing fireman marked as Exhibit 236 during Gordon Duquenoy's Deposition.

65. Kirks Fire Investigation notes/ pages referenced to and marked as Exhibit 242 during Gordon Duquenoy's Deposition.

66. Photo marked as Exhibit 243 during Gordon Duquenoy's Deposition.

67. Photo marked as Exhibit 245 during Gordon Duquenoy's Deposition.

68. Photo marked as Exhibit 246 during Gordon Duquenoy's Deposition.

69. Photo marked as Exhibit 247 during Gordon Duquenoy's Deposition.

70. Rule 26 Disclosures marked as Exhibit 307 during Scott Jones' Deposition.

71. Cost Repair Estimate Spreadsheets marked as Exhibit 309 during Art Sarcione's Deposition.

72. Marshall Evaluation Service Documents marked as Exhibit 312 during Art Sarcione's Deposition.

73. 08500 Windows Document marked as Exhibit 313 during Art Sarcione's Deposition.

74. Photos marked as Exhibit 314 during Art Sarcione's Deposition.

75. Art Sarcione's Rule 26 Expert Report.

76. GE Plastics: Valox Design Guide marked as Exhibit 320 during Joseph Fallows' Deposition taken on 10/16/06.

77. Design Articles marked as Exhibit 321 during Joseph Fallows' Deposition taken on 10/16/06.

78. Copies of Photos marked as Exhibit 324 during Joseph Fallows' Deposition taken on 10/16/06.

79.   Weatherability Web Articles marked as Exhibit 325 during Joseph Fallows' Deposition taken on 10/16/06.

80.   Email from Janice Sims, May 11, 2006 Enc. ZUTEL/MINLON Design Guide marked as Exhibit 326 during Joseph Fallows' Deposition taken on 10/16/06.

81.   Scratchpad Typed Notes marked as Exhibit 327A during Joseph Fallows' Deposition taken on 10/16/06.

82.   Handwritten Notes and Copies of Other Docs marked as Exhibit 328 during Joseph Fallows' Deposition taken on 10/16/06.

83.   UL 746C Article marked as Exhibit 329 during Joseph Fallows' Deposition taken on 10/16/06.

84.   Email from Doug Sekelik to Maureen Reitman, Tuesday, June 13, 2006 marked as Exhibit 551 during John Moalli's Deposition.

85.   Exponent Invoices marked as Exhibit 552 during John Moalli's Deposition.

86.   Email from Michelle Poliskie to Maureen Reitman, Thursday, June 8, 2006 marked as Exhibit 553 during John Moalli's Deposition.

87.   Handwritten Notes marked as Exhibit 554 during John Moalli's Deposition.

88.   Modern Plastics Encyclopedia Issue for 1955 marked as Exhibit 556 during John Moalli's Deposition.

89.   Du Pont Zytel Nylon Resin Article marked as Exhibit 557 during John Moalli's Deposition.

90.   Presenting the Services of a Specialist in Nylon Conversion Article marked as Exhibit 558 during John Moalli's Deposition.

91.   Modern Plastics Encyclopedia Issue for 1959 marked as Exhibit 559 during John Moalli's Deposition.

92.   Modern Plastics Encyclopedia Issue for 1962 marked as Exhibit 560 during John Moalli's Deposition.

93.   Modern Plastics Encyclopedia Issue for 1964 marked as Exhibit 561 during John Moalli's Deposition.

94.   Modern Plastics Encyclopedia 1969-1970 marked as Exhibit 562 during John Moalli's Deposition.

95.   Nylons (Polyamides) Article marked as Exhibit 563 during John Moalli's Deposition.

96.   Nylon Plastics Article marked as Exhibit 564 during John Moalli's Deposition.

97.   Polypropylene Article marked as Exhibit 564A during John Moalli's Deposition.

98.   Nylons (Polyamides) Article marked as Exhibit 564B during John Moalli's Deposition.

99.   Material Trade Name and Pertinent Descriptive Information Spreadsheet marked as Exhibit 564C during John Moalli's Deposition.

100.  Comparison of the UV-degradation Chemistry of Polypropylene, Polyethylene, Polyamide 6 and Polybutylene Terephthalate Article marked as Exhibit 564D during John Moalli's Deposition.

101.  Melamine-Formaldehyde Molding Compounds Spreadsheet marked as Exhibit 564E during John Moalli's Deposition.

102.  Plastics Technology: Top 50 Innovations Article marked as Exhibit 564F during John Moalli's Deposition.

103.  The Effect of UV Light and Weather on Plastics and Elastomers marked as Exhibit 564G during John Moalli's Deposition.

104.  Nylon property retention vs. weathering data from DuPont in Fallows' materials and referenced in Fallows' report.

105.  DuPont "Nylon" Design Guide (weather resistance data) in Fallows' materials and referenced in Fallows' report.

106.  Material Identification data produced by Travelers Engineering Laboratory in    Windsor CT in Fallows' materials and referenced in Fallows' report.

107.  Environmental Properties data for Bayer Corp. in Fallows' materials and referenced in Fallows' report.

108.  Opinion of Dr. George Kriek (Bayer Corp.) regarding the need for UV stabilizers in white and natural unfilled Nylon applications for full time outdoor use in Fallows' materials and referenced in Fallows' report.

109.  Grille retention clips from an exemplar air conditioner in the subject building in Fallows' materials and referenced in Fallows' report.

110.  Thermo-oxidative Degradation, Photo-oxidation, and weather resistance data from "The Nylons Handbook". ("Nylon Handbook" published by Hanser/Gardner Publications 1995) in Fallows' materials and referenced in Fallows' report.

111.   Microscopic inspection and microphotographs of grille retention clips in the possession of St. Paul Travelers Lab in Fallows' materials and referenced in Fallows' report.

112.   Exempler grille clips in Fallows' materials and referenced in Fallows' report.

113.   Friedrick "Through the wall unit" assembly instructions in Fallows' materials and referenced in Fallows' report.

114.   Frigidaire Owners Manual in Fallows' materials and referenced in Fallows' report in Fallows' materials and referenced in Fallows' report.

115.   UL 484 - Standard For Room Air Conditioners, Sixth Edition March 29, 1982 in Fallows' materials and referenced in Fallows' report.

116.   UL 746C - Polymeric Materials - Use in Electrical Equipment Evaluations

117.   UL Testing file SA2141 issued 8-8-75 and revised 10-9-87 in Fallows' materials and referenced in Fallows' report.

118.   Interview of Brad Haymond Fastex Div. of Illinois Tool Works in Fallows' materials and referenced in Fallows' report.

119.   GE responses to plaintiff's first set of interrogatories.

120.   GE response to plaintiff's first set of requests to produce documents and associated prints in Fallows' materials and referenced in Fallows' report.

121.   Certificates that Mr. Duquenoy received for fire origin and cause related work and produced at his deposition.

122.   Debris from base of A/C unit at severed wires (3A) as identified in Mr. Haynes' report.

123.   Core of A/C unit (3A) as identified in Mr. Haynes' report.

124.   Sample cellulose insulation form condo 3A as identified in Mr. Haynes' report.

125.   A/C metal sleeve & cover from 2F as identified in Mr. Haynes' report.

126.   Section of roof deck as identified in Mr. Haynes' report.

127.   A/C unit from condo 2M as identified in Mr. Haynes' report.

128.   A/C metal sleeve from condo 3A as identified in Mr. Haynes' report.

129.   Exemplar A/C unit from condo 1J as identified in Mr. Haynes' report.

130. Condo 3A panel box (circuit breaker panel) as identified in Mr. Haynes' report.

131. Condo 3A branch circuit for living room receptacles, light and smoke detector as identified in Mr. Haynes' report.

132. Branch circuit wiring found at sliding door – condo 3A as identified in Mr. Haynes' report.

133. Branch circuit wiring found on living room floor – condo 3A as identified in Mr. Haynes' report.

134. Branch circuit wiring found on living room floor – condo 3A as identified in Mr. Haynes' report.

135. Branch circuit & receptacle found in living room of condo 3A as identified in Mr. Haynes' report.

136. Remains of partition & receptacle south of sliding door – condo 3A as identified in Mr. Haynes' report.

137. A/C receptacle & wiring and wood structural members – condo 3A as identified in Mr. Haynes' report.

138. South portion of sliding door jamb and frame – condo 3A as identified in Mr. Haynes' report.

139. North portion of sliding door jamb and frame – condo 3A as identified in Mr. Haynes' report.

140. Structural framing at A/C unit – condo 3A as identified in Mr. Haynes' report.

141. Handwritten Notes marked as Exhibit 554A during Maureen Reitman's Deposition.

142. Handwritten Notes marked as Exhibit 554B during Maureen Reitman's Deposition.

143. Copy of Photographs marked as Exhibit 556A during Maureen Reitman's Deposition.

144. Marks on drawing 864C709 marked as Exhibit 567 during Maureen Reitman's Deposition.

145. Arthur Sarcione Rule 26 Report and supporting documents.

146. Scott Jones Rule 26 Report and supporting documents.

147. Evan Haynes 3-Ring Binder produced during his deposition.

148.   Documents marked GE028-GE237.

All of the following photographs will not be introduced into evidence.  However, we have listed the following photographs because some of them will be introduced into evidence and others will form the basis of demonstrative evidence.

### Photographs

| AUTHOR | # OF PHOTOS | DESCRIPTION |
|---|---|---|
| | | |
| Evan Haynes | No. 1-36 | Roll A |
| Evan Haynes | No. 1-36 | Roll B |
| Evan Haynes | No. 32-36 | Roll C |
| Evan Haynes | No. 1-24 | Roll D |
| Evan Haynes | No. 1-36 | Roll E |
| Evan Haynes | No. 1-36 | Roll F |
| Evan Haynes | No. 1-37 | Roll G |
| Evan Haynes | No. 1-36 | Roll H |
| Evan Haynes | No. 1-36 | Roll I |
| Evan Haynes | No. 1-36 | Roll J |
| Evan Haynes | No. 1-36 | Roll K |
| Evan Haynes | No. 29-36 | Roll L |
| Evan Haynes | No. 1-36 | Roll M |
| Evan Haynes | No. 19-36 | Roll N |
| Evan Haynes | No. 1-35 | Roll O |
| Evan Haynes | No. 1-36 | Roll P |
| Gordon Duquenoy | No. 1-22 | C5N4424001 |
| Gordon Duquenoy | No. 1-170 | C5N4424011 |
| Crime Scene Services | No. 1-63 | |
| Jappah | No. 1-86 | |
| Cathy Hull | No. 1-19 | CD 0594 |
| Cathy Hull | No. 1-7 | CD 0595 |
| Joe Fallows | 8 photos | Part A (inside) |
| Joe Fallows | 8 photos | Part A (outside) |
| Joe Fallows | 4 photos | Part B (inside) |
| Joe Fallows | 9 photos | Part B (outside) |
| Joe Fallows | 4 photos | Part C (inside) |
| Joe Fallows | 5 photos | Part C (outside) |
| Sarcione & Assoc. | No. 1-38 | |
| CA Pretzer | No. 1, 1A-24A | Roll 1 |
| CA Pretzer | No. 0A-23A | Roll 2 |
| CA Pretzer | No. 0A-24A | Roll 3 |
| CA Pretzer | No. 0A-21A | Roll 4 |

| Scott Jones | No. 1-1 thru 1-24 | |
| Scott Jones | No. 2-1 thru 2-24 | |
| Scott Jones | No. 3-1 thru 3-24 | |
| Scott Jones | No. 4-1 thru 4-24 | |
| Scott Jones | No. 5-1 thru 5-24 | |
| Scott Jones | No. 6-1 thru | |

### Miscellanous Photos

| |
| --- |
| Jappah Photos – DISC |
| Gordon Duquenoy Photos – DISC |
| Joe Fallows Photos (3/28/03 Plastic Clip photos from microscope) – DISC |
| Evan Haynes Photos (as of 3/9/06) – DISC |
| Evan Haynes Photos (Rolls A through P) – DISC |
| Donald Hoffman Photos (Defendant's Expert) |
| Timothy Little's Photos |

Plaintiff intends to use demonstrative evidence during the trial which will not be moved into evidence. Plaintiff also intends to introduce a damages exhibit, if necessary. All of the backup to that exhibit has been identified in these disclosures.

### Exhibits the Plaintiff May Offer if the Need Arises

1.    Damage documentation from the claim file if necessary.

2.    Property insurance policy if necessary.

3.    Damage documentation from EP Management if necessary.

### Exhibits GE Expects to Offer

1.    Floor plan (I-lull Exhibit 1)

2.    Photographs (Hull Exhibit 2)

3.    Sketch (DiFelice Exhibit 4)

4.    Photograph (DiFelice Exhibit 5)

5.    Photograph (DiFelice Exhibit 6)

6.    Photograph (DiFelice Exhibit 7)

7.      Photograph (DiFelice Exhibit 8)

8.      Photograph (DiFelice Exhibit 9)

9.      Photograph (DiFelice Exhibit 10)

10.     Relevant portions of Fire Department records (Chipperini Exhibit 12)

11.     Photograph (Chipperini Exhibit 14)

12.     Photograph (Chipperini Exhibit 15)

13.     Relevant portions of Fire Chiefs notes (Cooney Exhibit 16)

14.     Floor plan and notes (Hobbs Exhibit 18)

15.     City Council Order (McKay Exhibit 22)

16.     Photograph (McKay Exhibit 24)

17.     Diagram of electrical panel (McKay Exhibit 25)

18.     Photograph (McKay Exhibit 26)

19.     James Welch Curriculum Vitae (Welch Exhibit 35)

20.     Fire Marshall's Report (Exclusive of Witness Statements) (Welch  Exhibit 36)

21.     Photograph (Welch Exhibit 41)

22.     Photograph (Welch Exhibit 42)

23.     Photograph (Welch Exhibit 42 A)

24.     NFPA 921 (Welch Exhibit 48)

25.     Welch Photographs (Welch Exhibit 50)

26.     Photograph (Welch Exhibit 53)

27.     Photograph (Welch Exhibit 54)

28.     Photograph (Welch Exhibit 55)

29.     Photograph (Welch Exhibit 56)

30.     Photograph (Welch Exhibit 57)

31.     Photograph (Welch Exhibit 58)

32.     Photograph (Welch Exhibit 60)

33.     Photograph (Welch Exhibit 61)

34.     Ocean Terrace Condominium Trust (Kotar Exhibit 64)

35.     Master Deed (Kotar Exhibit 65)

36.     Condominium Management Agreement (Kotar Exhibit 66)

37.     Invoices (Ziner Exhibit 68)

38.     Letter (Ziner Exhibit 69)

39.     Letter (Ziner Exhibit 70)

40.     Notice (Ziner Exhibit 76)

41.     Photographs (Little Exhibit 82)

42.     Report (Little Exhibit 83)

43.     Exterior Building Renovations (Little Exhibit 84)

44.     Contract (Little Exhibit 84 A)

45.     Field Report if 13, 14, 15, 16 (Little Exhibit 84 B)

46.     Field Report #2 (Little Exhibit 84)

47.     Field Report #9 (Little Exhibit 84)

48.     Building Permit & Application (Mahoney Exhibit 152)

49.     BOCA Basic Building Code Excerpts (Mahoney 154)

50.     Sketch (Sanborn Exhibit 55)

51.     FAX (Schernecker Exhibit 200)

52.     10/06/99 Memo (Schernecker Exhibit 202)

53.    Original Wiring Diagram from Air Conditioner in issue and wall case in   issue.

54.    Air Conditioner unit in issue, and surrounding materials

55.    UL File (on the Model Air Conditioner in issue)

56.    Electrical panel and associated wiring from condominium Unit 3A.

57.    Physical Evidence from Unit 3 A including flaming and electrical   receptacles

58.    Exemplar replacement grill

59.    U. L. Standard 484 Sixth Edition

60.    Rear grill ordering information

61.    Drawings produced by GE relating to rear grill assemblies and wall sleeves

62.    Bill of Materials for Air Conditioner

63.    Structure Assembly Drawing for Air Conditioner

64.    Current screw grommet drawing

65.    Label drawings

66.    Clip drawings

67.    Chassis ASM Final drawing

68.    Installation Instructions

69.    Binder of Fire Scene Photos taken by Donald Hoffman

70.    Photographs of the Air Conditioner and wall sleeve in issue taken by Donald Hoffman

71.    Photographs of the Air Conditioner in issue and wall sleeve in issue taken by Maureen Reitman

72.    Calculations of Fire size by Donald Hoffman

73.    Materials Analysis Report (Hoffman file)

74.    Exponent test reports of materials identification

75.    Modern Plastics Encyclopedia (Moalli Exhibit 556)

76.    Modem Plastics Encyclopedia (Moalli Exhibit 559)

77.    Modern Plastics Encyclopedia (Moalli Exhibit 560)

78.    Modem Plastics Encyclopedia (Moalli Exhibit 561)

79.    Modern Plastics Encyclopedia (Moalli Exhibit 562)

80.    Nylons (Moalli Exhibit 563)

81.    John E. Moalli, Sc. D. Curriculum Vitae (Moalli Exhibit 565)

82.    Nylons (Moalli Exhibit 564 B)

83.    Exemplar Air Conditioner

84.    Exemplar grommets currently used.

85.    Curriculum Vitae of Donald Hoffman

86.    Curriculum Vitae of Maureen Reitman, Sc.D.


## Exhibits which GE may Offer if the Need Arises

1.    Weather Records

2.    Polymers, Aromatic (Hoffman file)

3.    Characterization of the Ignition Behavior of Polymers (Hoffman file)

4.    Conditions for Series Arcing phenomena in PVC wiring (Hoffman file)

5.    Exemplar Air Conditioner and wall sleeve

6.    Inspection notes (Hoffman file)

7.    Product literature for Frederick Air Conditioner (Hoffman file)

8.    Product Literature for Sanyo Air Conditioner (Hoffman file)

9.    Circuit breaker testing (Hoffman file)

10.    Product literature for Frigidaire Air Conditioners (Hoffman file)

11.   Expert Report of Donald Hoffman

12.   Expert Report of Exponent (Moalli Exhibit 566)

13.   Zytel (Moalli Exhibit 557)

14.   Nylon Plastics (Moalli Exhibit 564)

15.   Polypropylene (Moalli Exhibit 564 A)

16.   Materials date (Moalli Exhibit 564 C)

17.   Polymer degeneration and stability (Moalli Exhibit 564 D)

18.   Nylons (Moalli Exhibit 564 E)

19.   Plastics technology (Moalli Exhibit 564 F)

20.   The effect of UV light and weather (Moalli Exhibit 564 G)

21.   Refrigeration and Air Conditioning, Billy C. Langley, Prentice Hall 1986

22.   Documents identified in the course of discovery and not specifically listed above


12.   **The Parties' Respective Positions on any Remaining Objections to the Evidence Identified in the Pretrial Disclosure Required by Fed. R. Civ. P. 26(a)(3)**

        The parties have filed objections and are working through those objections to narrow these issues for the Court.

Respectfully submitted,
By its Attorneys for:

Plaintiff, Ocean Terrace Condominium Trust

**FALK METZ LLC**

Dated: 11-9-07

Paul T. Falk
FALK METZ LLC
20 South Clark Street, Suite 1900
Chicago IL 60603
(312) 922-5800

Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA 02110
(617) 772-2800

**AND**

Defendant, General Electric Company

**CURLEY & CURLEY P.C.**

Robert A. Curley, Esq.
CURLEY & CURLEY P.C.
27 School Street
Boston, MA 02108
BBO #109180

## *CERTIFICATE OF SERVICE*

I, Paul T. Falk, hereby certify that I served a true copy of the foregoing pleading by mailing a copy postage prepaid on November 9, 2007 to the following counsel of record:

Robert A. Curley, Esq.
CURLEY & CURLEY P.C.
27 School Street
Boston, MA 02108
BBO #109180


Steven B. Stein, Esq.
Law Offices of Thomas M. Niarchos
100 Summer Street, Suite 201
Boston, MA  02110


Dated: _11-9-07_                                              
Paul T. Falk